> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**
>
> **THE DEBTORS ARE FILING THIS DISCLOSURE STATEMENT AND PLAN IN ORDER TO INITIATE A CONFIRMATION PROCESS THAT SHALL CONCLUDE WITH THE CONSUMMATION OF THE PLAN PRIOR TO DECEMBER 31, 2024.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile:  (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (admitted *pro hac vice*)
Andrew F. O'Neill (admitted *pro hac vice*)
William A. Guerrieri (*pro hac vice* pending)
Fan B. He (admitted *pro hac vice*)
Adam T. Swingle (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  bojan.guzina@whitecase.com
        aoneill@whitecase.com
        william.guerrieri@whitecase.com
        fhe@whitecase.com
        adam.swingle@whitecase.com
        barrett.lingle@whitecase.com

*Counsel to the Debtors and Debtors in Possession*

Dated: October 9, 2024
Houston, Texas

---

[1] The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814.  A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI.  The location of the Debtors' service address in these Chapter 11 Cases is: P.O. Box 240130, San Antonio, Texas 78224.

**DISCLOSURE STATEMENT, DATED OCTOBER 9, 2024**

**SOLICITATION OF VOTES ON THE *JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES* PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 3** | **PREPETITION CREDIT FACILITY CLAIMS** |
| **CLASS 6** | **GENERAL UNSECURED CLAIMS** |

**IF YOU ARE IN CLASS 3 OR 6, YOU ARE RECEIVING THIS DISCLOSURE STATEMENT, THE PLAN, AND OTHER ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

> **THIS SOLICITATION (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE *JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES* IN THE ABOVE CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "DEBTORS"), ATTACHED HERETO AS EXHIBIT A (THE "PLAN").**
>
> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON [DECEMBER 3, 2024], UNLESS EXTENDED BY THE DEBTORS IN WRITING.**
>
> **THE VOTING RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS [OCTOBER 28, 2024] (THE "VOTING RECORD DATE").**

> **BALLOTS SUBMISSION**
>
> **BALLOTS MUST BE SUBMITED VIA ONE OF THE METHODS BELOW:**

| BY FIRST CLASS MAIL, REGULAR MAIL, HAND DELIVERY, OR OVERNIGHT COURIER AT: | ELECTRONICALLY AT: |
|---|---|
| Zachry Ballot Processing Center<br>c/o KCC LLC dba Verita Global<br>222 N. Pacific Coast Highway, Suite 300<br>El Segundo, CA 90245 | www.veritaglobal.net/zhi |

> **BALLOTS SUBMITTED VIA ANY METHOD OTHER THAN THOSE SPECIFIED ABOVE, INCLUDING VIA FACSIMILE OR EMAIL, WILL NOT BE COUNTED.**
>
> **IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY SUBMITTING AN INQUIRY AT: WWW.VERITAGLOBAL.NET/ZHI/INQUIRY, OR BY TELEPHONE AT: (866) 479-8211 (US AND CANADA) OR +1 (781) 575-2037 (INTERNATIONAL) AND REQUEST TO HAVE A MEMBER OF THE SOLICITATION TEAM CONTACT YOU.**

**RECOMMENDATION BY THE DEBTORS**

EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH DEBTOR'S ESTATE, PROVIDE THE BEST RECOVERY AVAILABLE TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AND REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT NO LATER THAN [DECEMBER 3, 2024], AT 4:00 P.M. (PREVAILING CENTRAL TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.

BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE INFORMATION CONTAINED HEREIN IS FOR THE SOLE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN, AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  A COPY OF THE PLAN IS ATTACHED HERETO AS EXHIBIT A.  EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

PLEASE READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. THIS DISCLOSURE STATEMENT SUMMARIZES THE MATERIAL TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE AND FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.   FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

READERS ARE FURTHER CAUTIONED THAT MANY OF THE ASSUMPTIONS, RISKS, AND UNCERTAINTIES RELATING TO THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN, INCLUDING THE IMPLEMENTATION OF THE PLAN, ARE BEYOND THE CONTROL OF THE DEBTORS.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" IN ARTICLE X OF THIS DISCLOSURE STATEMENT AS WELL AS OTHER RISKS INHERENT TO THE DEBTORS. PARTIES ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS, AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND TO, AND UNDERTAKE NO OBLIGATION TO, UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS ATTACHED HERETO AS EXHIBIT D.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS

CONCERNING THE DEBTORS OR THE VALUE OF THEIR BUSINESS OR PROPERTY TO BE MADE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OF THE PLAN OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ...................................................................................................1

II.     SUMMARY OF PLAN CLASSIFICATION AND TREATMENT ...............................2

        A.      Classified Claims and Interests ...............................................................................2

III.    SOLICITATION AND VOTING PROCEDURES .........................................................5

        A.      Voting Rights Summary ...........................................................................................5
        B.      Votes Required for Acceptance by a Class of Claims..............................................6
        C.      Voting Record Date ..................................................................................................6
        D.      Solicitation Procedures ............................................................................................6
        E.      Voting on the Plan....................................................................................................7
        F.      Ballots Not Counted .................................................................................................7

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS .........7

        A.      Corporate History.....................................................................................................7
        B.      Business Operations..................................................................................................9
        C.      Zachry Industrial's Current Projects ......................................................................10
        D.      The Debtors' Prepetition Corporate and Capital Structure ....................................11

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS.............................................12

VI.     SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES .........................................13

        A.      Commencement of Chapter 11 Cases .....................................................................13
        B.      First Day Motions ..................................................................................................13
        C.      Procedural Motions ................................................................................................14
        D.      Appointment of the Committee ..............................................................................14
        E.      Retention of Professionals .....................................................................................14
        F.      Section 341 Meeting ..............................................................................................14
        G.      De Minimis Asset Sales..........................................................................................14
        H.      Schedules and Statements ......................................................................................15
        I.      GPX Project Litigation and Settlement ..................................................................15
        J.      Claims Bar Date .....................................................................................................17
        K.      Assumption and Rejection of Executory Contracts and Unexpired Leases ...........17
        L.      OPPD Settlement and Contract Assumption...........................................................17
        M.      Approval of the GTPP ISBL Conversion Certificate .............................................18
        N.      Extension of Time to Remove Civil Actions ..........................................................18
        O.      Extension of Exclusive Period for the Debtors to File a Plan .................................18
        P.      Adversary Proceedings and Other Litigation .........................................................18

VII.    OTHER KEY ASPECTS OF THE PLAN ....................................................................21

        A.      Unclassified Claims ...............................................................................................21
        B.      Means for Implementation of the Plan ...................................................................22
        C.      The Reorganized Debtors........................................................................................23
        D.      Vesting of Assets in the Reorganized Debtors........................................................23
        E.      Sources of Consideration for Plan Distributions ....................................................23
        F.      Cancellation of Existing Agreements and Interests ................................................24
        G.      Corporate Action ....................................................................................................24
        H.      Preservation of Causes of Action ...........................................................................25
        I.      Effectuating Documents; Further Transactions.......................................................25
        J.      Directors and Officers of the Reorganized Debtors ................................................25
        K.      Indemnification Obligations...................................................................................25
        L.      Provisions Regarding Treatment of Executory Contracts and Unexpired Leases...........26
        M.      Provisions Governing Distributions ......................................................................26
        N.      Provisions Governing Disputed Claims and Interests ............................................26

|  | O. | Settlement, Release, Injunction, and Related Provisions | 26 |
|  | P. | Conditions Precedent to Confirmation and Consummation of the Plan | 31 |
| **VIII.** | **PROJECTED FINANCIAL INFORMATION** | | **31** |
| **IX.** | **CONFIRMATION OF THE PLAN** | | **31** |
|  | A. | The Confirmation Hearing | 31 |
|  | B. | Requirements for Confirmation of the Plan | 32 |
|  | C. | Feasibility | 32 |
|  | D. | Acceptance by Impaired Classes | 32 |
|  | E. | Confirmation Without Acceptance by All Impaired Classes | 32 |
|  | F. | Liquidation Analysis | 33 |
| **X.** | **RISK FACTORS** | | **33** |
|  | A. | General | 34 |
|  | B. | Bankruptcy Law and Chapter 11 Case Considerations | 34 |
|  | C. | Risks Related to Recoveries Under the Plan | 37 |
|  | D. | Risks Related to the Company's and the Reorganized Debtors' Businesses | 38 |
| **XI.** | **CERTAIN SECURITIES LAW MATTERS** | | **43** |
|  | A. | Existing Equity Interests | 43 |
|  | B. | No Issuance of Securities Under the Plan | 44 |
| **XII.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **44** |
|  | A. | Introduction | 44 |
|  | B. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote on the Plan | 45 |
|  | C. | Information Reporting and Back-Up Withholding | 47 |
| **XIII.** | **RECOMMENDATION** | | **49** |

**EXHIBITS**

| | |
|---|---|
| **EXHIBIT A** | Joint Chapter 11 Plan of Reorganization |
| **EXHIBIT B** | A&R Credit Facility Term Sheet |
| **EXHIBIT C** | Financial Projections |
| **EXHIBIT D** | Liquidation Analysis |
| **EXHIBIT E** | Organizational Structure Chart |

Zachry Holdings, Inc. ("**ZHI**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-Debtor Affiliates, "**Zachry Industrial**" or the "**Company**"), submit this disclosure statement (this "**Disclosure Statement**"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (the "**Plan**"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.[1]

## I.       EXECUTIVE SUMMARY

Zachry Industrial (headquartered in San Antonio, Texas) is the engineering, construction, maintenance, turnaround, and fabrication services offshoot of the storied family-owned business that began as H.B. Zachry Company one hundred years ago.[2] Zachry Industrial provides these services to customers in the energy, chemicals, power, manufacturing, and industrial sectors across North America. Customers have learned to trust the Zachry Industrial name for reliably delivering on their most high-profile commitments. Zachry Industrial's reputation for excellence and care has made it a go-to choice in the industries it serves. The Company's approximately 15,300 employees are central to making its customers' ambitious goals a reality.

The Debtors entered these Chapter 11 Cases on May 21, 2024 (the "**Petition Date**") as a result of the financial distress caused by one of their major projects—the liquefied natural gas ("**LNG**") project that would, upon completion, treat, process, and liquefy domestic natural gas in Sabine Pass, Texas (the "**GPX Project**"). Prior to the Petition Date, the Debtors and interested parties, including the project owners and Debtor Zachry Industrial, Inc.'s ("**ZII**") joint venture partners, mediated disputes relating to the GPX Project without reaching a resolution. After the commencement of these cases, however, and approximately two months of arm's-length, hard-fought negotiations under the guidance of mediator Judge Christopher M. Lopez, the Debtors and interested parties agreed to a comprehensive settlement (the "**GPX Settlement**"). As discussed in more depth throughout this Disclosure Statement, the GPX Settlement provided for, among other things, the orderly transition of ZII's responsibility as the lead contractor on the GPX Project to its joint venture partners and the direct payment of GPX Project vendor claims by the project owner. The Bankruptcy Court approved the GPX Settlement on an interim basis on July 25, 2024 and on a final basis on August 12, 2024. By August 26, 2024, ZII had completely demobilized from the GPX Project.

Following the GPX Settlement, the Debtors began discussions with their stakeholders, including the Prepetition Lenders and the Committee, regarding a framework for a consensual plan of reorganization. That general framework is set forth in the current version of the Plan, which generally includes the following terms:

- The Prepetition Credit Facility will be amended and restated and deemed binding on the Debtors and Holders of Prepetition Credit Facility Claims as of the Plan's Effective Date. The material terms of that amended and restated facility will be set forth in the A&R Credit Facility Term Sheet attached as **Exhibit B** to this Disclosure Statement.

- The Debtors will enter into a new money Junior Exit Facility that will fund additional capital needs for Plan-related distributions and the Reorganized Debtors' go-forward business. The material terms of the Junior Exit Facility will be set forth in the Junior Exit Facility Term Sheet to be filed in the Plan Supplement.

- Holders of Allowed General Unsecured Claims will receive deferred cash payments in an amount equal to the Allowed amount of their Claims, in a manner that satisfies the requirements of section 1129(b)(2)(B)(i) of the Bankruptcy Code.

---

[1]     Terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan. This Disclosure Statement is modified to remove certain confidential information related to the GPX Settlement inadvertently included in a prior version of the Disclosure Statement [Docket No. 1108].

[2]     The other offshoot, Zachry Construction, has operated separately from Zachry Industrial since the two businesses branched off from their common roots in 2008. None of the entities affiliated with Zachry Construction are Debtors in these Chapter 11 Cases.

- The Debtors will assume all executory contracts and unexpired leases that are not otherwise rejected pursuant to the Plan or a separate motion.

- Interests in Debtor Zachry Holdings, Inc., will be reinstated and the legal, equitable, and contractual rights associated with such interests shall remain unaltered.

The Plan will provide the Reorganized Debtors with sufficient liquidity to continue providing first-class services to their customers, while also ensuring the Company's long-term viability. Distributions to all stakeholders—including Holders of Allowed Prepetition Credit Facility Claims and General Unsecured Claims—will be significantly greater under the Plan than in a chapter 7 liquidation.

As of the date of this Disclosure Statement, the Debtors continue to engage with interested parties, including the Prepetition Lenders, the Committee, and Golden Pass, regarding the Plan.[3]  However, in order to avoid delaying the Debtors' exit and distributions to Holders of Allowed Claims, as well as to limit the continued accrual of administrative expenses in these Chapter 11 Cases, the Debtors determined that it is necessary to start the plan confirmation process now.

