IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) Case No. 24-90377 (MI) |
| Debtors. | ) (Jointly Administered) |

**DEBTORS' OBJECTION TO THE CLAIM OF
INTERNATIONAL BUSINESS MACHINES CORPORATION [CLAIM NO. 181]**

> **This is an objection to your claim. This objection asks the Court to disallow the claim that you filed in this bankruptcy case. If you do not file a response within 30 days after the objection was served on you, your claim may be disallowed without a hearing.**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") file this objection (the "**Objection**") to the general unsecured claim of International Business Machines Corporation ("**IBM**") in the amount of $1,759,724.04, set forth in proof of claim number 181 (the "**IBM Claim**"). In support of this Objection, the Debtors submit the *Declaration of John Wilke in Support of the Debtors' Objection to the Claim of International Business Machines Corporation [Claim No. 181]* attached hereto as **Exhibit A** (the "**Wilke Decl.**"). In further support of this Objection, the Debtors respectfully state as follows:

**Preliminary Statement**

1. In late 2021, the Debtors and their non-Debtor affiliates (collectively, "**Zachry**") decided to replace their legacy human resources and payroll systems with a new, standardized, and streamlined Human Capital Management ("**HCM**") platform. Zachry hired IBM for the job based

---

[1] The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these chapter 11 cases is: P.O. Box 240130, San Antonio, Texas 78224.

on IBM's agreement to complete the work in one year for $5.05 million. The parties entered into a contract that contemplated specific deliverables, deadlines, and standards of work. It also contemplated that IBM would remediate any software integration issues at no cost to Zachry.

2.    IBM breached its obligations under the contract. It failed to timely perform work. It failed to provide working software components. It failed to integrate the legacy platform with the new platform. Zachry extended agreed deadlines by months to allow IBM to remediate issues and finish the job. After months of additional delays and costs in excess of $13.7 million (more than twice the initial estimated cost), IBM still failed to complete the job. Zachry was ultimately forced to replace IBM at a cost of $8.1 million, after paying IBM more than $12 million.

3.    Zachry believes that IBM overbilled by approximately $8.28 million. Zachry told IBM that it would not pursue legal action if IBM did not pursue a claim for unpaid invoices. IBM filed a proof of claim seeking recovery of $1,759,724.04.

4.    The Court should disallow the IBM Claim in its entirety as unenforceable against the Debtors. IBM should not be entitled to recover from the Debtors for its untimely and defective work. The Debtors' claims against IBM exceed the IBM Claim by multiples. The Debtors continue to investigate such claims and will assert them at the proper time in the proper forum. In the meantime, the IBM Claim should be disallowed in its entirety.

## Relief Requested

5.    By this Objection, the Debtors seek entry of an order, substantially in the form attached hereto (the "**Proposed Order**") (i) disallowing and expunging the IBM Claim in its entirety as unenforceable against the Debtors and (ii) granting such other and further relief as the Court deems just and proper.

**Jurisdiction, Venue, and Predicates for Relief**

6. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and this Court has constitutional authority to enter a final order because the matter involves allowance or disallowance of claims against the estate.[2]

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The predicates for the relief requested herein are sections 105(a), 502(b), and 558 of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 3007-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

**Background**

**I.    General Background**

9. On May 21, 2024 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in these chapter 11 cases. On June 4, 2024, the Office of the United States Trustee for the Southern District of Texas appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Committee**") [Docket No. 176].

---

[2] To the extent the Court does not have constitutional authority to enter a final order in this matter, the Debtors confirm their consent to the entry of a final order by the Court.

10. A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to these chapter 11 cases, is set forth in the *Declaration of Mohsin Y. Meghji in Support of Debtors' Petitions and Requests for First Day Relief* [Docket No. 7].

11. On July 16, 2024, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "**Schedules and Statements**") [Docket Nos. 510–531]. On August 30, 2024, several of the Debtors filed amendments to their Schedules and Statements [Docket Nos. 855–865]. On December 2, 2024, after commencing their claims reconciliation process, the Debtors filed additional amendments to their Schedules and Statements as they relate to IBM [Docket No. 1564].