The Debtors intend to file a motion seeking conditional approval of the Disclosure Statement, proposing the following key dates relating to the plan process, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | October 28, 2024 |
| Solicitation and Publication Deadline | November 5, 2024 |
| Deadline to File Rule 3018 Motions | November 26, 2024 |
| Plan Supplement Deadline | November 26, 2024 |
| Voting, Plan Objection, and Third-Party Release Opt-Out Deadline | December 3, 2024 |
| Deadline to File Voting Report | December 9, 2024 |
| Deadline to File Confirmation Brief | December 9, 2024 |
| Combined Hearing Date | December 11, 2024 |

Ultimately, the Debtors believe that the Plan is in the best interests of the Debtors' Estates and stakeholders and represents the best available restructuring transaction at this time.  Accordingly, the Debtors strongly recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan.

## II.    SUMMARY OF PLAN CLASSIFICATION AND TREATMENT

### A.    Classified Claims and Interests

#### 1.    Classified Claims and Interest Summary

**Article III** of the Plan classifies Claims against and Interests in the Debtors and sets forth the treatment for each Class.  The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Allowed Interests under the Plan.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to consummate the Plan.

---

[3]     The Debtors will continue to negotiate in good faith with all parties and will file updated versions of the Plan and Disclosure Statement based on those ongoing discussions to supplement the details of the Plan prior to any hearing on conditional approval of the Disclosure Statement.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND, THEREFORE, ARE SUBJECT TO CHANGE. REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.[4]**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment in accordance with the terms of the Plan.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1 | Other Secured Claims | In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, either: (i) payment in full in cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the treatment provided to any Allowed Other Secured Claim related to the GPX Project shall be provided by Golden Pass in accordance with the terms of the GPX Settlement. | $[●] | 100% |
| 2 | Other Priority Claims | In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $[●] | 100% |

---

[4]   The recoveries set forth in the chart are, in some cases, based on the estimated going concern value of the Reorganized Debtors, and may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business assets and general economic conditions.

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 3 | Prepetition Credit Facility Claims | Each Holder of an Allowed Prepetition Credit Facility Claim shall, on the Effective Date, become party to, and bound by, the A&R Credit Facility on account of such Holder's Allowed Prepetition Credit Facility Claim, on the terms set forth in the A&R Credit Facility Documents. | $281.25[5] | 100% |
| 4 | Deferred Compensation Plan Claims | Each Holder of an Allowed Deferred Compensation Plan Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Deferred Compensation Plan Claim, Reinstatement of such Allowed Deferred Compensation Plan Claim pursuant to section 1124 of the Bankruptcy Code. | $60.80 | 100% |
| 5 | Convenience Claims | Each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Convenience Claim, on the Initial Distribution Date or as soon as practicable thereafter, Cash in an amount equal to such Holder's Allowed Convenience Claim, inclusive of any prepetition interest validly owed on such Claim and any postpetition interest owed and calculated at the Federal Judgment Rate, but in no event shall distributions on any Allowed Convenience Claim exceed the Convenience Claim Amount. | $[●] | 100% |
| 6 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, cash payments in an amount equal to the Allowed amount of such Claim as of the Effective Date to be paid in a manner that satisfies the requirements of section 1129(b)(2)(B)(i) of the Bankruptcy Code.<br><br>Notwithstanding anything to the contrary in the Plan, all Allowed General Unsecured Claims that are GPX Claims shall be paid by Golden Pass in accordance with the terms of the GPX Settlement. | $[●] | 100% |
| 7 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released, in each case, in accordance with the Plan. | N/A | N/A |
| 8 | Intercompany Interests | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor, Reinstated, converted, or otherwise set off, settled, distributed, contributed, | N/A | N/A |

---

[5] Prepetition Credit Facility Claims include Prepetition L/C Claims, which are contingent and excluded from the amount disclosed here. This amount also excludes all other fees, premiums, and accrued and unpaid interest due and owing to Holders of Prepetition Credit Facility Claims under the Prepetition Credit Facility as of the Petition Date.

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | canceled, or released, in each case, in accordance with the Plan. | | |
| 9 | Zachry Interests | Zachry Interests shall be Reinstated on the Plan Effective Date, and the legal, equitable, and contractual rights to which Holders of Zachry Interests are entitled shall remain unaltered. | N/A | N/A |

## III.  SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots (the "**Ballot**" or "**Ballots**") to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.  Voting Rights Summary

The following chart provides a summary of the status and voting rights of the classes of Claims and Interests under the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3 | Prepetition Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | Deferred Compensation Plan Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 5 | Convenience Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired/Unimpaired | Presumed to Accept / Presumed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Presumed to Accept / Presumed to Reject; Not Entitled to Vote |
| 9 | Zachry Interests | Unimpaired | Presumed to Accept; Not Entitled to Vote |

As set forth above, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3 and 6 (the "**Voting Classes**").

If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions in the Ballot(s).  Please only use the Ballot(s) that accompany this Disclosure Statement or the Ballot(s) that the Debtors or the Claims and Noticing Agent, otherwise provide to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Class.

The Debtors are **not** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 4, 5, 7, 8, and 9.

B.      **Votes Required for Acceptance by a Class of Claims**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the amount and the number of claims voting to accept, as a percentage of the claims eligible to vote that have actually voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total claims that have voted.

C.      **Voting Record Date**

**The Voting Record Date is [October 28, 2024]**.  The Voting Record Date is the date that determines when certain entities or persons are Holders of Claims for voting purposes under the Plan.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

D.      **Solicitation Procedures**

1.      **Claims and Noticing Agent**

The Debtors have retained Kurtzman Carson Consultants, LLC doing business as Verita Global to act as the claims, noticing, and solicitation agent in connection with the solicitation of votes to accept or reject the Plan [Docket Nos. 9; 22].

2.      **Solicitation Package**

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Classes (collectively, the "**Solicitation Package**"): (a) the Cover Letter, substantially in the form attached to the Disclosure Statement Order[6] as **Exhibit 11**; (b) this Disclosure Statement (including the Plan and all other exhibits) on a USB flash drive; (c) the Disclosure Statement Order (excluding exhibits), on a USB flash drive; (d) the appropriate Ballot substantially in the forms attached to the Disclosure Statement Order as **Exhibits 2** and **3**; and (e) the Combined Hearing Notice substantially in the form attached to the Disclosure Statement Order as **Exhibit 6**.

3.      **The Solicitation Package and Plan Supplement**

After the Court enters the Disclosure Statement Order, conditionally approving the Disclosure Statement in connection with the Disclosure Statement Motion,[7] the Claims and Noticing Agent will send the Solicitation Package to Holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by: (a) calling the Debtors' restructuring hotline at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International), (b) submitting the inquiry form at www.veritaglobal.net/zhi/inquiry, and/or (c) writing to the Claims and Noticing Agent at Zachry Ballot Processing c/o Kurtzman Carson Consultants LLC dba Verita Global, 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245.  You may also obtain copies of any pleadings Filed with the Bankruptcy Court free of charge by visiting the Debtors' restructuring website: www.veritaglobal.net/zhi.

The Debtors shall File the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than five (5) days before the Voting Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

---

[6]   "**Disclosure Statement Order**" means entry of an Order by the Court approving the Disclosure Statement Motion.

[7]   "**Disclosure Statement Motion**" means the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, and Notices, (IV) Establishing Procedures for Objecting to the Plan and Final Approval of the Disclosure Statement, and (V) Granting Related Relief*, which will be filed in the coming weeks.

E.       **Voting on the Plan**

**The Voting Deadline is [December 3, 2024], at 4:00 p.m. (prevailing Central Time)**.  Holders of Claims in the Voting Classes are able to return their Ballots in hard copy or submit them electronically on the Debtors' online balloting portal.  Ballots must be (1) properly completed, executed, and delivered timely via first-class mail, regular mail, overnight courier, or hand delivery to the Claims and Noticing Agent at 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245 or (2) submitted timely on the Debtors' online balloting portal at www.veritaglobal.net/zhi.

Holders of Claims entitled to vote that cast a Ballot using the Debtors' online portal should **NOT** also submit a paper Ballot.  The Debtors' online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots submitted via facsimile, email, or other means of electronic transmission will not be counted**.

The Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion.

F.       **Ballots Not Counted**

No ballot will be counted toward Confirmation if, among other things: (1) it partially rejects and partially accepts the Plan; (2) it both accepts and rejects the Plan; (3) it is sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), the Committee, the Prepetition Credit Facility Agent, or the Professionals; (4) it is sent via facsimile or any electronic means other than via the Debtors' online balloting portal; (5) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (6) it is cast by an Entity that does not hold a Claim in the Class indicated in Item 1 of the Ballot; (7) it is submitted by a Holder not entitled to vote pursuant to the Plan; (8) it is unsigned; (9) it is a non-original Ballot (excluding those Ballots submitted via the Debtors' online balloting portal); and (10) it is not marked to accept or reject the Plan.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS, IN THEIR SOLE DISCRETION, DETERMINE OTHERWISE.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN A VOTING CLASS FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.  NO BALLOT VOTING TO ACCEPT THE PLAN MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.**

IV.      **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS**

A.       **Corporate History**

Zachry Industrial traces its history back 100 years, to 1924, when Henry Bartell "Pat" Zachry founded H.B. Zachry Company and the company took on its first construction project: a series of four highway concrete-reinforced bridges in Laredo, Texas.  For the construction of this initial project, Bridge No. 2 on Highway 12A, Pat Zachry and his crew used mule-drawn wagons and H.B. Zachry Company's total working capital was $2,400. Other than the crew's mule-drawn wagons, the only equipment used was a 7S concrete mixer powered with a one-cylinder motor.

Over the next several years, the company continued to perform on a series of small construction contracts and, in 1930, it officially incorporated. The company continued to win contracts throughout the 1930's and 40's, including its first federal contract (a concrete paving job at Randolph Field, now known as Randolph Air Force Base, in San Antonio, Texas) and its first project outside of Texas (the Texas-New Mexico pipeline in Lea County, New Mexico). In 1952, the Company moved its headquarters from Laredo to San Antonio, then a budding metropolitan area with a population of less than 500,000.

In the 1950's and 60's, the company continued to expand its reach in the United States and internationally with projects including the Nike Zeus military complex in the Marshall Islands and a highway to connect the towns of Pucallpa and Aguaytia in Peru.

In 1965, Pat Zachry stepped down and his son, Henry "Bartell" Zachry, Jr., became the company's new president. The company continued to grow. That same year, the company began work on Spain's first nuclear power plant, the Jose Cabrera Power Plant, near Zorita. The next year, in 1966, H.B. Zachry Company was one of five contractors awarded the largest single contract in U.S. history, to develop a multipurpose flood control, water, and power project on the Yuba River in California. Also in 1966, the company began work on the Lake Brazos Dam in Waco, Texas—another of the company's largest projects at the time. It was completed in 1969.

In 1968, the company constructed San Antonio's Hilton Palacio del Rio Hotel. The construction started in advance of the HemisFair 1968 World's Fair so that visitors would have a place to stay. Because traditional construction methods would have been too time-consuming to allow the hotel to be completed on the timeline needed to meet the expected influx of visitors for the World's Fair, the company employed an innovative modular construction method and prefabricated the hotel rooms. With these methods, the company completed the 21 story, 496 room hotel in only 202 days (just over seven months), with employees working around the clock to accomplish the job. The prefabricated rooms were assembled 7 miles off-site. They were each fitted at ground level with furniture, drapes, carpeting, lamps, radios, television sets, pictures on the walls, towels on the towel rails, and even soap in the soap dishes. Then, the rooms were loaded onto the back of flatbed trucks and driven into the construction site in San Antonio, where a specially-built crane lifted each room to its assigned floor. The feat is now remembered as a local legend. The success of the World's Fair, and the hotel that the company constructed for it, is credited as the spark that set San Antonio's now-bustling tourist industry aflame. The American Society of Civil Engineers named Bartell Zachry its Engineer of the Year for the project. Now, every day tourists floating along the San Antonio River on tour barges learn the story of the hotel's construction as they pass by where it stands as a testament to the company's engineering prowess and ingenuity.

In 1969, the company was commissioned by the Puerto Rican government to build two oil-fired power plants in the town of Guayanilla. In 1996, H.B. Zachry Company began construction on the West Dam in Hemet, California, along with its joint venture partners on the project. The West Dam is an approximately 1.7-mile long, 300-foot-high dam that required the excavation of 5.5 million cubic yards of earth. It was part of one of the largest civil engineering projects in the United States at the time of its construction. The West Dam was completed in 1998.

In 1998, John Zachry and his brother David Zachry assumed top executive roles at the company, the third generation of Zachry family members to take the helm of the business, after 33 successful years under the leadership of Bartell Zachry.

In 1999, the company completed construction of the U.S. Embassy in Moscow in the wake of the Cold War. The company's involvement in the project came after the revelation that the prior construction was laden with sophisticated Soviet-era surveillance devices. That construction had been abandoned, until Congress determined to knock down the top two preexisting floors and build four new floors that would serve as bug-free offices for U.S. diplomats. The project, aptly named "Operation Top Hat," was highly confidential at the time. All three hundred members of the H.B. Zachry Company construction team had to obtain top security clearances and worked behind a carefully-guarded barbed-wire perimeter.

In 2008, the company reorganized to split into two independent and separately run businesses bearing the Zachry name. John Zachry became the head of Zachry Industrial, which includes the Debtors in these Chapter 11 Cases, focusing on industrial projects. David Zachry took over the company's heavy civil and building construction work under the name Zachry Construction. No entities related to Zachry Construction's business are included in these Chapter 11 Cases.

### B.    Business Operations

Zachry Industrial's business segments include industrial, engineering, nuclear engineering, maintenance, and turnaround services. The Debtors' operating revenue for the twelve-month period that ended on December 31, 2023 was approximately $5.4 billion. As of the Petition Date, the Debtors had $281.25 million in aggregate original principal amount of prepetition funded debt obligations and approximately $163.3 million in cash on hand. The Debtors' business segments are each described below.