12. On July 26, 2024, the Court entered the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 636] (the "**Bar Date Order**"). The Bar Date Order established September 16, 2024, at 5:00 p.m. (prevailing Central Time) as the deadline for all non-governmental entities holding or wishing to assert a "claim" (as defined in section 101(5) of the Bankruptcy Code) against any of the Debtors that arose before the Petition Date to file proof of such claim. The bar date for claims related to the August 30, 2024 amended Schedules and Statements was October 4, 2024, at 5:00 p.m. (prevailing Central Time), and the bar date for claims related to the December 2, 2024 amended Schedules and Statements is 5:00 p.m. (prevailing Central Time) on the date that is thirty 30 days following the date on which the Debtors mail notice of the amendment. The deadline for all governmental entities holding or

4

wishing to assert a claim against any of the Debtors that arose prior to the Petition Date to file proof of such claim was November 18, 2024, at 5:00 p.m. (prevailing Central Time).

**II.     Zachry's Prepetition Agreement with IBM**

13.     In late 2021, Zachry decided to replace its human resources and payroll systems with a new, standardized, and streamlined HCM platform.  Wilke Decl. ¶ 5.  As part of these efforts, Zachry sought to acquire and integrate various software components, or modules, developed by Oracle and Workforce Software, which together would operate as Zachry's enterprise-wide system for managing human resource functions, such as employee time, payroll, performance, recruiting, and other related processes.  *Id.*  After soliciting proposals through a request for proposal process, Zachry chose IBM to do the job.  *Id.* ¶ 6.

14.     On January 13, 2022, Zachry Holdings, Inc. ("**ZHI**") and IBM entered into a Master Client Relationship Agreement for Integration Services (excluding Cloud Services & Non-IBM Products) (the "**Master Agreement**").  *See* IBM Claim, at 107.  Pursuant to the Master Agreement, IBM agreed to provide Zachry certain consulting, installation, customization and configuration, maintenance, and other services.  Master Agreement § 1a.  The parties agreed that the scope and specific terms governing provision of the services would be set forth in separate Transaction Documents (such as statements of work, project change requests, ordering documents, supplements, or invoices) and Attachments (Transaction Documents, Attachments, and the Master Agreement, collectively, the "**Agreement**").  *Id.*, Preamble.  The Agreement is governed by New York law.  Master Agreement § 7b.

15.     Among other things, IBM warranted in the Master Agreement it would provide services "using commercially reasonable care and skill in accordance with the applicable Attachment or [Transaction Document], including any completion criteria, and that Project

5

Materials [would] comply with the Attachment or [Transaction Document] at the time of delivery." *Id.* § 3a.

16. As contemplated by the Master Agreement, on January 15, 2022, ZHI and IBM executed a Statement of Work for Human Resources System Implementation (the "**Statement of Work**"). *See* IBM Claim, at 7–66. The Statement of Work specified the scope of IBM's services in connection with the HCM project, allocated certain project tasks between the parties, and outlined the parties' respective responsibilities. Statement of Work § 2. Specifically, the Statement of Work set forth a multi-phased project roadmap, including the "Discovery," "Design," "Build," "Test," "Transition," and "Realization" phases. *Id.* § 3. In describing each phase, the Statement of Work listed associated activities and services and IBM's deliverable materials ("**Deliverables**"), which were subject to Zachry's review and approval. *Id.* IBM agreed to complete the Deliverables "to a standard mutually agreed upon" by IBM and Zachry and to remediate the Deliverables that did not meet the standard at no additional cost to Zachry. *Id.* § 8. IBM also agreed to assign to the project personnel that had "the appropriate technical skills, training and experience ('qualifications') for the work they are to perform." *Id.* § 4.2a.

17. Zachry and IBM agreed the project would be implemented—or "go live"—by December 26, 2022, and IBM's services would subsequently end on February 28, 2023. Statement of Work §§ 2.9, 10, 10.1. IBM estimated in the Statement of Work that its services would cost approximately $5.05 million. *Id.* § 11.