### 1.    Industrial Projects

Debtor ZII manages capital projects of the Debtors' customers, including new facilities, improvements, and expansions. ZII is the Debtor entity that is the counterpart to the Debtors' major industrial engineering, procurement, and construction ("**EPC**") project commitments, including the Debtors' four current major projects summarized in more detail in **Article IV.C**, below. The Debtors typically perform all EPC-related services on a turnkey basis but can also provide these services on a stand-alone basis. ZII's industrial services include: (i) project and construction management; (ii) EPC project delivery; (iii) direct-hire construction; (iv) plant startup and commissioning; and (v) logistics and supply chain management. As of October 1, 2024, ZII had approximately 8,620 employees.

### 2.    Engineering

Zachry Industrial's engineering services are performed by Debtor Zachry Engineering Corporation ("**ZEC**"). ZEC is a full-service engineering firm, with an integrated high-value engineering center ("**HVEC**") in Manila, Philippines. With a growing emphasis on HVEC support for its customers, ZEC has integrated teams of engineers across its U.S. and Manila offices. ZEC's customers can choose the engineering services that meet their needs, or conveniently streamline industrial projects with a single provider of engineering, procurement, fabrication, and construction services. As of October 1, 2024, ZEC had 411 employees.

### 3.    Nuclear Engineering

Zachry Industrial's nuclear engineering services are provided by Zachry Nuclear Engineering, Inc. ("**ZNE**"). ZNE is a full-service engineering firm providing analysis, engineering, design, and project management services to the operating nuclear fleet, as well as analysis and design services for the next generation of advanced reactors including nonlight water reactors. ZNE offers skilled mechanical, electrical, controls, civil, structural, and nuclear engineering professionals and designers who are knowledgeable and experienced in power plant systems, engineering analysis, software, and design development. ZNE has performed all phases of nuclear power plant projects from conceptual and detailed design to construction and startup testing. As of October 1, 2024, ZNE had 117 employees.

### 4.    Maintenance

Zachry Industrial's maintenance services are provided by Zachry Maintenance Services, LLC ("**ZMS**"), a direct subsidiary of Debtor Zachry Plant Services Holdings, Inc. ("**Zachry Plant Services**"). ZMS has a presence in over 60 customer locations and is one of America's largest "merit shop" employers. Maintenance services include a range of work on its customer's sites, including nested presence, continuous presence small capital projects and facilities maintenance, and full service or supplemental support to customer's staff. ZMS provides small to large crew sizes, has a large geographic footprint, and has numerous multi-site alliance relationships. As of October 1, 2024, ZMS had 2,775 employees.

### 5.    JVIC Turnaround & Specialty Services

Debtor J.V. Industrial Companies LLC ("**JVIC**") which has been a part of Zachry Industrial since 2012, provides turnaround and specialty services to industrial customers across North America. JVIC offers a comprehensive suite of capabilities required to perform the work to the highest standards of quality, safety, and timeliness. JVIC's services include: (i) planning and scheduling (JVIC offers a dedicated team of experts who provide turnkey management of turnaround planning and execution); (ii) piping and specialty welding (JVIC maintains a long-tenured team of specialty craftspeople with state-of-the-art skills across all alloys); (iii) tower services (JVIC has knowledgeable tower superintendents who are experienced in the modification, maintenance, and replacement of towers and tower internals, as well as all associated process enhancements and reconfigurations); (iv) mechanical and heat exchanger services (JVIC's expertise in this area includes bolted connections and process equipment assembly

covering bundle extraction and repair and heat exchangers); and (v) bolt torqueing and machining (JVIC has extensive experience across all types of heavy equipment to deliver the torqueing, extraction, beveling, machining and monitoring of critical bolted components). In addition, JVIC provides project turnaround scope development strategy, management, and coordination; turnaround readiness assessments; heavy rigging and lifting; and engineered critical lift planning. As of October 1, 2024, JVIC had 2,503 employees.

### 6. JVIC Turnaround & Specialty Services

Debtor JVIC Fabrication, LLC ("**JVIC Fabrication**"), a direct subsidiary of Zachry Plant Services, is one of the largest pipe fabricators on the Gulf Coast. JVIC Fabrication has multiple state-of-the-art facilities in the Gulf Coast capable of supporting all project requirements, including American Society of Mechanical Engineers (or ASME) code pipe, vessel, and modular fabrication. JVIC Fabrication's turnkey industrial pipe and vessel fabrication capabilities span over 200,000 square feet of indoor fabrication and machining space, with over 5,000 pipe spools per month production capacity, and 46 acres of laydown yardage available for material storage. As of October 1, 2024, JVIC Fabrication had 158 employees.

### 7. Madison Turnaround Services

Debtor Madison Industrial Services Team, LLC ("**Madison**") was established in 2005 to offer union labor to better serve customers' needs. Madison is the only Debtor entity with union employees. Today, Madison provides turnaround/outage and specialty services to America's process, pulp and paper, and power industries. Madison is a single source company with industrial, mechanical, and specialty welding services to meet all unique technical and safety challenges that this field of work involves. As of October 1, 2024, Madison had 248 employees.

## C. Zachry Industrial's Current Projects

After ZII's withdrawal from the GPX Project pursuant to the terms of the GPX Settlement, Zachry Industrial, through Debtor ZII, is currently involved in four major EPC projects, each of which has a contract value of at least $400 million. Each of these EPC projects is summarized below. In addition to its major projects, Zachry Industrial is involved in over 700 additional ongoing projects, including ones for maintenance, fabrication, and turnaround services.

### 1. OPPD Project

The OPPD Project is a project for Omaha Public Power District ("**OPPD**") related to its Power with Purpose initiative. Zachry is responsible for the design and construction of both of OPPD's new natural gas generation facilities, Standing Bear Lake Station, a 150 MW facility in Douglas County, Nebraska, and Turtle Creek Station, a 450 MW facility in Sarpy County, Nebraska, and associated substations. Major construction on the OPPD Project began in the first quarter of 2022 and is now scheduled to be completed in the fourth quarter of 2024. The total contract value of the OPPD Project is approximately $429 million.

### 2. GTPP ISBL Project

GTPP ISBL Project is a project for an integrated polymers facility in Orange, Texas for Golden Triangle Polymers Company LLC ("**GTPP**"), a joint venture between Chevron Phillips Chemical Company LLC ("**CP Chem**") and Qatar Energy ("**QE**"). ZII's inside battery limits ("**ISBL**") work on the project is performed through ZDJV, a joint venture between Debtor ZII and DL USA, Inc. (the U.S. subsidiary of the South Korean chemical and construction conglomerate DL Group) (together with ZII, the "**GTPP ISBL Contractor**"). ZDJV is responsible for the engineering, procurement, and construction of the polyethylene units. The total contract value of the GTPP ISBL Project is approximately $1.3 billion, with ZII's estimated share totaling approximately $800 million.

### 3. GTPP OSBL Project

GTPP OSBL Project is the integrated polymers facility being constructed for the CP Chem and QE joint venture, GTPP. The outside battery limits ("**OSBL**") GTPP project relates to portions of the facility's "ethane cracker," a plant that performs the first step in the process of transforming ethane from natural gas into plastics products. The work includes the utilities and infrastructure scope of the GTPP ethane cracker. The GTPP OSBL work is being executed by BMZ Third Coast Partners, a joint venture between ZII and Burns & McDonnell

Engineering Company, Inc. The total contract value of the GTPP OSBL Project is approximately $2.25 billion, with ZII's estimated share totaling approximately $1.13 billion.

### 4. PLNG Project

The PLNG Project is a project for an LNG export plant in Plaquemines Parish, Louisiana for Venture Global LNG. The work is being performed in two phases by KZJV, a joint venture between ZII and KBR Inc. The total contract value for both phases of the PLNG Project is approximately $10.7 billion, with ZII's share totaling approximately $5.7 billion.

### D. The Debtors' Prepetition Corporate and Capital Structure

### 1. Corporate Structure

As shown in the organizational chart attached to this Disclosure Statement as **Exhibit E**, Zachry Industrial's operations are divided across numerous operating entities. The operating entities include ZEC, ZII, ZNI, JVIC Fabrication, LLC, ZMS, JVIC, and Madison, and non-Debtor UE Properties, Inc. and Moss Point Properties, LLC. All operating companies are directly or indirectly owned by ZHI.

### 2. Capital Structure

### a. The Debtors' Prepetition Indebtedness

As of the Petition Date, the Debtors had approximately $163.3 million in cash on hand, $281.25 million in aggregate outstanding principal amount of funded debt obligations under the Prepetition Credit Agreement, and $618.9 million in outstanding undrawn letters of credit issued under the Prepetition Credit Agreement.

### i. Prepetition Credit Agreement

The Debtors' prepetition capital structure consisted of (i) a revolving credit facility, which included a swing line facility (the "**Revolving Credit Facility**"), and (ii) a term loan facility (the "**Term Loan Facility**"), each pursuant to that Prepetition Credit Agreement and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including, without limitation, the Loan Documents (as defined therein), collectively, the "**Loan Documents**"), by and among the Prepetition Loan Parties, the Prepetition Lenders, the Prepetition Credit Facility Agent, and each other party thereto.

Pursuant to the Loan Documents, the Debtors granted the Prepetition Lenders a first priority security interest in, and lien on, Collateral (as defined in the Prepetition Credit Agreement), consisting of substantially all assets of the Debtors (the "**Collateral**," and the liens and security interests granted on the Collateral under the Loan Documents, the "**Liens**"), to secure all obligations under the Loan Documents (collectively, the "**Secured Obligations**").

Pursuant to that certain *Third Amended and Restated Continuing Guaranty*, dated as of May 2, 2023 (as amended, restated, supplemented, or otherwise modified from time to time), the Debtors party thereto, as guarantors (the "**Guarantors**," and together with the Borrowers, collectively, the "**Loan Parties**") guaranteed, on a joint and several basis, all of the Secured Obligations. The Guarantors are Zachry Enterprise Solutions, LLC; ZNI; ZEC; ZII; Zachry Nuclear Construction, Inc.; ZNE; JVIC Fabrication; ZMS; JVIC; Zachry High Voltage Solutions, LLC; 2EC New York, Inc.; UE Properties, Inc.; ZEC Michigan, Inc.; Zachry Construction, Inc.; Moss Point Properties, LLC; Computer Simulation & Analysis, Inc.; Zachry Industrial Americas, Inc.; and Madison.

The Prepetition Credit Agreement provided for borrowings and letters of credit in the aggregate principal amount of $956.25 million. As of the Petition Date, the aggregate amount of revolving loans outstanding under the Revolving Credit Facility was approximately $125 million, and the aggregate amount of term loans outstanding under the Term Loan Facility was approximately $156.25 million. As of the Petition Date, there was approximately $618.9 million in outstanding undrawn letters of credit issued under the Prepetition Credit Agreement.[8]

---

[8]   In addition, ZHI is the obligor on a $5 million letter of credit issued by IBC outside of the Credit Agreement in connection with the Debtors' legacy workers compensation program. That letter of credit is fully cash collateralized.

As described further below in the section titled, "GPX Project Litigation and Settlement" (in **Article VI.I** hereof) the letter of credit related to the GPX Project has been reduced to equal the amount of Golden Pass's permitted, scheduled draws plus the GPX Excess L/C Amount.  The GPX Excess L/C Amount is the amount of unpaid GPX Claims in excess of the GPX Direct Payment Cap, if any, calculated pursuant to the terms of the GPX Settlement and as set forth in the Plan Supplement.

### ii.        Prepetition Unsecured and Secured Trade Debt

As of the date of this Disclosure Statement, the Debtors estimate that their general unsecured trade debt totals approximately $[●] million, subject to further reconciliation and reduction on account of GPX Claims paid by Golden Pass.

The Debtors filed a motion, and obtained Court approval, to pay the undisputed prepetition claims of certain critical vendors, foreign vendors, lien claimants, and vendors holding claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, in order to preserve the Debtors' partnerships with these vendors and the Debtors' ability to continue operating in the ordinary course during the pendency of these Chapter 11 Cases.

### iii.       Deferred Compensation Plan

The Debtors offer the Deferred Compensation Plan to certain employees, which provides participating employees with the opportunity to defer payment of certain earned compensation, thereby deferring the associated income tax obligations to a later date.  The amount that the Debtors pay to plan participants through the Deferred Compensation Plan each year varies, and is dependent on, among other things, the employment status of the participants and elections made by the participants as to the timing of payments.  While the Debtors stopped matching contributions to the Deferred Compensation Plan after 2015, the Debtors still owe some amounts to participants from employer matches to employee contributions under the Deferred Compensation Plan.  There are 333 participants in the Deferred Compensation Plan.  As of the date hereof, the Debtors estimate that they owe participants approximately $60.8 million under the Deferred Compensation Plan.

As set forth in the Plan, Deferred Compensation Plan Claims by plan participants: (i) are separately classified as Class 4; (ii) are Unimpaired; and (iii) will recover in full on and after the Effective Date.

Specifically, the Plan provides that all compensation and benefits plans, including the Deferred Compensation Plan, in place as of the Effective Date with the Debtors shall be assumed or reinstated by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  Any assumption or reinstatement of such compensation and benefits plans, including the Deferred Compensation Plan, pursuant to the terms of the Plan shall be deemed not to trigger any applicable change of control, immediate vesting, termination, or similar provisions in any applicable plan or program, or an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions.  No counterparty shall have rights under a compensation and benefit plan or program, including the Deferred Compensation Plan, assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

## V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS

The Debtors commenced these Chapter 11 Cases as a result of financial distress caused by the GPX Project. In 2019, Golden Pass, an entity 100% owned by affiliates of Exxon Mobil Corporation and QE, selected ZII's bid for the design and construction of the LNG liquefaction and export facilities.  ZII, CB&I, and Chiyoda then formed an unincorporated joint venture ("**CCZJV**") through the Hybrid Joint Venture Agreement dated January 30, 2019 (the "**HJVA**") to allocate design and construction responsibilities on the GPX Project.  CCZJV, as the "Contractor," entered into that certain *Contract No. GPP-EPC 1*, dated January 30, 2019 (as amended, the "**GPX EPC Contract**") with Golden Pass to provide engineering, procurement, construction, and commissioning for the GPX Project.