### III. IBM's Failure to Perform Services Under the Agreement Properly

18. Despite the agreed timeline and scope of work, IBM failed to deliver a working HCM product, including several critical Deliverables that were necessary for the proper implementation and integration of the Oracle and Workforce Software components. Wilke Decl. ¶ 13. IBM's services fell far behind schedule, were demonstrably defective, and did not comport

6

with the recommended configuration schema for Oracle and Workforce Software. *Id*. By December 2022—the agreed "go live" date—IBM was far from complete and was "still in Build, not even to [system integration testing] yet." *Id.* ¶ 14. IBM also required numerous extensions of time, which extended the project deadline from 12 months to nearly 22 months and increased the project cost by more than double. *Id.*

19. In April 2023, after it became clear that IBM was incapable of completing the work within the time and standards the parties had agreed to, Zachary was forced to hire eVerge Group, LLC ("**eVerge**"), a different software integrator, to begin reviewing and remediating the various critical issues caused by IBM, as more specifically discussed in the chart below. *Id.* ¶ 15. In October 2023, Zachary officially terminated IBM and fully transitioned all remediation and rebuild work to eVerge thereafter. *Id.*

20. Ultimately, IBM billed Zachry a total of approximately $13.7 million for its purported services under the Statement of Work, of which Zachry has already paid approximately $12 million to date. *Id.* ¶ 16. However, as set forth in the below chart, Zachry estimates it was overbilled by over $8.28 million for services that IBM either effectively did not deliver or delivered with material defects, as follows:

| Failed Deliverables | Failure Issue | Disputed Amount Billed |
|---|---|---|
| Oracle Cloud Payroll | IBM failed to configure Oracle Cloud Payroll correctly as part of its scope of work.<br><br>Cloud Payroll and Cloud HCM were the two main priorities for IBM's engagement. According to the Statement of Work, IBM had to deliver Cloud Payroll and Cloud HCM within 12 months by December 26, 2022. However, six months into the project, IBM began demonstrating an inability to configure key modules for Cloud Payroll correctly. This prevented a valid payroll test from being | $3,309,928 (100% of the billed amount) |

7

| Failed Deliverables | Failure Issue | Disputed Amount Billed |
|---|---|---|
| | achieved by June 2022, which Zachry fully expected would be completed by this time.<br><br>Consequently, the original project timeline and "go live" date had to be extended three additional months to March 27, 2023. But problems with IBM's configuration abilities continued. By February 2023, it became evident that IBM would not meet the new March 2023 delivery deadline, which required further project deadline extensions to June 2023, then to September 2023, and then to December 2023.<br><br>Despite multiple extensions to the project deadline, IBM was unable to deliver a valid payroll test for Cloud Payroll. Zachry was thus forced to terminate IBM's payroll configuration efforts in October 2023 and contract with another vendor (eVerge) to address IBM's inability to configure Cloud Payroll correctly.<br><br>In sum, IBM failed to deliver a successfully configured and tested Cloud Payroll software module after 22 months, despite convincing Zachry that it would be accomplished within 12 months. | |
| Workforce Software | IBM also failed to configure Workforce Software correctly.<br><br>IBM originally had to configure Workforce Software within approximately 7 months. But Zachry was forced to terminate those efforts after 15 months into the project due to IBM's inability to configure the software correctly.<br><br>Despite IBM expending more than double the originally estimated time and effort attempting to configure and implement Workforce Software correctly, Zachry was unable to access successfully or test the product through IBM's efforts. Instead, Zachry had to procure another software product, called Oracle Time and Labor. | $2,421,081 (100% of the billed amount) |
| Fusion Analytics Warehouse | IBM also failed to implement properly Fusion Analytics Warehouse ("**FAW**")—a standard Oracle tool used to produce advanced analytics and various reports that can be used to view the data.<br><br>In September 2023, well beyond the original December 2022 project deadline, FAW was released to Zachry users | $223,350 (100% of the billed amount) |

| Failed Deliverables | Failure Issue | Disputed Amount Billed |
|---|---|---|
| | in a non-working condition. Upon further investigation with Oracle engineers, Zachry discovered that the FAW solution IBM had provided was a customized database installed into the area in which the FAW tool resides. Upon information and belief, a customized database solution is not a workable substitute because it is not supported natively by Oracle and does not receive periodic patch updates from Oracle necessary to maintain a supportable software model.<br><br>Consequently, Zachry was forced to contract with eVerge to reconfigure and reimplement the FAW tool as it was intended so that Zachry could take advantage of the promised functionality and return to a supportable software model. | |
| Oracle Recruiting Cloud | IBM also failed to implement properly Oracle Recruiting Cloud ("**ORC**").<br><br>ORC is an additional product that Zachry ordered from IBM to provide better functionality to its recruiting and employee onboarding processes. The product was added to IBM's original scope of work through a project change request in September 2022. Once added, IBM was expected to complete the installation by March 2023, but IBM failed to do so fully until May 2023.<br><br>Moreover, once ORC was tested and deployed to Zachry users in September 2023, it was not working properly, which severely impacted Zachry's applicants and recruiting team. Again, Zachry had to engage eVerge and Oracle engineers to assess the issues, and like with other problems, Zachry discovered that IBM had failed to configure the ORC application correctly. In fact, IBM's configuration of ORC was far outside of Oracle's standards and recommendations. Upon information and belief, the project lead from IBM had never implemented ORC in the past. Zachry ultimately had to pay eVerge to assist with reconfiguration and reimplementation of ORC. | $700,206 (50% of the billed amount) |
| Other Critical Defects | IBM also failed to deliver secure application programming interfaces ("**APIs**") as requested by Zachry. Part of the HCM platform modernization effort was to replace less secure file exchanges with a more secure framework | $1,627,323 (100% of the billed amount) |