The total contract value of the GPX Project was approximately $10 billion, with ZII's estimated share totaling approximately $5.8 billion.  The project consists of three "trains" (the liquefaction units that produce LNG), each capable of producing approximately 5.2 million tons of LNG per year.  The first train was initially scheduled to become

operational in 2024. Once completed, the Golden Pass LNG export facility is expected to generate billions of dollars in revenue every year.

ZII's engineering and construction of the GPX Project was a massive undertaking. Although the contract price was fixed, the contract price was subject to modification via change orders, with ZII and its joint venture partners to receive only set progress payments absent Golden Pass's approval of change orders. ZII quickly faced unexpected obstacles after it began work in mid-2019 and other challenges arose when construction on the additional LNG facilities broke ground. The original contract price did not address the cost challenges. Accordingly, ZII and its joint venture partners engaged in negotiations with Golden Pass and its owners to address the need for additional funding for the GPX Project. The series of amendments or side letters to the GPX EPC Contract provided limited additional support for ZII.

Prior to April 2024, ZII was expending significantly more on the GPX Project than it was receiving in monthly progress payments from Golden Pass. In March of this year, Golden Pass began direct-paying vendors, and significantly reduced advance progress payments due to ZII—further constraining ZII's cash flows. In April, Golden Pass stopped the progress payments to ZII altogether.

In April and May of 2024, ZII and Golden Pass engaged in mediation in an attempt to resolve their issues consensually, but these efforts did not ultimately lead to a settlement. On May 8, 2024, ZII received a notice of default and breach under the GPX EPC Contract from Golden Pass and a notice of default and breach under the HJVA from CCZJV. ZII responded to these default notices by denying the allegations set forth therein. ZII received a subsequent notice of default from Golden Pass on May 16, 2024 and responded that same day. Golden Pass agreed to a standstill with respect to its notice of default until May 21, 2024.

Having exhausted all other options, the Debtors were forced to commence these Chapter 11 Cases prior to the expiration of the standstill with Golden Pass in order to preserve ZII's rights under the GPX EPC Contract.

## VI.   SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES

### A.   Commencement of Chapter 11 Cases

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered under ZHI's case number 24-90377 (MI) pursuant to Bankruptcy Rule 1015(b). The Debtors remain in possession of their property and continue to manage their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.   First Day Motions

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors filed several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. The Debtors sought, and the Bankruptcy Court entered orders approving, those First Day Motions to maintain their operations in the ordinary course. This relief allowed the Debtors, among other things:

- to continue paying employee wages and paying for and maintaining employee benefits programs;

- to continue the use of the Debtors' cash management system, bank accounts, and business forms;

- to continue insurance programs and the Debtors' surety bond program;

- to pay certain prepetition taxes and fees;

- to pay certain prepetition claims of critical vendors, lien claimants, foreign claimants, and § 503(b)(9) claimants;

- to establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service; and

13

- to consensually use cash collateral.

The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge at www.veritaglobal.net/zhi.

### C.    Procedural Motions

The Debtors also filed various motions that are common to chapter 11 proceedings of similar size and complexity as these Chapter 11 Cases, including:

- a motion to employ the Claims and Noticing Agent;

- a motion establishing procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals;

- a motion to extend the time for the Debtors to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs, as well as Rule 2015.3 Financial Reports; and

- a motion for joint administration of the Chapter 11 Cases.

### D.    Appointment of the Committee

On June 4, 2024, the U.S. Trustee appointed the Committee [Docket No. 176].  On July 9, 2024, the Committee filed its *Verified Statement of the Statutory Unsecured Claimholders' Committee of Zachry Holdings, Inc., et al. Pursuant to Bankruptcy Rule 2019(c)* [Docket No. 433].  The Committee members are: (i) Sunbelt Rentals, Inc., and its wholly owned subsidiary, Sunbelt Rental Scaffold Services LLC; (ii) Bigge Crane and Rigging Co.; (iii) Rush, LLC aka Rush Resources; (iv) Innovative Heat Treatment Solutions; (v) Calcam Logistics & Contracting, LLC; (vi) P & I Supply.  The Committee filed applications for, and the Bankruptcy Court entered orders approving, the retention of Proskauer Rose LLP as counsel [Docket Nos. 329; 574]; Gray Reed LLP as co-counsel [Docket Nos. 330; 333; 572]; and Huron Consulting Group Inc. as financial advisor [Docket Nos. 332; 573].

### E.    Retention of Professionals

The Debtors filed applications for, and the Bankruptcy Court entered orders approving, the retention of certain Professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in these Chapter 11 Cases, including White & Case LLP as restructuring counsel [Docket Nos. 217; 441]; Hicks Thomas, LLP as special litigation co-counsel [Docket Nos. 219; 440]; Susman Godfrey LLP as special litigation co-counsel [Docket Nos. 220; 442]; and M3 Advisory Partners, LP as financial advisor [Docket Nos. 218; 443].

On October 8, 2024, the Debtors filed an emergency application to retain Lazard as their investment banker to raise certain exit financing in connection with the Plan [Docket No. 1102].  As of the date hereof, the Bankruptcy Court has not entered an order on this application.

### F.    Section 341 Meeting

On June 28, 2024 and August 15, 2024, the Debtors attended meetings of their creditors pursuant to section 341 of the Bankruptcy Code and addressed inquiries from the U.S. Trustee regarding, among other topics, the Debtors' schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs and other issues related to these Chapter 11 Cases [Docket Nos. 249; 376; 652; 655].

### G.    *De Minimis* Asset Sales

Prior to the Petition Date, in connection with the ordinary course operations of their businesses, the Debtors regularly entered into transactions to sell or otherwise dispose of equipment, machinery, spare parts, vehicles, and

other assets, that were no longer needed, that had otherwise become obsolete and were not useful to continue their business operations, that were exceedingly expensive to remove, store, or otherwise dispose, or that the Debtors had a legitimate business reason to sell or otherwise dispose of.

On July 2, 2024, the Debtors filed a motion seeking approval of procedures for the sale or transfer of certain assets that were of relatively *de minimis* value compared to the Debtors' total asset base (the "**De Minimis Assets**") free and clear of liens, claims, interests, and encumbrances [Docket No. 411]. On July 24, 2024, the Bankruptcy Court entered an order approving the motion [Docket No. 609].

## H.    Schedules and Statements

On July 16, 2024, the Debtors filed their Schedules of Assets and Liabilities [Docket Nos. 511-31] and Statements of Financial Affairs [Docket Nos. 532-52]. On August 30, 2024, certain of the Debtors filed amendments to Schedules E/F, Part 2 (Creditors Who Have Unsecured Claims) [Docket Nos. 855-64] (the "**Amended Schedules**").

## I.    GPX Project Litigation and Settlement

On the Petition Date, ZII filed the adversary proceeding captioned *Zachry Industrial, Inc. v. Golden Pass LNG Terminal LLC* (Adv. Pro. No. 24-03105 (MI)) (the "**GPX Project Litigation**"), seeking, among other things, avoidance of the Claims Settlement Agreement and the First, Second, and Third Amendments to the GPX EPC Contract, recovery of the value of the avoided transfers, as well as equitable subordination of any claims that Golden Pass may assert against ZII.

On May 23, 2024, the Court entered a stipulation and agreed order modifying the automatic stay, to the extent applicable, to allow Golden Pass to pay certain vendors directly in order to ensure the health and safety of personnel, protect the environment, preserve equipment and other physical assets, and allow for other essential services on the GPX Project pending ZII's decision to assume or reject the GPX EPC Contract.

After discussion at the first day hearing in these Chapter 11 Cases and a subsequent status hearing about the GPX Project, ZII, Golden Pass, CB&I, Chiyoda, and the CCZJV (together, the "**Mediation Parties**") agreed to mediate disputes arising out of the GPX Project. The negotiations began on the weekend of June 1, with the Honorable Judge Christopher M. Lopez serving as mediator. After nearly two months of hard-fought negotiations, and the entry of two consensual stipulations negotiated by the Mediation Parties to provide for the continuation of certain essential services at the GPX Project, the Mediation Parties reached an agreement on a comprehensive resolution of all issues related to the GPX Project Litigation and disputes.

On June 18, 2024, following the termination of the litigation standstill under the June 5 stipulation, Golden Pass filed: (i) the *Emergency Motion of Golden Pass LNG Terminal LLC for Entry of an Order Compelling Rejection of EPC Contract; or, in the Alternative Granting Relief from the Automatic Stay* [Docket No. 299], seeking entry of an order compelling rejection of ZII's interest in the GPX EPC Contract, or, alternatively, relief from the automatic stay to permit Golden Pass to exercise its rights under the GPX EPC Contract, and (ii) the *Motion for Entry of an Order Modifying the Automatic Stay, to the Extent Applicable, to Permit Golden Pass LNG Terminal LLC to Comply with Administrative Requirements Imposed by Non-Debtor Letter of Credit Issuer Under Letter of Credit* [Docket No. 302], seeking entry of order permitting Golden Pass to submit documents required to draw on the standby letter of credit issued by Bank of America, N.A. in favor of Golden Pass by the order of and for the account of ZII (the "**Letter of Credit**").

On June 25, 2024, CB&I and Chiyoda filed the *Joint Emergency Motion of Chiyoda International Corporation and CB&I LLC for Entry of an Order (I) Granting Relief from the Automatic Stay, (II) Waiving the Requirements of Bankruptcy Rule 4001(A)(3), and (III) Granting Related Relief* [Docket No. 350], seeking entry of an order lifting the automatic stay to, among other things, permit them to enforce their own rights and remedies against ZII under the HJVA.

On July 19, 2024, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV, (II) Authorizing the Parties to Perform Any and All Obligations Contemplated*

*by the Settlement, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 587], seeking Court approval of this global settlement, which:

- released the Debtors from all current and future claims or causes of action arising under, related to, or in connection with the GPX EPC Contract, the HJVA, and CCZJV;

- provided for the processing and direct payment of vendors' valid GPX Project-related claims by Golden Pass, subject to a cap, with the Debtors agreeing to a commensurate increase to the GPX Project letter of credit amount under their prepetition credit facility for any amounts paid by Golden Pass above the cap;

- provided for the Debtors' immediate rejection of the GPX EPC Contract and transition of the Debtors' work scope to their joint venture partners, allowing parties to rehire workers, advance scope, and complete a project that will have substantial economic benefits;

- limited the amount that Golden Pass can draw from the GPX Project letter of credit and provides for a schedule of when remaining amounts can be drawn, minimizing secured claims against the Debtors;

- provided for the transfer of certain equipment and other documents, data, and materials from the Debtors to Golden Pass and the joint venture partners without charge, facilitating the Debtors' efficient demobilization from the GPX Project and the remaining parties' ongoing work;

- provided for ZII's rejection of its interests in the HJVA, allowing the joint venture partners to enter into new terms with Golden Pass to complete the project; and

- provided for the payment of certain retainage to the Debtors to support the Debtors' demobilization efforts, and the Debtors' agreement to complete such demobilization by August 26, 2024.[9]

On July 24, 2024, the Court entered the *Interim Order (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV, (II) Authorizing the Parties to Perform Any and All Obligations Contemplated by the Settlement, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 625] (the "**GPX Settlement Interim Order**"). On August 12, 2024, the Court entered the *Final Order (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV, (II) Authorizing the Parties to Perform Any and All Obligations Contemplated by the Settlement, and (III) Granting Related Relief* [Docket No. 744] (the "**GPX Final Settlement Order**").

In connection with the Debtors' transition and demobilization from the GPX Project, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Personal Property Leases and Related Executory Contracts Effective as of July 20, 2024* [Docket No. 591] (the "**First GPX Omnibus Rejection Motion**"), seeking authorization to reject certain equipment leases for property utilized at the GPX Project. On August 15, 2024, the Court entered an order granting the relief requested in the First GPX Omnibus Rejection Motion [Docket No. 771].

The Debtors also filed the *Debtors' Second Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Executory Contracts Effective as of August 10, 2024* [Docket No. 730] (the "**Second GPX Omnibus Rejection Motion**"), seeking authorization to reject various vendor agreements that ZII entered into in connection with the GPX Project that would not be assumed and assigned or novated to ZII's former joint venture partner on the GPX Project, CB&I. On September 11, 2024, the Court entered an order approving the Second GPX Omnibus Rejection Motion [Docket No. 935]. On September 13, 2024, the Debtors filed the *Debtors' Third Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Executory Contracts Effective as of September 13, 2024* [Docket No. 951] (the "**Third GPX Omnibus Rejection Motion**"), further seeking to reject various vendor agreements. On October 7, 2024, the Court entered an order approving the Third GPX Omnibus Rejection Motion [Docket No. 1095].

On August 14, 2024, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Assumption and Assignment of Certain GPX Project Executory Contracts* [Docket No. 767] (the "**First GPX**

---

[9] The specific terms of the GPX Settlement are set forth in the Term Sheet attached as **Exhibit A** to the GPX Settlement Interim Order.

**Omnibus Assumption Motion**"), seeking authorization to assume and assign various executory contracts and unexpired leases to CB&I. Consistent with the term sheet attached to the GPX Settlement Interim Order, Golden Pass agreed to pay outstanding obligations owed to contract counterparties and cure defaults under the assigned contracts and cure defaults under the assigned contracts. On October 4, 2024, the Court entered an order approving the First GPX Omnibus Assumption Motion [Docket No. 1088].