9

| Failed Deliverables | Failure Issue | Disputed Amount Billed |
|---|---|---|
| | utilizing APIs to exchange data. Zachry expected IBM to bring its modern integration methodologies to the project and create APIs to do so. But rather than utilize a more secure approach with APIs, IBM chose instead to keep Zachry's existing, less secure file exchange system. Zachry's internal development team raised this issue to IBM's integration team, but in an attempt to remain on schedule, Zachry reluctantly accepted IBM's offering of continued file exchanges instead of the promised modern data integrations.<br><br>Furthermore, system security configurations presented a constant issue for IBM throughout the project. IBM did not configure system security for the HCM product in a manner that was consistent with best practices. For example, IBM's system security configuration for the FAW tool (discussed above) has never worked, and Zachry understands that it will not work as designed and implemented by IBM. As a result, Zachry had to engage eVerge to remediate IBM's entire security solution to ensure it works and is supported as part of Zachry's overall HCM system upgrade.<br><br>Additionally, Zachry procured additional licensing for a product called Oracle Identity Cloud Services ("**IDCS**"), which IBM advised was necessary for the Oracle Cloud HCM installation. But IDCS caused numerous user issues that disrupted workflow. After discussions with Oracle engineers, Zachry learned that ICDS was not in fact needed for Zachry's HCM system upgrade and that the entire IDCS solution now needs to be changed and decommissioned. | |
| | **Total:** | **$8,281,888** |

*Id.*

21. On June 24, 2024—two and a half years after contracting with IBM—Zachry finally launched its new Oracle-based HCM platform. *Id.* ¶ 17. To get to that point, eVerge had to review and remediate several issues created by IBM's deficient work, at a cost to Zachry of approximately $8.1 million. *Id.* ¶ 18.

10

22. On February 16, 2024, John Wilke, Zachry's Vice President, Enterprise Services, and the Client Project Manager under the Agreement, informed IBM that Zachry would not pursue the full $8.28 million claim for undelivered or defective items so long as IBM did not pursue the remaining balance due from Zachry. *Id.* ¶ 19.

## IV. IBM's Proof of Claim

23. On June 6, 2024, IBM filed a proof of claim asserting a general unsecured claim in the total amount of $1,759,724.04 for professional services provided pursuant to the Agreement. Claim No. 181. IBM's proof of claim attaches the Master Agreement, the Statement of Work, and four invoices covering the period of May through November 2023. *See generally id.*

## Argument

24. Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Further, section 502(b)(1) of the Bankruptcy Code provides that a court "shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—such claim is unenforceable against the debtor and the property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). This statutory exception to the allowance of a claim is "generally complemented by § 558, which provides that '[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of fraud, usury, and other personal defenses.'" *In re W.R. Grace & Co.*, 626 B.R. 217, 235 (Bankr. D. Del. 2021) (quoting 11 U.S.C. § 558). Section 558 preserves for the benefit of the estate not only defenses the statute specifically references but also such defenses as counterclaim, setoff, and recoupment. *See, e.g.*, *In re ABC-NACO, Inc.*, 294 B.R. 832, 836 (Bankr. N.D. Ill. 2003) (counterclaim); *In re Gaulsh*, 602 B.R. 849, 854–55 (Bankr. S.D.N.Y.

2019) (setoff); *see e.g.*, *In re e.Spire Commc'ns, Inc.*, 293 B.R. 639, 648 (Bankr. D. Del. 2003) (recoupment).