Although the GPX Settlement resolved all core issues between the Mediation Parties, two intra-joint venture issues remained outstanding after entry of the GPX Final Settlement Order. On August 20, 2024, the Debtors filed an *Emergency Motion to Interpret and Enforce the Golden Pass Settlement Agreement* [Docket No. 792], seeking resolution of: (i) the Debtors' entitlement to proceeds of a first-party professional liability insurance claim for losses in connection with repairing a levee on the GPX Project, and (ii) the Debtors' entitlement to funds in the joint venture receiving account for work ZII had completed and invoiced prior to the Chapter 11 Cases. Under the HJVA, Zachry Industrial believes that it is entitled to certain potential insurance proceeds related to levee repair and funds held by the HJVA related to invoices for their completed work submitted prior to entry of the GPX Settlement Interim Order. On August 27, 2024, Chiyoda and CB&I filed their *Joint Response of Chiyoda International Corporation and CB&I LLC to Debtors' Emergency Motion to Interpret and Enforce the Golden Pass Settlement Agreement* [Docket No. 817], arguing that the Debtors had released their contractual entitlement to any levee insurance proceeds and CCZJV's profits upon the Court's entry of the GPX Settlement Interim Order. The Debtors filed their reply on August 30, 2024 [Docket No. 833]. The Court held a hearing on the issues on September 5, 2024. On September 19, 2024, Chiyoda and CB&I as well as the Debtors filed supplemental exhibits [Docket Nos. 982; 983]. As of the date hereof, the Court has not ruled on the matter.

As of August 26, 2024, ZII had completely demobilized from the GPX Project and transitioned its scope of work to its former joint venture partners pursuant to the terms of the GPX Settlement. The Mediation Parties continue to work to reconcile claims related to the GPX Project, and to date, the Debtors believe that approximately 80% of all valid GPX Project-related claims have been paid by Golden Pass pursuant to the terms of the GPX Settlement. The Debtors are working with Golden Pass to determine whether the cap related to such payments will be exceeded and whether their GPX Project letter of credit will need to be increased.

### J.     Claims Bar Date

On July 26, 2024, the Bankruptcy Court entered an order (i) establishing September 16, 2024 at 5:00 p.m. (prevailing Central Time), as the deadline (the "**Bar Date**") for persons or entities (except governmental units) to file proofs of claim (each, a "**Proof of Claim**") in respect of prepetition Claims against any of the Debtors, (ii) establishing November 18, 2024 at 5:00 p.m. (prevailing Central Time) as the deadline for governmental units to file Proofs of Claim in respect of prepetition Claims against any of the Debtors; and (iii) approving certain other related procedures [Docket No. 636] (the "**Bar Date Order**").

Pursuant to the Bar Date Order, persons and entities affected by the changes to the Amended Schedules that disagreed with the nature, amount, or characterization of their Claim(s) in the Amended Schedules were required to file a Proof of Claim no later than October 4, 2024 at 5:00 p.m. (prevailing Central Time).

### K.     Assumption and Rejection of Executory Contracts and Unexpired Leases

On September 10, 2024, the Debtors filed their *Motion for Entry of an Order Extending Time to Assume or to Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 934], seeking to extend the initial 120-day period to assume or reject unexpired leases of nonresidential real property through and including December 17, 2024. On October 2, 2024, the Court entered an order approving this motion [Docket No. 1071]. As of the date hereof, the Debtors have not filed any other motions to assume or reject executory contracts and unexpired leases (except as otherwise set forth in this Disclosure Statement).

### L.     OPPD Settlement and Contract Assumption

ZII has made substantial progress in the design and construction of the OPPD Project as further described in **Article IV.C.1** hereof. However, in the months leading up to these Chapter 11 Cases, ZII experienced increased costs associated with the OPPD Project and untenable milestones under the OPPD Contract. Accordingly, the Debtors

17

engaged OPPD in arm's-length, good faith negotiations to work towards an amendment to the OPPD Contract that would help right-size the project so that the Debtors could continue to perform work on, and finish, the project on an agreed-upon time frame, for the benefit of both parties, and release certain funds for the immediate payment of OPPD vendors. After months of negotiation, OPPD and ZII reached an agreement (the "**OPPD Settlement**") that settled alleged liquidated damages, reset deadlines related to the project, released certain funds to facilitate completion of the project, and provided additional funding if certain new milestones were achieved. That settlement is embodied in the *Debtors' Motion for Entry of an Order (I) Approving Settlement By and Among the Debtors and Omaha Public Power District, (II) Authorizing the Debtors to Amend and Assume (As Amended) the Omaha Public Power District Contract, and (III) Granting Related Relief* [Docket No. 809] (the "**OPPD Contract Assumption Motion**"). On September 17, 2024, the Court entered an order approving the OPPD Contract Assumption Motion and the related contract amendment [Docket No. 961].

### M. Approval of the GTPP ISBL Conversion Certificate

The EPC contract governing ZII's work on the GTPP ISBL Project provides that a portion of GTPP ISBL Contractor's compensation for work performed is fixed and another portion is adjustable in accordance with certain parameters (the "**GTPP ISBL Contract Price**"). The GTPP ISBL Project EPC contract also provides that if the GTPP ISBL Contractor met certain conditions, the GTPP ISBL Contract Price may be converted into a fixed lump sum to be memorialized in a certificate (the "**Conversion Certificate**") that set forth the adjusted GTPP ISBL Contract Price and the effective date of the conversion. On September 3, 2024, the Debtors filed the *Stipulation and Agreed Order Regarding Entry into GTPC Contract Conversion Certificate* [Docket No. 877]. Pursuant to this stipulation, ZII was authorized to execute the Conversion Certificate and amend the EPC contract in accordance with the Conversion Certificate. On September 25, 2024, the Court entered an order approving the stipulation [Docket No. 1017].

### N. Extension of Time to Remove Civil Actions

On August 9, 2024, the Debtors filed their *Motion for Entry of an Order Extending the Time Within Which the Debtors May Remove Actions* [Docket No. 728], seeking to extend the August 19, 2024 deadline to remove civil actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027. On September 3, 2024, the court entered an order extending the removal deadline through and including December 17, 2024 [Docket No. 878].

### O. Extension of Exclusive Period for the Debtors to File a Plan

The Debtors have the exclusive right to propose a plan in these Chapter 11 Cases. On September 10, 2024, the Debtors filed *Debtors' Motion for Entry of an Order Extending the Exclusive Periods to File and Solicit a Plan* [Docket No. 933] (the "**Exclusivity Motion**"), seeking an extension of the Debtors' exclusive plan filing period through and including December 17, 2024 and an extension of the Debtors' exclusive solicitation period through and including February 15, 2025. On October 2, 2024, the Court entered an order granting the relief requested in the Exclusivity Motion [Docket No. 1072].

### P. Adversary Proceedings and Other Litigation

#### 1. Zachry Industrial, Inc. v. Golden Pass LNG Terminal LLC

On the Petition Date, ZII filed a complaint against Golden Pass seeking to avoid amendments to the GPX EPC Contract and equitable subordination of Golden Pass's claims in the Chapter 11 Cases. (Adv. Pro. No. 24-03105 (MI)) [Adv. Docket No. 1]. Before Golden Pass filed its answer, the GPX Settlement (discussed in **Article I** hereof) was agreed to by the Mediation Parties and approved by the Bankruptcy Court. On August 13, 2024, ZII filed a *Notice of Voluntary Dismissal* [Adv. Docket No. 12].

#### 2. Lamotte v. Zachry Industrial, Inc.

On June 17, 2024, plaintiff Avis Lamotte filed a class action complaint under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (the "**WARN Act**"), on behalf of herself and similarly situated individuals against ZII (Adv. Pro. No. 24-03122 (MI)) [Adv. Docket No. 1] (the "**WARN Adversary Proceeding**").

On July 22, 2024, ZII filed its answer denying the allegations in the complaint [Adv. Docket No. 20]. ZII vigorously contests the applicability of the WARN Act under these facts, and also asserted various defenses to the claims on their merits. In an effort to avoid needless delay, uncertainty, and expense, the parties agreed to mediate and retained Ms. Gloria Portela to serve as mediator. After submitting confidential mediation statements and participating in multiple Zoom sessions and a full day, in-person mediation session on September 3, 2024, the parties agreed to settlement terms that would fully resolve all disputes, claims, and causes of actions arising out of the WARN Adversary Proceeding without admission by ZII of the applicability of the WARN Act, or to any liability on the part of ZII. On September 26, 2024, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (A)(I) Approving the Settlement by and Between Avis Lamotte, on Her Own Behalf and on Behalf of Others Similarly Situated, and the Debtors, (II) Certifying a Class for Settlement Purposes Only, (III) Appointing the Plaintiff as Class Representative and Plaintiff's Counsel as Class Counsel for Settlement Purposes Only, (IV) Approving the Form and Manner of Service of the Settlement Class Notice, (V) Appointing the Settlement Administrator, and (VI) Scheduling a Final Hearing, and (B) Granting Related Relief* [Docket No. 1030] (the "**WARN Settlement Motion**"). On October 3, 2024, the Court entered an interim order approving the WARN Settlement Motion [Docket No. 1080] (the "**Interim Approval Order**"). The Interim Approval Order preliminarily approved the settlement as reasonable and in the best interest of the Debtors under Bankruptcy Rule 9019, certified the class for settlement purposes only, appointed Ms. Lamotte as class representative and her counsel as class counsel, approved the settlement notice and opt-out form as well as the manner of serving it upon class members, appointed a settlement administrator to distribute notice, and scheduled a final fairness hearing to consider final approval of the settlement on January 9, 2025, with an objection and opt-out deadline on December 13, 2024. If approved on a final basis, the settlement will fully and completely resolve all claims in the WARN Adversary Proceeding for an aggregate amount of $7,000,000, inclusive of costs, fees, and expenses to the class.

### 3.    Zachry Holdings, Inc. vs. Brignac

On July 19, 2024, the Debtors filed a complaint seeking a declaratory judgment that the automatic stay under section 362 of the Bankruptcy Code applies and extends to prohibit the continued prosecution of *Brignac v. 3M Company et al.*, 127-046 (La. 10/15/2019) (the "**Brignac Matter**"), or in the alternative, a preliminary injunctive relief halting the prosecution of the Brignac Matter (Adv. Pro. No. 24-03146 (MI)) [Adv. Docket No. 1]. The Brignac Matter included the Debtors' non-Debtor Affiliate, JVIC Catalyst Services, LLC as a defendant. On July 30, 2024, the Court entered an order temporarily enjoining the Brignac Matter through October 22, 2024 [Adv. Docket No. 35].

### 4.    FLNG Litigation

#### a.    FLNG Contract Suit

On April 23, 2024, FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC (together, "**FLNG**") brought suit against ZII, CB&I, and Chiyoda (together, the "**FLNG JV Partners**"), alleging breach of contract with regard to the three engineering, procurement, construction, pre-commissioning, commissioning, start-up, and testing service contracts (together, the "**FLNG Contracts**") entered by and between FLNG and the FLNG JV Partners for the construction of three trains at their Quintana Island LNG Facility (Case No. 2024-26036 (MI) (Tex. Dist. Ct. Apr. 23, 2024)) (the "**FLNG Contract Litigation**"). In their complaint, FLNG alleged that the FLNG JV Partners breached the FLNG Contracts by causing or contributing to certain defects in the trains' LNG compression motors that caused one of the motors to fail in January 2024 (years after the equipment was put into service and long after any warranty period on the FLNG JV Partners' work had expired), and sought damages, interest, costs, and attorneys' fees.

On July 31, 2024, the suit was removed to the U.S. District Court for the Southern District of Texas (the "**District Court**") (Case No. 4:24-cv-02841). On August 28, 2024, the District Court issued an order referring the case to the Bankruptcy Court to be heard by the Honorable Judge Marvin Isgur in these Chapter 11 Cases (Adv. Pro. No. 24-03195 (MI)). FLNG filed an *Amended Motion to Remand* [Docket No. 943; Adv. Docket No. 18], arguing, among other things, that: (i) mandatory abstention requires remand of the suit; (ii) the claims have no independent basis for federal jurisdiction other than 28 U.S.C. § 1334(b); (iii) that the Plaintiffs' claims are non-core; and (iv) the case can be timely adjudicated in state court. On September 13, 2024, FLNG filed Proofs of Claim based entirely on the claims asserted in the FLNG Contract Litigation. On September 25, 2024, FLNG filed their *Notice of Withdrawal of Amended Motion to Remand* [Docket No. 1019; Adv. Docket No. 28].

The Debtors believe that the claims asserted in the FLNG Contract Litigation are without merit. At this time, the Debtors intend to assert that: (i) FLNG rejected the FLNG JV Partners' recommendation against using the motors in question, and thus FLNG waived any right to complain of defects, latent or otherwise, in the compression motors; (ii) the scope of the FLNG JV Partners' work did not include the interior of the motors, and as such the alleged defects in the compression motors was not caused by the FLNG JV Partners' (including the Debtors') work on the project and resulted from a latent defect in the goods; and (iii) waiver and release provisions within the EPC contract documents allocate the risk of loss for harm claimed by FLNG to FLNG and relieve the Debtors and/or Reorganized Debtors of liability (including provisions waiving consequential damages, subrogation and recovery for losses exceeding insurance proceeds under FLNG's policies, allocating risk of loss, precluding warranty obligations, and limiting aggregate recoverable damages).[10]

**b.     Subrogation Suits**

On June 7, 2024, FLNG filed suit (the "**FLNG Subrogation Litigation**") against the FLNG JV Partners and certain other defendants, alleging negligence and joint and several liability in connection with an explosion that took place at the FLNG-owned, Quintana Island LNG Liquefaction and Export Terminal (the "**Terminal**") (Case No. 128933-CV (Tex. Dist. Ct. June 7, 2024)). Through their complaint, FLNG alleges that the piping instrumentation and process alarms installed at the Terminal by the FLNG JV Partners were inadequate and failed to prevent the explosion, which occurred despite years of successful operation and years after the FLNG JV Partners completed their work, long after any warranty period had expired. This complaint seeks monetary damages, interest, costs, and attorneys' fees. The Debtors contend, and FLNG's own post-incident investigative documents as well as those created by various governmental entities that investigated the incident establish, that the explosion was caused by operator error and that FLNG's claims are without merit.