25. As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code. *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010). However, a proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations essential to the claim's legal sufficiency. *See In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence. *See id.* Despite this shifting burden during the claim objection process, "the ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

26. The Court should disallow and expunge the IBM Claim in its entirety because IBM failed to perform the services the parties negotiated for in a manner consistent with the scope and conditions set forth in the Agreement. Despite not receiving the benefits they bargained for, the Debtors have already paid IBM approximately $12 million (approximately $7 million over budget), including $8.28 million for the defective services, and spent an additional $8.1 million to remediate IBM's faulty work. IBM has not earned the amount asserted in the IBM Claim.

27. To plead a cause of action for breach of contract under New York law, a plaintiff usually must allege that: "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (cleaned up); *see also In*

*re Robertshaw US Holding Corp.*, 662 B.R. 146, 158 (Bankr. S.D. Tex. 2024) (citing *Seneca*) (same).

28. Here, the Agreement constitutes a valid contract. Zachry performed in accordance with the Agreement. IBM, on the other hand, breached its contractual obligations to provide services, including its obligation to complete Deliverables set forth in section 3 of the Statement of Work, on time, in working order, and to a standard mutually agreed upon by IBM and Zachry, as set forth in detail in paragraph 20 above. Zachry communicated those issues to IBM and attempted to work with IBM on a solution but eventually had to terminate IBM's services and retain a different software integration company. As a result of IBM's breaches, Zachry incurred damages as it paid IBM approximately $8.28 million for services it either did not deliver or delivered with material defects. Zachry also had to contract and pay over $8.1 million to a different software integration company to perform the services it had contracted IBM to perform.

29. The Debtors have already paid approximately $12 million for services IBM performed, even though IBM's performance was not in accordance with the Agreement. To require the Debtors to pay the IBM Claim when the Debtors have claims against it that exceed the IBM Claim by multiples would be inequitable and would result in a windfall to IBM. Simply put, IBM did not earn the fees for which it is now seeking payment. Thus, in light of Zachry's claims against IBM, the IBM Claim should be disallowed in its entirety.

## **Reservation of Rights**

30. By this Objection, the Debtors object to the IBM Claim solely for the reasons identified therein. Regardless of whether one or more of the bases for objection stated herein is overruled, or otherwise not sustained, the Debtors reserve the right to (i) amend, modify, or supplement this Objection, (ii) file additional objections to the IBM Claim on any basis, and (iii) pursue claims and causes of action against IBM or any other person or entity and seek appropriate

remedies in connection with same. Further, the Debtors reserve their rights to object to any proof of claim, including but not limited to the IBM Claim, on any grounds whatsoever at a later date, including, among other things, based on amount, priority, classification, or otherwise.

31. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance of property of the Debtors' estates; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Objection are valid and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

## Notice

32. The Debtors will provide notice of this Motion to: (a) the United States Trustee for the Southern District of Texas; (b) counsel for the Committee; (c) the Prepetition Agent; (d) the United States Attorney's Office for the Southern District of Texas; (e) the state attorneys general

for the states in which the Debtors operate; (f) the Internal Revenue Service; (g) IBM; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d). In light of the nature of the relief requested, no other or further notice need be provided.

### No Previous Request

33.    No previous request for the relief sought herein has been made by the Debtors to this Court or any other court.

### Conclusion

34.    For the foregoing reasons, the Debtors respectfully request the Court enter the Proposed Order (i) disallowing and expunging the IBM Claim in its entirety pursuant to section 502(b)(1) of the Bankruptcy Court as unenforceable against the Debtors and (ii) granting such other and further relief as the Court deems just and proper.

Dated: December 2, 2024
Houston, Texas

/s/ *Charles R. Koster*
**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

Bojan Guzina (admitted *pro hac vice*)
Andrew F. O'Neill (admitted *pro hac vice*)
Michael Andolina (admitted *pro hac vice*)
William Guerrieri (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
Adam T. Swingle (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: bojan.guzina@whitecase.com
   aoneill@whitecase.com
   mandolina@whitecase.com
   william.guerrieri@whitecase.com
   fhe@whitecase.com
   adam.swingle@whitecase.com
   barrett.lingle@whitecase.com

*Counsel to the Debtors and*
*Debtors in Possession*

**Certificate of Service**

      I certify that on December 2, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                                                  */s/  Charles R. Koster*
                                                                                  Charles R. Koster