On July 5, 2024, the FLNG Subrogation Litigation was removed to the District Court (Case No. 3:24-cv-00209). On September 13, 2024, the District Court issued an order referring the case to the Bankruptcy Court to be heard by the Honorable Judge Marvin Isgur (Adv. Pro. No. 24-03189 (MI)). On September 18, 2024, the Bankruptcy Court granted an agreed motion by CB&I and FLNG extending CB&I's time to answer [Adv. Docket No. 26]. On September 20, 2024, Defendant PSRG, Inc. filed *Defendant PSRG, Inc.'s Original Answer* [Adv. Docket No. 29], which denied the allegations in the complaint and asserted affirmative defenses, including, among others, that FLNG's own actions and/or negligence were the sole cause or proximate cause of the incident in question.

Relatedly, on the same timeline, Allianz Global Risks US Insurance Co., Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0180ME2219036, Great Lakes Insurance SE, GuideOne National Insurance Co., and Tokio Marine America Insurance Company (together, the "**Subrogees**") filed a lawsuit in Texas state court on June 7, 2024, against the FLNG JV Partners and certain other defendants seeking monetary relief for payouts made on account of the alleged damages caused by the same explosion and events at issue in the FLNG Subrogation Litigation (Case No. 128926-CV (Tex. Dist. Ct. June 7, 2024)) (the "**Allianz Subrogation Litigation,**" together with the FLNG Subrogation Litigation, the "**Subrogation Litigations**"). The Subrogees assert negligence and joint and several liability. The Subrogees seek monetary damages, interest, costs, and attorneys' fees. On July 5, 2024, the Allianz Subrogation Litigation was removed to the District Court. On September 13, 2024, the District Court entered an order transferring the case to the Bankruptcy Court to be adjudicated by the Honorable Judge Marvin Isgur (Adv. Pro. No. 24-03190 (MI)). On September 16, 2024, FLNG filed Proofs of Claim individually, and on behalf of the Subrogees, based entirely on the claims asserted in the FLNG Subrogation Litigation.

Again, as described above, the Debtors believe (and post-incident investigations confirm) that the claims asserted in the Subrogation Litigations are without merit. In any event, the Debtors intend to assert that: (i) plaintiffs failed to provide a Certificate of Merit by a qualified engineer attesting to the merits of the claims, as required under Chapter 150 of the Texas Civil Practice and Remedies Code; (ii) the economic loss doctrine bars tort liability for economic losses caused by the supposed non-performance of obligations under the EPC contract; (iii) waiver and release provisions in the EPC contract allocate the risk of loss for harm claimed by FLNG to FLNG, and relieve the Debtors and/or Reorganized Debtors of liability (including provisions waiving consequential damages, subrogation, and recovery for losses exceeding insurance proceeds under FLNG's policies, allocating risk of loss, precluding

---

[10]     This list of potential defenses is not exhaustive and shall not be binding on the Debtors and/or the Reorganized Debtors, and the Debtors reserve all rights in connection with the FLNG Contract Litigation.

warranty obligations, and limiting aggregate recoverable damages); and (iv) FLNG's own negligent actions were the cause of the explosion, as reported in investigation reports commissioned by FLNG.[11]

## VII.    OTHER KEY ASPECTS OF THE PLAN

This section of this Disclosure Statement summarizes some of the significant elements of the Plan. This summary is qualified in its entirety by reference to the Plan. The Debtors encourage all Holders of Claims entitled to vote on the Plan to review the Plan closely.

### A.    Unclassified Claims

#### 1.    Unclassified Claims Summary

Administrative Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** of the Plan. The treatment of unclassified Claims is set forth in **Article II** of the Plan and is restated below.

##### a.    Administrative Claims

On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim agrees to different treatment or has already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in Cash; *provided that* any Allowed Administrative Claims that are GPX Administrative Claims shall be paid by Golden Pass or Zachry in accordance with the terms of the GPX Settlement.

##### b.    Professional Fee Claims

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

##### c.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each

---

[11]    This list of potential defenses is not exhaustive and shall not be binding on the Debtors and/or the Reorganized Debtors, and the Debtors reserve all rights in connection with the Subrogation Litigations.

Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### d. Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth in the Plan, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

### B. Means for Implementation of the Plan

### 1. General Settlement of Claims and Interests

As discussed in detail in the Plan and as otherwise provided therein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Credit Facility Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to **Article VI** of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

### 2. GPX Settlement

The terms of the GPX Settlement, as approved by the GPX Final Settlement Order, are incorporated into, and are an integral part of, the Plan. The GPX Settlement Parties, as applicable, shall comply with the terms of the GPX Final Settlement Order through and following the Plan Effective Date, as if such terms were set forth in full in the Plan.

For the avoidance of doubt, the GPX Settlement Parties are Released Parties under the Plan and shall be entitled to the protections of the Plan's release and injunction provisions, including the Third-Party Release, to the fullest extent provided under applicable law.

In addition, notwithstanding anything to the contrary in the Plan, the Plan shall not impair Golden Pass's right to make the GPX L/C Permitted Draws, pursuant to the terms of the GPX Settlement. Upon Golden Pass's receipt of the final GPX L/C Draw, the remaining GPX L/C shall be deemed canceled, null, and void, without any further notice to or action, order, or approval of the Bankruptcy Court; Golden Pass shall not be permitted to request any other or additional draws thereunder; and Golden Pass shall be deemed to release, waive, and discharge any and all rights it has or may have in respect of the GPX L/C, the GPX L/C Issuer, and the GPX Parent Guarantee. Until Golden Pass receives the final GPX L/C Permitted Draw, the Debtors, GPX L/C Issuer, and the A&R Credit Facility Lenders, as applicable, shall renew the GPX L/C as necessary, and shall not take any action that would impair, affect, or prejudice Golden Pass's rights to the GPX L/C Permitted Draws.

3. **Restructuring Transactions**

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the Confirmation Order; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the Confirmation Order, and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the execution and delivery of the A&R Credit Facility Documents and entry into the A&R Credit Facility; (5) the execution and delivery of the Junior Exit Facility Documents and entry into the Junior Exit Facility; (6) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Steps Memorandum; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

C. **The Reorganized Debtors**

Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, each of the Reorganized Debtors shall continue their existence as separate Entities after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each Reorganized Debtor is incorporated and pursuant to the Organizational Documents. On the Effective Date, all Zachry Interests shall be Reinstated and the Reorganized Debtors shall be deemed to adopt and re-affirm the Organizational Documents without any further action, notice, or approval. The Reorganized Debtors shall be authorized to adopt any agreements, documents, and instruments, and to take any other action contemplated under the Plan as necessary to consummate the Plan.

D. **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, including all Causes of Action and any property acquired by any of the Debtors pursuant to the Plan, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E. **Sources of Consideration for Plan Distributions**

Each distribution and issuance referred to in **Article VI** of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with (a) Cash on hand, and (b) proceeds from the Exit Facilities.

1. **Use of Cash**

The Debtors, Reorganized Debtors, and Distribution Agent, as applicable, shall use Cash on hand for working capital purposes and to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

### 2.      Exit Facilities

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth, respectively, in the A&R Credit Facility Documents and Junior Exit Facility Documents.  Confirmation of the Plan shall be deemed final approval of each of the Exit Facilities, the A&R Credit Facility Documents, the Junior Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization for the Reorganized Debtors to enter into and execute the A&R Credit Facility Documents, Junior Exit Facility Documents, and such other documents as may be required to effectuate the financings and treatment provided by the Plan.

Acceptance of the Plan by Class 3 (Prepetition Credit Facility Claims) and execution of the A&R Credit Facility Documents by the A&R Credit Facility Agent shall be deemed to bind each A&R Credit Facility Lender as if each such party had executed the A&R Credit Facility Documents with appropriate authorization.  Execution of the Junior Exit Facility Documents by the Junior Exit Facility Agent shall be deemed to bind each Junior Exit Lender as if each such party had executed the Junior Exit Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the A&R Credit Facility Documents and Junior Exit Facility Documents shall (a) be deemed to be granted; (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the A&R Credit Facility Documents and Junior Exit Facility Documents; (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the A&R Credit Facility Documents and Junior Exit Facility Documents; and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### F.      Cancellation of Existing Agreements and Interests

On the Effective Date, except with respect to the Exit Facilities, the Zachry Interests, the GPX L/C (subject to **Article IV.B** of the Plan), the GPX Parent Guarantee (subject to **Article IV.B** of the Plan), all Employee Obligations assumed pursuant to **Article IV.J** of the Plan, all Indemnification Obligations assumed pursuant to **Article IV.K** of the Plan, and all Executory Contracts and Unexpired Leases assumed pursuant to **Article V.A** of the Plan, or to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, canceled, discharged, and of no force or effect.  Holders of, or parties to, such canceled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan.

### G.      Corporate Action

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all

documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the officers or directors of the Debtors, any Governing Body, or the Bankruptcy Court.

### H. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to **Article VIII** of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the GPX Final Settlement Order and the releases and exculpations contained in the Plan, including in **Article VIII** of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the GPX Final Settlement Order and the Plan, including Article VIII of the Plan**. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation, Consummation, or the occurrence of the Effective Date.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the GPX Final Settlement Order and the Plan, including **Article VIII** of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### I. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### J. Directors and Officers of the Reorganized Debtors

On the Effective Date, the directors and officers of each Reorganized Debtor shall consist of the current directors and officers of each respective Debtor, which individuals will be identified in the Plan Supplement.

### K. Indemnification Obligations

All indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for (each in their

capacities as such) the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants, other professionals of, or acting on behalf of, the Debtors, and the Sureties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, other professionals of, or acting on behalf of, the Debtors, and the Sureties as provided under the indemnification obligations in place prior to the Effective Date; *provided*, *however*, nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

### L.      Provisions Regarding Treatment of Executory Contracts and Unexpired Leases

**Article V** of the Plan contains additional detailed provisions regarding the treatment of Executory Contracts and Unexpired Leases, including, among other things, (i) the procedures for assumption or rejection of Executory Contracts and Unexpired Leases, (ii) the cure of defaults for assumed Executory Contracts and Unexpired Leases, and (iii) the treatment of Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases.

### M.      Provisions Governing Distributions

**Article VI** of the Plan contains additional provisions governing Plan distributions, including provisions regarding, among other things, (i) compliance with tax requirements, (ii) undeliverable distributions and unclaimed property, and (iii) Claims paid or payable by third parties.

### N.      Provisions Governing Disputed Claims and Interests

**Article VII** of the Plan contains provisions regarding the procedures for resolving Disputed Claims.

### O.      Settlement, Release, Injunction, and Related Provisions

#### 1.      Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.  For the avoidance of doubt, the discharge provided herein shall discharge, release, and extinguish any right of any Holder of any Claim to file, assert, levy, or attach any liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged or released pursuant to the Plan, or otherwise enforce, collect, or recover on account of any such Claims, liens, or bonds.

#### 2.      Release of Liens

**Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective**

Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with <u>Article III.C</u> of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including any bonds related to the Debtors shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The foregoing direction to release liens shall be considered a direction in accordance with, as applicable, the Prepetition Credit Agreement, as if such direction included the signatures of the necessary lenders thereunder to direct the applicable agent to take the actions contemplated thereby. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, including with respect to any bonds related to the Debtors, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

3.      **Release by the Debtors**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf each Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Released Avoidance Actions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the Junior Exit Facility, the GPX Final Settlement Order, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other

documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.        Releases by Third Parties

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the Junior Exit Facility, the GPX Final Settlement Order, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

## 5.    Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the Junior Exit Facility, the GPX Final Settlement Order, the Cash Collateral Order, the Disclosure Statement, all related agreements, instruments, and other documents, or any transaction related to the Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## 6.    Injunction

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to the Plan.

Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to <u>Article VIII</u> of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties and/or the Released Parties:

1.    commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

2. enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

3. creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

4. filing, asserting, levying, or attaching any liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged or released pursuant to the Plan, and enforcing, collecting, or recovering on account of any such liens;

5. except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

6. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the Junior Exit Facility, the GPX Final Settlement Order, the Cash Collateral Order, or the Disclosure Statement, the solicitation of votes with respect to the Plan, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action. The injunction in the Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order from bringing an action to enforce the terms of the Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order.

### P. Conditions Precedent to Confirmation and Consummation of the Plan

#### 1. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article IX.B** of the Plan:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the Confirmation Order shall be in full force and effect;

2. The settlements embodied in the Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

3. The A&R Credit Facility Documents and Junior Exit Facility Documents shall have been become effective in accordance with their terms; and

4. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other restructuring transactions.

#### 2. Waiver of Conditions

The conditions to the Effective Date set forth in **Article IX** of the Plan may be waived, in whole or in part, by the Debtors only with the prior written consent of the Prepetition Credit Facility Agent (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

#### 3. Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively.

## VIII. PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit C** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "**Financial Projections**") for the fiscal years ending December 31, 2025 through December 31, 2027. The Financial Projections are based on an assumed Effective Date of December 31, 2024.

Creditors, equity holders, and other interested parties should see the "Risk Factors" set forth in **Article X** below for a discussion of, among other things, certain factors that may affect the future financial performance of the Reorganized Debtors.

## IX. CONFIRMATION OF THE PLAN

### A. The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Confirmation Hearing may be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation of the Plan. An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy

Court so that it is actually received on or before the deadline to file such objections as set forth therein. **The Objection Deadline is [December 3, 2024], at 4:00 p.m. (prevailing Central Time).**

**B.      Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

**C.      Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their Professionals, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their Financial Projections. Creditors and other interested parties should review **Article X** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that the Plan will meet the feasibility requirements of the Bankruptcy Code.

**D.      Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[12]

Pursuant to **Article III.F** of the Plan, if a Class contains Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

**E.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

---

[12]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Professionals and reliance upon the valuation methodologies utilized by the Professionals. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## X. RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH**

**OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

> **A.      General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims entitled to vote on the Plan should read and carefully consider the factors set forth below, as well as other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

> > **1.      The Debtors Will Consider All Available Restructuring Alternatives if the Plan is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

If the Plan is not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it could adversely affect some or all of:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators and lenders;

- the Debtors' enterprise value; and

- the Debtors' business relationship with current and potential customers and vendors.

> **B.      Bankruptcy Law and Chapter 11 Case Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

> > **1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  Here, it is possible that parties may object to confirmation of the Plan on grounds related to how the Claims and Interests are classified in the Plan.  In that case, the cost of the Chapter 11 Cases and time needed to confirm could increase.  This is particularly the case if the Bankruptcy Court concludes that the classification of Claims and/or Interests under the Plan do not comply with the Bankruptcy Code's requirements.  Under such circumstances, the Plan might need to be modified.  Such modification could require the Debtors to re-solicit votes on the Plan before the Plan can be confirmed.

Nevertheless, the Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as

applicable, in each such Class.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2.  The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (b) ability to maintain relationships with suppliers, vendors, subcontractors, service providers, customers, employees, and other third parties; (c) ability to maintain contracts that are critical to the Debtors' operations; (d) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (f) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' objectives.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, vendors, subcontractors, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations, interfere with ongoing contract negotiations for prospective work, and impair the Debtors' financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**3.  The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in **Article IX.A** of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan.  If the Debtors do not secure sufficient exit capital to implement the Plan and continue their operations or if the Plan is not confirmed, the Debtors may be forced to file a new plan with less favorable terms or liquidate their assets.

**4.  The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  If the Plan is not accepted by one or more Voting Classes, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

**5.  The Debtors May Not Be Able to Obtain Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether

the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

**6.      The Debtors May Not Be Able to Obtain Nonconsensual Confirmation of the Plan Over the Objections of Certain Impaired Non-Accepting Classes**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

**7.      Continued Risk Following Confirmation of the Plan**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as changes in economic conditions, changes in the industry, potential revaluing of their assets due to these Chapter 11 Cases, changes in demand for the services that the Debtors provide, and increasing expenses. *See* **Article X.D** of this Disclosure Statement, entitled "Risks Related to the Company's and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. At this time, the Debtors maintain the exclusive right to propose a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**8.      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code**

Although uncommon, if a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, a bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such cases, a chapter 7 trustee is appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. As set forth in the Liquidation Analysis attached as **Exhibit D**, the Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of: (a) the likelihood that the

assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be secured or entitled to priority, that would be generated during the liquidation, including Claims resulting from the draw of existing letters of credit and the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

    **9.**  **The Debtors May Object to the Amount or Classification of a Claim**

    Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

    **10.**  **Risk of Non-Occurrence of the Effective Date**

    Although the Debtors believe that the Effective Date should occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

    **11.**  **The U.S. Trustee or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions**

    **Article VIII** of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved as currently drafted, certain Released Parties may withdraw their support for the Plan.

    The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts.  The Plan's release and exculpation provisions are an inextricable component of the Plan.

  **C.**  **Risks Related to Recoveries Under the Plan**

    **1.**  **Contingencies Could Affect Distributions to Holders of Allowed Claims**

    The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

    **2.**  **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results**

    The Financial Projections attached as **Exhibit C** to this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance as of the date of this Disclosure Statement, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized and, therefore, the Debtors actual results may differ materially from the Financial Projections.  If the Debtors do not achieve their projected financial results, the value of the Zachry Interests may be negatively affected, and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

### 3. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review **Article XII** of this Disclosure Statement entitled "Certain United States Federal Income Tax Consequences of the Plan" to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

### D. Risks Related to the Company's and the Reorganized Debtors' Businesses

### 1. Operating in Bankruptcy for a Long Period of Time May Harm the Company's Businesses

The Company's future results are dependent upon the successful confirmation and implementation of a plan of reorganization. In addition, the Company is relying on an expedited case timeline to maintain its business through this restructuring. A longer process could have a material adverse effect on the Company's businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Company's businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers could lose confidence in the Company's ability to reorganize their businesses successfully and seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of counterparties to do business with a company that recently emerged from bankruptcy protection.

### 2. Financial Results May Be Volatile and May Not Reflect Historical Trends

The Financial Projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Company, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Company and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Company's operations. There can be no assurance that the projected results will be realized or that actual results will not be subject to significant variations. These variations may be material and may adversely affect the value of Zachry Interests, the Company's financial position, and the ability of the Company to make payments with respect to its indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Company also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities

on the Company's consolidated balance sheets.  The Company's financial results after the application of fresh start accounting also may be different from historical trends.

3.      **The Company's Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Company's operations are subject to various federal, state, and local laws and regulations, including occupational health and safety laws.  The Company may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Company to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

4.      **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors, many of which are beyond the Reorganized Debtors' control.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance such debt.  These alternative measures may not be available, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and the willingness of third parties to do business with them could be adversely affected.

5.      **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

It is possible that certain parties will commence litigation with respect to the treatment of their Claims or other provisions under the Plan.  It is also possible that certain parties will commence litigation with respect to other aspects of the Debtors' business that may not have materialized through formal litigation at this time.  It is possible that certain existing litigation will result in higher liabilities than the Debtors currently anticipate.

It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  In general, litigation can be expensive and time consuming to bring or defend against and could divert management's attention.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability could thus be material.

The outcomes of any litigation involving the Debtors may have material impacts on the Debtors' ability to confirm the Plan and may prevent the Plan becoming effective.

6.      **Demand for the Debtors' Services Is Cyclical and Vulnerable to Economic Downturns and Customers' Ability to Meet Existing Payment Obligations**

The domestic energy and industrial sectors have been, and will likely continue to be, cyclical in nature and vulnerable to general downturns in the economy.  Consequently, the results of the Debtors' operations have fluctuated and may continue to fluctuate depending on the demand for services from these industries.

Global economic conditions may negatively impact customers' willingness and ability to fund their projects.  These conditions may make it difficult for the Debtors' customers to accurately forecast future business trends and plan activities, thereby causing the Debtors' customers to slow or even curb spending on the Debtors' services, or seek contract terms more favorable to them.  In addition, customers' ability to timely pay invoices may be affected by an ongoing weak economy.

In many instances, the Debtors commit and/or pay for products or expenses attributable to customers prior to receiving payments, with an understanding that the customer will pay per the terms of the commercial contract. If the Debtors' customers are not able to make such payments in a timely manner, or at all, the Debtors could be forced to absorb these costs. If a customer defaults in making its payments on a project in which the Debtors have devoted significant financial resources, it could have a material adverse effect on the Debtors' business, results of operations, or financial condition.

7.       **The Debtors Operate in a Highly Competitive Industry**

The Debtors face competition from numerous regional, national, and international competitors. The degree and type of competition the Debtors face is influenced by the type and scope of a particular project, as well as the particular market and geographic area being served. The Debtors' competitors include well-established, well-financed businesses, both privately and publicly held, including many major engineering and construction companies, energy equipment manufacturers, and internal engineering and maintenance departments at utilities, and include some of the Debtors' customers. Some of the Debtors' competitors have achieved greater market penetration in the markets in which the Debtors compete. Other competitors may be smaller and more specialized, and concentrate their resources in particular areas of expertise.

The award of many of the Debtors' contracts is determined by competitive bid, which is based upon qualifications, experience, performance, reputation, technology, customer relationships, and ability to provide the relevant services in a timely, safe, and cost-efficient manner. Increased competition can impact the margin the Debtors earn on contracts or cause the Debtors not to win a competitive bid.

As the U.S. energy market becomes more attractive, many global competitors have focused their attention on the domestic end markets the Debtors operate in, further increasing the competitive nature of the Debtors' business. In addition, the technical and professional aspects of some of the Debtors' services, especially in the maintenance business, generally do not require large upfront capital expenditures and provide limited barriers against new competitors.

8.       **The Debtors' Projections and Results Depend on New Contract Awards Not Within the Debtors' Control**

A substantial portion of the Debtors' earned revenue is directly or indirectly dependent on winning new contracts. The Debtors operate in highly competitive markets and it is difficult to predict whether and when they will be awarded new contracts due to multiple factors influencing how customers evaluate potential contractors and service providers, such as qualifications, experience, reputation, technology, customer relationships, financial strength, and ability to provide the relevant services in a timely, safe, and cost-efficient manner. In addition, a project can be canceled or delayed due to the lengthy and complex bidding and selection process, customer capital investment decisions, market conditions, available financing, government approvals, permitting, and environmental matters. Consequently, the Debtors are subject to the risk of losing new awards to competitors and the risk that a project may experience significant delay or cancellation which will adversely impact the Debtors' earned revenue, net income, cash flows, and overall financial condition. The Debtors' results of operations and cash flows may fluctuate from quarter to quarter depending on the timing and size of new contract awards and delays or cancellations.

9.       **Inability to Obtain Adequate Surety Capacity or Letters of Credit Could Affect the Debtors' Business Strategies by Requiring the Modification of Existing Facilities and Reduce the Debtors' Ability to Bid on New Work**

In line with industry practice, the Debtors are often required to provide performance and surety bonds or letters of credit to customers. These bonds and letters of credit provide credit support for the customer if the Debtors fail to perform obligations under the contract. If security is required for a particular project and the Debtors are unable to obtain a bond or letter of credit on commercially acceptable terms, the Debtors cannot pursue that project. The Debtors have letter of credit and bonding arrangements but, as is typically the case, the issuance of bonds under surety facilities is at the surety's sole discretion. A restriction, reduction, or termination or the Debtors' surety bond arrangements could increase letter of credit utilization, thereby reducing availability under the Debtors' credit facilities.

It could be more difficult for the Debtors to obtain surety bonding for new projects in the future, and the Debtors may be required to increase or provide additional cash collateral to obtain these surety bonds, which would reduce available cash and could impact the Debtors' ability to renew or increase availability under their credit facilities. Any new or modified bonding facilities might not be on terms as favorable as current terms, and the Debtors could also be subject to increased costs of capital and interest rates.

Furthermore, if bond underwriting standards were to be tightened, then identifying bonding capacity may become an issue. Moreover, the size and complexity of contracts requiring bonds are inherent constraints in identifying bonding capacity. These types of contracts often necessitate the use of a joint venture, often with a competitor, to bid on and perform these types of contracts, especially since it may be easier to jointly pursue the necessary bonding. However, entering into these types of joint ventures exposes the Debtors to the credit and performance risks of third parties, some of whom may not be as financially strong as the Debtors.

### 10. Participation in Joint Ventures and Actions of Joint Venture Partners and Subcontractors Could Expose the Debtors to Risk of Loss

The Debtors often enter into joint ventures in order to jointly bid on construction contracts and perform a particular project. The success of these joint ventures depends, in large part, on the satisfactory performance of the contractual obligations of the Debtors' joint venture partners. Under agreements with joint and several liability, the Debtors may be liable for both their obligations and the obligations of their partners. Similarly, the Debtors rely on equipment and material manufacturers to supply them with the necessary machinery and materials to complete their work, and a failure of equipment supplied or a delay in shipping materials to the Debtors could cause the Debtors to fail to meet their obligations. Under any of these circumstances, the Debtors may incur additional costs, make additional investments, and provide additional services to ensure the adequate performance and delivery of the contracted services, and/or pay liquidated damages.

To the extent the Debtors' partners cannot execute their portion of the work, are unable to deliver their services, equipment, or materials according to the negotiated terms, the Debtors cannot engage subcontractors or acquire equipment or materials, and/or suffer an equipment malfunction, the Debtors' ability to complete a project in a timely fashion or at a profit may be impaired. If the amount the Debtors are required to pay for these goods and services in an effort to meet contractual obligations exceeds the amount estimated in bidding for fixed-price work, the Debtors could experience losses in the performance of these contracts.

Investments in joint ventures can involve risks that would not otherwise be present if a third-party were not involved. Such risks include the limited ability to dispose of interest in a joint venture, joint venture partners becoming bankrupt or failing to perform their obligations, joint venture partners potentially having competing interests creating conflict of interest issues, disputes between the Debtors and their joint venture partners resulting in litigation or arbitration, and the potential joint and several liability of the Debtors for the actions of joint venture partners. If any of the foregoing were to occur, the Debtors' business, results of operations, and financial condition could be adversely affected.

### 11. If the Debtors Are Unable to Form Joint Ventures, Their Ability to Compete For and Win Business May Be Negatively Impacted

Either acting as a prime contractor, a subcontractor, or as a member of a joint venture, the Debtors may join with other firms to form a team to compete for a single contract. Because a joint venture can often offer stronger combined qualifications than any firm standing alone, these joint venture arrangements can be very important to the success of a particular contract bid process or proposal. In joint venture arrangements, the Debtors are required to select joint venture partners best suited for a particular contract, which leads to competition to "line up" with competitors on particular bids and seek their cooperation. The Debtors can lose these bids by teaming up with available competitors that may be operationally or financially weaker than other competitors. If the Debtors are not able to select a desirable contractor to team with, the Debtors' proposal may suffer by comparison to other bidding teams. The failure to maintain relationships with strong participants in our markets may impact our ability to win bids.

12.     **The Debtors' Business Is Subject to Risks Associated with Contractual Pricing in Their Industry, Including the Risk That, if Their Actual Costs Exceed the Costs the Debtors Estimate on Their Fixed-Price Contracts, the Debtors' Profitability will Decline, and the Debtors May Suffer Losses**

The Debtors offer their customers a range of commercial options for their contracts, including fixed-price, cost-reimbursable and hybrid, which has both fixed-price and cost-reimbursable components.  Under fixed-price contracts, the Debtors perform their services and execute their projects at an established price.  Under cost-reimbursable contracts, the Debtors generally perform series in exchange for a price that consists of reimbursement of all customer-approved costs and a profit component, which is typically a fixed rate per hour, an overall fixed fee, or a percentage of total reimbursable costs.  Under cost-reimbursable contracts, if the Debtors are unable to obtain proper reimbursement for all costs incurred due to improper estimates, performance issues, customer disputes, or any of the other factors noted below for fixed-price contracts, the project may be less profitable than the Debtors expected.

The Debtors are engaged in a highly competitive industry, and the Debtors have contracted for a substantial number of projects on a fixed-price basis.  The Debtors are often required to bid aggressively on fixed-price contracts in order to obtain them and, as a result, must execute the projects with minimal variances from internal projections used by the Debtors for their bidding process in order for them to be profitable.  In many cases, these projects involve complex design and engineering, significant procurement of equipment and supplies, extensive construction management, and other activities conducted over extended time periods, sometimes in remote locations where personnel, equipment, supplies, and in some cases basic infrastructure must be remotely sourced.  The Debtors' actual costs related to these projects have in the past exceeded the Debtors' projections and could do so in the future.  The Debtors attempt to cover the increased costs of anticipated changes in labor, material, and service costs of long-term contracts, either through estimates of cost increases, which are reflected in the original contract price, or through price escalation clauses.  Despite these attempts, however, the cost and gross profit the Debtors realize on a fixed-price contract could vary, and has in the past varied materially from the estimated amounts because of supplier, contractor, and subcontractor performance, the Debtors' own performance, including the quality and timeliness of work performed, failure to properly estimate costs of engineering, materials, components, equipment, escalation, labor or subcontractors, changes in job conditions, unanticipated weather conditions, variations in labor and equipment productivity and associated costs, increases in the cost of raw materials over the term of the contract, difficulties in obtaining required governmental permits or approvals, changes in laws and regulations, and changes in general economic and market conditions.

In the future, these factors and other risks generally inherent in the industry in which the Debtors operate may result in actual revenues or costs being different from those the Debtors originally estimated and may result in reduced profitability or losses on projects.  Some of these risks include:

- the Debtors' EPC projects may encounter difficulties related to the procurement of materials and equipment, or due to schedule disruptions, equipment performance failures, or other factors that may result in additional costs to the Debtors, reduction in revenues, claims, or disputes;

- the Debtors may not be able to obtain compensation for additional work performed or expenses incurred as a result of customers' change orders or the Debtors' customers providing deficient design or engineering information or equipment or materials;

- the Debtor may be required to pay significant amounts of liquidated damages upon the Debtors' failure to meet schedule or perform requirements of contracts; and

- difficulties in engaging, or failure to perform by, third-party subcontractors, equipment manufacturers, or materials suppliers could result in project delays and cause the Debtors to incur additional costs.

Performance problems relating to any significant existing or future contract arising as a result of any of these or other risks could cause the Reorganized Debtors' actual results of operations to differ materially from those the Debtors anticipate at the time they enter into the contract and could have a material adverse effect on the Reorganized Debtors' results of operation and financial condition, as well as cause the Reorganized Debtors to suffer damage to their reputation within the industry and customer base.

13. **The Debtors' Operations Are Subject to Hazards Inherent in the Energy Services Industry**

Safety is a leading focus of the Debtors' business, and the Debtors' safety record is critical to their reputation and is of paramount importance to their employees, customers, and equity holders. However, the Debtors often work on large-scale and complex projects which can place their employees and others near large mechanized equipment, moving vehicles, dangerous processes, highly regulated materials, or in challenging environments. Although the Debtors have a functional group whose primary purpose is to implement effective quality, health, safety, environmental, and security procedures throughout their organization, if the Debtors fail to implement effective safety procedures, their employees and others may become injured, disabled, or lose their lives, their projects may be delayed, and the Debtors may be exposed to litigation or investigations.

Unsafe conditions at project work sites also have the potential to increase employee turnover, increase project costs, and raise the Debtors' operating costs. Additionally, many of the Debtors' customers require that they meet certain safety criteria to be eligible to bid for contracts, and the Debtors' failure to maintain adequate safety standards could result in reduced profitability or lost project awards or customers. Any of the foregoing could result in financial losses or reputational harm, which could have a material adverse impact on the Debtors' business, financial condition, and results of operations.

14. **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced, and may continue to experience, increased levels of employee attrition. Because competition for experienced personnel in the Debtors' industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience. The loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

15. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entities and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## XI. CERTAIN SECURITIES LAW MATTERS

### A. Existing Equity Interests

As discussed herein, the Plan provides for the Zachry Interests to remain outstanding and unmodified. Since the Zachry Interests are being retained (thus, riding through unimpaired) under the Plan and will not be reissued or traded by virtue of the Plan, no transfer of securities will occur or be deemed to have occurred requiring registration of such equity interests under the Securities Act or an exemption therefrom (whether under section 1145 of the Bankruptcy Code or otherwise). For the avoidance of doubt, the Zachry Interests (i) will not be restricted securities as defined in Rule 144(a)(3) under the Securities Act and (ii) will be freely tradeable and transferable in the U.S. by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to and compliance with applicable securities laws and any rule and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments or subject to any restrictions in the Governance Documents.

### B.  No Issuance of Securities Under the Plan

No securities are being issued under the Plan.  Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.  Holders of Zachry Interests will continue to hold their shares and retain all of their rights as equity holders in the Reorganized Debtors.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under U.S. federal income tax laws (including, for example, banks, brokers, dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, wash sale, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims in the hands of Non-U.S. Holders constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "**U.S. Holder**" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "**Non-U.S. Holder**" is any Holder of a Claim that is not a

U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote on the Plan**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan, including the steps described above. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Allowed Claim and the amount realized by the Holder in respect of its Allowed Claim. Over time and on a cumulative basis, the amount realized generally will equal the aggregate amount of the Cash (and the fair market value of property, if any) distributed to the Holder, less the amount, if any, attributable to accrued but unpaid interest. A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on an Allowed Claim but was not previously paid by the Debtor or previously included in income by the Holder of the Allowed Claim.

The character of any gain or loss recognized by a Holder will depend upon a number of factors, including the status of the Holder, the nature of the Allowed Claim in the Holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the Holder's holding period of the Allowed Claim. If the Allowed Claim in the Holder's hands is a "capital asset" within the meaning of IRC section 1221, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder held such Allowed Claim for longer than one year or short-term capital gain or loss if the Holder held such Allowed Claim for one year or less. Any capital loss realized generally may be used by a corporate Holder only to offset capital gains and by an individual Holder only to the extent of capital gains plus a certain limited statutorily proscribed amount of ordinary income in any single taxable year, currently $3,000.00.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any

accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than face value or distributed, transmitted, sold, or otherwise disposed of within the meaning of IRC section 453B.

### 1.    Treatment of Holders of Prepetition Credit Facility Claims

As discussed in **Article II.A** above, if the Plan is confirmed, the Prepetition Credit Agreement will be restated pursuant to the terms of the A&R Credit Facility Documents.

The treatment of U.S. Holders of Prepetition Credit Facility Claims depends on whether the Restructuring Transactions result in a "significant modification" of the Prepetition Credit Facility. A "significant modification" of a debt instrument will result in a deemed exchange of the instrument and a taxable event to the U.S. Holder. Under applicable Treasury Regulations, the modification of the terms of a debt instrument (including pursuant to an exchange of a new debt instrument for the existing debt instrument) generally is a significant modification if, based on all of the facts and circumstances and taking into account all modifications of the debt instrument, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." A modification that adds, deletes, or alters customary accounting or financial covenants is not a significant modification. A modification that releases or otherwise alters the collateral for, a guarantee on, or other form of credit enhancement for a recourse debt instrument is a significant modification if the modification results in a "change in payment expectations." In general, a release of a guarantee or collateral results in a change in payment expectations if the modification (i) gives rise to a substantial impairment of the issuer's capacity to meet its payment obligations and (ii) such capacity was adequate prior to the modification and is primarily speculative thereafter. A modification that changes the timing of payments due under a debt instrument is a significant modification if it results in a material deferral of scheduled payments. However, a deferral of one or more scheduled payments is not a material deferral if it is within a safe-harbor period beginning on the original due date of the first scheduled payment that is deferred and extending for a period equal to the lesser of five years or 50% of the original term of the instrument. A change in the yield of a debt instrument is a significant modification if the yield of the modified instrument (as computed under the applicable Treasury Regulations and taking into account any payments made as consideration for the modification, such as any consent fees) varies from the annual yield of the unmodified instrument (determined as of the date of the modification) by more than the greater of 0.25% or 5% of the annual yield of the unmodified instrument.

As described above, a significant modification of a debt instrument will result in a deemed exchange of the instrument and a taxable event to the Holder. Pursuant to the Plan (if it is confirmed), the terms of the Prepetition Credit Facility would generally remain the same as set forth in the A&R Credit Facility Documents. The Debtors intend to take the position that the restatement of the Prepetition Credit Agreement as set forth in the A&R Credit Facility Documents should not result in a significant modification of the Prepetition Credit Facility for U.S. federal income tax purposes.

If the restatement of the Prepetition Credit Agreement as set forth in the A&R Credit Facility Documents does not result, for U.S. federal income tax purposes, in a deemed exchange, then a U.S. Holder generally would not recognize any income, gain, or loss with respect to the Prepetition Credit Facility Claims as a result of the Restructuring Transactions. In addition, a U.S. Holder would generally have the same adjusted tax basis and holding period in the A&R Credit Facility or as it had before confirmation of the Plan. If the restatement of the Prepetition Credit Agreement as set forth in the A&R Credit Facility Documents results in a significant modification of the Prepetition Credit Agreement (thus, resulting in a deemed exchange), the U.S. federal income tax consequences of the restatement would generally depend on whether the Prepetition Credit Facility Claims and the A&R Credit Facility are treated as "securities" for purposes of the reorganization provisions of the IRC, as discussed immediately below.

### a.    Treatment if Prepetition Credit Facility Claims and the A&R Credit Facility are Treated as Securities

If the Prepetition Credit Facility Claims and the A&R Credit Facility are treated as securities, then the exchange of such Claims should be treated as a "recapitalization" within the meaning of section 368(a)(1)(E) of the IRC. The term "security" is not defined in the IRC or in the U.S. Treasury Regulations and has not been clearly

defined by judicial decisions. The determination of whether a particular debt obligation constitutes a security depends on an evaluation of the overall nature of the debt obligation. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations with a maturity at issuance of less than five years often do not constitute securities, whereas debt obligations with a maturity at issuance between five and ten years or more often do constitute securities, in each case depending on their facts and circumstances. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should not recognize gain or loss. The U.S. Holder should obtain a tax basis in the A&R Credit Facility deemed received, other than such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the tax basis of the Prepetition Credit Facility Claim deemed surrendered. The tax basis of the A&R Credit Facility treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. Subject to amounts treated as received in satisfaction of accrued but untaxed interest, the holding period for the A&R Credit Facility deemed received should include the holding period for the exchanged Prepetition Credit Facility Claims. The holding period for the A&R Credit Facility treated as received in satisfaction of accrued but untaxed interest should begin on the day following the receipt of such property. For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID, or market discount.

<b>b.    Treatment if Prepetition Credit Facility Claims and the A&R Credit Facility are not Treated as Securities</b>

To the extent that the Prepetition Credit Facility Claims or the A&R Credit Facility are not treated as securities, such U.S. Holder would be treated as exchanging its Prepetition Credit Facility Claim for the A&R Credit Facility in a fully taxable exchange under section 1001 of the IRC. A U.S. Holder of a Prepetition Credit Facility Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the issue price of the A&R Credit Facility (calculated as described under "Issue Price") in exchange for its Prepetition Credit Facility Claim and (ii) the U.S. Holder's adjusted tax basis in its Prepetition Credit Facility Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Prepetition Credit Facility Claim in such U.S. Holder's hands, whether the Prepetition Credit Facility Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Prepetition Credit Facility Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Prepetition Credit Facility Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. To the extent that a portion of the consideration received in exchange for its Prepetition Credit Facility Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. A U.S. Holder's tax basis in the A&R Credit Facility should be equal to the issue price of the A&R Credit Facility. A U.S. Holder's holding period for the A&R Credit Facility deemed received on the Effective Date should begin on the day following the Effective Date.

<b>2.    Treatment of Holders of General Unsecured Claims</b>

Pursuant to the Plan, each U.S. Holder of an Allowed General Unsecured Claim will receive cash payments in an amount equal to the Allowed amount of such Claim as of the Effective Date to be paid in a manner that satisfies the requirements of section 1129(b)(2)(B)(i) of the Bankruptcy Code in exchange for surrendering its General Unsecured Claim. In each case, each U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the amount of cash received and its adjusted tax basis in the surrendered General Unsecured Claim. A U.S. Holder's adjusted tax basis in the surrendered General Unsecured Claim generally will equal the cost of the Claim.

<b>C.    Information Reporting and Back-Up Withholding</b>

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at

47

a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

*[Remainder of Page Intentionally Left Blank]*

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and interest holders than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  October 9, 2024

ZACHRY HOLDINGS, INC.
(for itself and on behalf of each of the other Debtors
and Debtors in Possession)

By:   */s/ Mohsin Y. Meghji*
Name: Mohsin Y. Meghji
Title:   Chief Restructuring Officer

**Exhibit A**

**Joint Chapter 11 Plan of Reorganization**

[Filed Separately]

**<u>Exhibit B</u>**

**A&R Credit Facility Term Sheet**

[To Come]

**<u>Exhibit C</u>**

**Financial Projections**

[To Come]

**Exhibit D**

**Liquidation Analysis**

[To Come]

**<u>Exhibit E</u>**

**Organizational Structure Chart**

# Zachry Organizational Chart



- **Non-Debtor entities have been excluded from this organizational chart.**