United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 24, 2025

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) Case No. 24-90377 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**ORDER (I) SCHEDULING A COMBINED
DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION
HEARING, (II) CONDITIONALLY APPROVING THE DISCLOSURE STATEMENT,
(III) APPROVING THE REVISED CONFIRMATION TIMELINE, SOLICITATION
PROCEDURES, SOLICITATION PACKAGE, AND NOTICES, (IV) ESTABLISHING
PROCEDURES FOR OBJECTING TO THE DISCLOSURE STATEMENT
AND MODIFIED FIRST AMENDED PLAN, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "**Order**"), (a) approving the adequacy of the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (the "**Disclosure Statement**"), (b) approving the solicitation procedures with respect to confirmation of the chapter 11 plan; (c) approving the forms of ballots and notices in connection therewith; (d) approving the form, manner, and scope of confirmation notices; (e) establishing certain deadlines in connection with approval of the disclosure statement and confirmation of the plan; and (f) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C.

---

[1] The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these Chapter 11 Cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

§ 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "**Hearing**"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Disclosure Statement is conditionally approved as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, and the Debtors are authorized to distribute the Disclosure Statement, attached hereto as **Exhibit 1**, and the Solicitation Packages in accordance with the Solicitation Procedures detailed in the Disclosure Statement.

2. The Combined Hearing, at which time the Court will consider final approval of the Disclosure Statement and confirmation of the Plan, will be held before the Honorable Judge Marvin Isgur, United States Bankruptcy Judge, in Courtroom 404 of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas, 77002 on February 26, 2025 at 1:30 p.m. (prevailing Central Time).  The Combined Hearing may be adjourned from time to time without further notice other than an announcement of the adjourned date or dates in open

court or by a notice of adjournment or notice of agenda of matters scheduled for hearing filed by

the Debtors with the Court and available on the electronic case filing docket.

3.      The following dates and deadlines are hereby established with respect to

confirmation of the Plan.

| Event | Date |
|---|---|
| Voting Record Date | Wednesday, January 22, 2025 |
| Hearing on Conditional Approval of the Disclosure Statement | Thursday, January 23, 2025 at 9:00 a.m. (prevailing Central Time) |
| Solicitation Deadline | Thursday, January 30, 2025 or 5 Business Days after entry of the Disclosure Statement Order |
| Publication Deadline | Thursday, January 30, 2025 or as soon as reasonably practicable thereafter |
| Deadline to: (i) file (A) GUC Trust Unsecured Note Term Sheet and (B) GUC Trust Agreement; and (ii) share the Debtors' most recent draft and the Prepetition Lenders' most recent draft of the A&R Credit Facility Term Sheet with the Committee on a "professional eyes only" basis | Wednesday, February 5, 2025 |
| Deadline to File Rule 3018 Motions | Thursday, February 13, 2025 at 4:00 p.m. (prevailing Central Time) |
| Plan Supplement Deadline | Thursday, February 13, 2025 |
| Deadline for Committee to File Plan Objection | Wednesday, February 19, 2025 at 1:30 p.m. (prevailing Central Time) |
| Voting, Plan Objection, and Third-Party Release Opt-Out Deadline | Thursday, February 20, 2025 at 4:00 p.m. (prevailing Central Time) |
| Deadline to File Confirmation Brief | Sunday, February 23, 2025 at 1:30 p.m. (prevailing Central Time) |
| Deadline to File Voting Report | Tuesday, February 25, 2025 |
| Combined Hearing Date | Wednesday, February 26, 2025, at 1:30 p.m. (prevailing Central Time) |

4.      Any objections to the adequacy of the Disclosure Statement or confirmation of the

Plan must: (i) be in writing; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the

Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the amount

and nature of the Claim or Interest; (iv) state the legal and factual basis for such objections, and, if practicable, a proposed modification to the Plan that would resolve such objections; and (v) be filed with this Court with proof of service thereof **so as to be actually received on or before the Objection Deadline of February 20, 2025 at 4:00 p.m. (prevailing Central Time)**; *provided* that the Objection Deadline for the Committee is February 19, 2025 at 1:30 p.m. (prevailing Central Time).

5.      The Committee shall have the right to seek, on an emergency basis, and the Debtors and Prepetition Lenders agree not object to hearing on an emergency basis, an extension of its Objection Deadline and an adjournment of the Combined Hearing to the extent that the Debtors file material modifications to the GUC Trust Unsecured Note Term Sheet or GUC Trust Agreement after February 5, 2025, or to the extent that the terms of the A&R Credit Facility Term Sheet filed on or before the Plan Supplement Deadline differ in any material respect from the range of terms in the A&R Credit Facility Term Sheets shared with the Committee on or before February 5, 2025 pursuant to this Order, in each case solely to the extent that the relevant modifications materially alter the basis of the Committee's Plan objection, if any.  The Committee is permitted to file any documents shared on a confidential basis, but shall file such documents under seal.  All parties' rights in connection with any extension or adjournment request are preserved.

6.      Objections, if any, not Filed and served in the manner set forth above may, in the Court's discretion, not be considered and may be overruled.

7.      The notice and objection procedures set forth in this Order and the Motion constitute good and sufficient notice of the Combined Hearing, deadlines and procedures for objecting to approval of the Solicitation Procedures, adequacy of the Disclosure Statement, and confirmation of the Plan, and no other or further notice shall be necessary.

8.      The Solicitation Procedures comply with the requirements of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules and are approved in their entirety.

9.      The Voting Record Date is approved and shall be January 22, 2025 for determining the Holders of Claims that are entitled to vote to accept or reject the Plan.

10.     The Prepetition Credit Facility Agent shall provide contact information (including names, physical addresses and email addresses to which Solicitation Packages shall be sent, and amounts of Prepetition Credit Facility Claims) to the Debtors and the Claims and Noticing Agent no later than 2 business days following entry of this Order, to the extent any such contact information has changed following solicitation of the Initial Plan.

11.     The Ballots substantially in the form attached hereto as **Exhibits 2** and **3** are approved.

12.     All Ballots must be properly executed, completed, and returned **so that they are actually received** by the Claims and Noticing Agent by no later than the Voting Deadline of **4:00 p.m. (prevailing Central Time) on February 20, 2025**.  The Debtors are authorized to extend the Voting Deadline in their sole discretion and will include notice of any extension in any voting report tabulating the Ballots and votes received that is filed with the Court.  For the avoidance of doubt, any Ballots submitted with respect to the Initial Plan shall not be counted as votes to accept or reject the Plan.

13.     The Claims and Noticing Agent is authorized to accept Ballots via electronic online transmission through a customized online portal on the Debtors' case website.  The encrypted Ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

14.    The Claims and Noticing Agent shall complete delivery of the Solicitation Packages by the Solicitation Deadline.  The materials constituting the Solicitation Packages, the forms of each of which are approved, shall be delivered to the Holders in the Voting Classes in accordance with the Solicitation Procedures.

15.    The Debtors are further authorized, but not directed, in their discretion, to distribute the Plan, the Disclosure Statement, and the Order (excluding exhibits) in an electronic format, such as a flash drive, instead of a paper format.  If a party who receives the Plan, the Disclosure Statement, and the Order (excluding exhibits) electronically prefers a paper copy format, the party may request paper copies from the Claims and Noticing Agent by visiting the Debtors' case website at www.veritaglobal.net/ZHI or calling the Claims and Noticing Agent at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International).

16.    For purposes of serving the Solicitation Package, the Claims and Noticing Agent is authorized to rely on the address information maintained by the Debtors and the Prepetition Credit Facility Agent as of the Voting Record Date and provided to the Claims and Noticing Agent.  The Debtors are not required to mail Solicitation Packages to creditors whose prior mailings in these Chapter 11 Cases were returned as undeliverable and who have not provided a new forwarding address by the Voting Record Date.

17.    The Non-Voting Status Notice and the Opt-Out Form, substantially in the forms attached hereto as **Exhibits 4** and **5**, are approved.  The Debtors shall cause the Claims and Noticing Agent to mail a copy of the Non-Voting Status Notice and the Opt-Out Form in lieu of Solicitation Packages to Holders in the Non-Voting Classes by the Solicitation Deadline.

18.    To the extent any party in interest properly submitted an Opt-Out Form in connection with the solicitation of the Initial Plan, such Opt-Out Form shall remain effective and

such party in interest shall not be required to re-submit an Opt-Out Form to opt-out of the Plan's Third-Party Release.

19.     The Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 6**, is approved and shall be deemed good and sufficient notice of the Combined Hearing and no further notice need be given.  The Debtors shall cause the Claims and Noticing Agent to complete service upon (a) all known Holders of Claims against and Interests in the Debtors and (b) all Notice Parties, in each case, as of the Voting Record Date, as described in the Motion, with a copy of the Combined Hearing Notice by January 24, 2025, or one business day after the Court's entry of this Order.

20.     The Debtors are authorized to enter into transactions to cause the Publication Notice, substantially in the form attached hereto as **Exhibit 7**, to be published in *The New York Times* (National Edition), *USA Today* (National Edition), *Beaumont Enterprise*, and *Port Arthur News* by January 30, 2025 or as soon as reasonably practicable thereafter, and to make reasonable payments required for such publication.

21.     The form of the Assumption Notice, substantially in the form attached hereto as **Exhibit 8**, is approved.

22.     The form of the Rejection Notice, substantially in the form attached hereto as **Exhibit 9**, is approved.

23.     The Disputed Claims Notice, substantially in the form attached hereto as **Exhibit 10**, and the Disputed Claims Procedures are approved.  The Debtors shall cause the Disputed Claims Notice to be served on Holders of Claims that are subject to a pending objection by the Debtors as set forth in the Disputed Claim Procedures, and such notice shall be sufficient

and appropriate notice of the Combined Hearing under the circumstances of these Chapter 11 Cases.

24.     The Reclassification Notice, substantially in the form attached hereto as **Exhibit 11**, is approved.  The Debtors shall cause the Reclassification Notice to be served on Holders of Claims that are subject to a Reclassification Objection by the Debtors as set forth in the Disputed Claim Procedures, and such notice shall be sufficient and appropriate notice of the Combined Hearing under the circumstances of these Chapter 11 Cases.

25.     The Cover Letter, substantially in the form attached to this Order as **Exhibit 12**, is approved.  The Debtors shall cause the Claims and Noticing Agent to serve the Cover Letter in the Solicitation Packages on all Holders of Claims entitled to vote on the Plan.

26.     The form of the Employee Letter, substantially in the form attached hereto in **Exhibit 13**, is approved.  The Debtors shall cause the Claims and Noticing Agent to serve the Employee Letter on Non-Creditor Employees via first class mail.  No other or further notice to Non-Creditor Employees shall be necessary.

27.     The Debtors shall cause the Claims and Noticing Agent to include the U.S. Trustee Letter, substantially in the form attached hereto as **Exhibit 14**, in the Solicitation Package.

28.     The Debtors shall cause the Claims and Noticing Agent to include a letter from the Committee in the Solicitation Package, to the extent the Committee provides such letter prior to the commencement of solicitation.

29.     The Claims and Noticing Agent shall File the Voting Report with the Court **on or before February 25, 2025**.  The Debtors shall cause such certification to be served upon all parties entitled to receive notice under Bankruptcy Rule 2002(b) and posted on the website maintained by the Claims and Noticing Agent.

30. The Claims and Noticing Agent is authorized to assist the Debtors in: (a) distributing the Solicitation Packages; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims entitled to vote on the Plan; (c) responding to inquiries from Holders of Claims, Holders of Interests, and other parties in interest relating to the Disclosure Statement, the Plan, the Ballot, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan; (d) soliciting votes on the Plan; and (e) if necessary, contacting creditors and equityholders regarding the Plan.

31. The notice and objection procedures set forth in this Order and the Motion constitute good and sufficient notice of the Combined Hearing, deadline and procedures for objecting to approval of the Solicitation Procedures, adequacy of the Disclosure Statement, and confirmation of the Plan, and no other or further notice shall be necessary.

32. Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion and the requirements of the Bankruptcy Local Rules are satisfied by such notice.

33. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

34. The Debtors are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages and all documents provided therein, the Non-Voting Status Notice, the Opt-Out Form, the Combined Hearing Notice, the Publication Notice, the Assumption Notice, the Rejection Notice, the Disputed Claim Notice, the Reclassification Notice, the Cover Letter, and the Employee Letter, and related documents (including any exhibits, schedules, or annexes attached to the foregoing) before distributing Solicitation Packages to each creditor or other party in interest in accordance with the terms of this

Order without further order of the Court, including changes to correct typographical, clerical, and grammatical errors, and to make conforming changes among the above-listed documents where, in the Debtors' reasonable discretion, doing so would better facilitate the solicitation process.

35.     Notwithstanding entry of the Order, nothing herein shall create, nor is intended to create any rights in favor of or enhance the status of any claim held by any party.

36.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a Proof of Claim after the Voting Record Date.

37.     Nothing in this Order shall be construed as a waiver of any right or arguments that any party in interest may raise to confirmation of the Plan or approval of the Disclosure Statement on a final basis.

38.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: January 23, 2025

Marvin Isgur
United States Bankruptcy Judge

## Exhibit 1

**Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile:  (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (admitted *pro hac vice*)
Andrew F. O'Neill (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
Adam T. Swingle (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  bojan.guzina@whitecase.com
          aoneill@whitecase.com
          william.guerrieri@whitecase.com
          fhe@whitecase.com
          adam.swingle@whitecase.com
          barrett.lingle@whitecase.com

*Counsel to the Debtors and Debtors in Possession*

Dated: January 23, 2025
Houston, Texas

---

[1] The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814.  A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI.  The location of the Debtors' service address in these Chapter 11 Cases is: P.O. Box 240130, San Antonio, Texas 78224.

**DISCLOSURE STATEMENT, DATED JANUARY 23, 2025**

**SOLICITATION OF VOTES ON THE *MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES* PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | PREPETITION CREDIT FACILITY CLAIMS |
| CLASS 6 | GENERAL UNSECURED CLAIMS |

**IF YOU ARE IN CLASS 3 OR 6, YOU ARE RECEIVING THIS DISCLOSURE STATEMENT, THE PLAN, AND OTHER ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES IN THE ABOVE CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "DEBTORS"), ATTACHED HERETO AS EXHIBIT A (THE "PLAN").**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON FEBRUARY 20, 2025, UNLESS EXTENDED BY THE DEBTORS IN WRITING OR BY ORDER OF THE COURT.**

**THE VOTING RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS JANUARY 22, 2025 (THE "VOTING RECORD DATE").**

**ANY VOTES CAST DURING THE SOLICITATION OF THE INITIAL PLAN WILL NOT COUNT TOWARDS ACCEPTANCE OR REJECTION OF THE PLAN. EVEN IF YOU PREVIOUSLY SUBMITTED A VOTE ON THE INITIAL PLAN, YOU SHOULD RETURN YOUR BALLOT ACCEPTING OR REJECTING THE PLAN TO ENSURE YOUR VOTE IS COUNTED.**

**HOWEVER, IF YOU PREVIOUSLY SUBMITTED AN OPT-OUT FORM ELECTING TO OPT-OUT OF THE THIRD-PARTY RELEASE, YOUR OPT-OUT ELECTION REMAINS VALID AND EFFECTIVE. PARTIES WHO PROPERLY SUBMITTED OPT-OUT FORMS IN CONNECTION WITH SOLICITATION OF THE INITIAL PLAN NEED NOT RE-SUBMIT ANY OPT-OUT FORM.**

| BALLOTS SUBMISSION | |
| --- | --- |
| BALLOTS MUST BE SUBMITTED VIA <u>ONE</u> OF THE METHODS BELOW: | |
| **BY FIRST CLASS MAIL, REGULAR MAIL, HAND DELIVERY, OR OVERNIGHT COURIER AT:** | **ELECTRONICALLY AT:** |
| Zachry Ballot Processing Center<br>c/o Verita<br>222 N. Pacific Coast Highway, Suite 300<br>El Segundo, CA 90245 | www.veritaglobal.net/zhi |

---

BALLOTS SUBMITTED VIA ANY METHOD OTHER THAN THOSE SPECIFIED ABOVE, INCLUDING VIA FACSIMILE OR EMAIL, WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY SUBMITTING AN INQUIRY AT: WWW.VERITAGLOBAL.NET/ZHI/INQUIRY, OR BY TELEPHONE AT: (866) 479-8211 (US AND CANADA) OR +1 (781) 575-2037 (INTERNATIONAL) AND REQUEST TO HAVE A MEMBER OF THE SOLICITATION TEAM CONTACT YOU.

---

## RECOMMENDATION BY THE DEBTORS

EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH DEBTOR'S ESTATE, PROVIDE THE BEST RECOVERY AVAILABLE TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AND REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT NO LATER THAN <u>FEBRUARY 20, 2025, AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.

BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.

---

## NOTICE OF OBJECTION BY THE U.S. TRUSTEE

THE U.S. TRUSTEE ASSERTS THAT THE PLAN'S OPT-OUT PROVISIONS ARE AN IMPERMISSIBLE METHOD OF OBTAINING CREDITORS' APPROVAL FOR THIRD-PARTY RELEASES BECAUSE FAILURE TO ACT CANNOT BE CONSIDERED CONSENT TO THOSE RELEASES.  THE U.S. TRUSTEE PREVIOUSLY FILED AN OBJECTION [DOCKET NO. 1369] RAISING THIS ISSUE, AMONG OTHER PLAN CONFIRMATION OBJECTIONS.  THE U.S. TRUSTEE'S OBJECTION CAN BE OBTAINED FREE OF CHARGE FROM THE DOCKET MAINTAINED ON THE CLAIMS AND NOTICING AGENT'S WEBSITE, AVAILABLE AT HTTPS://VERITAGLOBAL.NET/ZHI.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE INFORMATION CONTAINED HEREIN IS FOR THE SOLE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN, AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

PLEASE READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  THIS DISCLOSURE STATEMENT SUMMARIZES THE MATERIAL TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE AND FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

READERS ARE FURTHER CAUTIONED THAT MANY OF THE ASSUMPTIONS, RISKS, AND UNCERTAINTIES RELATING TO THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN, INCLUDING THE IMPLEMENTATION OF THE PLAN, ARE BEYOND THE CONTROL OF THE DEBTORS.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" IN <u>ARTICLE X</u> OF THIS DISCLOSURE STATEMENT AS WELL AS OTHER RISKS INHERENT TO THE DEBTORS.  PARTIES ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS, AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND TO, AND UNDERTAKE NO OBLIGATION TO, UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS ATTACHED HERETO AS <u>EXHIBIT C</u>.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR BUSINESS OR PROPERTY TO BE MADE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OF THE PLAN OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ................................................................................................. 1

II.     SUMMARY OF PLAN CLASSIFICATION AND TREATMENT ............................ 4

        A.      Classified Claims and Interests ...................................................................... 4

III.    SOLICITATION AND VOTING PROCEDURES ...................................................... 7

        A.      Voting Rights Summary ................................................................................... 7
        B.      Votes Required for Acceptance by a Class of Claims .................................... 7
        C.      Voting Record Date ......................................................................................... 7
        D.      Solicitation Procedures ................................................................................... 8
        E.      Voting on the Plan .......................................................................................... 8
        F.      Ballots Not Counted ....................................................................................... 9
        G.      Voting and Tabulation Procedures.................................................................. 9
        H.      Disputed Claim Procedures........................................................................... 11

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS ................. 12

        A.      Corporate History ......................................................................................... 12
        B.      Business Operations...................................................................................... 13
        C.      Zachry Industrial's Current Projects ........................................................... 14
        D.      The Debtors' Prepetition Corporate and Capital Structure .......................... 15

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS ......................................... 17

VI.     SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES....................................... 18

        A.      Commencement of Chapter 11 Cases ........................................................... 18
        B.      First Day Motions ......................................................................................... 18
        C.      Procedural Motions....................................................................................... 18
        D.      Appointment of the Committee .................................................................... 19
        E.      Retention of Professionals ........................................................................... 19
        F.      Section 341 Meeting ..................................................................................... 19
        G.      *De Minimis* Asset Sales ................................................................................ 19
        H.      Schedules and Statements ............................................................................ 19
        I.      GPX Project Litigation and Settlement......................................................... 20
        J.      Claims Bar Date............................................................................................ 23
        K.      Claims Reconciliation and Objections.......................................................... 23
        L.      Exit Financing............................................................................................... 24
        M.      Assumption and Rejection of Executory Contracts and Unexpired Leases....... 24
        N.      OPPD Settlement and Contract Assumption ................................................ 24
        O.      Approval of the GTPP ISBL Conversion Certificate.................................... 25
        P.      Extension of Time to Remove Civil Actions ................................................ 25
        Q.      Extension of Exclusive Period for the Debtors to File a Plan....................... 25
        R.      Insurance Premium Financing and New Insurance Program ........................ 25
        S.      Adversary Proceedings and Other Litigation ............................................... 26

VII.    OTHER KEY ASPECTS OF THE PLAN................................................................. 31

        A.      Unclassified Claims ...................................................................................... 31
        B.      Means for Implementation of the Plan.......................................................... 32
        C.      The Reorganized Debtors.............................................................................. 34
        D.      Vesting of Assets in the Reorganized Debtors ............................................. 34
        E.      GUC Trust..................................................................................................... 34

F. Sources of Consideration for Plan Distributions.................................................. 37
G. Cancellation of Existing Agreements and Interests ............................................ 38
H. Corporate Action.................................................................................................. 38
I. Preservation of Causes of Action........................................................................ 38
J. Effectuating Documents; Further Transactions................................................... 39
K. Directors and Officers of the Reorganized Debtors............................................ 39
L. Indemnification Obligations ............................................................................... 39
M. Provisions Regarding Treatment of Executory Contracts and Unexpired Leases ........... 39
N. Provisions Governing Distributions.................................................................... 40
O. Provisions Governing Disputed Claims and Interests......................................... 40
P. Settlement, Release, Injunction, and Related Provisions.................................... 40
Q. Conditions Precedent to Confirmation and Consummation of the Plan ............. 45

**VIII.    PROJECTED FINANCIAL INFORMATION** .................................................. **46**

**IX.    CONFIRMATION OF THE PLAN** ...................................................................... **46**

A. The Confirmation Hearing .................................................................................. 46
B. Requirements for Confirmation of the Plan........................................................ 46
C. Feasibility............................................................................................................ 47
D. Acceptance by Impaired Classes ........................................................................ 47
E. Confirmation Without Acceptance by All Impaired Classes............................... 47
F. Liquidation Analysis ........................................................................................... 48

**X.    RISK FACTORS** .................................................................................................. **48**

A. General................................................................................................................. 48
B. Bankruptcy Law and Chapter 11 Case Considerations....................................... 49
C. Risks Related to Recoveries Under the Plan........................................................ 52
D. Risks Related to the Company's and the Reorganized Debtors' Businesses................... 53

**XI.    CERTAIN SECURITIES LAW MATTERS** ....................................................... **59**

A. Issuance of Securities Under the Plan Pursuant to Section 1145 of the Bankruptcy
Code ..................................................................................................................... 59
B. Transferability of GUC Trust Unsecured Note ................................................... 60

**XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN**  60

A. Introduction ......................................................................................................... 60
B. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of
Claims Entitled to Vote on the Plan .................................................................... 61
C. Market Discount .................................................................................................. 65
D. U.S. Federal Income Tax Consequences to U.S. holders of Owning and Disposing of
GUC Trust Unsecured Note ................................................................................. 65
E. Information Reporting and Back-Up Withholding ............................................... 66

**XIII.    RECOMMENDATION** ....................................................................................... **67**

**EXHIBITS**

**EXHIBIT A**          Joint Chapter 11 Plan of Reorganization

**EXHIBIT B**          Financial Projections

**EXHIBIT C**          Liquidation Analysis

**EXHIBID D**          Valuation Analysis

**EXHIBIT E**          Organizational Structure Chart

Zachry Holdings, Inc. ("**ZHI**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-Debtor Affiliates, "**Zachry Industrial**" or the "**Company**"), submit this disclosure statement (this "**Disclosure Statement**"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (the "**Plan**"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.[1]

## I.   EXECUTIVE SUMMARY

Zachry Industrial, together with its affiliates, is the engineering, construction, maintenance, turnaround, and fabrication services offshoot of the storied family-owned business that began as H.B. Zachry Company one hundred years ago.[2] The Company (headquartered in San Antonio, Texas) provides these services to customers in the energy, chemicals, power, manufacturing, and industrial sectors across North America. Customers have learned to trust the Company's name for reliably delivering on their most high-profile commitments. The Company's reputation for excellence and care has made it a go-to choice in the industries it serves. The Company's over 15,000 employees are central to making its customers' ambitious goals a reality.

The Debtors entered these Chapter 11 Cases on May 21, 2024 (the "**Petition Date**") as a result of the financial distress caused by one of their major projects—the liquefied natural gas ("**LNG**") project that would, upon completion, treat, process, and liquefy domestic natural gas in Sabine Pass, Texas (the "**GPX Project**"). Prior to the Petition Date, the Debtors and interested parties, including the project owners and Debtor Zachry Industrial, Inc.'s ("**ZII**") joint venture partners, mediated disputes relating to the GPX Project without reaching a resolution. After the commencement of these cases, however, and approximately two months of arm's-length, hard-fought negotiations under the guidance of mediator Judge Christopher M. Lopez, the Debtors and interested parties agreed to the comprehensive GPX Settlement. As discussed in more depth throughout this Disclosure Statement, the GPX Settlement provided for, among other things, the orderly transition of ZII's responsibility as the lead contractor on the GPX Project to its joint venture partners and the direct payment of GPX Project vendor claims by the project owner, subject to a payment cap and certain letter of credit draw rights, as set forth in the GPX Settlement. The Bankruptcy Court approved the GPX Settlement on an interim basis on July 25, 2024 and on a final basis on August 12, 2024. By August 26, 2024, ZII had completely demobilized from the GPX Project. As of the date of this Disclosure Statement, the vast majority of the GPX Claims have been satisfied by Golden Pass.

Following approval of the GPX Settlement, the Debtors filed and solicited votes on the *Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and its Debtors Affiliates* (the "**Initial Plan**") [Docket No. 1393]. During the solicitation of the Initial Plan, the Debtors and their retained investment banker, Lazard Fréres & Co. LLC ("**Lazard**"), sought and obtained proposals from interested parties to raise junior exit capital. The Debtors intended to use the proceeds of that junior exit capital to fund working capital needs and distributions under the Initial Plan, including distributions to Holders of General Unsecured Claims. However, despite the Debtors' diligent efforts, the Debtors did not receive a financing proposal that was acceptable to all relevant parties, including the Holders of the senior secured Prepetition Credit Facility Claims. Due to the results of the financing process, the Debtors determined that confirmation of the Initial Plan was no longer tenable. In its place, the Debtors have filed—and now seek to confirm—the Plan attached to this Disclosure Statement as **Exhibit A**, which provides the same economic value to all stakeholders, does not require a junior exit capital raise, and allows the Debtors to exit chapter 11 expeditiously.

The general framework for the Plan is as follows:

- The Prepetition Credit Facility will be amended and restated and deemed binding on the Debtors and Holders of Prepetition Credit Facility Claims as of the Plan's Effective Date. The Debtors have had productive discussions with the steering committee representing the Holders of Prepetition Credit

---

[1]   Terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2]   The other offshoot, Zachry Construction, has operated separately from Zachry Industrial since the two businesses branched off from their common roots in 2008. None of the entities affiliated with Zachry Construction are Debtors in these Chapter 11 Cases.

Facility Claims and anticipate reaching agreement on the terms of the amended and restated facility during the solicitation of the Plan. The Debtors will disclose the material terms of the facility, as agreed among the parties, in the A&R Credit Facility Term Sheet, which will be included in the Plan Supplement prior to the deadline to vote on the Plan.

- Allowed General Unsecured Claims of $25,000 or less will be treated as Convenience Claims. Convenience Claims are unimpaired and will receive a cash distribution of the full Allowed amount of such Claims, up to $25,000. Holders of General Unsecured Claims in excess of $25,000 may elect on their ballot to reduce their General Unsecured Claims to $25,000 and receive the Convenience Claim treatment.

- General Unsecured Claims that are not Convenience Claims will receive beneficial interests in a liquidating GUC Trust. On the Effective Date, the Debtors will issue the GUC Trust Unsecured Note to the GUC Trust. The face amount of the GUC Trust Unsecured Note will equal the value of Allowed General Unsecured Claims in the aggregate, and its terms will provide for the present value of Allowed General Unsecured Claims. The cash proceeds of the GUC Trust Unsecured Note shall be distributed pro rata to Holders of Allowed General Unsecured Claims. The material terms of the GUC Trust Unsecured Note will be set forth in the GUC Trust Unsecured Note Term Sheet. The GUC Trust Unsecured Note Term Sheet is under negotiation by the Debtors and the Committee as of the date hereof.

- The immediate parent company of ZHI will make a capital contribution, totaling $50 million, to ZHI on or prior to the Effective Date. Of the $50 million, $20 million will be in the form of forgiveness of intercompany liabilities and $30 million will be a cash contribution from the immediate parent company. The non-Debtor Affiliates of the Debtors have sufficient liquidity to fund the Parent Capital Contribution in the amount currently proposed by the Debtors. The Debtors will establish at the Combined Hearing that the Plan is feasible, including on account of the Parent Capital Contribution.

- The Debtors will assume and cure all executory contracts and unexpired leases that are not otherwise rejected pursuant to the Plan or a separate motion.

- Interests in ZHI will be reinstated and the legal, equitable, and contractual rights associated with such interests shall remain unaltered.

Further, the Debtors have worked diligently to minimize the impact of these Chapter 11 Cases on their trade creditors, including by arranging for payment of trade claims through various Court-approved processes and by non-Debtor joint venture parties. As the following chart shows, hundreds of millions of dollars of trade claims have been satisfied through the GPX Settlement (described in detail in **Article VI.I**), the Debtors' OPPD Project settlement (described below in **Article VI.N**), the Debtors' designation of certain trade partners as critical vendors, and other payments by the Debtors' joint venture partners, including KZJV for amounts owed on the PLNG Project.

| Satisfied and Outstanding Unsecured Claims as of January 22, 2025 | |
|---|---|
| Postpetition Settlement, Critical Vendor, and Third-Party Payments Made During the Chapter 11 Cases | $610.77 million |
| Outstanding Total Trade and WARN Claims – as of January 22, 2025 | $132.50 million |

Of the $132.50 million of outstanding trade debt, only approximately $57.40 million of such claims are projected to be treated as General Unsecured Claims under the Plan:[3]

| Proposed Classification and Treatment of $132.50 Million of Outstanding Unsecured Claims | |
|---|---|
| Priority and Section 503(b)(9) Claims | -5.50 million[4] |
| Cure Claims | -$58.50 million |
| Convenience Claims | -$4.10 million |
| WARN Settlement | -$7.0 million |
| Total General Unsecured Claims | $57.40 million |

For the subset of trade claims that have not been paid during the Chapter 11 Cases and that will be treated as General Unsecured Claims, such Claims will still recover in full under the Plan. As a result, distributions to all stakeholders—including Holders of Allowed General Unsecured Claims and Allowed Prepetition Credit Facility Claims—will be significantly greater under the Plan than in a chapter 7 liquidation. The Plan will also provide the Reorganized Debtors with sufficient liquidity to continue providing first-class services to their customers, while also ensuring the Company's long-term viability.

The Debtors are currently discussing the Plan's terms with their stakeholders, including the Holders of Prepetition Credit Facility Claims and the Committee. The Debtors intend to complete those negotiations during solicitation, confirm the Plan by the end of February 2025, and emerge quickly thereafter. Accordingly, the Debtors have filed a motion seeking conditional approval of the Disclosure Statement, proposing the following key dates relating to the plan process, subject to Court approval and availability.

| Event | Date |
|---|---|
| Voting Record Date | Wednesday, January 22, 2025 |
| Hearing on Conditional Approval of the Disclosure Statement | Thursday, January 23, 2025 at 9:00 a.m. (prevailing Central Time) |
| Solicitation Deadline | Thursday, January 30, 2025 or 5 Business Days after entry of the Disclosure Statement Order |
| Publication Deadline | Thursday, January 30, 2025 or as soon as reasonably practicable thereafter |
| Deadline to: (i) file (A) GUC Trust Unsecured Note Term Sheet and (B) GUC Trust Agreement; and (ii) share the Debtors' most recent draft and the Prepetition Lenders' most recent draft of the A&R Credit Facility Term Sheet with the Committee | Wednesday, February 5, 2025 |
| Deadline to File Rule 3018 Motions | Thursday, February 13, 2025 at 4:00 p.m. (prevailing Central Time) |
| Plan Supplement Deadline | Thursday, February 13, 2025 |

---

[3]   The amounts described herein are subject to further review and reconciliation by the Debtors' Professionals.

[4]   This amount includes an estimated $2.87 million of trade claims to be treated as Other Secured Claims.

| Event | Date |
|---|---|
| Deadline for Committee to File Plan Objection | Wednesday, February 19, 2025 at 1:30 p.m. (prevailing Central Time) |
| Voting, Plan Objection, and Third-Party Release Opt-Out Deadline | Thursday, February 20, 2025 at 4:00 p.m. (prevailing Central Time) |
| Deadline to File Confirmation Brief | Sunday, February 23, 2025 at 1:30 p.m. (prevailing Central Time) |
| Deadline to File Voting Report | Tuesday, February 25, 2025 |
| Combined Hearing Date | Wednesday, February 26, 2025 at 1:30 p.m. (prevailing Central Time) |

The Committee reserves the right to seek to adjourn its objection deadline and the Combined Hearing in the event that the Debtors file material modifications to the GUC Trust Unsecured Note Term Sheet, the GUC Trust Agreement, or the A&R Credit Facility Term Sheet after February 5, 2025.

The Debtors believe that the Plan is in the best interests of the Debtors' Estates and stakeholders and represents the best available restructuring transaction at this time.  Accordingly, the Debtors strongly recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan.

## II.     SUMMARY OF PLAN CLASSIFICATION AND TREATMENT

### A.     Classified Claims and Interests

#### 1.     Classified Claims and Interest Summary

**Article III** of the Plan classifies Claims against and Interests in the Debtors and sets forth the treatment for each Class.  The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Allowed Interests under the Plan.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND, THEREFORE, ARE SUBJECT TO CHANGE.  REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.[5]**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment in accordance with the terms of the Plan.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

---

[5]     The recoveries set forth in the chart are, in some cases, based on the estimated going concern value of the Reorganized Debtors, and may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business assets and general economic conditions.

| Class | Claim or Interest | Treatment of Claim or Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1 | Other Secured Claims | Each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, either:<br>(i) payment in full in Cash of its Allowed Other Secured Claim;<br>(ii) the collateral securing its Allowed Other Secured Claim;<br>(iii) Reinstatement of its Allowed Other Secured Claim; or<br>(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.<br>For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the treatment provided to any Allowed Other Secured Claim that is a GPX Claim that has not been satisfied prior to the Effective Date, if any, shall be provided by Golden Pass in accordance with the terms of the GPX Settlement and the Plan. | $2.87 | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $1.35 | 100% |
| 3 | Prepetition Credit Facility Claims | Each Holder of an Allowed Prepetition Credit Facility Claim shall, on the Effective Date, become party to, and bound by, the A&R Credit Facility on account of such Holder's Allowed Prepetition Credit Facility Claim, on the terms set forth in the A&R Credit Facility Documents. | $281.25[6] | 100% |
| 4 | Deferred Compensation Plan Claims | Except to the extent that a Holder of an Allowed Deferred Compensation Plan Claim agrees to less favorable treatment, each Allowed Deferred Compensation Plan Claim shall be Reinstated pursuant to section 1124 of the Bankruptcy Code, and each such Holder's rights under the Deferred Compensation Plan shall be honored by the Reorganized Debtors in accordance with the terms of the Deferred Compensation Plan. | $62.58 | 100% |
| 5 | Convenience Claims | Except to the extent that a Holder of an Allowed Convenience Claim agrees to less favorable treatment, | $4.10[7] | 100% |

---

[6]   Prepetition Credit Facility Claims include Prepetition L/C Claims, which are contingent and excluded from the amount disclosed here. This amount also excludes all other fees, premiums, and accrued and unpaid interest due and owing to Holders of Prepetition Credit Facility Claims under the Prepetition Credit Facility as of the Petition Date.

[7]   Any election to treat an Allowed General Unsecured Claim in excess of $25,000 as a Convenience Claim will increase the total amount of Allowed Convenience Claims, with a corresponding decrease to the total amount of Allowed General Unsecured Claims. Potential Convenience Claim elections are not included in this projection of the estimated amount of Allowed Convenience Claims.

| Class | Claim or Interest | Treatment of Claim or Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|-------|-------------------|-------------------------------|------------------------------------------|-----------------------------------|
| | | each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Convenience Claim, on the Effective Date or as soon as practicable thereafter, Cash in an amount equal to such Holder's Allowed Convenience Claim (excluding any interest that may be owed on such Claim), but in no event shall distributions on account of any Allowed Convenience Claim exceed the Convenience Claim Amount. | | |
| 6 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, its Pro Rata share of the GUC Trust Interests, the economic value of which shall (i) comply with the requirements of section 1129(b)(2)(B)(i) of the Bankruptcy Code even if Class 6 votes to accept the Plan, and (ii) be equal to the Allowed amount of such Claim as of the Effective Date, *plus* such Holder's Pro Rata share of any accrued interest on the GUC Trust Unsecured Note; *provided, however*, notwithstanding anything to the contrary in the Plan, all Allowed General Unsecured Claims that are GPX Claims, to the extent not satisfied prior to the Effective Date shall be paid by Golden Pass in accordance with the terms of the GPX Settlement and the Plan. | $57.40[8] | 100% |
| 7 | Intercompany Claims | Allowed Intercompany Claims shall be, at the option of the applicable Debtor, Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors, as applicable. | N/A | N/A |
| 8 | Intercompany Interests | Intercompany Interests shall, at the option of the applicable Debtor, be:<br>(i)  Reinstated; or<br>(ii)  set off, settled, addressed, distributed, contributed, merged, cancelled, or released. | N/A | N/A |
| 9 | Zachry Interests | Zachry Interests shall be Reinstated on the Effective Date, and the legal, equitable, and contractual rights to which Holders of Zachry Interests are entitled shall remain unaltered. | N/A | N/A |

---

[8]    The projected amount of Allowed General Unsecured Claims excludes various trade claims that are otherwise treated as Administrative Expense Claims, Other Secured Claims, and Other Priority Claims, as described in further detail in **Article I** hereof.

### III.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots (the "**Ballot**" or "**Ballots**") to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.      Voting Rights Summary

The following chart provides a summary of the status and voting rights of the classes of Claims and Interests under the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3 | Prepetition Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | Deferred Compensation Plan Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 5 | Convenience Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired/Unimpaired | Presumed to Accept / Presumed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Presumed to Accept / Presumed to Reject; Not Entitled to Vote |
| 9 | Zachry Interests | Unimpaired | Presumed to Accept; Not Entitled to Vote |

As set forth above, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3 and 6 (the "**Voting Classes**").

If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions in the Ballot(s).  Please only use the Ballot(s) that accompany this Disclosure Statement or the Ballot(s) that the Debtors or the Claims and Noticing Agent, otherwise provide to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Class.

The Debtors are **not** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 4, 5, 7, and 8.

### B.      Votes Required for Acceptance by a Class of Claims

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the amount and the number of claims voting to accept, as a percentage of the claims eligible to vote that have actually voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total claims that have voted.

### C.      Voting Record Date

**The Voting Record Date is January 22, 2025**.  The Voting Record Date is the date that determines when certain entities or persons are Holders of Claims for voting purposes under the Plan.  Except as otherwise set forth

herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

### D.      Solicitation Procedures

#### 1.      Claims and Noticing Agent

The Debtors have retained Kurtzman Carson Consultants, LLC doing business as Verita Global, LLC to act as the claims, noticing, and solicitation agent in connection with the solicitation of votes to accept or reject the Plan [Docket Nos. 9; 22].

#### 2.      Solicitation Package

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Classes (collectively, the "**Solicitation Package**"): (a) the Cover Letter, substantially in the form attached to the Disclosure Statement Order as **Exhibit 12**; (b) this Disclosure Statement (including the Plan and all other exhibits) on a USB flash drive; (c) the Disclosure Statement Order (without exhibits), on a USB flash drive; (d) the appropriate Ballot substantially in the forms attached to the Disclosure Statement Order as **Exhibits 2** and **3**; and (e) the Combined Hearing Notice, substantially in the form attached to the Disclosure Statement Order as **Exhibit 6**.

#### 3.      The Solicitation Package and Plan Supplement

The Claims and Noticing Agent will serve the Solicitation Package on Holders of Claims in the Voting Classes entitled to vote on the Plan, as of the Voting Record Date, by the later of January 30, 2025 and five Business Days following entry of the Disclosure Statement Order.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by: (a) calling the Debtors' restructuring hotline at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International), (b) submitting the inquiry form at www.veritaglobal.net/zhi/inquiry, and/or (c) writing to the Claims and Noticing Agent at Zachry Ballot Processing c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245. You may also obtain copies of any pleadings Filed with the Bankruptcy Court free of charge by visiting the Debtors' restructuring website: www.veritaglobal.net/zhi.

The Debtors shall File the Plan Supplement with the Bankruptcy Court no later than seven (7) calendar days before the Voting Deadline. The Plan Supplement may include initial drafts of the documents to be included in the Plan Supplement and may be further updated or modified after such deadline. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

### E.      Voting on the Plan

The Voting Deadline is **February 20, 2025, at 4:00 p.m. (prevailing Central Time)**. Holders of Claims in the Voting Classes are able to return their Ballots in hard copy or submit them electronically on the Debtors' online balloting portal. Ballots must be (1) properly completed, executed, and delivered timely via first-class mail, regular mail, overnight courier, or hand delivery to the Claims and Noticing Agent at 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245 or (2) submitted timely through the Debtors' online balloting portal on the Debtors' case website at www.veritaglobal.net/zhi.

Holders of Claims entitled to vote that cast a Ballot using the Debtors' online portal should **NOT** also submit a paper Ballot. The Debtors' online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots submitted via facsimile, email, or other means of electronic transmission will not be counted**.

The Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first

Business Day next succeeding the previously announced Voting Deadline.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion.

**Any votes cast on the Initial Plan will not count toward acceptance or rejection of the Plan.  Even if you previously submitted a vote on the Initial Plan, you should return your Ballot accepting or rejecting the Plan to ensure your vote is counted.**

**However, if you previously submitted an Opt-Out Form electing to opt-out of the Third-Party Release, your opt-out election remains valid and effective.  Parties who properly submitted Opt-Out Forms in connection with solicitation of the Initial Plan need not re-submit any Opt-Out Form.**

F.     **Ballots Not Counted**

No ballot will be counted toward Confirmation if, among other things: (1) it partially rejects and partially accepts the Plan; (2) it both accepts and rejects the Plan; (3) it is sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), the Committee, the Prepetition Credit Facility Agent, or the Professionals; (4) it is sent via facsimile or any electronic means other than via the Debtors' online balloting portal; (5) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (6) it is cast by an Entity that does not hold a Claim in the Class indicated in Item 1 of the Ballot; (7) it is submitted by a Holder not entitled to vote pursuant to the Plan; (8) it is unsigned; (9) it is a non-original Ballot (excluding those Ballots submitted via the Debtors' online balloting portal); and (10) it is not marked to accept or reject the Plan.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS, IN THEIR DISCRETION, DETERMINE OTHERWISE OR BY ORDER OF THE COURT.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN A VOTING CLASS FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.  NO BALLOT VOTING TO ACCEPT THE PLAN MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.**

G.     **Voting and Tabulation Procedures**

The Debtors' procedures and standard assumptions for tabulating Ballots (the "**Voting and Tabulation Procedures**") are set forth below.

| | |
|---|---|
| **Votes Not Counted** | • Any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; <br> • Any Ballot that is not actually received by the Claims and Noticing Agent by the Voting Deadline, unless the Debtors determine otherwise or as permitted by the Court; <br> • Any unsigned Ballot; <br> • Any Ballot that partially rejects and partially accepts the Plan in a particular Voting Class; |

| | |
|---|---|
| | • Any Ballot not marked to accept or reject the Plan in a particular Voting Class or marked both to accept and reject the Plan in a particular Voting Class; |
| | • Any Ballot superseded by a later, timely submitted valid Ballot, including all paper ballots if an E-Ballot is submitted; and |
| | • Any improperly submitted Ballot. |
| **No Vote Splitting** | • Holders are required to vote all of their Claims in a particular Voting Class to either accept or reject the Plan and are not permitted to split any votes in a particular Voting Class. |
| **Establishing Claim Amounts** | • Claim amounts for each Claim in a Voting Class will be pre-populated in the Ballots.<br><br>• Claim amounts for voting purposes:<br><br>(a) for Holders of Prepetition Credit Facility Claims will be established by reference to the list of recordholders maintained by the Prepetition Credit Facility Agent and provided to the Debtors;<br><br>(b) for Holders of General Unsecured Claims will be established by reference to the Debtors' Schedules and any filed Proof of Claim, as applicable, and subject to the following:<br><br>(i) the Claim amount Allowed by order of the Court;<br><br>(ii) the Claim amount (a) settled or agreed upon by the Debtors, as reflected in a document filed with the Court, or (b) set forth in an order of the Court;<br><br>(iii) the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under these Voting and Tabulation Procedures;<br><br>(iv) the Claim amount listed in the Proof of Claim; *provided* that such Claim is not objected to by the Debtors;<br><br>(v) the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim), *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid;<br><br>(vi) if the Claim amount is listed in the Schedules as contingent, disputed, or unliquidated and/or has not been paid (to the extent such Claim is not superseded by a timely filed Proof of Claim), provided that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, the amount of such Claim for voting purposes only (and not for ultimate distribution or allowance) shall be $1.00;<br><br>(vii) Proofs of Claim filed for $0.00 are not entitled to vote;<br><br>(viii) if a Claim for which a Proof of Claim has been timely and properly filed for unknown or undetermined amounts, or is unliquidated or contingent (as determined on the face of the Proof of Claim or after a reasonable review of the supporting documentation by the Debtors and the Claims and Noticing Agent), the amount of such Claim for voting purposes only (and not for ultimate allowance or distribution) shall be $1.00; *provided* that if a timely filed Proof of Claim is partially unliquidated or partially contingent (as determined on the face of the Proof of Claim or after a reasonable review of the supporting documentation by the Debtors and the Claims and Noticing Agent), such Claim is temporarily allowed in the amount that is liquidated and non-contingent for voting purposes only, and not for purposes of allowance or distribution;<br><br>(ix) notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and |

| | |
|---|---|
| | (x)   if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Voting Record Date, the later filed amending Proof of Claim shall be entitled to vote in a manner consistent with these Voting and Tabulation Procedures, and the earlier filed Proof of Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended Claim.  Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Voting Record Date shall not be considered for purposes of these Voting and Tabulation Procedures. |
| | • To the extent any Holder of a Claim in a Voting Class disagrees with the voting amount listed on its Ballot, it must file a motion under Bankruptcy Rule 3018 by the Rule 3018 Motion Deadline (as defined below) to request to vote in a different amount. |

### H.      Disputed Claim Procedures

The following procedures govern the treatment of Claims in a Voting Class subject to pending claims objections (the "**Disputed Claim Procedures**"):

1.   Absent further order of the Court, the Holder of a Claim in a Voting Class that is the subject of a pending objection only to reclassify or reduce the amount of such Claim, *i.e.*, a "reclassify" claims objection or a "reduce and allow" claim objection, shall be entitled to vote such Claim in accordance with the proposed reclassification or in the reduced amount (as applicable) contained in such claim objection.

2.   If a Claim in a Voting Class is subject to an objection other than a "reclassify" or "reduce and allow" objection that is filed with the Court ***on or prior*** to the Solicitation Deadline (a "**Disputed Claim**"), (a) the Debtor shall cause the applicable Holder to be served with the Disputed Claim Notice, and (b) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined below) occurs.

3.   If a Claim in a Voting Class is subject to an objection other than a "reclassify" or "reduce and allow" objection that is filed with the Court ***after*** the Solicitation Deadline, the applicable Claim shall be deemed temporarily allowed solely for voting purposes in an amount determined under the Voting and Tabulation Procedures, without further action by the Debtor or the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

4.   If the Holder of any Disputed Claim seeks to challenge the disallowance of its Claim for voting purposes or the amount of such Claim listed on its Ballot, such Holder must file with the Court a motion for entry of an order, pursuant to Bankruptcy Rule 3018(a), temporarily allowing such claim for purposes of voting to accept or reject the Plan or allowing such claim in a different amount for voting purposes (a "**Rule 3018 Motion**").  Any Rule 3018 Motion must be filed with the Court and served on the Debtors so as to be **actually received by February 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Rule 3018 Motion Deadline**"), and the Court shall resolve the Rule 3018 Motion at the Combined Hearing, provided a Resolution Event does not occur prior to the Combined Hearing.  The Debtors' deadline to formally respond to any Rule 3018 Motion shall be February 26, 2025.

5.   **If a Holder of a Claim in the Voting Classes did not file a timely Rule 3018 Motion during the solicitation of the Initial Plan, and if the voting amount listed on such Holder's Ballot is the same as the voting amount listed on any prior ballot, such Holder shall be deemed to accept the amount of their Claim listed on their Ballot for voting purposes and may not file a Rule 3018 Motion.**

A "**Resolution Event**" means, with respect to a Disputed Claim, the occurrence of one or more of the following events prior to or at the Combined Hearing:

1.   Entry of an order of the Court, after notice and a hearing, allowing such Claim pursuant to section 502(b) of the Bankruptcy Code;

2. Entry of an order of the Court, after notice and a hearing, granting a Rule 3018 Motion and temporarily allowing such Claim for voting purposes;

3. Execution of a stipulation or other agreement between the Holder of a Disputed Claim and the Debtor resolving the objection and allowing such Claim for voting purposes in an agreed-upon amount or otherwise fixing an amount of the Claim for voting purposes; or

4. Voluntary withdrawal of the pending objection by the objecting party.

## IV. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS

### A. Corporate History

The Company traces its history back 100 years, to 1924, when Henry Bartell "Pat" Zachry founded H.B. Zachry Company and the company took on its first construction project: a series of four highway concrete-reinforced bridges in Laredo, Texas. For the construction of this initial project, Bridge No. 2 on Highway 12A, Pat Zachry and his crew used mule-drawn wagons and H.B. Zachry Company's total working capital was $2,400. Other than the crew's mule-drawn wagons, the only equipment used was a 7S concrete mixer powered with a one-cylinder motor.

Over the next several years, the company continued to perform on a series of small construction contracts and, in 1930, it officially incorporated. The company continued to win contracts throughout the 1930's and 40's, including its first federal contract (a concrete paving job at Randolph Field, now known as Randolph Air Force Base, in San Antonio, Texas) and its first project outside of Texas (the Texas-New Mexico pipeline in Lea County, New Mexico). In 1952, the Company moved its headquarters from Laredo to San Antonio, then a budding metropolitan area with a population of less than 500,000.

In the 1950's and 60's, the company continued to expand its reach in the United States and internationally with projects including the Nike Zeus military complex in the Marshall Islands and a highway to connect the towns of Pucallpa and Aguaytia in Peru.

In 1965, Pat Zachry stepped down and his son, Henry "Bartell" Zachry, Jr., became the company's new president. The company continued to grow. That same year, the company began work on Spain's first nuclear power plant, the Jose Cabrera Power Plant, near Zorita. The next year, in 1966, H.B. Zachry Company was one of five contractors awarded the largest single contract in U.S. history, to develop a multipurpose flood control, water, and power project on the Yuba River in California. Also in 1966, the company began work on the Lake Brazos Dam in Waco, Texas—another of the company's largest projects at the time. It was completed in 1969.

In 1968, the company constructed San Antonio's Hilton Palacio del Rio Hotel. The construction started in advance of the HemisFair 1968 World's Fair so that visitors would have a place to stay. Because traditional construction methods would have been too time-consuming to allow the hotel to be completed on the timeline needed to meet the expected influx of visitors for the World's Fair, the company employed an innovative modular construction method and prefabricated the hotel rooms. With these methods, the company completed the 21 story, 496 room hotel in only 202 days (just over seven months), with employees working around the clock to accomplish the job. The prefabricated rooms were assembled 7 miles off-site. They were each fitted at ground level with furniture, drapes, carpeting, lamps, radios, television sets, pictures on the walls, towels on the towel rails, and even soap in the soap dishes. Then, the rooms were loaded onto the back of flatbed trucks and driven into the construction site in San Antonio, where a specially-built crane lifted each room to its assigned floor. The feat is now remembered as a local legend. The success of the World's Fair, and the hotel that the company constructed for it, is credited as the spark that set San Antonio's now-bustling tourist industry aflame. The American Society of Civil Engineers named Bartell Zachry its Engineer of the Year for the project. Now, every day tourists floating along the San Antonio River on tour barges learn the story of the hotel's construction as they pass by where it stands as a testament to the company's engineering prowess and ingenuity.

In 1969, the company was commissioned by the Puerto Rican government to build two oil-fired power plants in the town of Guayanilla. In 1996, H.B. Zachry Company began construction on the West Dam in Hemet, California,

12

along with its joint venture partners on the project. The West Dam is an approximately 1.7-mile long, 300-foot-high dam that required the excavation of 5.5 million cubic yards of earth. It was part of one of the largest civil engineering projects in the United States at the time of its construction. The West Dam was completed in 1998.

In 1998, John Zachry and his brother David Zachry assumed top executive roles at the company, the third generation of Zachry family members to take the helm of the business, after 33 successful years under the leadership of Bartell Zachry.

In 1999, the company completed construction of the U.S. Embassy in Moscow in the wake of the Cold War. The company's involvement in the project came after the revelation that the prior construction was laden with sophisticated Soviet-era surveillance devices. That construction had been abandoned, until Congress determined to knock down the top two preexisting floors and build four new floors that would serve as bug-free offices for U.S. diplomats. The project, aptly named "Operation Top Hat," was highly confidential at the time. All three hundred members of the H.B. Zachry Company construction team had to obtain top security clearances and worked behind a carefully-guarded barbed-wire perimeter.

In 2008, the company reorganized to split into two independent and separately run businesses bearing the Zachry name. John Zachry became the head of Zachry Industrial, which includes the Debtors in these Chapter 11 Cases, focusing on industrial projects. David Zachry took over the company's heavy civil and building construction work under the name Zachry Construction. No entities related to Zachry Construction's business are included in these Chapter 11 Cases.

### B.    Business Operations

The Company's business segments include industrial, engineering, nuclear engineering, maintenance, and turnaround services. The Debtors' operating revenue for the twelve-month period that ended on December 31, 2023 was approximately $5.4 billion. As of the Petition Date, the Debtors had $281.25 million in aggregate original principal amount of prepetition funded debt obligations and approximately $163.3 million in cash on hand. The Debtors' business segments are each described below.

#### 1.    Industrial Projects

Debtor ZII manages capital projects of the Debtors' customers, including new facilities, improvements, and expansions. ZII is the Debtor entity that is the counterparty on the Debtors' major industrial engineering, procurement, and construction ("**EPC**") project commitments, including the Debtors' four current major projects summarized in more detail in **Article IV.C**, below. The Debtors typically perform all EPC-related services on a turnkey basis but can also provide these services on a stand-alone basis. ZII's industrial services include: (i) project and construction management; (ii) EPC project delivery; (iii) direct-hire construction; (iv) plant startup and commissioning; and (v) logistics and supply chain management.

#### 2.    Engineering

The Company's engineering services are performed by Debtor Zachry Engineering Corporation ("**ZEC**"). ZEC is a full-service engineering firm, with an integrated high-value engineering center ("**HVEC**") in Manila, Philippines. With a growing emphasis on HVEC support for its customers, ZEC has integrated teams of engineers across its U.S. and Manila offices. ZEC's customers can choose the engineering services that meet their needs, or conveniently streamline industrial projects with a single provider of engineering, procurement, fabrication, and construction services.

#### 3.    Nuclear Engineering

The Company's nuclear engineering services are provided by Zachry Nuclear Engineering, Inc. ("**ZNE**"). ZNE is a full-service engineering firm providing analysis, engineering, design, and project management services to the operating nuclear fleet, as well as analysis and design services for the next generation of advanced reactors including nonlight water reactors. ZNE offers skilled mechanical, electrical, controls, civil, structural, and nuclear

engineering professionals and designers who are knowledgeable and experienced in power plant systems, engineering analysis, software, and design development.  ZNE has performed all phases of nuclear power plant projects from conceptual and detailed design to construction and startup testing.

### 4.    Maintenance

The Company's maintenance services are provided by Zachry Maintenance Services, LLC ("**ZMS**"), a direct subsidiary of Debtor Zachry Plant Services Holdings, Inc. ("**Zachry Plant Services**").  ZMS has a presence in over 60 customer locations and is one of America's largest "merit shop" employers.  Maintenance services include a range of work on its customer's sites, including nested presence, continuous presence small capital projects and facilities maintenance, and full service or supplemental support to customer's staff.  ZMS provides small to large crew sizes, has a large geographic footprint, and has numerous multi-site alliance relationships.

### 5.    JVIC Turnaround & Specialty Services

Debtor J.V. Industrial Companies LLC ("**JVIC**") which has been a part of the Company since 2012, provides turnaround and specialty services to industrial customers across North America.  JVIC offers a comprehensive suite of capabilities required to perform the work to the highest standards of quality, safety, and timeliness.  JVIC's services include: (i) planning and scheduling (JVIC offers a dedicated team of experts who provide turnkey management of turnaround planning and execution); (ii) piping and specialty welding (JVIC maintains a long-tenured team of specialty craftspeople with state-of-the-art skills across all alloys); (iii) tower services (JVIC has knowledgeable tower superintendents who are experienced in the modification, maintenance, and replacement of towers and tower internals, as well as all associated process enhancements and reconfigurations); (iv) mechanical and heat exchanger services (JVIC's expertise in this area includes bolted connections and process equipment assembly covering bundle extraction and repair and heat exchangers); and (v) bolt torquing and machining (JVIC has extensive experience across all types of heavy equipment to deliver the torqueing, extraction, beveling, machining and monitoring of critical bolted components).   In addition, JVIC provides project turnaround scope development strategy, management, and coordination; turnaround readiness assessments; heavy rigging and lifting; and engineered critical lift planning.

### 6.    JVIC Turnaround & Specialty Services

Debtor JVIC Fabrication, LLC ("**JVIC Fabrication**"), a direct subsidiary of Zachry Plant Services, is one of the largest pipe fabricators on the Gulf Coast.  JVIC Fabrication has multiple state-of-the-art facilities in the Gulf Coast capable of supporting all project requirements, including American Society of Mechanical Engineers (or ASME) code pipe, vessel, and modular fabrication.  JVIC Fabrication's turnkey industrial pipe and vessel fabrication capabilities span over 200,000 square feet of indoor fabrication and machining space, with over 5,000 pipe spools per month production capacity, and 46 acres of laydown yardage available for material storage.

### 7.    Madison Turnaround Services

Debtor Madison Industrial Services Team, LLC ("**Madison**") was established in 2005 to offer union labor to better serve customers' needs.  Madison is the only Debtor entity with union employees.  Today, Madison provides turnaround/outage and specialty services to America's process, pulp and paper, and power industries.  Madison is a single source company with industrial, mechanical, and specialty welding services to meet all unique technical and safety challenges that this field of work involves.

### C.    Zachry Industrial's Current Projects

After ZII's withdrawal from the GPX Project pursuant to the terms of the GPX Settlement, Zachry Industrial, through Debtor ZII, is currently involved in four major EPC projects, each of which has a contract value of at least $400 million.  Each of these EPC projects is summarized below.  In addition to its major projects, Zachry Industrial is involved in over 700 additional ongoing projects, including ones for maintenance, fabrication, and turnaround services.

1.      **OPPD Project**

The OPPD Project is a project for Omaha Public Power District ("**OPPD**") related to its Power with Purpose initiative.  Zachry is responsible for the design and construction of both of OPPD's new natural gas generation facilities, Standing Bear Lake Station, a 150 MW facility in Douglas County, Nebraska, and Turtle Creek Station, a 450 MW facility in Sarpy County, Nebraska, and associated substations.  Major construction on the OPPD Project began in the first quarter of 2022 and scheduled to be completed in the first quarter of 2025.  As discussed further in **Article VI.N** hereof, the Debtors and OPPD entered into a settlement related to the OPPD project, modifying certain project milestones and providing for the immediate payment of certain OPPD vendors, among other terms.  The total contract value of the OPPD Project is approximately $429 million.

2.      **GTPP ISBL Project**

GTPP ISBL Project is a project for an integrated polymers facility in Orange, Texas for Golden Triangle Polymers Company LLC ("**GTPP**"), a joint venture between Chevron Phillips Chemical Company LLC ("**CP Chem**") and Qatar Energy ("**QE**").  ZII's inside battery limits ("**ISBL**") work on the project is performed through ZDJV, a joint venture between Debtor ZII and DL USA, Inc. (the U.S. subsidiary of the South Korean chemical and construction conglomerate DL Group) (together with ZII, the "**GTPP ISBL Contractor**").  ZDJV is responsible for the engineering, procurement, and construction of the polyethylene units.  As discussed further in **Article VI.O** hereof, the contract price for the GTPP ISBL Project originally included fixed and variable components.  The GTPP Contractor and GTPP subsequently agreed to convert the contract price to a single fixed sum, which agreement was approved by the Bankruptcy Court.  The total contract value of the GTPP ISBL Project is now approximately $1.3 billion, with ZII's estimated share totaling approximately $800 million.

3.      **GTPP OSBL Project**

GTPP OSBL Project is the integrated polymers facility being constructed for the CP Chem and QE joint venture, GTPP.  The outside battery limits ("**OSBL**") GTPP project relates to portions of the facility's "ethane cracker," a plant that performs the first step in the process of transforming ethane from natural gas into plastics products.  The work includes the utilities and infrastructure scope of the GTPP ethane cracker.  The GTPP OSBL work is being executed by BMZ Third Coast Partners, a joint venture between ZII and Burns & McDonnell Engineering Company, Inc.  The total contract value of the GTPP OSBL Project is approximately $2.25 billion, with ZII's estimated share totaling approximately $1.13 billion.

4.      **PLNG Project**

The PLNG Project is a project for an LNG export plant in Plaquemines Parish, Louisiana for Venture Global LNG.  The work is being performed in two phases by KZJV, a joint venture between ZII and KBR Inc.  The total contract value for both phases of the PLNG Project is approximately $10.7 billion, with ZII's share totaling approximately $5.7 billion.

D.      **The Debtors' Prepetition Corporate and Capital Structure**

1.      **Corporate Structure**

As shown in the organizational chart attached to this Disclosure Statement as **Exhibit E**, the Company's operations are divided across numerous operating entities.  The operating entities include ZEC, ZII, ZNI, JVIC Fabrication, LLC, ZMS, JVIC, and Madison, and non-Debtor UE Properties, Inc. and Moss Point Properties, LLC.  All operating companies are directly or indirectly owned by ZHI.

2.      **Capital Structure**

a.      **The Debtors' Prepetition Indebtedness**

As of the Petition Date, the Debtors had approximately $163.3 million in cash on hand, $281.25 million in aggregate outstanding principal amount of funded debt obligations under the Prepetition Credit Agreement, and $618.9 million in outstanding undrawn letters of credit issued under the Prepetition Credit Agreement.

### i.      Prepetition Credit Agreement

The Debtors' prepetition capital structure consisted of (i) a revolving credit facility, which included a swing line facility (the "**Revolving Credit Facility**"), and (ii) a term loan facility (the "**Term Loan Facility**"), each pursuant to that Prepetition Credit Agreement and together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including, without limitation, the Loan Documents (as defined therein), collectively, the "**Loan Documents**"), by and among the Prepetition Loan Parties, the Prepetition Lenders, the Prepetition Credit Facility Agent, and each other party thereto.

Pursuant to the Loan Documents, the Debtors granted the Prepetition Lenders a first priority security interest in, and lien on, Collateral (as defined in the Prepetition Credit Agreement), consisting of substantially all assets of the Debtors (the "**Collateral**," and the liens and security interests granted on the Collateral under the Loan Documents, the "**Liens**"), to secure all obligations under the Loan Documents (collectively, the "**Secured Obligations**").

Pursuant to that certain *Third Amended and Restated Continuing Guaranty*, dated as of May 2, 2023 (as amended, restated, supplemented, or otherwise modified from time to time), the Debtors party thereto, as guarantors (the "**Guarantors**," and together with the Borrowers, collectively, the "**Loan Parties**") guaranteed, on a joint and several basis, all of the Secured Obligations.  The Guarantors are Zachry Enterprise Solutions, LLC; ZNI; ZEC; ZII; Zachry Nuclear Construction, Inc.; ZNE; JVIC Fabrication; ZMS; JVIC; Zachry High Voltage Solutions, LLC; 2EC New York, Inc.; UE Properties, Inc.; ZEC Michigan, Inc.; Zachry Construction, Inc.; Moss Point Properties, LLC; Computer Simulation & Analysis, Inc.; Zachry Industrial Americas, Inc.; and Madison.

The Prepetition Credit Agreement provided for borrowings and letters of credit in the aggregate principal amount of $956.25 million.  As of the Petition Date, the aggregate amount of revolving loans outstanding under the Revolving Credit Facility was approximately $125 million, and the aggregate amount of term loans outstanding under the Term Loan Facility was approximately $156.25 million.  As of the Petition Date, there was approximately $618.9 million in outstanding undrawn letters of credit issued under the Prepetition Credit Agreement.[9]

### ii.      Prepetition Unsecured and Secured Trade Debt

As of the date of this Disclosure Statement, the Debtors estimate that their valid, prepetition trade debt totals approximately $132.50 million, subject to further reconciliation and reduction on account of GPX Claims paid by Golden Pass and other postpetition settlements and payments authorized by the Bankruptcy Court.  The Debtors' outstanding trade debt is hundreds of millions of dollars lower than it was on the Petition Date, as set forth in **Article I** of this Disclosure Statement.  Ultimately, only approximately $57.40 million in trade debt remains outstanding that is expected to be treated as General Unsecured Claims under the Plan.

### iii.      Deferred Compensation Plan

The Debtors offer the Deferred Compensation Plan to certain employees, which provides participating employees with the opportunity to defer payment of certain earned compensation, thereby deferring the associated income tax obligations to a later date.  The amount that the Debtors pay to plan participants through the Deferred Compensation Plan each year varies, and is dependent on, among other things, the employment status of the participants and elections made by the participants as to the timing of payments.  While the Debtors stopped matching contributions to the Deferred Compensation Plan after 2015, the Debtors still owe some amounts to participants from employer matches to employee contributions under the Deferred Compensation Plan.  As of the date hereof, there are 315 participants in the Deferred Compensation Plan and the Debtors estimate that they owe participants approximately $62.58 million under the Deferred Compensation Plan.

---

[9]      In addition, ZHI is the obligor on a $5 million letter of credit issued by IBC outside of the Credit Agreement in connection with the Debtors' legacy workers compensation program.  That letter of credit is fully cash collateralized.

As set forth in the Plan, Deferred Compensation Plan Claims by plan participants: (i) are separately classified as Class 4; (ii) are Unimpaired; and (iii) will recover in full on and after the Effective Date. Specifically, the Plan provides that all compensation and benefits plans, including the Deferred Compensation Plan, in place as of the Effective Date with the Debtors shall be assumed or reinstated by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans in full. In exchange for such treatment, the Plan provides that all Proofs of Claim asserting Deferred Compensation Plan Claims shall be deemed satisfied, in the Allowed amount for any Deferred Compensation Plan Claims that have been Allowed by the Court, and expunged on the Effective Date, without prejudice to such Holders' rights to recover on their Deferred Compensation Plan Claims in full in the ordinary course of business following the Effective Date.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Any assumption or reinstatement of such compensation and benefits plans, including the Deferred Compensation Plan, pursuant to the terms of the Plan shall be deemed not to trigger any applicable change of control, immediate vesting, termination, or similar provisions in any applicable plan or program, or an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions. No counterparty shall have rights under a compensation and benefit plan or program, including the Deferred Compensation Plan, assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

## V.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

The Debtors commenced these Chapter 11 Cases as a result of financial distress caused by the GPX Project. In 2019, Golden Pass, an entity 100% owned by affiliates of Exxon Mobil Corporation and QE, selected ZII's bid for the design and construction of the LNG liquefication and export facilities. ZII, CB&I, and Chiyoda then formed an unincorporated joint venture ("**CCZJV**") through the Hybrid Joint Venture Agreement dated January 30, 2019 (the "**HJVA**") to allocate design and construction responsibilities on the GPX Project. CCZJV, as the "Contractor," entered into that certain *Contract No. GPP-EPC 1*, dated January 30, 2019 (as amended, the "**GPX EPC Contract**") with Golden Pass to provide engineering, procurement, construction, and commissioning for the GPX Project.

The total contract value of the GPX Project was approximately $10 billion, with ZII's estimated share totaling approximately $5.8 billion. The project consists of three "trains" (the liquefaction units that produce LNG), each capable of producing approximately 5.2 million tons of LNG per year. The first train was initially scheduled to become operational in 2024.

ZII's engineering and construction of the GPX Project was a massive undertaking. Although the contract price was fixed, the contract price was subject to modification via change orders, with ZII and its joint venture partners to receive only set progress payments absent Golden Pass's approval of change orders. ZII quickly faced unexpected obstacles after it began work in mid-2019 and other challenges arose when construction on the additional LNG facilities broke ground. The original contract price did not address the cost challenges. Accordingly, ZII and its joint venture partners engaged in negotiations with Golden Pass and its owners to address the need for additional funding for the GPX Project. The series of amendments or side letters to the GPX EPC Contract provided insufficient support for ZII.

Prior to April 2024, ZII was expending significantly more on the GPX Project than it was receiving in monthly progress payments from Golden Pass. In March of this year, Golden Pass began direct-paying vendors, and significantly reduced advance progress payments due to ZII—further constraining ZII's cash flows. In April, Golden Pass stopped the progress payments to ZII altogether.

In April and May of 2024, ZII and Golden Pass engaged in mediation in an attempt to resolve their issues consensually, but these efforts did not ultimately lead to a settlement. On May 8, 2024, ZII received a notice of default and breach under the GPX EPC Contract from Golden Pass and a notice of default and breach under the HJVA from CCZJV. ZII responded to these default notices by denying the allegations set forth therein. ZII received a subsequent notice of default from Golden Pass on May 16, 2024 and responded that same day. Golden Pass agreed to a standstill with respect to its notice of default until May 21, 2024.

Having exhausted all other options, the Debtors were forced to commence these Chapter 11 Cases in order to preserve ZII's rights under the GPX EPC Contract.

## VI.   SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES

### A.   Commencement of Chapter 11 Cases

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered under ZHI's case number 24-90377 (MI) pursuant to Bankruptcy Rule 1015(b).  The Debtors remain in possession of their property and continue to manage their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.   First Day Motions

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors filed several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  The Debtors sought, and the Bankruptcy Court entered orders approving, those First Day Motions to maintain their operations in the ordinary course.  This relief allowed the Debtors, among other things:

- to continue paying employee wages and paying for and maintaining employee benefits programs;

- to continue the use of the Debtors' cash management system, bank accounts, and business forms;

- to continue insurance programs and the Debtors' surety bond program;

- to pay certain prepetition taxes and fees;

- to pay certain prepetition claims of critical vendors, lien claimants, foreign claimants, and § 503(b)(9) claimants;

- to establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service; and

- to consensually use cash collateral.

The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge at www.veritaglobal.net/zhi.

### C.   Procedural Motions

The Debtors also filed various motions that are common to chapter 11 proceedings of similar size and complexity as these Chapter 11 Cases, including:

- a motion to employ the Claims and Noticing Agent;

- a motion establishing procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals;

- a motion to extend the time for the Debtors to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs, as well as Rule 2015.3 Financial Reports; and

- a motion for joint administration of the Chapter 11 Cases.

### D.       Appointment of the Committee

On June 4, 2024, the U.S. Trustee appointed the Committee [Docket No. 176].  On July 9, 2024, the Committee filed its *Verified Statement of the Statutory Unsecured Claimholders' Committee of Zachry Holdings, Inc., et al. Pursuant to Bankruptcy Rule 2019(c)* [Docket No. 433].  The Committee members are: (i) Sunbelt Rentals, Inc., and its wholly owned subsidiary, Sunbelt Rental Scaffold Services LLC; (ii) Bigge Crane and Rigging Co.; (iii) Rush, LLC aka Rush Resources; (iv) Innovative Heat Treatment Solutions; (v) Calcam Logistics & Contracting, LLC; and (vi) P & I Supply.  The Committee filed applications for, and the Bankruptcy Court entered orders approving, the retention of Proskauer Rose LLP as counsel [Docket Nos. 329; 574]; Gray Reed LLP as co-counsel [Docket Nos. 330; 333; 572]; and Huron Consulting Group Inc. as financial advisor [Docket Nos. 332; 573].

### E.       Retention of Professionals

The Debtors filed applications for, and the Bankruptcy Court entered orders approving, the retention of certain Professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in these Chapter 11 Cases, including White & Case LLP as restructuring counsel [Docket Nos. 217; 441]; Hicks Thomas, LLP as special litigation co-counsel [Docket Nos. 219; 440]; Susman Godfrey LLP as special litigation co-counsel [Docket Nos. 220; 442]; and M3 Advisory Partners, LP as financial advisor [Docket Nos. 218; 443].

On October 8, 2024, the Debtors filed an emergency application to retain Lazard as their investment banker to raise certain exit financing in connection with the Initial Plan [Docket No. 1102].  On October 15, 2024, the Court entered an order approving Lazard's retention [Docket No. 1159].  On January 10, 2025, the Debtors filed an emergency supplemental application expanding Lazard's engagement terms to provide valuation services and otherwise assist in the development and confirmation of the current Plan [Docket No. 1901].  The hearing date on the Debtors' application to amend Lazard's scope of retention is scheduled for January 23, 2025.

### F.       Section 341 Meeting

On June 28, 2024 and August 15, 2024, the Debtors attended meetings of their creditors pursuant to section 341 of the Bankruptcy Code and addressed inquiries from the U.S. Trustee regarding, among other topics, the Debtors' schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs and other issues related to these Chapter 11 Cases [Docket Nos. 249; 376; 652; 655].

### G.       *De Minimis* Asset Sales

Prior to the Petition Date, in connection with the ordinary course operations of their businesses, the Debtors regularly entered into transactions to sell or otherwise dispose of equipment, machinery, spare parts, vehicles, and other assets, that were no longer needed, that had otherwise become obsolete and were not useful to continue their business operations, that were exceedingly expensive to remove, store, or otherwise dispose, or that the Debtors had a legitimate business reason to sell or otherwise dispose of.

On July 2, 2024, the Debtors filed a motion seeking approval of procedures for the sale or transfer of certain assets that were of relatively *de minimis* value compared to the Debtors' total asset base (the "**De Minimis Assets**") free and clear of liens, claims, interests, and encumbrances [Docket No. 411].  On July 24, 2024, the Bankruptcy Court entered an order approving the motion [Docket No. 609].

### H.       Schedules and Statements

On July 16, 2024, the Debtors filed their Schedules of Assets and Liabilities [Docket Nos. 511-31] and Statements of Financial Affairs [Docket Nos. 532-52].  On August 30, 2024, December 2, 2024, and December 20, 2024, certain of the Debtors filed amendments to Schedules E/F, Part 2 (Creditors Who Have Unsecured Claims) and/or Schedule A/B 75 (Assets – Real and Personal Property) [Docket Nos. 855-864, 1564, 1770-1775] (the "**Amended Schedules**").

I.        **GPX Project Litigation and Settlement**

On the Petition Date, ZII filed the adversary proceeding captioned *Zachry Industrial, Inc. v. Golden Pass LNG Terminal LLC* (Adv. Pro. No. 24-03105 (MI)) (the "**GPX Project Litigation**"), seeking, among other things, avoidance of the First, Second, and Third Amendments to the GPX EPC Contract and certain other agreements and transfers among the Debtors and Golden Pass, recovery of the value of the avoided transfers, and equitable subordination of any claims that Golden Pass may assert against ZII.

On May 23, 2024, the Court entered a stipulation and agreed order modifying the automatic stay, to the extent applicable, to allow Golden Pass to pay certain vendors directly in order to ensure the health and safety of personnel, protect the environment, preserve equipment and other physical assets, and allow for other essential services on the GPX Project pending ZII's decision to assume or reject the GPX EPC Contract.

After discussion at the first day hearing in these Chapter 11 Cases and a subsequent status hearing about the GPX Project, ZII, Golden Pass, CB&I, Chiyoda, and the CCZJV (together, the "**Mediation Parties**") agreed to mediate disputes arising out of the GPX Project.  The negotiations began on the weekend of June 1, with the Honorable Judge Christopher M. Lopez serving as mediator.  In connection with the mediation, on June 5, 2024, the Mediation Parties stipulated to a litigation standstill through June 17, 2024.

On June 18, 2024, following the termination of that litigation standstill, Golden Pass filed: (i) the *Emergency Motion of Golden Pass LNG Terminal LLC for Entry of an Order Compelling Rejection of EPC Contract; or, in the Alternative Granting Relief from the Automatic Stay* [Docket No. 299], seeking entry of an order compelling rejection of ZII's interest in the GPX EPC Contract, or, alternatively, relief from the automatic stay to permit Golden Pass to exercise its rights under the GPX EPC Contract, and (ii) the *Motion for Entry of an Order Modifying the Automatic Stay, to the Extent Applicable, to Permit Golden Pass LNG Terminal LLC to Comply with Administrative Requirements Imposed by Non-Debtor Letter of Credit Issuer Under Letter of Credit* [Docket No. 302], seeking entry of order permitting Golden Pass to submit documents required to draw on the standby letter of credit issued by Bank of America, N.A. in favor of Golden Pass by the order of and for the account of ZII (the "**GPX L/C**").

On June 25, 2024, CB&I and Chiyoda filed the *Joint Emergency Motion of Chiyoda International Corporation and CB&I LLC for Entry of an Order (I) Granting Relief from the Automatic Stay, (II) Waiving the Requirements of Bankruptcy Rule 4001(A)(3), and (III) Granting Related Relief* [Docket No. 350], seeking entry of an order lifting the automatic stay to, among other things, permit them to enforce their own rights and remedies against ZII under the HJVA.

Despite the parties' filings, mediation and settlement discussions continued among the Mediation Parties. After nearly two months of hard-fought negotiations, and the entry of two consensual stipulations negotiated by the Mediation Parties to provide for the continuation of certain essential services at the GPX Project, the Mediation Parties reached an agreement on a comprehensive resolution of all issues related to the GPX Project Litigation and disputes.

On July 19, 2024, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV, (II) Authorizing the Parties to Perform Any and All Obligations Contemplated by the Settlement, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 587], seeking Court approval of this global settlement, which:

- released the Debtors from all current and future claims or causes of action arising under, related to, or in connection with the GPX EPC Contract, the HJVA, and CCZJV;

- provided for the processing and direct payment of vendors' valid GPX Project-related claims by Golden Pass, subject to a cap, with the Debtors agreeing to a commensurate increase to the GPX Project letter of credit amount under their prepetition credit facility for any amounts paid by Golden Pass above the cap;

- provided for the Debtors' immediate rejection of the GPX EPC Contract and transition of the Debtors' work scope to their joint venture partners, allowing parties to rehire workers, advance scope, and complete a project that will have substantial economic benefits;

- limited the amount that Golden Pass can draw from the GPX Project letter of credit and provides for a schedule of when remaining amounts can be drawn, minimizing secured claims against the Debtors;

- provided for the transfer of certain equipment and other documents, data, and materials from the Debtors to Golden Pass and the joint venture partners without charge, facilitating the Debtors' efficient demobilization from the GPX Project and the remaining parties' ongoing work;

- provided for ZII's rejection of its interests in the HJVA, allowing the joint venture partners to enter into new terms with Golden Pass to complete the project; and

- provided for the payment of certain retainage to the Debtors to support the Debtors' demobilization efforts, and the Debtors' agreement to complete such demobilization by August 26, 2024. [10]

On July 24, 2024, the Court entered *the Interim Order (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV, (II) Authorizing the Parties to Perform Any and All Obligations Contemplated by the Settlement, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 625] (the "**GPX Interim Settlement Order**"). On August 12, 2024, the Court entered the *Final Order (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV, (II) Authorizing the Parties to Perform Any and All Obligations Contemplated by the Settlement, and (III) Granting Related Relief* [Docket No. 744] (the "**GPX Final Settlement Order**"). The GPX Final Settlement Order approved, on a final basis, the GPX Settlement pursuant to the terms of the Settlement Term Sheet (attached as **Exhibit A** to the GPX Interim Settlement Order and filed under seal at Docket No. 610) and related Definitive Documents (as defined therein), including the Confidential Settlement Agreement and Release in Connection with the Settlement Term Sheet (as such terms are defined in the Settlement Term Sheet), filed at Docket No. 739.

As of August 26, 2024, ZII had completely demobilized from the GPX Project and transitioned its scope of work to its former joint venture partners pursuant to the terms of the GPX Settlement. In connection with the Debtors' transition and demobilization from the GPX Project, and in consultation with Golden Pass and CB&I, the Debtors filed numerous motions to assume and assign or reject various Executory Contracts and Unexpired Leases relating to the GPX Project:

- On July 20, 2024 the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Personal Property Leases and Related Executory Contracts Effective as of July 20, 2024* [Docket No. 591] (the "**First GPX Omnibus Rejection Motion**"), seeking authorization to reject certain equipment leases for property utilized at the GPX Project. On August 15, 2024, the Court entered an order granting the relief requested in the First GPX Omnibus Rejection Motion [Docket No. 771].

- On August 10, 2024, the Debtors filed the *Debtors' Second Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Executory Contracts Effective as of August 10, 2024* [Docket No. 730] (the "**Second GPX Omnibus Rejection Motion**"), seeking authorization to reject various vendor agreements that ZII entered into in connection with the GPX Project that would not be assumed and assigned or novated to ZII's former joint venture partner on the GPX Project, CB&I. On September 11, 2024, the Court entered an order approving the Second GPX Omnibus Rejection Motion [Docket No. 935].

- On September 13, 2024, the Debtors filed the *Debtors' Third Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Executory Contracts Effective as of September 13, 2024* [Docket No. 951] (the "**Third GPX Omnibus Rejection Motion**"), further seeking to reject various vendor agreements. On October 7, 2024, the Court entered an order approving the Third GPX Omnibus Rejection Motion [Docket No. 1095].

- On August 14, 2024, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Assumption and Assignment of Certain GPX Project Executory Contracts* [Docket No. 767] (the "**First GPX Omnibus Assumption Motion**"), seeking authorization to assume and assign

---

[10] The specific terms of the GPX Settlement are set forth in the Term Sheet attached as **Exhibit A** to the GPX Interim Settlement Order.

various executory contracts and unexpired leases to CB&I. Consistent with the Settlement Term Sheet attached to the GPX Interim Settlement Order, Golden Pass agreed to pay cure amounts under the assigned contracts. On October 4, 2024, the Court entered an order approving the First GPX Omnibus Assumption Motion [Docket No. 1088].

Although the GPX Settlement resolved all core issues between the Mediation Parties, two intra-joint venture issues remained outstanding after entry of the GPX Final Settlement Order. On August 20, 2024, the Debtors filed an *Emergency Motion to Interpret and Enforce the Golden Pass Settlement Agreement* [Docket No. 792], seeking resolution of: (i) the Debtors' entitlement to proceeds of a first-party professional liability insurance claim for losses in connection with repairing a levee on the GPX Project, and (ii) the Debtors' entitlement to funds in the joint venture receiving account for work ZII had completed and invoiced prior to the Chapter 11 Cases. Under the HJVA, the Debtors asserted that they are entitled to certain potential insurance proceeds related to levee repair and funds held by the HJVA related to invoices for their completed work submitted prior to entry of the GPX Interim Settlement Order. On August 27, 2024, Chiyoda and CB&I filed their *Joint Response of Chiyoda International Corporation and CB&I LLC to Debtors' Emergency Motion to Interpret and Enforce the Golden Pass Settlement Agreement* [Docket No. 817], arguing that the Debtors had released their contractual entitlement to any levee insurance proceeds (the "**GPX Levee Insurance**") and CCZJV's profits upon the Court's entry of the GPX Interim Settlement Order. The Debtors filed their reply on August 30, 2024 [Docket No. 833]. The Court held a hearing on the issues on September 5, 2024. On September 19, 2024, Chiyoda and CB&I as well as the Debtors filed supplemental exhibits [Docket Nos. 982; 983]. On October 29, 2024, the Court issued its *Memorandum Opinion* [Docket No. 1266] and *Order* [Docket No. 1267], holding that ZII is not entitled to the insurance proceeds related to the levee repair or funds held by the HJVA related to invoices for ZII's completed work submitted prior to entry of the GPX Interim Settlement Order.

Pursuant to the terms of the GPX Settlement, the Debtors and Golden Pass continue to reconcile GPX Claims to determine whether the GPX Claims will exceed the GPX Direct Payment Cap under the GPX Settlement. If the GPX Claims exceed the GPX Direct Payment Cap and Golden Pass pays such Excess Claims, it will be entitled to draw on the GPX L/C for reimbursement of such payments (referred to as the "**GPX Excess L/C Amount**"). As of the date of this Disclosure Statement, Golden Pass has paid approximately 97% of the amount of the GPX Direct Payment Cap. The Debtors and their advisors have also conducted a comprehensive review of (a) Schedule 2 to the GPX Settlement Term Sheet, which listed GPX Claims based on the Debtors' books and records; (b) Chiyoda's data regarding Pool A obligations of the CCZJV that constitute GPX Claims; (c) Proofs of Claim filed in these Chapter 11 Cases; and (d) Golden Pass's records of its payments of GPX Claims pursuant to the GPX Settlement, all in order to determine the GPX Excess L/C Amount, if any. Based on that review, the Debtors have projected that the total valid GPX Claims will not exceed the GPX Direct Payment Cap or require a GPX Excess L/C Amount but have been unable to agree with Golden Pass on the final determination regarding whether or not the GPX Direct Payment Cap has been exceeded.

On December 13, 2024, the Debtors filed the *Motion to Enforce the Golden Pass Settlement Agreement with Respect to Additional Pool A Claims and Excess Claims* [Docket No. 1694] (the "**GPX Settlement Enforcement Motion**"). First, the GPX Settlement Enforcement Motion requests that the Court declare that certain claims are not validly due GPX Claims that count against the GPX Direct Payment Cap. On November 20, 2024, Chiyoda identified various change orders and final milestone payments allegedly owed by CCZJV (the "**Additional Pool A Claims**"). As set forth in the GPX Settlement Enforcement Motion, the Debtors assert that the Additional Pool A Claims are not valid obligations of the Debtors or GPX Claims because they had not accrued as of July 25, 2024 when the GPX Settlement was approved, ZII exited CCZJV, and ZII's responsibility to pay Pool A obligations of CCZJV terminated. Second, the GPX Settlement Enforcement Motion requests that the Court determine, based on the record established at an evidentiary hearing, that the GPX Direct Payment Cap has not been exceeded and there is no GPX Excess L/C Amount. The Court originally set the GPX Settlement Enforcement Motion for hearing on January 22, 2025.

On January 15, 2025, Golden Pass filed *Golden Pass LNG Terminal LLC's Emergency Motion to Continue January 22 Hearing and Response to Debtors' Motion to Enforce the Golden Pass Settlement Agreement with Respect to Additional Pool a Claims and Excess Claims* [Docket Nos. 1919 (redacted) and 1920 (sealed)] (the "**Emergency Motion to Continue**"). Golden Pass argues, among other things, that the GPX Settlement Enforcement Motion is premature because: (a) the universe of the GPX Claims remains subject to various uncertainties; (b) the GPX Settlement Enforcement Motion does not afford Golden Pass sufficient time to complete necessary due diligence related to the GPX Settlement Enforcement Motion; and (c) continuation of the hearing on the GPX Settlement

Enforcement Motion will not prejudice the Debtors.  Golden Pass requests that the Bankruptcy Court: (i) deny the GPX Settlement Enforcement Motion as procedurally improper or, alternatively, convert it to an adversary proceeding and enter an appropriate scheduling order; (ii) continue the hearing on the requested relief for no less than thirty days; and (iii) estimate the GPX Excess L/C Amount in the full amount of the GPX L/C.

Additionally, on January 15, 2025, Chiyoda filed *Chiyoda International Corporation's Emergency Motion to Convert the Debtors' Motion to Enforce the Golden Pass Settlement Agreement to an Adversary Proceeding* [Docket No. 1922] and *Chiyoda International Corporation's Response to Debtors' Motion to Enforce the Golden Pass Settlement Agreement with Respect to Additional Pool A Claims and Excess Claims* [Docket No. 1923]. Chiyoda argues, among other things, that the GPX Settlement Enforcement Motion is procedurally improper and should have been filed as an adversary proceeding. Chiyoda, thus, requests the Bankruptcy Court to enter an order (i) converting the GPX Settlement Enforcement Motion from a contested matter to an adversary proceeding and (ii) requiring the Debtors to replead the GPX Settlement Enforcement Motion as a complaint in the adversary proceeding if the Debtors proceed with the dispute.  Chiyoda further argues that the GPX Settlement Enforcement Motion should be denied. Also on January 15, 2025, CB&I filed the *Reservation of Rights of CB&I LLC with Respect to Debtors' Motion to Enforce the Golden Pass Settlement Agreement* [Docket No. 1924], seeking to preserve all of its rights, claims, defenses, and interests related or unrelated to the GPX Settlement but which may be implicated in or otherwise affected by any Bankruptcy Court's ruling on the GPX Settlement Enforcement Motion.

On January 22, 2025, the Court continued the hearing on the GPX Settlement Enforcement Motion to February 19, 2025, and scheduled a status conference on February 7, 2025 for the parties to update the Court on the progress of settlement negotiations.  The GPX Settlement Enforcement Motion remains pending at this time.

**J.       Claims Bar Date**

On July 26, 2024, the Bankruptcy Court entered an order (i) establishing September 16, 2024 at 5:00 p.m. (prevailing Central Time), as the deadline (the "**Bar Date**") for persons or entities (except governmental units) to file proofs of claim (each, a "**Proof of Claim**") in respect of prepetition Claims against any of the Debtors, (ii) establishing November 18, 2024 at 5:00 p.m. (prevailing Central Time) as the deadline for governmental units to file Proofs of Claim in respect of prepetition Claims against any of the Debtors; and (iii) approving certain other related procedures [Docket No. 636] (the "**Bar Date Order**").

Pursuant to the Bar Date Order, persons and entities affected by the changes to the Amended Schedules that disagreed with the nature, amount, or characterization of their Claim(s) in the Amended Schedules were required to file a Proof of Claim no later than October 4, 2024, January 2, 2025 and January 20, 2025 at 5:00 p.m. (prevailing Central Time).

**K.       Claims Reconciliation and Objections**

As of the Bar Date, claimants filed approximately 1,700 Proofs of Claim asserting over $23 billion in purported Claims, plus certain unliquidated and contingent Claims.  To prepare for the Effective Date and to ensure an accurate claims register for purposes of Claims allowance and distributions, the Debtors have engaged in a comprehensive claims review and reconciliation process with their advisors, and have objected to, among other things, Claims that do not assert amounts validly owed by the Debtors.  On September 13, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Claims Objection Procedures and the Form of Notice* [Docket No. 952] (the "**Claims Objection Procedures Motion**"), seeking entry of an order approving procedures governing omnibus objections to proofs of claim in accordance with Bankruptcy Rule 3007 and Bankruptcy Local Rule 3007-1.  On October 24, 2024, the Court entered an order approving the Claims Objection Procedures Motion [Docket No. 1209], authorizing the Debtors to begin filing omnibus objections to invalid Claims.

To date, the Debtors have filed approximately 30 omnibus claims objections and three individual claims objections against approximately 1,130 Proofs of Claim.  The claims objections sought to disallow Claims that: (a) are duplicative; (b) have been superseded by amended Claims; (c) lack supporting documentation; (d) are asserted against the wrong Debtor; (e) are asserted against multiple Debtors; (f) have already been satisfied by the Debtors or Golden Pass; or (g) otherwise seek recovery for amounts on which the Debtors are not liable under section 502(b) of the Bankruptcy Code.  On December 3, 16, and 17, 2024, and January 9, 2025, the Court entered orders sustaining certain

of the Debtors' omnibus claims objections, thereby disallowing (or reducing and allowing) certain claims as proposed by the Debtors [Docket Nos. 1596-1601, 1707, 1717-1719, 1730, 1837-1887, 1892, 1893]. In addition, as described in **Article VI.S.4** hereof, the Debtors objected to Proofs of Claim filed by FLNG (as defined below) and the Court has entered orders sustaining those objections.

The Debtors anticipate filing additional omnibus and individual claims objections to correct the claims register. Under the Plan, the Debtors must file any additional objections to, or requests for estimation of, General Unsecured Claims by the Claims Objection Deadline. The Claims Objection Deadline is initially set as ninety (90) days after the Effective Date. If the Bankruptcy Court orders the Claim Objection Deadline extended with respect to specific Claims and an objection or request for estimation is not filed with respect to any such specific Claim by the extended Claims Objection Deadline, such Claim shall be deemed Allowed, unless such Claim is otherwise Disputed or Disallowed under the Plan or a Final Order or such Claim is contingent or unliquidated as of the extended Claims Objection Deadline.

No Claim shall be entitled to any distribution under the Plan unless and until it is an Allowed Claim. If a Claim is subject to a pending objection as of the Effective Date, it will not be entitled to any distribution under the Plan until such objection is resolved or withdrawn.

### L.      Exit Financing

Following its retention, Lazard began soliciting proposals for junior exit capital, which would have funded distributions under the Initial Plan and the Reorganized Debtors' go-forward business. As described above, the financing process did not produce financing proposals that were acceptable to all relevant stakeholders, including the Holders of the Prepetition Credit Facility Claims, and the Debtors determined to seek confirmation of the Plan which is not reliant on junior exit capital. The Debtors will fund distributions under the Plan and their ordinary course of operations using Cash on hand, proceeds of the A&R Credit Facility, and proceeds of the Parent Capital Contribution.

### M.      Assumption and Rejection of Executory Contracts and Unexpired Leases

The Debtors have filed numerous motions to assume, assume and assign, or reject certain Executory Contracts and Unexpired Leases in connection with the GPX Settlement and OPPD Settlement, as described in **Articles VI.I** and **VI.N** hereof.

On September 10, 2024, the Debtors filed their *Motion for Entry of an Order Extending Time to Assume or to Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 934], seeking to extend the initial 120-day period to assume or reject unexpired leases of nonresidential real property through and including December 17, 2024. On October 2, 2024, the Court entered an order approving this motion [Docket No. 1071]. On December 13, 2024 the Debtors filed their *Second Omnibus Motion For Entry of an Order Authorizing the Assumption of Certain Unexpired Leases of Non-Residential Real Property* [Docket No. 1691], seeking to assume the Debtors' office leases and other non-residential real property leases (the "**Second Omnibus Assumption Motion**"). On January 6, 2025, the Court entered an order granting the Second Omnibus Assumption Motion [Docket No. 1842].

### N.      OPPD Settlement and Contract Assumption

ZII has made substantial progress in the design and construction of the OPPD Project as further described in **Article IV.C.1** hereof. However, in the months leading up to these Chapter 11 Cases, ZII experienced increased costs associated with the OPPD Project and untenable milestones under the OPPD Contract. Accordingly, the Debtors engaged OPPD in arm's-length, good faith negotiations to work towards an amendment to the OPPD Contract that would help right-size the project so that the Debtors could continue to perform work on, and finish, the project on an agreed-upon time frame, for the benefit of both parties, and release certain funds for the immediate payment of OPPD vendors. After months of negotiation, OPPD and ZII reached an agreement (the "**OPPD Settlement**") that settled alleged liquidated damages, reset deadlines related to the project, released certain funds to facilitate completion of the project, and provided additional funding if certain new milestones were achieved. That settlement is embodied in the *Debtors' Motion for Entry of an Order (I) Approving Settlement By and Among the Debtors and Omaha Public Power District, (II) Authorizing the Debtors to Amend and Assume (As Amended) the Omaha Public Power District Contract,*

*and (III) Granting Related Relief* [Docket No. 809] (the "**OPPD Contract Assumption Motion**").  On September 17, 2024, the Court entered an order approving the OPPD Contract Assumption Motion and the related contract amendment [Docket No. 961].

### O.    Approval of the GTPP ISBL Conversion Certificate

The EPC contract governing ZII's work on the GTPP ISBL Project provides that a portion of GTPP ISBL Contractor's compensation for work performed is fixed and another portion is adjustable in accordance with certain parameters (the "**GTPP ISBL Contract Price**").  The GTPP ISBL Project EPC contract also provides that if the GTPP ISBL Contractor met certain conditions, the GTPP ISBL Contract Price may be converted into a fixed lump sum to be memorialized in a certificate (the "**Conversion Certificate**") that set forth the adjusted GTPP ISBL Contract Price and the effective date of the conversion.  On September 3, 2024, the Debtors filed the *Stipulation and Agreed Order Regarding Entry into GTPC Contract Conversion Certificate* [Docket No. 877].  Pursuant to this stipulation, ZII was authorized to execute the Conversion Certificate and amend the EPC contract in accordance with the Conversion Certificate.  On September 25, 2024, the Court entered an order approving the stipulation [Docket No. 1017].

### P.    Extension of Time to Remove Civil Actions

On August 9, 2024, the Debtors filed their *Motion for Entry of an Order Extending the Time Within Which the Debtors May Remove Actions* [Docket No. 728], seeking to extend the August 19, 2024 deadline to remove civil actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027.  On September 3, 2024, the court entered an order extending the removal deadline through and including December 17, 2024 [Docket No. 878].  On December 16, 2024, the Debtors filed their *Second Motion for Entry of an Order Extending the Time Within Which the Debtors May Remove Actions* [Docket No. 1726].  On January 7, 2025, the Court entered an order further extending the deadline through and including March 17, 2025 [Docket No. 1854].

### Q.    Extension of Exclusive Period for the Debtors to File a Plan

The Debtors have the exclusive right to propose a plan in these Chapter 11 Cases.  On September 10, 2024, the Debtors filed *Debtors' Motion for Entry of an Order Extending the Exclusive Periods to File and Solicit a Plan* [Docket No. 933] (the "**First Exclusivity Motion**"), seeking an extension of the Debtors' exclusive plan filing period through and including December 17, 2024 and an extension of the Debtors' exclusive solicitation period through and including February 15, 2025.  On October 2, 2024, the Court entered an order granting the relief requested in the Exclusivity Motion [Docket No. 1072].

On December 13, 2024, the Debtors filed their *Second Motion for Entry of an Order Extending the Exclusive Periods to File and Solicit a Plan* [Docket No. 1690] (the "**Second Exclusivity Motion**").  On January 10, 2024, the Debtors, in agreement with the Prepetition Lenders and the Committee, filed a revised proposed order extending the Debtors' exclusive filing period through and including February 28, 2025 and extending the Debtors' exclusive solicitation period through and including April 29, 2025 [Docket No. 1898].

### R.    Insurance Premium Financing and New Insurance Program

On October 18, 2024, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Enter into Premium Financing Agreements and (II) Granting Related Relief* [Docket No. 1186] (the "**Insurance Financing Motion**"), seeking court authority to enter into financing agreements with FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Company, N.A. and IPFS Corporation to finance the premiums associated with various insurance policies renewing in November and December of 2024.  On October 22, 2024, the Court entered an order approving the Insurance Financing Motion [Docket No. 1201].

On October 27, 2024, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Enter into the New Insurance Program, (II) Authorizing Assumption of the Existing Insurance Program, and (III) Granting Related Relief* [Docket No. 1244] (the "**Zurich Insurance Motion**"), seeking authority to convert certain prepetition undersecured or unsecured insurance obligations into postpetition or secured claims to ensure that

the Debtors may obtain new insurance coverage through Zurich American Insurance Company (together, with certain of its affiliated insurance companies, "**Zurich**"). On October 29, 2024, the Court entered an order approving the Zurich Insurance Motion [Docket No. 1262]. Pursuant to the order, the Debtors bound new insurance coverage with Zurich effective as of November 1, 2024.

S.       **Adversary Proceedings and Other Litigation**

1.       **Zachry Industrial, Inc. v. Golden Pass LNG Terminal LLC**

On the Petition Date, ZII filed a complaint against Golden Pass seeking to avoid amendments to the GPX EPC Contract and equitable subordination of Golden Pass's claims in the Chapter 11 Cases. (Adv. Pro. No. 24-03105 (MI)) [Adv. Docket No. 1]. Before Golden Pass filed its answer, the GPX Settlement (discussed in **Article VI.I** hereof) was agreed to by the Mediation Parties and approved by the Bankruptcy Court. On August 13, 2024, ZII filed a *Notice of Voluntary Dismissal* [Adv. Docket No. 12].

2.       **Lamotte v. Zachry Industrial, Inc.**

On June 17, 2024, plaintiff Avis Lamotte filed a class action complaint under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (the "**WARN Act**"), on behalf of herself and similarly situated individuals against ZII (Adv. Pro. No. 24-03122 (MI)) [Adv. Docket No. 1] (the "**WARN Adversary Proceeding**"). On July 22, 2024, ZII filed its answer denying the allegations in the complaint [Adv. Docket No. 20]. ZII vigorously contests the applicability of the WARN Act under these facts, and also asserted various defenses to the claims on their merits. In an effort to avoid needless delay, uncertainty, and expense, the parties agreed to mediate and retained Ms. Gloria Portela to serve as mediator. After submitting confidential mediation statements and participating in multiple Zoom sessions and a full day, in-person mediation session on September 3, 2024, the parties agreed to settlement terms that would fully resolve all disputes, claims, and causes of actions arising out of the WARN Adversary Proceeding without admission by ZII of the applicability of the WARN Act, or to any liability on the part of ZII. On September 26, 2024, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (A)(I) Approving the Settlement by and Between Avis Lamotte, on Her Own Behalf and on Behalf of Others Similarly Situated, and the Debtors, (II) Certifying a Class for Settlement Purposes Only, (III) Appointing the Plaintiff as Class Representative and Plaintiff's Counsel as Class Counsel for Settlement Purposes Only, (IV) Approving the Form and Manner of Service of the Settlement Class Notice, (V) Appointing the Settlement Administrator, and (VI) Scheduling a Final Hearing, and (B) Granting Related Relief* [Docket No. 1030] (the "**WARN Settlement Motion**"). On October 3, 2024, the Court entered an interim order approving the WARN Settlement Motion [Docket No. 1080] (the "**Interim Approval Order**"). The Interim Approval Order preliminarily approved the settlement as reasonable and in the best interest of the Debtors under Bankruptcy Rule 9019, certified the class for settlement purposes only, appointed Ms. Lamotte as class representative and her counsel as class counsel, approved the settlement notice and opt-out form as well as the manner of serving it upon class members, appointed a settlement administrator to distribute notice, and scheduled a final fairness hearing to consider final approval of the settlement on January 9, 2025, with an objection and opt-out deadline on December 13, 2024.

On January 9, 2025, the Court entered an order approving the WARN Settlement Motion on a final basis [Adv. Docket No. 35], resolving all claims in the WARN Adversary Proceeding for an aggregate amount of $7,000,000, inclusive of costs, fees, and expenses to the class.

3.       **Zachry Holdings, Inc. vs. Brignac**

On July 19, 2024, the Debtors filed a complaint seeking a declaratory judgment that the automatic stay under section 362 of the Bankruptcy Code applies and extends to prohibit the continued prosecution of *Brignac v. 3M Company et al*., 127-046 (La. 10/15/2019) (the "**Brignac Matter**"), or in the alternative, a preliminary injunctive relief halting the prosecution of the Brignac Matter (Adv. Pro. No. 24-03146 (MI)) [Adv. Docket No. 1]. The Brignac Matter included the Debtors' non-Debtor Affiliate, JVIC Catalyst Services, LLC as a defendant. On July 30, 2024, the Court entered an order temporarily enjoining the Brignac Matter through October 22, 2024 [Adv. Docket No. 35]. On October 24, 2024, the Debtors informed the Court at a status conference that the parties were unable to resolve the Brignac Matter and, on November 27, 2024, the Debtors dismissed the Brigmac Matter without prejudice [Adv. Docket No. 47].

4.        **FLNG Litigation**

a.        **FLNG Contract Suit**

On April 23, 2024, FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC (together, "**FLNG**") brought suit against ZII, CB&I, and Chiyoda (together, the "**FLNG JV Partners**"), alleging joint and several liability for breach of contract with regard to the three engineering, procurement, construction, pre-commissioning, commissioning, start-up, and testing service contracts (together, the "**FLNG Contracts**") entered by and between FLNG and the FLNG JV Partners for the construction of three trains at their Quintana Island LNG Facility (the "**Facility**") (Case No. 2024-26036 (MI) (Tex. Dist. Ct. Apr. 23, 2024)) (the "**FLNG Contract Litigation**").  In their original petition, FLNG alleged that the FLNG JV Partners breached the FLNG Contracts and were negligent in causing or contributing to certain defects in the trains' LNG compression motors that caused one of the motors to fail in January 2024 (years after the equipment was put into service and long after any warranty period on the FLNG JV Partners' work had expired), and sought damages, interest, costs, and attorneys' fees.

On July 31, 2024, ZII removed the suit to the United States District Court for the Southern District of Texas (the "**District Court**") (Case No. 4:24-cv-02841).  On August 28, 2024, the District Court issued an order referring the case to the Bankruptcy Court to be heard by the Honorable Judge Marvin Isgur in these Chapter 11 Cases (Adv. Pro. No. 24-03195 (MI)).  FLNG filed an *Amended Motion to Remand* [Docket No. 943; Adv. Docket No. 18], arguing, among other things, that: (i) mandatory abstention requires remand of the suit; (ii) the claims have no independent basis for federal jurisdiction other than 28 U.S.C. § 1334(b); (iii) that the Plaintiffs' claims are non-core; and (iv) the case can be timely adjudicated in state court.  On September 13, 2024, FLNG filed Proofs of Claim against ZII and ZHI, as parent guarantor, based entirely on the claims asserted in the FLNG Contract Litigation [Claim Nos. 1443, 1499, 1500, 1501, 1502, and 1523].  On September 25, 2024, FLNG filed their *Notice of Withdrawal of Amended Motion to Remand* [Docket No. 1019; Adv. Docket No. 28].

On October 18, 2024, ZII filed a Rule 12(b)(6) motion to dismiss FLNG's claim for lost profits and other consequential damages because the claim was barred by a consequential damages waiver provision in the FLNG Contracts [Adv. Docket No. 39] (the "**Motion to Dismiss Consequential Damages Claim**").  On November 8, FLNG filed a response to the Motion to Dismiss Consequential Damages Claim, arguing that the damages were the result of the FLNG JV Partners' gross negligence and that the consequential damages waiver provision was, therefore, void as against public policy under Texas law [Adv. Docket No. 42].  On November 12, 2024, ZII filed a reply in support of the Motion to Dismiss Consequential Damages Claim arguing, *inter alia*, that FLNG failed to sufficiently plead gross negligence [Adv. Docket No. 44].  On November 18, 2024, the Bankruptcy Court heard oral argument on the Motion to Dismiss Consequential Damages Claim and the responsive pleadings, and on November 25, 2024, the Bankruptcy Court issued an oral ruling granting the Motion to Dismiss Consequential Damages Claim with leave to replead gross negligence.

On December 3, 2024, FLNG filed its first amended complaint [Adv. Docket No. 60].  On December 4, 2024, ZII filed a supplemental brief in support of the Motion to Dismiss Consequential Damages Claim arguing that FLNG's first amended complaint failed to state a claim for gross negligence and that the consequential damages waiver provision was, therefore, valid, precluding FLNG's claim for lost profits and other consequential damages [Adv. Docket No. 61].  On December 5, 2024, Chiyoda filed a joinder to the Motion to Dismiss Consequential Damages Claim [Adv. Docket No. 62].  On December 9, 2024, the Bankruptcy Court heard oral argument on the Motion to Dismiss Consequential Damages Claim alleged in the first amended complaint and on the responsive pleadings, and on December 13, 2024, the Bankruptcy Court issued an oral ruling granting the Motion to Dismiss Consequential Damages Claim.  Consistent with its oral ruling, on January 7, 2025, the Bankruptcy Court issued the *Memorandum Opinion* [Adv. Docket No. 82] and the *Order Granting Partial Dismissal* [Adv. Docket No. 83] dismissing FLNG's claim for consequential damages with prejudice.  As of the date hereof, no appeal from the *Order Granting Partial Dismissal* has been filed.

As of the date hereof, the FLNG Contract Litigation remains pending with respect to the surviving claims for actual damages (the "**FLNG Contract Litigation Surviving Claims**").  Pursuant to the *Joint Stipulation and Agreed Order to Extend Time to Answer Plaintiffs' First Amended Complaint* [Adv. Docket No. 87], Chiyoda's and CB&I's deadline to answer or otherwise respond to the FLNG's first amended complaint was extended to February 17,

2025.  FLNG has separately agreed to extend ZII's deadline to answer or otherwise respond to the FLNG's first amended complaint to the same date.

The Debtors believe that they have meritorious defenses to the FLNG Contract Litigation Surviving Claims.  At this time, the Debtors intend to assert that: (i) the claims are barred, in whole or in part, by the applicable statute of limitations; and (ii) the damages limitations in the applicable EPC contracts limits FLNG's recovery to $1 million and that insurance coverage is available to cover any such loss.

In addition to the Motion to Dismiss Consequential Damages Claim, on October 18, 2024, the Debtors filed the *Debtors' Objection to the FLNG Contract Claims* [Docket No. 1187] (the "**First FLNG Claim Objection**"), seeking entry of an order disallowing and expunging Proofs of Claim No. 1443, 1499, 1500, 1501, 1502, and 1523.  The First FLNG Claim Objection argues that the Proofs of Claim should be disallowed and expunged because: (i) the FLNG Contract Claims (as defined in the First FLNG Claim Objection) cannot survive the Motion to Dismiss Consequential Damages Claim to the extent FLNG seeks damages for lost profits and other consequential damages; (ii) the FLNG Contract Claims are otherwise meritless since the Debtors have common-law and contractual defenses; and (iii) if FLNG has no claims against ZII, the FLNG Contract Claims against ZHI should also be disallowed.  On November 14, 2024, FLNG filed *FLNG's Response to Debtors' Objection to the FLNG Contract Claims* [Docket No. 1418].  In its response, FLNG argues that: (i) the First FLNG Claim Objection violates Bankruptcy Rule 3007(b); (ii) the objection to the lost profit and consequential damages portion of the Proofs of Claim should be rejected for substantially the same reasons as FLNG argued in its response to the Motion to Dismiss Consequential Damages Claim; (iii) ZII's causation and waiver-based arguments fail because the FLNG JV Partners are liable for the acts or omissions of the compression motors' manufacturer and should have performed shop and other inspections of its work; (iv) the FLNG JV Partners have obligations under the warranty provisions in the FLNG Contracts that have not expired; (v) the FLNG Contracts' liability limitations do not apply based on the FLNG Contracts' terms; and (vi) FLNG's guaranty claims against ZHI are valid because FLNG's underlying claims against ZII are valid.  On November 14, 2024, the Committee filed a joinder to the First FLNG Claim Objection [Docket No. 1411].  On November 16, 2024, Chiyoda and CB&I filed a joinder to the First FLNG Claim Objection and the Second FLNG Claim Objection (as defined below) [Docket No. 1428].  As of the date hereof, the Bankruptcy Court has not yet ruled on the First FLNG Claim Objection.

### b.      Subrogation Suits

On June 7, 2024, FLNG, on behalf of several of its subrogated insurers, filed a lawsuit in Texas state court (the "**FLNG Subrogation Litigation**") against the FLNG JV Partners and certain other defendants, alleging negligence and joint and several liability in connection with an explosion that took place at the Facility (Case No. 128933-CV (Tex. Dist. Ct. June 7, 2024)).  Through their complaint, FLNG alleged that the piping instrumentation and process alarms installed at the Facility by the FLNG JV Partners were inadequate and failed to prevent the explosion, which occurred despite years of successful operation and years after the FLNG JV Partners completed their work, long after any warranty period had expired.  The complaint sought monetary damages, interest, costs, and attorneys' fees.

On July 5, 2024, the FLNG Subrogation Litigation was removed to the District Court (Case No. 3:24-cv-00209).  On September 13, 2024, the District Court issued an order referring the case to the Bankruptcy Court to be heard by the Honorable Judge Marvin Isgur (Adv. Pro. No. 24-03189 (MI)).  On September 20, 2024, Defendant PSRG, Inc. filed *Defendant PSRG, Inc.'s Original Answer* [Adv. Pro. No. 24-03189, Adv. Docket No. 29], which denied the allegations in the complaint and asserted affirmative defenses, including, among others, that FLNG's own actions and/or negligence were the sole cause or proximate cause of the incident in question.

Relatedly, also on June 7, 2024, a separate group of FLNG's subrogated insurers comprising Allianz Global Risks US Insurance Co., Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0180ME2219036, Great Lakes Insurance SE, GuideOne National Insurance Co., and Tokio Marine America Insurance Company (together, the "**Subrogees**") filed a lawsuit in Texas state court against the FLNG JV Partners and certain other defendants seeking monetary relief for payouts made on account of the alleged damages caused by the same explosion and events at issue in the FLNG Subrogation Litigation (Case No. 128926-CV (Tex. Dist. Ct. June 7, 2024)) (the "**Allianz Subrogation Litigation**," and together with the FLNG Subrogation Litigation, the "**Subrogation**

**Litigations**").  The Subrogees asserted negligence and joint and several liability and sought monetary damages, interest, costs, and attorneys' fees totaling over $1.3 billion.

On July 5, 2024, the Allianz Subrogation Litigation was removed to the District Court (Case No. 3:24-cv-00208).  On September 13, 2024, the District Court entered an order transferring the case to the Bankruptcy Court to be adjudicated by the Honorable Judge Marvin Isgur (Adv. Pro. No. 24-03190 (MI)).  On September 20, 2024, Defendant PSRG, Inc. filed *Defendant PSRG, Inc.'s Original Answer* [Adv. Pro. No. 24-03190, Adv. Docket No. 26], which denied the allegations in the complaint and asserted affirmative defenses, including, among others, that FLNG's own actions and/or negligence were the sole cause or proximate cause of the incident in question.

On September 16, 2024, FLNG, individually and on behalf of its purported subrogated insurers, filed Proofs of Claim against ZII based entirely on the claims asserted in the Subrogation Litigations [Claim Nos. 1562, 1564, 1579].

ZII and other FLNG JV Partners sought dismissal of the Subrogation Litigations, which FLNG and the Subrogees opposed.  Specifically:

- On July 29, 2024, September 24, 2024, and October 9, 2024, CB&I, Chiyoda, and ZII, respectively, filed motions to dismiss the Subrogation Litigations pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "**Subrogation Litigations Motions to Dismiss**") [Adv. Pro. No. 24-03189, Adv. Docket Nos. 13 (CB&I's Motion to Dismiss), 31 (Chiyoda's Motion to Dismiss), and 33 (ZII's Motion to Dismiss); Adv. Pro. No. 24-03190, Adv. Docket Nos. 13 (CB&I's Motion to Dismiss), 27 (Chiyoda's Motion to Dismiss), and 29 (ZII's Motion to Dismiss)].

- On August 30, 2024 between October 22 and October 24, 2024, FLNG and the Subrogees filed responses to the FLNG JV Partners' motions to dismiss [Adv. Pro. No. 24-03189, Adv. Docket Nos. 19 (Response to CB&I's Motion to Dismiss), 33 (Response to ZII's Motion to Dismiss), and 39 (Response to Chiyoda's Motion to Dismiss); Adv. Pro. No. 24-03190, Adv. Docket Nos. 20 (Response to CB&I's Motion to Dismiss), 34 (Response to Chiyoda's Motion to Dismiss), and 35 (Response to ZII's Motion to Dismiss)].

- On September 6, 2024, and November 6, 2024, the FLNG JV Partners' filed replies in support of their respective motions to dismiss the Subrogation Litigations [Adv. Pro. No. 24-03189, Adv. Docket Nos. 20 (CB&I's Reply in Support of Motion to Dismiss), 50 (Chiyoda's Reply in Support of Motion to Dismiss), and 51 (ZII's Reply in Support of Motion to Dismiss); Adv. Pro. No. 24-03190, Adv. Docket Nos. 22 (CB&I's Reply in Support of Motion to Dismiss), 46 (Chiyoda's Reply in Support of Motion to Dismiss), and 47 (ZII's Reply in Support of Motion to Dismiss)].

- On November 13, 2024, FLNG and the Subrogees filed sur-replies to ZII's and Chiyoda's motions to dismiss [Adv. Pro. No. 24-03189, Adv. Docket Nos. 54 (Sur-Reply to ZII's Motion to Dismiss) and 55 (Sur-Reply to Chiyoda's Motion to Dismiss); Adv. Pro. No. 24-03190, Adv. Docket Nos. 50 (Sur-Reply to ZII's Motion to Dismiss) and 51 (Sur-Reply to Chiyoda's Motion to Dismiss)].

Additionally, on October 18, 2024, the Debtors filed the *Debtors' Objection to the Subrogation Litigation Claims* [Docket No. 1188] (the "**Second FLNG Claim Objection**"), seeking entry of an order disallowing and expunging Proofs of Claim No. 1562, 1564, and 1579 as unenforceable against the Debtors.  The Second FLNG Claim Objection argued that the Proofs of Claim should be disallowed and expunged because: (i) the Subrogation Litigation Claims (as defined in the Second FLNG Claim Objection) could not survive the Subrogation Litigations Motions to Dismiss and (ii) even if they could, those claims had no merit since the explosion occurred due to FLNG's own actions. On November 14, 2024, the Committee filed a joinder to the Second FLNG Claim Objection [Docket No. 1412].  As noted, on November 16, 2024, Chiyoda and CB&I filed a joinder to the First FLNG Claim Objection and the Second FLNG Claim Objection [Docket No. 1428].  On November 17, 2024, FLNG filed *Preliminary Response of FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC to Debtors' Objection to the Subrogation Litigation Claims Filed by FLNG Individually and by and Through Its Subrogated Insurers and Motion to Consolidate* [Docket No. 1441], incorporating the arguments made in response to the Subrogation Litigations

Motions to Dismiss and further arguing that the Second FLNG Claim Objection violated Bankruptcy Rule 3007(b) or, in the alternative, that the Second FLNG Claim Objection should be consolidated with the Subrogation Litigations.

On November 18, 2024, the Bankruptcy Court held oral argument on the Subrogation Litigations Motions to Dismiss and the responsive pleadings.  At the conclusion of the argument, the Bankruptcy Court dismissed all claims in the Subrogation Litigations for lack of standing and disallowed Proofs of Claim No. 1562, 1564, and 1579.  The Bankruptcy Court held that FLNG and the Subrogees failed to show that they had standing to assert claims on behalf of FLNG based on the plain language of the applicable FLNG Contract requiring FLNG to maintain insurance containing a waiver of subrogation rights in favor of ZII, CB&I, and Chiyoda.  Consistent with its oral ruling, on November 20 and November 21, 2024, the Bankruptcy Court entered the *Order on (I) Motions to Dismiss the Subrogation Actions and (II) Related Claim Objection* [Docket No. 1469; Adv. Pro. No. 24-03189, Adv. Docket No. 65; Adv. Pro. No. 24-03190, Adv. Docket No. 58].

On December 2, 2024, FLNG and the Subrogees filed notices of appeal from the *Order on (I) Motions to Dismiss the Subrogation Actions and (II) Related Claim Objection* to the District Court [Docket No. 1560; Adv. Pro. No. 24-03189, Adv. Docket No. 69; Adv. Pro. No. 24-03190, Adv. Docket No. 62].  The appeals were assigned to the Honorable Judge Charles Eskridge (Case Nos. 24-cv-4807 (Allianz Subrogation Litigation Appeal), 24-cv-4801 (FLNG Subrogation Litigation Appeal), and 24-cv-4798 (Claims Objection Appeal)).  The appeals remain pending as of the date of this Disclosure Statement.

The Debtors believe that the Bankruptcy Court correctly determined that plaintiffs in the Subrogation Litigations lacked standing to bring the claims.  The Debtors also believe that even if the District Court overturns dismissal of the Subrogation Litigations on standing grounds, the claims asserted in the Subrogation Litigations are without merit because: (i) the plaintiffs failed to provide a Certificate of Merit by a qualified engineer attesting to the merits of the claims, as required under Chapter 150 of the Texas Civil Practice and Remedies Code; (ii) the economic loss doctrine bars tort liability for economic losses caused by the supposed non-performance of obligations under the FLNG Contracts; (iii) waiver and release provisions in the FLNG Contracts allocate the risk of loss for harm claimed by FLNG to FLNG, and relieve the Debtors and/or Reorganized Debtors of liability (including provisions waiving consequential damages, subrogation, and recovery for losses exceeding insurance proceeds under FLNG's policies, allocating risk of loss, precluding warranty obligations, and limiting aggregate recoverable damages); and (iv) FLNG's own negligent actions were the cause of the explosion, as reported in investigation reports commissioned by FLNG.

### c.       The Chiyoda and CB&I Freeport Claims

On September 16, 2024, Chiyoda and CB&I filed proofs of claim against ZII and ZHI relating to, *inter alia*, the FLNG Contract Litigation and the Subrogation Litigations [Claim Nos. 1555 and 1559 and Claim Nos. 1524 and 1527] (collectively, the "**Chiyoda and CB&I Freeport Claims**").  The Chiyoda and CB&I Freeport Claims are unliquidated and, on their face, assert contingent contribution and reimbursement claims in connection with the Freeport Project and the FLNG Contract Litigation and the Subrogation Litigations.  On November 26, 2024, the Debtors filed the (i) *Debtors' Objection to CB&I Claims [Claim Nos. 1524 and 1527]* [Docket No. 1510] and (ii) *Debtors' Objection to Chiyoda Claims [Claim Nos. 1555 and 1559]* [Docket No. 1511].  The Debtors seek disallowance of the Chiyoda and CB&I Freeport Claims pursuant to section 502(e)(1) of the Bankruptcy Code because they assert contingent claims for contribution or reimbursement by a co-liable entity and/or claims for contribution and reimbursement asserted by a co-liable entity based on the underlying claims that have been disallowed (such as the consequential damages claims dismissed in the FLNG Contract Litigation and claims based on the dismissed Subrogation Litigations).  As of the date hereof, no party has responded to the Debtors' objections to the Chiyoda and CB&I Freeport Claims.  The Debtors have agreed that Chiyoda and CB&I's deadline to respond to the Debtors' objections is February 10, 2025, subject to additional mutually agreeable extensions. Chiyoda's and CB&I's rights to respond are preserved in all respects.

The Debtors also intend to pursue contribution and indemnity claims against Chiyoda and CB&I, and the Debtors' ability to pursue contribution and indemnity claims against Chiyoda and CB&I is preserved in all respects.  Debtor ZII, Chiyoda, and CB&I are each named insureds under project-specific policies which, each entity contends, provide coverage for, and are required to respond to, the FLNG Contract Litigation and Subrogation Litigations.  Chiyoda and CB&I contend that certain of the insurance policies that may cover or otherwise apply to the FLNG Contract Litigation and the Subrogation Litigations were purchased by the joint ventures formed for the

purpose of providing engineering, procurement, and construction services for the liquefied natural gas project near Freeport, Texas (the "**Freeport Joint Ventures**") and such policies (the "**Freeport Insurance Policies**") are therefore property of the Freeport Joint Ventures.  Chiyoda and CB&I contend that the each of the FLNG JV Partners, including the Debtors, has an interest in the Freeport Insurance Policies pursuant to terms of the Freeport Insurance Policies and the documents that govern the relationship between the FLNG JV Partners.  Chiyoda and CB&I contend that the decisions about disposition of the Freeport Insurance Policies or proceeds therefrom require unanimous consent of the FLNG JV Partners.  While acknowledging that the agreement between the FLNG JV Partners governed the parties in that relationship, it is less clear to the Debtors how and to what extent the agreement governs the disposition of the proceeds of the project-specific policies obligated to respond to the FLNG Contract Litigation and the Subrogation Litigations.  The Debtors believe they (as do CB&I and Chiyoda) have a direct right to insurance proceeds under policies which they have been made named insureds, which the Debtors believe the Bankruptcy Court decided in conjunction with the GPX Levee Insurance matter.  Chiyoda and CB&I disagree with this view of the Bankruptcy Court's ruling in the GPX Levee Insurance matter.  Thus far, the FLNG JV Partners have not reached any consensus about the disposition of such insurance proceeds.  To the extent that the Debtors are adjudicated liable in connection with the FLNG Contract Litigation or the Subrogation Litigations and become responsible for damages in excess of any applicable insurance coverage, the Debtors intend to pursue any and all available claims and causes of action against Chiyoda, CB&I, and applicable insurance carriers, including for contribution, indemnity and, in the case of insurance carriers, improper denial of coverage (including statutory bad faith claims).  The Debtors may also pursue claims and causes of action against third parties responsible for damages alleged in the FLNG Contract Litigation and the Subrogation Litigations.  **The Debtors' projections, including the Financial Projections attached hereto as <u>Exhibit B</u>, the projected amount of claims (discussed in <u>Article II.A.1</u> hereof), and the projected recoveries under the Plan (also discussed in <u>Article II.A.1</u> hereof), do not include the Chiyoda and CB&I Freeport Claims or the claims subject to the First FLNG Claim Objection or the Second FLNG Claim Objection, or any potential recoveries that the Debtors may be able to realize on their contribution and indemnity claims against Chiyoda and CB&I, insurance carriers, or other third parties.  To the extent that the Debtors ultimately have any material obligations on account of the claims subject to the First FLNG Claim Objection or the Second FLNG Claim Objection in excess of any applicable insurance coverage, or on account of the Chiyoda and CB&I Freeport Claims, such obligations may impact the feasibility of the Plan.  Such obligations are General Unsecured Claims, subject to the same classification and treatment as other General Unsecured Claims under the Plan.  The Debtors may be unable to satisfy any such obligations at the time Allowed in the manner and time prescribed by the Plan for other General Unsecured Claims.**

## VII.    OTHER KEY ASPECTS OF THE PLAN

This section of this Disclosure Statement summarizes some of the significant elements of the Plan.  This summary is qualified in its entirety by reference to the Plan.  The Debtors encourage all Holders of Claims entitled to vote on the Plan to review the Plan closely.

### A.    Unclassified Claims

#### 1.    Unclassified Claims Summary

Administrative Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **<u>Article III</u>** of the Plan.  The treatment of unclassified Claims is set forth in **<u>Article II</u>** of the Plan and is restated below.

##### a.    Administrative Claims

On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim agrees to different treatment or has already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in Cash; *provided that* any Allowed Administrative Claims that are GPX Administrative Claims to the extent not satisfied prior to the Effective Date, if any, shall be paid by Golden Pass or Zachry in accordance with the terms of the GPX Settlement and the Plan.

b.        **Professional Fee Claims**

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash as soon as practicable after such Professional Fee Claims are Allowed.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

c.        **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

d.        **Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth in the Plan, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

B.        **Means for Implementation of the Plan**

1.        **General Settlement of Claims and Interests**

As discussed in detail in the Plan and as otherwise provided therein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including all General Unsecured Claims and GPX Claims, and any challenge to the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Credit Facility Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

Subject to **Article VI** of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

### 2.        GPX Settlement

The terms of the GPX Settlement, as approved by the GPX Final Settlement Order, are incorporated into, and are an integral part of, the Plan.  Nothing in the Plan modifies the terms of the GPX Settlement or the rights, obligations, and interests of the GPX Settlement Parties under the GPX Settlement Documents.  For the avoidance of doubt, the GPX Settlement Parties, as applicable, shall comply with the terms of the GPX Final Settlement Order through and following the Effective Date.  Notwithstanding anything to the contrary in the Plan, including **Article VIII** of the Plan, the terms of the GPX Settlement and the GPX Final Settlement Order remain binding on the GPX Settlement Parties and, as applicable, the A&R Credit Facility Agent and A&R Credit Facility Lenders.  In the event of any inconsistency between the Plan and the GPX Settlement Documents with respect to the terms of the GPX Settlement, the GPX Settlement Documents shall control.

For the avoidance of doubt, Golden Pass is a Released Party as set forth in the Plan and shall be entitled to the protections of the Plan's release and injunction provisions, including the Third-Party Release, to the fullest extent provided herein and under applicable law.  Further, and for the avoidance of doubt, Golden Pass and any property interest of Golden Pass shall be entitled to the protections of the Plan's release and injunction provisions with respect to all Claims that constitute GPX Claims that are satisfied, discharged, and/or released in connection with the GPX Settlement and the Plan, and no Holder of a satisfied GPX Claim shall have any recourse against Golden Pass or its property on account of such satisfied GPX Claim regardless of whether such Holder is a Releasing Party under the Plan.

In addition, notwithstanding anything to the contrary in the Plan, neither the Plan nor any Restructuring Transaction contemplated therein shall impair Golden Pass's right to make the GPX L/C Permitted Draws, pursuant to the terms of the GPX Settlement.  However, the Debtors may, with the consent of Golden Pass, wire Cash to Golden Pass in the amount of each Scheduled Draw on the date each Scheduled Draw is due under the GPX Settlement, in lieu of Golden Pass making each Scheduled Draw against the GPX L/C.  If the Debtors fail to make such Cash payments when due, Golden Pass may make the corresponding Scheduled Draw(s) against the GPX L/C, as contemplated under the GPX Settlement.  Upon Golden Pass's receipt of the final GPX L/C Permitted Draw, the remaining GPX L/C shall be deemed cancelled, null, and void, without any further notice to or action, order, or approval of the Bankruptcy Court, consistent with the GPX Settlement; Golden Pass shall not be permitted to request any other or additional draws thereunder; and Golden Pass shall be deemed to release, waive, and discharge any and all rights it has or may have in respect of the GPX L/C, the GPX L/C Issuer, and the GPX Parent Guarantee.  Until Golden Pass receives the final GPX L/C Permitted Draw, the Debtors, GPX L/C Issuer, and A&R Credit Facility Lenders, as applicable, shall renew the GPX L/C as necessary, and shall not take any action that would impair, affect, or prejudice Golden Pass's rights to the GPX L/C Permitted Draws.  The A&R Credit Facility Agent and A&R Credit Facility Lenders have consented to the GPX L/C Permitted Draws in accordance with the GPX Settlement; the Debtors and/or Reorganized Debtors, the A&R Credit Facility Agent, and the A&R Credit Facility Lenders further have waived, released, and extinguished any claims, defenses, or disputes with respect to the GPX L/C Permitted Draws, and stipulate and agree that all conditions and prerequisites for the GPX L/C Permitted Draws in accordance with the GPX L/C have been met (except, in the case of any GPX Excess L/C Amount, actual payment of any Excess Claims (as defined in the GPX Settlement Term Sheet) by Golden Pass), provided that, for each GPX L/C Permitted Draw actually drawn by Golden Pass against the GPX L/C, Golden Pass shall notify the A&R Credit Facility Agent of the GPX L/C Permitted Draw in the manner set forth in Annex A to the GPX L/C, as amended by the parties pursuant to the GPX Settlement.

### 3.        Restructuring Transactions

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and

the Confirmation Order; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the Confirmation Order, and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the execution and delivery of the A&R Credit Facility Documents and entry into the A&R Credit Facility; (5) the execution and delivery of the GUC Trust Agreement and the establishment of the GUC Trust; (6) the issuance of the GUC Trust Unsecured Note to the GUC Trust; (7) the issuance of the GUC Trust Interests to Holders of Allowed General Unsecured Claims; (8) the Parent Capital Contribution; (9) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Steps Memorandum; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**C.      The Reorganized Debtors**

Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, each of the Reorganized Debtors shall continue their existence as separate Entities after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each Reorganized Debtor is incorporated and pursuant to the Organizational Documents.  On the Effective Date, all Zachry Interests shall be Reinstated and the Reorganized Debtors shall be deemed to adopt and re-affirm the Organizational Documents without any further action, notice, or approval.  The Reorganized Debtors shall be authorized to adopt any agreements, documents, and instruments, and to take any other action contemplated under the Plan as necessary to consummate the Plan.

**D.      Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, including all Causes of Action and any property acquired by any of the Debtors pursuant to the Plan, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**E.      GUC Trust**

On or prior to the Effective Date, the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and shall take all steps necessary to establish the GUC Trust in accordance with the Plan.  In accordance with section 1141 of the Bankruptcy Code, the GUC Trust Assets shall automatically vest in the GUC Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.

**1.      GUC Trust Agreement and GUC Trustee**

The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee.  The GUC Trust Agreement will be included in the Plan Supplement and will provide, among other things, that: (a) the GUC Trustee shall be appointed on or prior to the Effective Date; (b) on the Effective Date, the GUC Trust Assets shall vest in the GUC Trust free and clear of all Claims and Liens, to be held in trust for the benefit of Holders of GUC Trust Interests; (c) the GUC Trust shall hold the GUC Trust Unsecured Note until such time as the GUC Trust Unsecured Note is satisfied and discharged in accordance with the terms and conditions of the GUC Trust Unsecured Note Term Sheet; (d) the GUC Trust shall distribute Cash to Holders of GUC Trust Interests in accordance with their

respective holdings of GUC Trust Interests pursuant to the terms of the GUC Trust Unsecured Note Term Sheet, including interim distributions prior to the satisfaction and discharge of the GUC Trust Unsecured Note to the extent such interim distributions are permitted under the GUC Trust Unsecured Note Term Sheet; (e) the GUC Trust shall satisfy the GUC Trust Fees and Expenses after the Effective Date in the ordinary course of business, without the necessity of any approval by the Bankruptcy Court, and solely using the GUC Trust Cash Amount and no other assets of the GUC Trust or the Reorganized Debtors; (f) the GUC Trustee shall be permitted to raise financing secured by assets of the GUC Trust in order to satisfy the ongoing costs and expenses of administering the GUC Trust; and (g) the GUC Trustee and its professionals may be subject to indemnification from the GUC Trust on customary and reasonable terms set forth in the GUC Trust Agreement.

The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in **Article IV.F** of the Plan.  The GUC Trustee shall be the exclusive administrator of the GUC Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), solely for purposes of carrying out the GUC Trustee's duties under the Plan and the GUC Trust Agreement.

**2.      GUC Trust Unsecured Note**

The GUC Trustee may not transfer, assign, or distribute the GUC Trust Unsecured Note held by the GUC Trust to any other Entity, including Holders of GUC Trust Interests, without the prior written consent of the Reorganized Debtors.

**3.      General Unsecured Claims and Reconciliation and GUC Trust Unsecured Note Reallocations**

As set forth in **Article VII.A** of the Plan, the Reorganized Debtors shall retain sole authority to reconcile and object to Claims after the Effective Date.  Following the GUC Trustee's appointment, the Debtors or Reorganized Debtors, as applicable, shall authorize the Claims and Noticing Agent to provide the GUC Trustee access to the Claims and Noticing Agent's claims register for General Unsecured Claims.  The Claims and Noticing Agent shall regularly distribute revised versions of the General Unsecured Claims register to the GUC Trustee, reflecting the Allowance, Disallowance, reclassification, withdrawal, or any other alteration of any General Unsecured Claims' status or classification after the Effective Date.

If any General Unsecured Claims are Allowed, Disallowed, reclassified, withdrawn, or otherwise altered after the Effective Date, the GUC Trustee shall allocate (and reallocate) GUC Trust Interests to (and among) Holders of Allowed General Unsecured Claims as necessary to ensure that each Holder of an Allowed General Unsecured Claim receives the treatment specified in **Article III.C.6** of the Plan.  The GUC Trustee may effect such allocations and reallocations solely on a book-entry basis, which shall be reflected in any statements or reporting required to be provided to Holders of the GUC Trust Interests under the GUC Trust Agreement.  Prior to the satisfaction and discharge of the GUC Trust Unsecured Note, the Reorganized Debtors and GUC Trustee shall modify the principal amount of the GUC Trust Unsecured Note after the Effective Date as necessary to ensure each Holder of an Allowed General Unsecured Claim receives the treatment specified in **Article III.C.6** of the Plan.

**4.      Non-Transferability of GUC Trust Interests**

Any and all GUC Trust Interests shall be non-transferable other than (a) with the prior written consent of the Reorganized Debtors or (b) by will, intestate succession, or otherwise by operation of law.  In addition, any and all GUC Trust Interests shall not constitute Securities and will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it is determined that any such interests constitute Securities, the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance, and distribution under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act and all applicable federal, state, and local securities laws and regulations.

5.      **Tax Treatment**

In furtherance of the Plan, (a) it is intended that the GUC Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the GUC Trust are intended to be deemed for federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Allowed General Unsecured Claims, and then contributed by the Holders of Allowed General Unsecured Claims to the GUC Trust in exchange for their GUC Trust Interests; (b) the primary purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the satisfaction of General Unsecured Claims in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business; (c) all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving GUC Trust Interests, and the GUC Trustee) shall report consistently with such treatment described in provisos (a) and (b) of this paragraph; (d) all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving GUC Trust Interests, and the GUC Trustee) shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the Debtors or the Bankruptcy Court at the Confirmation Hearing; (e) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (f) the GUC Trustee shall annually send to each Holder of a GUC Trust Interest a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (a) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving GUC Trust Interests, and the GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the GUC Trust as a result of this treatment shall be paid out of the assets of the GUC Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

6.      **Dissolution of the GUC Trust**

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, on the earlier of (a) such time as (i) the GUC Trust Unsecured Note has been satisfied and discharged and (ii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Agreement have been made; (b) such time as is necessary to maintain the GUC Trust's status as a liquidating, grantor trust for the benefit of Holders of GUC Trust Interests under applicable tax law; and (c) such time as set forth in the GUC Trust Unsecured Note Term Sheet.

Upon the dissolution of the GUC Trust, any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement; *provided*, *however*, if all Holders of General Unsecured Claims have received all distributions to which they are entitled under the Plan, any such remaining GUC Trust Assets shall revest in the Reorganized Debtors.

7.        **Single Satisfaction of Allowed General Unsecured Claims**

Notwithstanding anything to the contrary herein, in no event shall Holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from distributions provided by the GUC Trust.

F.        **Sources of Consideration for Plan Distributions**

Each distribution and issuance referred to in __Article VI__ of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with (a) Cash on hand, (b) proceeds from the A&R Credit Facility, (c) the issuance of the GUC Trust Unsecured Note, and (d) proceeds from the Parent Capital Contribution.

1.        **Use of Cash**

The Debtors, Reorganized Debtors, and Distribution Agent, as applicable, shall use Cash on hand for working capital purposes and to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

2.        **A&R Credit Facility**

On the Effective Date, the Reorganized Debtors shall enter into the A&R Credit Facility, the terms of which will be set forth in the A&R Credit Facility Documents.  Confirmation of the Plan shall be deemed final approval of the A&R Credit Facility, the A&R Credit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization for the Reorganized Debtors to enter into and execute the A&R Credit Facility Documents and such other documents as may be required to effectuate the financings and treatment provided by the Plan.

Acceptance of the Plan by Class 3 (Prepetition Credit Facility Claims) and execution of the A&R Credit Facility Documents by the A&R Credit Facility Agent shall be deemed to bind each A&R Credit Facility Lender as if each such party had executed the A&R Credit Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the A&R Credit Facility Documents shall: (a) be deemed to be granted; (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the A&R Credit Facility Documents; (c) be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the A&R Credit Facility Documents; and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

3.     **GUC Trust Unsecured Note**

On the Effective Date, the Reorganized Debtors shall issue the GUC Trust Unsecured Note to the GUC Trust, which shall hold the GUC Trust Unsecured Note in trust for the benefit of Holders of GUC Trust Interests, as set forth in the Plan and the GUC Trust Unsecured Note Term Sheet.  The issuance of GUC Trust Unsecured Note under the Plan is duly authorized without the need for any further action by the Debtors, the Reorganized Debtors, the GUC Trustee, or any other Entity.  The GUC Trust Unsecured Note issued pursuant to the Plan shall be duly authorized, validly issued, and non-assessable.

4.     **Parent Capital Contribution**

On or prior to the Effective Date, the Parent Capital Contribution shall be contributed to ZHI.  The Debtors, Reorganized Debtors, and the Distribution Agent, as applicable, shall use the Cash proceeds from the Parent Capital Contribution for working capital purposes and to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan and the A&R Credit Facility Term Sheet.

**G.     Cancellation of Existing Agreements and Interests**

On the Effective Date, except with respect to the A&R Credit Facility, the GUC Trust Unsecured Note, the Parent Capital Contribution, the Zachry Interests, the GPX Settlement Documents, the GPX L/C (subject to **Article IV.B** of the Plan), the GPX Parent Guarantee (subject to **Article IV.B** of the Plan), all Employee Obligations (including the Deferred Compensation Plan) assumed pursuant to **Article IV.K** of the Plan, all Indemnification Obligations assumed pursuant to **Article IV.L** of the Plan, and all Executory Contracts and Unexpired Leases assumed pursuant to **Article V.A** of the Plan, or to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of, or parties to, such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan.

**H.     Corporate Action**

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the officers or directors of the Debtors, any Governing Body, or the Bankruptcy Court.

**I.     Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to **Article VIII** of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the GPX Final Settlement Order and the releases and exculpations contained in the Plan, including in **Article VIII** of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the GPX Final Settlement Order**

**and the Plan, including <u>Article VIII</u> of the Plan**.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation, Consummation, or the occurrence of the Effective Date.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the GPX Final Settlement Order and the Plan, including <u>**Article VIII**</u> of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**J.        Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**K.        Directors and Officers of the Reorganized Debtors**

On the Effective Date, the directors and officers of each Reorganized Debtor shall consist of the current directors and officers of each respective Debtor.

**L.        Indemnification Obligations**

All indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for (each in their capacities as such) the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants, other professionals of, or acting on behalf of, the Debtors, and the Sureties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, other professionals of, or acting on behalf of, the Debtors, and the Sureties, as provided under the indemnification obligations in place prior to the Effective Date; *provided*, *however*, nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

**M.        Provisions Regarding Treatment of Executory Contracts and Unexpired Leases**

<u>**Article V**</u> of the Plan contains additional detailed provisions regarding the treatment of Executory Contracts and Unexpired Leases, including, among other things, (i) the procedures for assumption or rejection of Executory Contracts and Unexpired Leases, (ii) the cure of defaults for assumed Executory Contracts and Unexpired Leases, and (iii) the treatment of Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases.

N.       **Provisions Governing Distributions**

**Article VI** of the Plan contains additional provisions governing Plan distributions, including provisions regarding, among other things, (i) compliance with tax requirements, (ii) undeliverable distributions and unclaimed property, and (iii) Claims paid or payable by third parties.

O.       **Provisions Governing Disputed Claims and Interests**

**Article VII** of the Plan contains provisions regarding the procedures for resolving Disputed Claims.

P.       **Settlement, Release, Injunction, and Related Provisions**

1.       **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, and GPX or any of its assets or properties with respect to any Claims that constitute GPX Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.  For the avoidance of doubt, the discharge provided herein shall discharge, release, and extinguish any right of any Holder of any Claim to file, assert, levy, or attach any Liens or initiate any claim against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, or otherwise enforce, collect, or recover on account of any such Claims other than as expressly permitted under the Plan.  Further, and for the avoidance of doubt, the discharge provided herein shall discharge, release, and extinguish any right of any Holder of any GPX Claim to file, assert, levy, or attach any Liens against property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass or any property interest of Golden Pass.

2.       **Release of Liens**

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with **Article III.C** of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including any bonds related to the Debtors, shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the

Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The foregoing direction to release Liens shall be considered a direction in accordance with, as applicable, the Prepetition Credit Agreement, as if such direction included the signatures of the necessary lenders thereunder to direct the applicable agent to take the actions contemplated thereby. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, including with respect to any bonds related to the Debtors, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

3.    Release by the Debtors

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in the Plan, the Schedule of Retained Causes of Action, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of each Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Released Avoidance Actions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in <u>Article VIII.C</u> of the Plan, the Debtors shall maintain all rights to object to Filed Claims and shall not release any claims or Causes of Action (i) identified in the Schedule of Retained Causes of Action, or (ii) related to the GPX Settlement that are preserved by the GPX Settlement Documents, the GPX Settlement Dispute Opinion, or the GPX Settlement Dispute Order.  Any and all such rights, claims, and Causes of Action set forth in this paragraph shall be fully preserved and revest in the Reorganized Debtors pursuant to the Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### 4. Releases by Third Parties

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

42

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

5.      Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, all related agreements, instruments, and other documents, or any transaction related to the Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.      Injunction

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, satisfied, or released pursuant to the Plan.

Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, discharged, satisfied, released, or are subject to exculpation pursuant to Article VIII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties and/or the Released Parties:

1.      commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

2. enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

3. creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

4. filing, asserting, levying, or attaching any Liens against any property of the Debtors or Reorganized Debtors on account of any Claims arising under or related to Executory Contracts or Unexpired Leases that are assumed and cured pursuant to the Plan;

5. filing, asserting, levying, or attaching any Liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, and enforcing, collecting, or recovering on account of any such Liens;

6. filing, asserting, levying, or attaching any Liens against any property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, and enforcing, collecting, or recovering on account of any such Liens, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass;

7. filing, asserting, levying, or attaching any Claims or Liens on account of GPX Claims satisfied (or to be satisfied) by Golden Pass under the GPX Settlement, whether against the Released Parties, Exculpated Parties, Golden Pass, Chiyoda, CB&I, or CCZJV-GPX;

8. except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

9. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, the solicitation of votes with respect to the Plan, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action

**represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action. The injunction in the Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

**Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order from bringing an action to enforce the terms of the Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order**.

### 7. Limitation of Liability of Officers, Directors, and Agents

**The provisions of section 1125(e) of the Bankruptcy Code govern the protection from liability with respect to all matters governed by section 1125(e). The Debtors and their successors (and the officers, directors or agents of the Debtors or their successors) have no liability for conduct that was authorized by an order of the Bankruptcy Court. With respect to conduct during the period from the Petition Date through the Effective Date, the Debtors and their successors (and the officers, directors or agents of the Debtors or their successors) may be subject to liability only for conduct that constituted actual fraud, gross negligence, or willful misconduct, provided that such limitations on liability exist under applicable non-bankruptcy law. Notwithstanding the foregoing, the Plan does not limit liability for conduct for which the Bankruptcy Court's approval was required by applicable law, but for which approval was not granted.**

### Q. Conditions Precedent to Confirmation and Consummation of the Plan

#### 1. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article IX.B** of the Plan:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the Confirmation Order shall be in full force and effect;

2. The settlements embodied in the Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

3. The A&R Credit Facility Documents shall have become effective in accordance with their terms;

4. The Debtors shall have issued the GUC Trust Unsecured Note in accordance with the terms of the GUC Trust Unsecured Note Term Sheet;

5. The GUC Trust Agreement shall have been executed by the Debtors and the GUC Trustee, and the GUC Trust Assets, including the GUC Trust Unsecured Note, shall have vested in the GUC Trust;

6. The Parent Capital Contribution shall have been contributed to, and vested in, ZHI; and

7. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other restructuring transactions.

**2.**         **Waiver of Conditions**

The conditions to the Effective Date set forth in **Article IX** of the Plan may be waived, in whole or in part, by the Debtors only with the prior written consent of the Prepetition Credit Facility Agent (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**3.**         **Effect of Failure of Conditions**

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively.

## VIII.       PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit B** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "**Financial Projections**") for the fiscal years ending December 31, 2025 through December 31, 2027.  The Financial Projections are based on an assumed Effective Date of February 28, 2025.

Creditors, equity holders, and other interested parties should see the "Risk Factors" set forth in **Article X** below for a discussion of, among other things, certain factors that may affect the future financial performance of the Reorganized Debtors.

## IX.       CONFIRMATION OF THE PLAN

### A.       The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing may be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation of the Plan.  An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is **actually received on or before** the deadline to file such objections as set forth therein.  **The Objection Deadline is February 20, 2025, at 4:00 p.m. (prevailing Central Time).**

### B.       Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

46

### C.       Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their Professionals, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their Financial Projections.  Creditors and other interested parties should review **Article X** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit B** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.       Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[11]

Pursuant to **Article III.G** of the Plan, if a Class contains Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.       Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.       No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.,* classes of the same legal character).  Bankruptcy courts will take

---

[11]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Professionals and reliance upon the valuation methodologies utilized by the Professionals. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## X. RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A. General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, Holders of Claims entitled to vote on the Plan should read and carefully consider the factors set forth below, as well as other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

1. **The Debtors Will Consider All Available Restructuring Alternatives if the Plan is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

If the Plan is not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it could adversely affect some or all of:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators and lenders;

- the Debtors' enterprise value; and

- the Debtors' business relationship with current and potential customers and vendors.

B. **Bankruptcy Law and Chapter 11 Case Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1. **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. Here, it is possible that parties may object to confirmation of the Plan on grounds related to how the Claims and Interests are classified in the Plan. In that case, the cost of the Chapter 11 Cases and time needed to confirm could increase. This is particularly the case if the Bankruptcy Court concludes that the classification of Claims and/or Interests under the Plan do not comply with the Bankruptcy Code's requirements. Under such circumstances, the Plan might need to be modified. Such modification could require the Debtors to re-solicit votes on the Plan before the Plan can be confirmed.

Nevertheless, the Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2. **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a)

ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (b) ability to maintain relationships with suppliers, vendors, subcontractors, service providers, customers, employees, and other third parties; (c) ability to maintain contracts that are critical to the Debtors' operations; (d) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (f) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' objectives.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, vendors, subcontractors, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations, interfere with ongoing contract negotiations for prospective work, and impair the Debtors' financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3.     The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in **Article IX.A** of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan. If the Debtors do not secure sufficient exit capital to implement the Plan and continue their operations or if the Plan is not confirmed, the Debtors may be forced to file a new plan with less favorable terms or liquidate their assets.

### 4.     The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. If the Plan is not accepted by one or more Voting Classes, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 5.     The Debtors May Not Be Able to Obtain Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

6.     **The Debtors May Not Be Able to Obtain Nonconsensual Confirmation of the Plan Over the Objections of Certain Impaired Non-Accepting Classes**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

7.     **Continued Risk Following Confirmation of the Plan**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as changes in economic conditions, changes in the industry, potential revaluing of their assets due to these Chapter 11 Cases, changes in demand for the services that the Debtors provide, and increasing expenses. *See* **Article X.D** of this Disclosure Statement, entitled "Risks Related to the Company's and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. At this time, the Debtors maintain the exclusive right to propose a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

8.     **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code**

Although uncommon, if a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, a bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such cases, a chapter 7 trustee is appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. As set forth in the Liquidation Analysis attached as **Exhibit C**, the Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of: (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be secured or entitled to priority, that would be generated during the liquidation, including

51

Claims resulting from the draw of existing letters of credit and the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date should occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11. The U.S. Trustee or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions

**Article VIII** of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved as currently drafted, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts.  The Plan's release and exculpation provisions are an inextricable component of the Plan.

### 12. Risks Associated with the GUC Trust Interests and GUC Trust Unsecured Note

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution, or sale of securities. In addition, any and all GUC Trust Interests and the GUC Trust Unsecured Note shall be non-transferable and the value of such GUC Trust Interests and GUC Trust Unsecured Note may not be realized by the applicable Holders except as set forth in the Plan.

### C. Risks Related to Recoveries Under the Plan

### 1. Contingencies Could Affect Distributions to Holders of Allowed Claims

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### 2. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Financial Projections attached as **Exhibit B** to this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance as of the date of this Disclosure

Statement, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized and, therefore, the Debtors actual results may differ materially from the Financial Projections. If the Debtors do not achieve their projected financial results, the value of the Zachry Interests may be negatively affected, and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

### 3. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review **Article XII** of this Disclosure Statement entitled "Certain United States Federal Income Tax Consequences of the Plan" to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

### D. Risks Related to the Company's and the Reorganized Debtors' Businesses

### 1. Operating in Bankruptcy for a Long Period of Time May Harm the Company's Businesses

The Company's future results are dependent upon the successful confirmation and implementation of a plan of reorganization. In addition, the Company is relying on an expedited case timeline to maintain its business through this restructuring. A longer process could have a material adverse effect on the Company's businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Company's businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers could lose confidence in the Company's ability to reorganize their businesses successfully and seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of counterparties to do business with a company that recently emerged from bankruptcy protection.

### 2. Financial Results May Be Volatile and May Not Reflect Historical Trends

The Financial Projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Company, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Company and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Company's operations.  There can be no assurance that the projected results will be realized or that actual results will not be subject to significant variations.  These variations may be material and may adversely affect the value of Zachry Interests, the Company's financial position, and the ability of the Company to make payments with respect to its indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.

### 3. The Company's Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Company's operations are subject to various federal, state, and local laws and regulations, including occupational health and safety laws.  The Company may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Company to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

### 4. The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors, many of which are beyond the Reorganized Debtors' control.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance such debt.  These alternative measures may not be available, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and the willingness of third parties to do business with them could be adversely affected.

### 5. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

It is possible that certain parties will commence litigation with respect to the treatment of their Claims or other provisions under the Plan.  It is also possible that certain parties will commence litigation with respect to other aspects of the Debtors' business that may not have materialized through formal litigation at this time.  It is possible that certain existing litigation will result in higher liabilities than the Debtors currently anticipate.

It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  In general, litigation can be expensive and time consuming to bring or defend against and could divert management's attention.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability could thus be material.

The outcomes of any litigation (including the FLNG Contract Litigation and the Subrogation Litigations, discussed in **Article VI.S.4** hereof) involving the Debtors may have material impacts on the Debtors' ability to confirm the Plan and may prevent the Plan becoming effective.

6. **Demand for the Debtors' Services Is Cyclical and Vulnerable to Economic Downturns and Customers' Ability to Meet Existing Payment Obligations**

The domestic energy and industrial sectors have been, and will likely continue to be, cyclical in nature and vulnerable to general downturns in the economy. Consequently, the results of the Debtors' operations have fluctuated and may continue to fluctuate depending on the demand for services from these industries.

Global economic conditions may negatively impact customers' willingness and ability to fund their projects. These conditions may make it difficult for the Debtors' customers to accurately forecast future business trends and plan activities, thereby causing the Debtors' customers to slow or even curb spending on the Debtors' services, or seek contract terms more favorable to them. In addition, customers' ability to timely pay invoices may be affected by an ongoing weak economy.

In many instances, the Debtors commit and/or pay for products or expenses attributable to customers prior to receiving payments, with an understanding that the customer will pay per the terms of the commercial contract. If the Debtors' customers are not able to make such payments in a timely manner, or at all, the Debtors could be forced to absorb these costs. If a customer defaults in making its payments on a project in which the Debtors have devoted significant financial resources, it could have a material adverse effect on the Debtors' business, results of operations, or financial condition.

7. **The Debtors Operate in a Highly Competitive Industry**

The Debtors face competition from numerous regional, national, and international competitors. The degree and type of competition the Debtors face is influenced by the type and scope of a particular project, as well as the particular market and geographic area being served. The Debtors' competitors include well-established, well-financed businesses, both privately and publicly held, including many major engineering and construction companies, energy equipment manufacturers, and internal engineering and maintenance departments at utilities, and include some of the Debtors' customers. Some of the Debtors' competitors have achieved greater market penetration in the markets in which the Debtors compete. Other competitors may be smaller and more specialized, and concentrate their resources in particular areas of expertise.

The award of many of the Debtors' contracts is determined by competitive bid, which is based upon qualifications, experience, performance, reputation, technology, customer relationships, and ability to provide the relevant services in a timely, safe, and cost-efficient manner. Increased competition can impact the margin the Debtors earn on contracts or cause the Debtors not to win a competitive bid.

As the U.S. energy market becomes more attractive, many global competitors have focused their attention on the domestic end markets the Debtors operate in, further increasing the competitive nature of the Debtors' business. In addition, the technical and professional aspects of some of the Debtors' services, especially in the maintenance business, generally do not require large upfront capital expenditures and provide limited barriers against new competitors.

8. **The Debtors' Projections and Results Depend on New Contract Awards Not Within the Debtors' Control**

A substantial portion of the Debtors' earned revenue is directly or indirectly dependent on winning new contracts. The Debtors operate in highly competitive markets and it is difficult to predict whether and when they will be awarded new contracts due to multiple factors influencing how customers evaluate potential contractors and service providers, such as qualifications, experience, reputation, technology, customer relationships, financial strength, and ability to provide the relevant services in a timely, safe, and cost-efficient manner. In addition, a project can be canceled or delayed due to the lengthy and complex bidding and selection process, customer capital investment

decisions, market conditions, available financing, government approvals, permitting, and environmental matters. Consequently, the Debtors are subject to the risk of losing new awards to competitors and the risk that a project may experience significant delay or cancellation which will adversely impact the Debtors' earned revenue, net income, cash flows, and overall financial condition. The Debtors' results of operations and cash flows may fluctuate from quarter to quarter depending on the timing and size of new contract awards and delays or cancellations.

9. **Inability to Obtain Adequate Surety Capacity or Letters of Credit Could Affect the Debtors' Business Strategies by Requiring the Modification of Existing Facilities and Reduce the Debtors' Ability to Bid on New Work**

In line with industry practice, the Debtors are often required to provide performance and surety bonds or letters of credit to customers. These bonds and letters of credit provide credit support for the customer if the Debtors fail to perform obligations under the contract. If security is required for a particular project and the Debtors are unable to obtain a bond or letter of credit on commercially acceptable terms, the Debtors cannot pursue that project. The Debtors have letter of credit and bonding arrangements but, as is typically the case, the issuance of bonds under surety facilities is at the surety's sole discretion. A restriction, reduction, or termination or the Debtors' surety bond arrangements could increase letter of credit utilization, thereby reducing availability under the Debtors' credit facilities.

It could be more difficult for the Debtors to obtain surety bonding for new projects in the future, and the Debtors may be required to increase or provide additional cash collateral to obtain these surety bonds, which would reduce available cash and could impact the Debtors' ability to renew or increase availability under their credit facilities. Any new or modified bonding facilities might not be on terms as favorable as current terms, and the Debtors could also be subject to increased costs of capital and interest rates.

Furthermore, if bond underwriting standards were to be tightened, then identifying bonding capacity may become an issue. Moreover, the size and complexity of contracts requiring bonds are inherent constraints in identifying bonding capacity. These types of contracts often necessitate the use of a joint venture, often with a competitor, to bid on and perform these types of contracts, especially since it may be easier to jointly pursue the necessary bonding. However, entering into these types of joint ventures exposes the Debtors to the credit and performance risks of third parties, some of whom may not be as financially strong as the Debtors.

10. **Participation in Joint Ventures and Actions of Joint Venture Partners and Subcontractors Could Expose the Debtors to Risk of Loss**

The Debtors often enter into joint ventures in order to jointly bid on construction contracts and perform a particular project. The success of these joint ventures depends, in large part, on the satisfactory performance of the contractual obligations of the Debtors' joint venture partners. Under agreements with joint and several liability, the Debtors may be liable for both their obligations and the obligations of their partners. Similarly, the Debtors rely on equipment and material manufacturers to supply them with the necessary machinery and materials to complete their work, and a failure of equipment supplied or a delay in shipping materials to the Debtors could cause the Debtors to fail to meet their obligations. Under any of these circumstances, the Debtors may incur additional costs, make additional investments, and provide additional services to ensure the adequate performance and delivery of the contracted services, and/or pay liquidated damages.

To the extent the Debtors' partners cannot execute their portion of the work, are unable to deliver their services, equipment, or materials according to the negotiated terms, the Debtors cannot engage subcontractors or acquire equipment or materials, and/or suffer an equipment malfunction, the Debtors' ability to complete a project in a timely fashion or at a profit may be impaired. If the amount the Debtors are required to pay for these goods and services in an effort to meet contractual obligations exceeds the amount estimated in bidding for fixed-price work, the Debtors could experience losses in the performance of these contracts.

Investments in joint ventures can involve risks that would not otherwise be present if a third-party were not involved. Such risks include the limited ability to dispose of interest in a joint venture, joint venture partners becoming bankrupt or failing to perform their obligations, joint venture partners potentially having competing interests creating conflict of interest issues, disputes between the Debtors and their joint venture partners resulting in litigation or

arbitration, and the potential joint and several liability of the Debtors for the actions of joint venture partners.  If any of the foregoing were to occur, the Debtors' business, results of operations, and financial condition could be adversely affected.

11.     **If the Debtors Are Unable to Form Joint Ventures, Their Ability to Compete For and Win Business May Be Negatively Impacted**

Either acting as a prime contractor, a subcontractor, or as a member of a joint venture, the Debtors may join with other firms to form a team to compete for a single contract.  Because a joint venture can often offer stronger combined qualifications than any firm standing alone, these joint venture arrangements can be very important to the success of a particular contract bid process or proposal.  In joint venture arrangements, the Debtors are required to select joint venture partners best suited for a particular contract, which leads to competition to "line up" with competitors on particular bids and seek their cooperation.  The Debtors can lose these bids by teaming up with available competitors that may be operationally or financially weaker than other competitors.  If the Debtors are not able to select a desirable contractor to team with, the Debtors' proposal may suffer by comparison to other bidding teams.  The failure to maintain relationships with strong participants in our markets may impact our ability to win bids.

12.     **The Debtors' Business Is Subject to Risks Associated with Contractual Pricing in Their Industry, Including the Risk That, if Their Actual Costs Exceed the Costs the Debtors Estimate on Their Fixed-Price Contracts, the Debtors' Profitability will Decline, and the Debtors May Suffer Losses**

The Debtors offer their customers a range of commercial options for their contracts, including fixed-price, cost-reimbursable and hybrid, which has both fixed-price and cost-reimbursable components.  Under fixed-price contracts, the Debtors perform their services and execute their projects at an established price.  Under cost-reimbursable contracts, the Debtors generally perform series in exchange for a price that consists of reimbursement of all customer-approved costs and a profit component, which is typically a fixed rate per hour, an overall fixed fee, or a percentage of total reimbursable costs.  Under cost-reimbursable contracts, if the Debtors are unable to obtain proper reimbursement for all costs incurred due to improper estimates, performance issues, customer disputes, or any of the other factors noted below for fixed-price contracts, the project may be less profitable than the Debtors expected.

The Debtors are engaged in a highly competitive industry, and the Debtors have contracted for a substantial number of projects on a fixed-price basis.  The Debtors are often required to bid aggressively on fixed-price contracts in order to obtain them and, as a result, must execute the projects with minimal variances from internal projections used by the Debtors for their bidding process in order for them to be profitable.  In many cases, these projects involve complex design and engineering, significant procurement of equipment and supplies, extensive construction management, and other activities conducted over extended time periods, sometimes in remote locations where personnel, equipment, supplies, and in some cases basic infrastructure must be remotely sourced.  The Debtors' actual costs related to these projects have in the past exceeded the Debtors' projections and could do so in the future.  The Debtors attempt to cover the increased costs of anticipated changes in labor, material, and service costs of long-term contracts, either through estimates of cost increases, which are reflected in the original contract price, or through price escalation clauses.  Despite these attempts, however, the cost and gross profit the Debtors realize on a fixed-price contract could vary, and has in the past varied materially from the estimated amounts because of supplier, contractor, and subcontractor performance, the Debtors' own performance, including the quality and timeliness of work performed, failure to properly estimate costs of engineering, materials, components, equipment, escalation, labor or subcontractors, changes in job conditions, unanticipated weather conditions, variations in labor and equipment productivity and associated costs, increases in the cost of raw materials over the term of the contract, difficulties in obtaining required governmental permits or approvals, changes in laws and regulations, and changes in general economic and market conditions.

In the future, these factors and other risks generally inherent in the industry in which the Debtors operate may result in actual revenues or costs being different from those the Debtors originally estimated and may result in reduced profitability or losses on projects.  Some of these risks include:

- the Debtors' EPC projects may encounter difficulties related to the procurement of materials and equipment, or due to schedule disruptions, equipment performance failures, or other factors that may result in additional costs to the Debtors, reduction in revenues, claims, or disputes;

- the Debtors may not be able to obtain compensation for additional work performed or expenses incurred as a result of customers' change orders or the Debtors' customers providing deficient design or engineering information or equipment or materials;

- the Debtor may be required to pay significant amounts of liquidated damages upon the Debtors' failure to meet schedule or perform requirements of contracts; and

- difficulties in engaging, or failure to perform by, third-party subcontractors, equipment manufacturers, or materials suppliers could result in project delays and cause the Debtors to incur additional costs.

Performance problems relating to any significant existing or future contract arising as a result of any of these or other risks could cause the Reorganized Debtors' actual results of operations to differ materially from those the Debtors anticipate at the time they enter into the contract and could have a material adverse effect on the Reorganized Debtors' results of operation and financial condition, as well as cause the Reorganized Debtors to suffer damage to their reputation within the industry and customer base.

### 13.     The Debtors' Operations Are Subject to Hazards Inherent in the Energy Services Industry

Safety is a leading focus of the Debtors' business, and the Debtors' safety record is critical to their reputation and is of paramount importance to their employees, customers, and equity holders. However, the Debtors often work on large-scale and complex projects which can place their employees and others near large mechanized equipment, moving vehicles, dangerous processes, highly regulated materials, or in challenging environments. Although the Debtors have a functional group whose primary purpose is to implement effective quality, health, safety, environmental, and security procedures throughout their organization, if the Debtors fail to implement effective safety procedures, their employees and others may become injured, disabled, or lose their lives, their projects may be delayed, and the Debtors may be exposed to litigation or investigations.

Unsafe conditions at project work sites also have the potential to increase employee turnover, increase project costs, and raise the Debtors' operating costs. Additionally, many of the Debtors' customers require that they meet certain safety criteria to be eligible to bid for contracts, and the Debtors' failure to maintain adequate safety standards could result in reduced profitability or lost project awards or customers. Any of the foregoing could result in financial losses or reputational harm, which could have a material adverse impact on the Debtors' business, financial condition, and results of operations.

### 14.     The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced, and may continue to experience, increased levels of employee attrition. Because competition for experienced personnel in the Debtors' industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience. The loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

15. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entities and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## XI.   CERTAIN SECURITIES LAW MATTERS

Except as otherwise provided herein, in the Plan and the GUC Trust Documents, the GUC Unsecured Note and the GUC Trust Interests to be issued pursuant to the Plan will be issued without registration under the Securities Act or any other similar U.S. federal, state, or local Law in reliance upon either (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (b) including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to, in each case, other applicable securities Laws.

The Debtors believe that the GUC Trust Unsecured Note and the GUC Trust Interests to be issued pursuant to the Plan may, constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "**Blue Sky Law**"). The Debtors further believe that the offer, sale, issuance and initial distribution of the GUC Trust Unsecured Note and the GUC Trust Interests to be issued pursuant to the Plan is exempt from federal and state securities registration requirements under the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law, as described in more detail below. No registration statement for the GUC Trust Unsecured Note and the GUC Trust Interests to be issued pursuant to the Plan will be filed under the Securities Act or any state securities laws.

The following discussion of the issuance and transferability of the GUC Trust Unsecured Note and the GUC Trust Interests to be issued pursuant to the Plan relates solely to matters arising under federal and state securities laws. The rights of Holders of the GUC Trust Unsecured Note and the GUC Trust Interests to be issued pursuant to the Plan will also be governed by the terms of the GUC Trust Unsecured Note Term Sheet and the GUC Trust Agreement, respectively.

### A.   Issuance of Securities Under the Plan Pursuant to Section 1145 of the Bankruptcy Code

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of Securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be Securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or "principally" in exchange for such claim or interest and "partly" for cash or property.

The Debtors believe that the issuance of the GUC Trust Unsecured Note and the GUC Trust Interests should satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code, to the extent permitted and available with respect to any respective Holder, subject to other applicable securities law. No registration statement will be filed under the Securities Act or any local or state securities laws. Recipients of the GUC Trust Unsecured Note and the GUC Trust Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law or other local law. As discussed below, the exemptions provided for in section 1145(a)(1) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

B.     **Transferability of GUC Trust Unsecured Note**

Any right of a Holder of an Allowed General Unsecured Claim to receive a distribution or other payment from the GUC Trust Unsecured Note or on the GUC Trust Interests shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Debtors, Reorganized Debtors, or the GUC Trust, as applicable.  Further, any right of a Holder of an Allowed General Unsecured Claim to receive a distribution or other payment from the GUC Trust Unsecured Note or the GUC Trust shall be nontransferable and nonassignable except by will, intestate, succession, or operation of law.  Any rights to receive a Distribution or other payment from the GUC Trust Unsecured Note or the GUC Trust shall not constitute "securities" and shall not be registered pursuant to the Securities Act.  If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN[12]

A.     **Introduction**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under U.S. federal income tax laws (including, for example, banks, brokers, dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, wash sale, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims in the hands of Non-U.S. Holders constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax

---

[12]   The material terms of the GUC Trust and the GUC Trust Unsecured Note will be published in the Plan Supplement. The tax treatment and considerations described herein are subject to change based on such material terms and the final form of the GUC Trust and GUC Trust Unsecured Note.

consequences to Holders of Claims (a) whose Claims are Unimpaired, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "**U.S. Holder**" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "**Non-U.S. Holder**" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote on the Plan**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan, including the steps described above.  U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Allowed Claim and the amount realized by the Holder in respect of its Allowed Claim.  Over time and on a cumulative basis, the amount realized generally will equal the aggregate amount of the Cash (and the fair market value of property, if any) distributed to the Holder, less the amount, if any, attributable to accrued but unpaid interest.  A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on an Allowed Claim but was not previously paid by the Debtor or previously included in income by the Holder of the Allowed Claim.

The character of any gain or loss recognized by a Holder will depend upon a number of factors, including the status of the Holder, the nature of the Allowed Claim in the Holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the Holder's holding period of the Allowed Claim.  If the Allowed Claim in the Holder's hands is a "capital asset" within the meaning of IRC section 1221, the gain or loss realized will generally be characterized as a capital gain or loss.  Such gain or loss will constitute long-term capital gain or loss if the Holder held such Allowed Claim for longer than one year or short-term capital gain or loss if the Holder held such Allowed Claim for one year or less.  Any capital loss realized generally may be used by a corporate Holder only to offset capital gains and by an individual Holder only to the extent of capital gains plus a certain limited statutorily proscribed amount of ordinary income in any single taxable year, currently $3,000.00.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than face value or distributed, transmitted, sold, or otherwise disposed of within the meaning of IRC section 453B.

Due to the inherently factual nature of the determination, if relevant based on the form of the Restructuring Transactions, U.S. Holders are urged to consult their own tax advisors regarding the status of their Claims or the consideration received under the Plan as "securities" for U.S. federal income tax purposes.

### 1.        Treatment of Holders of Prepetition Credit Facility Claims

As discussed in **Article II.A** above, if the Plan is confirmed, the Prepetition Credit Agreement will be restated pursuant to the terms of the A&R Credit Facility Documents.

The treatment of U.S. Holders of Prepetition Credit Facility Claims depends on whether the Restructuring Transactions result in a "significant modification" of the Prepetition Credit Facility. A "significant modification" of a debt instrument will result in a deemed exchange of the instrument and a taxable event to the U.S. Holder. Under applicable Treasury Regulations, the modification of the terms of a debt instrument (including pursuant to an exchange of a new debt instrument for the existing debt instrument) generally is a significant modification if, based on all of the facts and circumstances and taking into account all modifications of the debt instrument, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." A modification that adds, deletes, or alters customary accounting or financial covenants is not a significant modification. A modification that releases or otherwise alters the collateral for, a guarantee on, or other form of credit enhancement for a recourse debt instrument is a significant modification if the modification results in a "change in payment expectations." In general, a release of a guarantee or collateral results in a change in payment expectations if the release (i) gives rise to a substantial impairment of the issuer's capacity to meet its payment obligations and (ii) such capacity was adequate prior to the modification and is primarily speculative thereafter. A modification that changes the timing of payments due under a debt instrument is a significant modification if it results in a material deferral of scheduled payments. However, a deferral of one or more scheduled payments is not a material deferral if it is within a safe-harbor period beginning on the original due date of the first scheduled payment that is deferred and extending for a period equal to the lesser of five years or 50% of the original term of the instrument. A change in the yield of a debt instrument is a significant modification if the yield of the modified instrument (as computed under the applicable Treasury Regulations and taking into account any payments made as consideration for the modification, such as any consent fees) varies from the annual yield of the unmodified instrument (determined as of the date of the modification) by more than the greater of 0.25% or 5% of the annual yield of the unmodified instrument.

As described above, a significant modification of a debt instrument will result in a deemed exchange of the instrument and a taxable event to the Holder. Pursuant to the Plan (if it is confirmed), the terms of the Prepetition Credit Facility would generally remain the same as set forth in the A&R Credit Facility Documents. The Debtors intend to take the position that the restatement of the Prepetition Credit Agreement as set forth in the A&R Credit

Facility Documents should not result in a significant modification of the Prepetition Credit Facility for U.S. federal income tax purposes.

If the restatement of the Prepetition Credit Agreement as set forth in the A&R Credit Facility Documents does not result, for U.S. federal income tax purposes, in a deemed exchange, then a U.S. Holder generally would not recognize any income, gain, or loss with respect to the Prepetition Credit Facility Claims as a result of the Restructuring Transactions. In addition, a U.S. Holder would generally have the same adjusted tax basis and holding period in the A&R Credit Facility or as it had before confirmation of the Plan. If the restatement of the Prepetition Credit Agreement as set forth in the A&R Credit Facility Documents results in a significant modification of the Prepetition Credit Agreement (thus, resulting in a deemed exchange), the U.S. federal income tax consequences of the restatement would generally depend on whether the Prepetition Credit Facility Claims and the A&R Credit Facility are treated as "securities" for purposes of the reorganization provisions of the IRC, as discussed immediately below.

### a. Treatment if Prepetition Credit Facility Claims and the A&R Credit Facility are Treated as Securities

If the Prepetition Credit Facility Claims and the A&R Credit Facility are treated as securities, then the exchange of such Claims should be treated as a "recapitalization" within the meaning of section 368(a)(1)(E) of the IRC. The term "security" is not defined in the IRC or in the U.S. Treasury Regulations and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a security depends on an evaluation of the overall nature of the debt obligation. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations with a maturity at issuance of less than five years often do not constitute securities, whereas debt obligations with a maturity at issuance between five and ten years or more often do constitute securities, in each case depending on their facts and circumstances. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should not recognize gain or loss. The U.S. Holder should obtain a tax basis in the A&R Credit Facility deemed received, other than such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the tax basis of the Prepetition Credit Facility Claim deemed surrendered. The tax basis of the A&R Credit Facility treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. Subject to amounts treated as received in satisfaction of accrued but untaxed interest, the holding period for the A&R Credit Facility deemed received should include the holding period for the exchanged Prepetition Credit Facility Claims. The holding period for the A&R Credit Facility treated as received in satisfaction of accrued but untaxed interest should begin on the day following the receipt of such property. For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID, or market discount.

### b. Treatment of Prepetition Credit Facility Claims and the A&R Credit Facility are not Treated as Securities

To the extent that the Prepetition Credit Facility Claims or the A&R Credit Facility are not treated as securities, such U.S. Holder would be treated as exchanging its Prepetition Credit Facility Claim for the A&R Credit Facility in a fully taxable exchange under section 1001 of the IRC. A U.S. Holder of a Prepetition Credit Facility Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the issue price of the A&R Credit Facility (calculated as described under "Issue Price") in exchange for its Prepetition Credit Facility Claim and (ii) the U.S. Holder's adjusted tax basis in its Prepetition Credit Facility Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Prepetition Credit Facility Claim in such U.S. Holder's hands, whether the Prepetition Credit Facility Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Prepetition Credit Facility Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Prepetition Credit Facility Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. To the extent that a portion of the consideration received in exchange for its Prepetition Credit Facility Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. A U.S. Holder's tax basis in the A&R Credit Facility should be equal to the issue price of the A&R Credit Facility. A U.S. Holder's holding period for the A&R Credit Facility deemed received on the Effective Date should begin on the day following the Effective Date.

2.        **Treatment of Holders of General Unsecured Claims**

Pursuant to the Plan, and in exchange for surrendering its General Unsecured Claim, each U.S. Holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release and discharge of such Claim, its Pro Rata share of the GUC Trust Interests; *provided*, *however*, notwithstanding anything to the contrary in this Plan, all Allowed General Unsecured Claims that are GPX Claims, to the extent not satisfied prior to the Effective Date, if any, shall be paid by Golden Pass in accordance with the terms of the GPX Settlement and this Plan. Such Holder would recognize gain or loss equal to the difference between (a) the fair market value of the GUC Trust Interests received and (b) the U.S. Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.

a.   **Liquidating Trust Treatment**

Although not free from doubt, the GUC Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of General Unsecured Claims. The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the GUC Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the GUC Trust and then contributed such undivided interest to the GUC Trust. If this treatment applies, the person or persons responsible for administering the GUC Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the GUC Trust pursuant to the Plan and not unduly prolong its duration. The GUC Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the governing documents for the GUC Trust.

Other than with respect to any assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Allowed General Unsecured Claims prior to the contribution of such assets to the GUC Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

The treatment of the deemed transfer of assets to applicable Holders of Allowed General Unsecured Claims prior to the contribution of such assets to the GUC Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

No entity-level tax should be imposed on the GUC Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the GUC Trust, even if no distributions are made. Allocations of taxable income with respect to the GUC Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the GUC Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable losses of the GUC Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in the GUC Trust, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the Holder. Taxable income or loss allocated to a beneficiary should be treated as income

or loss with respect to the interest of such beneficiary in the GUC Trust and not as income or loss with respect to such beneficiary's applicable General Unsecured Claim. In the event any tax is imposed on the GUC Trust, the person or persons responsible for administering the GUC Trust shall be responsible for payment, solely out of the assets of the GUC Trust, of any such taxes imposed on the GUC Trust.

The person or persons responsible for administering the GUC Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The person or persons responsible for administering the GUC Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the GUC Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each calendar year, the person or persons responsible for administering the GUC Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

### C.      Market Discount

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim.  Any such market discount is generally the excess of the "revised issue price" of such Claim over such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory de minimis amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID, if any, that has accrued over the term of the Claim. To the extent that Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Restructuring Transactions.

### D.      U.S. Federal Income Tax Consequences to U.S. holders of Owning and Disposing of GUC Trust Unsecured Note

#### 1.      Interest on GUC Trust Unsecured Note and Original Issue Discount

Payments of stated interest on the Unsecured Note, if any, will be includible in the gross income of a U.S. Holder as ordinary interest income at the time such payments are received or accrued, in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.

A debt instrument will be treated as issued with original issue discount ("**OID**") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument. If the debt instrument's stated interest is accrued and only payable at maturity, the debt instrument's stated redemption price will exceed its issue price, resulting in OID.  Since the Unsecured Note's stated interest is accruing and only payable at maturity, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Unsecured Note, in advance of the receipt of the cash attributable to such OID and regardless of the U.S. Holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the Unsecured Note that is attributable to previously accrued OID that has been included in its

income. The rules governing OID instruments are complex and prospective purchasers should consult their tax advisors concerning the application of such rules to the Unsecured Noted.

### 2. Sale, Exchange, Retirement, Redemption, or Other Taxable Disposition of the GUC Trust Unsecured Note

Upon the sale, exchange, retirement, redemption or other taxable disposition of the Unsecured Note, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between (i) the amount realized upon such sale, exchange, retirement, redemption or other taxable disposition (other than any amount equal to any accrued but unpaid stated interest, which, if not previously included in such U.S. Holder's income, will be taxable as ordinary interest income as discussed above) and (ii) such U.S. Holder's adjusted tax basis in the Unsecured Note. A U.S. Holder's adjusted tax basis in the Unsecured Note will generally equal the amount such U.S. Holder paid for such Unsecured Note, increased by any OID previously accrued by such U.S. holder with respect to such Unsecured Note and decreased by the amount of principal payments, if any, received by such U.S. Holder with respect to the Unsecured Note. Such gain will be long-term capital gain if at the time of the sale, exchange, retirement, redemption or other taxable disposition, the U.S. Holder has held the GUC Trust Unsecured Note for more than one year, taking into account the holding period rules described above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

### 3. Limitations on Use of Capital Losses

A U.S. Holder who recognizes capital losses will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### E. Information Reporting and Back-Up Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and interest holders than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated:  January 23, 2025                              ZACHRY HOLDINGS, INC.
                                                      (for itself and on behalf of each of the other Debtors
                                                      and Debtors in Possession)


                                        By:   */s/ Mohsin Y. Meghji*_____
                                              Name: Mohsin Y. Meghji
                                              Title:   Chief Restructuring Officer

<u>**Exhibit A**</u>

**Joint Chapter 11 Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile:  (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (admitted *pro hac vice*)
Andrew F. O'Neill (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
Adam T. Swingle (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:   bojan.guzina@whitecase.com
             aoneill@whitecase.com
             william.guerrieri@whitecase.com
             fhe@whitecase.com
             adam.swingle@whitecase.com
             barrett.lingle@whitecase.com

*Counsel to the Debtors and Debtors in Possession*

Dated: January 22, 2025
Houston, Texas

---

[1]  The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814.  A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI.  The location of the Debtors' service address in these Chapter 11 Cases is: P.O. Box 240130, San Antonio, Texas 78224.

# **TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ..................................................................................................................1

    A.    Defined Terms. .........................................................................................................................1
    B.    Rules of Interpretation. ..........................................................................................................12
    C.    Computation of Time. ...........................................................................................................12
    D.    Governing Law. .....................................................................................................................13
    E.    Reference to Monetary Figures. ............................................................................................13
    F.    Controlling Document. ..........................................................................................................13

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ...........................................................13

    A.    Administrative Claims. .........................................................................................................13
    B.    Professional Fee Claims. .......................................................................................................14
    C.    Priority Tax Claims. ..............................................................................................................14
    D.    Restructuring Expenses. ........................................................................................................14

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................14

    A.    Classification of Claims and Interests. .................................................................................14
    B.    Formation of Debtor Groups for Convenience Only..............................................................15
    C.    Treatment of Claims and Interests. .......................................................................................15
    D.    Special Provision Governing Unimpaired Claims. ...............................................................18
    E.    Elimination of Vacant Classes. .............................................................................................18
    F.    Acceptance by Impaired Classes. ..........................................................................................19
    G.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ..........................................19
    H.    Intercompany Interests. .........................................................................................................19
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................19
    J.    No Substantive Consolidation. ..............................................................................................19
    K.    Controversy Concerning Impairment. ...................................................................................19
    L.    Subordinated Claims. ............................................................................................................19

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ...................................................20

    A.    General Settlement of Claims and Interests. .........................................................................20
    B.    GPX Settlement. ....................................................................................................................20
    C.    Restructuring Transactions. ...................................................................................................21
    D.    The Reorganized Debtors. .....................................................................................................21
    E.    Vesting of Assets in the Reorganized Debtors. .....................................................................21
    F.    GUC Trust...............................................................................................................................22
    G.    Sources of Consideration for Plan Distributions. ..................................................................24
    H.    Cancellation of Existing Agreements and Interests. .............................................................25
    I.    Corporate Action....................................................................................................................25
    J.    Directors and Officers of the Reorganized Debtors. .............................................................25
    K.    Deferred Compensation Plan and Other Employee Obligations. ..........................................26
    L.    Indemnification Obligations. .................................................................................................26
    M.    Preservation of Causes of Action. ........................................................................................26
    N.    Effectuating Documents; Further Transactions. ...................................................................27
    O.    Certain Securities Law Matters. ............................................................................................27
    P.    Section 1146 Exemption. ......................................................................................................27
    Q.    Dissolution of Certain Debtors...............................................................................................28

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............28

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. .....................................28
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases..............................29
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................................29
    D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........30

E.      Insurance Policies. ................................................................................................30
F.      Workers' Compensation Program. ..........................................................................30
G.      Reservation of Rights. ............................................................................................30
H.      Contracts and Leases Entered Into After the Petition Date. ...................................31

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................31

A.      Timing and Calculation of Amounts to Be Distributed...........................................31
B.      Distributions to Holders of Disputed Claims and Interests. ....................................31
C.      Distribution Agent. .................................................................................................31
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions..............32
E.      Compliance with Tax Requirements. .......................................................................32
F.      No Postpetition or Default Interest on Claims. .......................................................33
G.      Allocations. ............................................................................................................33
H.      Foreign Currency Exchange Rate. ..........................................................................33
I.      Setoffs and Recoupment. ........................................................................................33
J.      Claims Paid or Payable by Third Parties. ...............................................................34

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED
            CLAIMS .......................................................................................................35

A.      Claims Administration Responsibilities. .................................................................35
B.      Allowance of Claims. ..............................................................................................36
C.      Estimation of Claims. ..............................................................................................36
D.      Adjustment to Claims Register Without Objection. .................................................36
E.      Disallowance of Claims or Interests. .......................................................................37
F.      Reimbursement or Contribution. .............................................................................37
G.      Amendments to Proofs of Claim. ............................................................................37
H.      No Distributions Pending Allowance. .....................................................................37
I.      Distributions After Allowance. ...............................................................................37
J.      Single Satisfaction of Claims. .................................................................................38

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........38

A.      Discharge of Claims and Termination of Interests. .................................................38
B.      Release of Liens. .....................................................................................................38
C.      Releases by the Debtors. .........................................................................................39
D.      Releases by Third Parties. .......................................................................................40
E.      Exculpation. ............................................................................................................41
F.      Injunction. ...............................................................................................................41
G.      Limitation of Liability of Officers, Directors, and Agents.......................................43
H.      Waiver of Statutory Limitations on Releases. .........................................................43
I.      Special Provision Regarding the United States Government. ...................................43
J.      Protections Against Discriminatory Treatment. ......................................................44
K.      Document Retention. ...............................................................................................44

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ..................44

A.      Conditions Precedent to the Effective Date. ...........................................................44
B.      Waiver of Conditions. .............................................................................................44
C.      Substantial Consummation. .....................................................................................45
D.      Effect of Failure of Conditions. ..............................................................................45

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ................45

A.      Modification and Amendments.................................................................................45
B.      Effect of Confirmation on Modifications.................................................................45
C.      Revocation or Withdrawal of Plan. .........................................................................45

ARTICLE XI. RETENTION OF JURISDICTION .................................................................46

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................48

A.     Immediate Binding Effect. ................................................................................................48
B.     Waiver of Stay. ...............................................................................................................48
C.     Additional Documents. ....................................................................................................48
D.     Payment of Statutory Fees. .............................................................................................48
E.     Statutory Committee and Cessation of Fee and Expense Payment. ...............................49
F.     Reservation of Rights. .....................................................................................................49
G.     Successors and Assigns. ..................................................................................................49
H.     Notices. ............................................................................................................................49
I.      Term of Injunctions or Stays. .........................................................................................51
J.      Entire Agreement. ...........................................................................................................51
K.     Exhibits. ...........................................................................................................................51
L.     Deemed Acts. ..................................................................................................................51
M.    Nonseverability of Plan Provisions. ...............................................................................51
N.    Votes Solicited in Good Faith. ........................................................................................51
O.    Request for Expedited Determination of Taxes. ............................................................52
P.     Closing of Chapter 11 Cases. ..........................................................................................52
Q.    Waiver or Estoppel. .........................................................................................................52
R.     Creditor Default. .............................................................................................................52

## INTRODUCTION

Zachry Holdings, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "**Debtors**") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in **Article I.A** of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      Defined Terms.

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "<u>A&R Credit Facility</u>" means the Prepetition Credit Facility as amended and restated in accordance with the terms of this Plan and the A&R Credit Facility Documents.

2.      "<u>A&R Credit Facility Agent</u>" means the Prepetition Credit Facility Agent, in its capacity as administrative agent under the A&R Credit Facility.

3.      "<u>A&R Credit Facility Documents</u>" means any documents governing the A&R Credit Facility, including the A&R Credit Facility Term Sheet, and any amendments, modifications, and supplements thereto, and together with any related commitments, notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

4.      "<u>A&R Credit Facility Lenders</u>" means, collectively, the lenders under the A&R Credit Facility.

5.      "<u>A&R Credit Facility Term Sheet</u>" means the term sheet describing the material terms of the A&R Credit Facility, to be filed in the Plan Supplement.

6.      "<u>Administrative Claim</u>" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (d) Adequate Protection Superpriority Claims (as defined in the Cash Collateral Order).

7.      "<u>Affiliate</u>" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

8.      "<u>Allowed</u>" means, with respect to any Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.

9. "<u>Assumption List</u>" means the list of Executory Contracts and Unexpired Leases that shall be assumed by the Debtors pursuant to the Plan, as may be amended from time to time and included in the Plan Supplement.

10. "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

11. "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas.

12. "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

13. "<u>Bar Date</u>" means the applicable deadline set by the Bankruptcy Court pursuant to this Plan, the Bar Date Order, or other Final Order by which Proofs of Claim must be filed with respect to a Claim.

14. "<u>Bar Date Order</u>" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 636].

15. "<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

16. "<u>Cash</u>" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

17. "<u>Cash Collateral</u>" has the meaning set forth in section 363(a) of the Bankruptcy Code.

18. "<u>Cash Collateral Order</u>" means either a further interim or final cash collateral order, based upon the *Sixth Interim Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 1676].

19. "<u>Cause of Action</u>" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, statutory or otherwise, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

20. "<u>CB&I</u>" means CB&I LLC, a wholly owned subsidiary of McDermott International, Inc.

21. "<u>CCZJV-GPX</u>" means the hybrid joint venture between ZII, CB&I, and Chiyoda with respect to the GPX Project.

22. "<u>Chapter 11 Cases</u>" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

23.     "Chiyoda" means Chiyoda International Corporation.

24.     "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

25.     "Claims and Noticing Agent" means Verita Global, LLC, formerly known as Kurtzman Carson Consultants, LLC, as claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

26.     "Claims Objection Deadline" means ninety (90) calendar days after the Effective Date, subject to extension as set forth in **Article VII.A** hereof.

27.     "Claims Register" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

28.     "Class" means a class of Claims or Interests as set forth in **Article III** hereof pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

29.     "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

30.     "Committee" means the Statutory Unsecured Claimholders' Committee, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on June 4, 2024 [Docket No. 176].

31.     "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32.     "Confirmation Date" means the date upon which the Bankruptcy Court confirms this Plan pursuant to section 1129 of the Bankruptcy Code.

33.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on the confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

34.     "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors.

35.     "Consummation" means the occurrence of the Effective Date.

36.     "Convenience Claim" means any Claim that would otherwise be a General Unsecured Claim that is (a) Allowed in the Convenience Claim Amount or less, or (b) irrevocably reduced to the Convenience Claim Amount at the election of the Holder of an Allowed General Unsecured Claim as evidenced on the Ballot timely and validly submitted by such Holder, pursuant to the solicitation procedures approved under the Disclosure Statement Order; *provided*, *however*, that General Unsecured Claims may not be subdivided into multiple Claims of the Convenience Claim Amount or less for purposes of receiving treatment as a Convenience Claim.

37.     "Convenience Claim Amount" means $25,000.00.

38.     "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

39.     "Debtor Release" means the release set forth in **Article VIII.C** of this Plan.

40.     "Debtors" has the meaning set forth in the introduction hereof.

3

41.     "Deferred Compensation Plan" means the supplemental non-qualified deferred compensation plan providing tax deferred income for certain employees of the Debtors.

42.     "Deferred Compensation Plan Claims" means any Claim against any Debtor derived from, based upon, or arising under the Deferred Compensation Plan.

43.     "Disallowed" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (i) has been disallowed, in whole or in part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or Reorganized Debtors in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, contingent, or unliquidated and in respect of which a Proof of Claim or a proof of Interest, as applicable, has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code, any Final Order, or other applicable law; (v) has been reclassified, expunged, subordinated, or estimated to the extent that such reclassification, expungement, subordination, or estimation results in a reduction in the filed amount of any Proof of Claim or proof of Interest; (vi) is evidenced by a Proof of Claim or a proof of Interest which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court, or which is required to be filed by order of the Bankruptcy Court, but as to which such Proof of Claim or proof of Interest was not timely or properly filed; (vii) is unenforceable to the extent provided in section 502(b) or 502(e) of the Bankruptcy Code, including because such Claim asserts a right of reimbursement or contribution that is contingent as of the Effective Date; or (viii) subject to the Debtor Release, where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity, or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

44.     "Disclosure Statement" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

45.     "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

46.     "Disputed" means, as to a Claim or an Interest, a Claim or an Interest that is (a) neither Allowed nor Disallowed under this Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; (b) subject to an objection or a request for estimation Filed by the Claims Objection Deadline by any party in interest, and such objection or request for estimation has not been withdrawn or determined by a Final Order; or (c) is contingent or unliquidated and not otherwise Allowed by a Final Order.

47.     "Distribution Agent" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to this Plan for all Claims other than General Unsecured Claims.

48.     "Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which shall be the Effective Date.

49.     "Effective Date" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in **Article IX.A** of this Plan have been satisfied or waived in accordance with **Article IX.B** of this Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

50.     "<u>Employee Obligations</u>" means any existing obligations to employees, independent contractors, and retirees of the Debtors to be assumed, Reinstated, or honored, as applicable, in accordance with **Article IV.L** of this Plan, including the Deferred Compensation Plan.

51.     "<u>Entity</u>" means any entity, as defined in section 101(15) of the Bankruptcy Code.

52.     "<u>Equity Security</u>" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

53.     "<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54.     "<u>Exculpated Parties</u>" means, collectively, and in each case in its capacity as such, the Debtors, the Committee, and each member of the Committee.

55.     "<u>Executory Contract</u>" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

56.     "<u>Federal Judgment Rate</u>" means the federal judgment rate in effect as of the Petition Date.

57.     "<u>File</u>" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

58.     "<u>Final Order</u>" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided, further,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

59.     "<u>General Unsecured Claim</u>" means any Unsecured Claim against the Debtors that is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) a Restructuring Expense; (e) an Other Priority Claim; (f) a Deferred Compensation Plan Claim; (g) a Convenience Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, General Unsecured Claims include (x) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (y) Claims resulting from litigation against one or more of the Debtors, arising prior to the Petition Date.

60.     "<u>Golden Pass</u>" means Golden Pass LNG Terminal LLC, f/k/a Golden Pass Products LLC.

61.     "<u>Governing Body</u>" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

62.     "<u>Governmental Unit</u>" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

63.     "<u>GPX Administrative Claims</u>" means GPX Claims for amounts due in connection with the GPX Project incurred by ZII between May 21, 2024 and July 25, 2024 that constitute Administrative Claims.

5

64. "GPX Claims" means Claims for ZII's obligations to vendors and subcontractors (including ZII's share of Pool A and Pool B obligations of CCZJV-GPX and MZJV-GPX, respectively, but excluding obligations to ZII and its affiliates) for amounts validly due for goods and/or services in respect of the GPX Project.

65. "GPX Direct Payment Cap" means the Direct Payment Cap (as defined in the GPX Settlement Documents).

66. "GPX Excess L/C Amount" means the amount of GPX Claims in excess of the GPX Direct Payment Cap, if any, calculated pursuant to the terms of the GPX Settlement and determined by the Bankruptcy Court at or before the Confirmation Hearing.

67. "GPX Final Settlement Order" means the *Final Order (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV (II) Authorizing the Parties to Perform Any and All Obligations Contemplated By the Settlement, and (III) Granting Related Relief* [Docket No. 744].

68. "GPX Interim Settlement Order" means the *Interim Order (I) Approving the Settlement By and Among the Debtors, Golden Pass LNG Terminal LLC, CB&I LLC, Chiyoda International Corporation, and CCZJV (II) Authorizing the Parties to Perform Any and All Obligations Contemplated By the Settlement, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket Nos. 610 (Sealed); 625 (Redacted)].

69. "GPX L/C" means the *Irrevocable Standby Letter of Credit*, No. 3139428, dated February 25, 2019, as amended, issued by the GPX L/C Issuer.

70. "GPX L/C Issuer" means the Prepetition Credit Facility Agent.

71. "GPX L/C Permitted Draws" means Golden Pass's right, pursuant to the terms of the GPX Settlement to make the GPX L/C Scheduled Draws, and to further draw on the GPX L/C in an amount not to exceed the GPX Excess L/C Amount, if any; *provided, however*, that pursuant to **Article IV.B** hereof, the Debtors may, with the consent of Golden Pass, wire Cash to Golden Pass in the amount of each Scheduled Draw on the date each Scheduled Draw is due under the GPX Settlement, in lieu of Golden Pass making each Scheduled Draw against the GPX L/C.

72. "GPX L/C Scheduled Draws" means Golden Pass's right to draw on the GPX L/C in specified amounts on specified dates in accordance with the GPX Settlement; *provided, however*, that pursuant to **Article IV.B** hereof, the Debtors may, with the consent of Golden Pass, wire Cash to Golden Pass in the amount of each Scheduled Draw on the date each Scheduled Draw is due under the GPX Settlement, in lieu of Golden Pass making each Scheduled Draw against the GPX L/C.

73. "GPX Parent Guarantee" means that certain guarantee executed by ZHI in favor of Golden Pass (as amended, supplemented, or otherwise modified), related to the GPX Project.

74. "GPX Project" means the Golden Pass liquefied natural gas project under construction in Sabine Pass, Texas.

75. "GPX Settlement" means the settlement among the GPX Settlement Parties resolving disputes related to the GPX Project, as set forth in the GPX Settlement Documents, and approved on a final basis under the GPX Final Settlement Order.

76. "GPX Settlement Dispute Opinion" means the *Memorandum Opinion* [Docket No. 1266], dated October 29, 2024.

77. "GPX Settlement Dispute Order" means the *Order* [Docket No. 1267], dated October 29, 2024.

78.     "GPX Settlement Documents" means, collectively, the GPX Final Settlement Order, the GPX Interim Settlement Order, the GPX Settlement Term Sheet (attached as Exhibit A to the GPX Interim Settlement Order), the Confidential Settlement Agreement and Release in Connection with the Settlement Term Sheet [Docket No. 739], and all ancillary documents contemplated and related to the foregoing documents.

79.     "GPX Settlement Parties" means the Debtors, Golden Pass, CCZJV-GPX, CB&I, and Chiyoda.

80.     "GUC Trust" means a trust established on or prior to the Effective Date pursuant to, and in accordance with, **Article IV.F** of the Plan, which shall hold the GUC Trust Assets for the benefit of Holders of GUC Trust Interests pursuant to the GUC Trust Agreement.

81.     "GUC Trust Agreement" means the trust agreement establishing the GUC Trust and the terms and conditions for its management for the benefit of Holders of GUC Trust Interests, to be entered into on or before the Effective Date between the Debtors and the GUC Trustee, and which shall be included in the Plan Supplement.

82.     "GUC Trust Assets" means (a) the GUC Trust Unsecured Note and (b) the GUC Trust Cash Amount.

83.     "GUC Trust Cash Amount" means Cash in the amount of $250,000.00 to be contributed by the Debtors to the GUC Trust on the Effective Date, which the GUC Trustee shall use to satisfy the GUC Trust Fees and Expenses in accordance with the GUC Trust Agreement.

84.     "GUC Trust Fees and Expenses" means all reasonable and documented fees, expenses, and costs incurred by the GUC Trust and any professionals retained by the GUC Trust, and any additional amounts that the GUC Trustee determines are necessary to adequately reserve for the operating expenses of the GUC Trust.

85.     "GUC Trust Interests" means the beneficial interests in the GUC Trust, which shall be uncertificated and represented solely by appropriate book entries in the register of the GUC Trust.  The GUC Trust Interests shall entitle each beneficiary thereof to its Pro Rata share of the proceeds of the GUC Trust Unsecured Note, subject to the terms and conditions of the Plan and the GUC Trust Agreement.

86.     "GUC Trust Unsecured Note" means an unsecured note to be issued to the GUC Trust on the Effective Date, in a face amount equal to the aggregate Allowed amount of General Unsecured Claims, with terms that provide the present value of Allowed General Unsecured Claims.  The material terms of the GUC Trust Unsecured Note shall be disclosed in the GUC Trust Unsecured Note Term Sheet.

87.     "GUC Trust Unsecured Note Term Sheet" means the term sheet describing the material terms of the GUC Trust Unsecured Note, to be included in the Plan Supplement.

88.     "GUC Trustee" means, solely in its capacity as such, an Entity selected by the Debtors, in consultation with the Committee, to serve as the trustee of the GUC Trust, and any successor thereto, in accordance with the GUC Trust Agreement.  The identity of the initial GUC Trustee shall be disclosed by the Debtors at or prior to the Confirmation Hearing.

89.     "Holder" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

90.     "Impaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

91.     "<u>Indemnification Obligation</u>" means any existing indemnification obligations to be assumed, Reinstated, or honored, as applicable, in accordance with **Article IV.K** of this Plan.

92.     "<u>Intercompany Claim</u>" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

93.     "<u>Intercompany Interest</u>" means any Interest in a Debtor held by another Debtor.

94.     "<u>Interest</u>" means, collectively, (a) any Equity Security in any Debtor and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor that existed immediately before the Effective Date.

95.     "<u>Judicial Code</u>" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

96.     "<u>Lien</u>" means any lien, as defined in section 101(37) of the Bankruptcy Code.

97.     "<u>MZJV-GPX</u>" means the joint venture between ZII and CB&I with respect to the GPX Project.

98.     "<u>Order</u>" means any judgment, order, award, injunction, writ, permit, license, or decree of any Governmental Body or arbitrator of applicable jurisdiction.

99.     "<u>Organizational Documents</u>" means the organizational and governance documents for the Debtors, as may be amended to give effect to the restructuring transactions as contemplated by the Plan, including, without limitation, any applicable certificates of incorporation, certificates of formation, or certificates of limited partnership (or equivalent organizational documents), bylaws, and limited liability company agreements.

100.     "<u>Other Priority Claim</u>" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

101.     "<u>Other Secured Claim</u>" means any Secured Claim against the Debtors other than the Prepetition Credit Facility Claims.

102.     "<u>Parent Capital Contribution</u>" means a capital contribution to be made on or prior to the Effective Date to ZHI by the immediate parent company of ZHI, the material terms of which shall be set forth in the A&R Credit Facility Term Sheet.

103.     "<u>Person</u>" has the meaning set forth in section 101(41) of the Bankruptcy Code.

104.     "<u>Petition Date</u>" means the date on which the Debtors commenced the Chapter 11 Cases, May 21, 2024.

105.     "<u>Plan</u>" means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article IX.A** hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference herein and made part of the Plan as if set forth herein.

106.     "<u>Plan Supplement</u>" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) calendar days before the deadline to object to confirmation of this Plan to the extent available, or such later date as may be approved by the

Bankruptcy Court, including the following, as applicable: (a) the Organizational Documents (solely to the extent that the Debtors determine, in their sole discretion, that any amendments to such Organizational Documents are necessary to effectuate the Restructuring Transactions on the Effective Date); (b) the Assumption List; (c) the Rejection List; (d) the Schedule of Retained Causes of Action; (e) the A&R Credit Facility Term Sheet; (f) the GUC Trust Unsecured Note Term Sheet; (g) the GUC Trust Agreement; and (h) the Restructuring Steps Memorandum (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date).

107.     "Prepetition Credit Agreement" means the *Third Amendment to Second Amended and Restated Credit Agreement*, dated as of May 2, 2023 (as amended, amended and restated, supplemented, or otherwise modified from time to time), among the Prepetition Loan Parties, the Prepetition Lenders, the Prepetition Credit Facility Agent, and each other party thereto.

108.     "Prepetition Credit Facility" means the senior secured credit facility, including the Prepetition Revolving Facility, Prepetition L/C Facility, and Prepetition Term Loan Facility, governed by the Prepetition Credit Agreement.

109.     "Prepetition Credit Facility Agent" means Bank of America, N.A., in its capacity as the administrative agent under the Prepetition Credit Agreement.

110.     "Prepetition Credit Facility Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition Credit Facility, including the Prepetition Revolver Claims, Prepetition L/C Claims, and Prepetition Term Loan Claims.

111.     "Prepetition L/C Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition L/C Facility.

112.     "Prepetition L/C Facility" means the senior secured letter of credit facility provided under the Prepetition Revolving Facility.

113.     "Prepetition Lenders" means, collectively, the lenders under the Prepetition Credit Facility.

114.     "Prepetition Loan Parties" means ZHI, Zachry EPC Holdings, LLC, and Zachry Plan Services Holdings, Inc., as borrowers, and the guarantors party to that certain *Third Amended and Restated Continuing Guaranty*, dated as of May 2, 2023.

115.     "Prepetition Revolver Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition Revolving Facility.

116.     "Prepetition Revolving Facility" means the senior secured revolving credit facility, including a swing line facility and the Prepetition L/C Facility, provided under the Prepetition Credit Facility.

117.     "Prepetition Secured Parties" means, collectively, the Prepetition Credit Facility Agent and the Prepetition Lenders.

118.     "Prepetition Term Loan Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition Term Loan Facility.

119.     "Prepetition Term Loan Facility" means the senior secured term loan facility provided under the Prepetition Credit Facility.

120.     "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.     "<u>Pro Rata</u>" means the proportion that the U.S. Dollar value of an Allowed Claim in a particular Class bears to the aggregated U.S. Dollar value of all Allowed Claims in that Class.

122.     "<u>Professional</u>" means any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.     "<u>Professional Fee Claim</u>" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

124.     "<u>Proof of Claim</u>" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

125.     "<u>Reinstatement</u>" means, with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstate" shall have correlative meanings.

126.     "<u>Rejection List</u>" means the list of Executory Contracts and Unexpired Leases that shall be rejected by the Debtors pursuant to the Plan, as may be amended from time to time and included in the Plan Supplement.

127.     "<u>Related Party</u>" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.

128.     "<u>Released Avoidance Actions</u>" means any and all avoidance, recovery, subordination, or other Claims and Causes of Action that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code, or other similar or related state, federal, or foreign statutes, common law, or other applicable law.

129.     "<u>Released Party</u>" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors, the Debtors' Related Parties, and Holders of Claims related to the GPX Project, consistent with the GPX Settlement; (h) the Sureties; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided, however,* in each case, an Entity shall not be a Released Party if it: (i) elects to opt out of the Third-Party Release or (ii) Files with the Bankruptcy Court an objection to the Plan, including with respect to the Third-Party Release, that is not consensually resolved before Confirmation or otherwise supports any such objection or objector.

130.     "<u>Released Prepetition Lenders</u>" means, collectively, the Prepetition Lenders that do not elect to opt-out of, or that do not object to, the Third-Party Release.

131.     "<u>Releasing Party</u>" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility

Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors and the Debtors' Related Parties consistent with the GPX Settlement; (h) the Sureties; (i) all Holders of Claims who vote to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (j) all Holders of Claims or Interests who are deemed to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (k) all Holders of Claims or Interests who are deemed to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided*, *however*, notwithstanding anything to the contrary in this Plan, current employees of the Debtors as of the Voting Record Date shall not be Releasing Parties under this Plan.

132.     "Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to this Plan.

133.     "Restructuring Expenses" means the actual, reasonable, and documented fees and expenses of the Prepetition Lenders, subject to the terms of the Prepetition Credit Facility or any applicable fee reimbursement letter between any Entity and the Debtors, as the case may be.

134.     "Restructuring Steps Memorandum" means the description of steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

135.     "Restructuring Transactions" means the transactions described in **Article IV.C** of this Plan.

136.     "Schedule of Retained Causes of Action" means the schedule of certain Causes of Action of the Debtors that, notwithstanding anything to the contrary in the Plan, are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

137.     "Schedules" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors on July 16, 2024 [Docket Nos. 511-52] pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as amended on August 30, 2024 [Docket Nos. 855-64], on December 2, 2024 [Docket No. 1564], and on December 20, 2024 [Docket Nos. 1770-75], and as the same may be further amended, modified, or supplemented from time to time.

138.     "Secured Claim" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

139.     "SIR" means any self-insured retention under the Debtors' insurance policies.

140.     "Sureties" means Travelers Casualty & Surety Company of America and Chubb Indemnity Insurance Company.

141.     "Third-Party Release" means the release set forth in **Article VIII.D** of this Plan.

142.     "Unexpired Lease" means a lease to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

143.    "<u>Unimpaired</u>" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is Unimpaired within the meaning of section 1124 of the Bankruptcy Code.

144.    "<u>Unsecured Claim</u>" means any Claim that is not a Secured Claim.

145.    "<u>U.S. Trustee</u>" means the Office of the United States Trustee.

146.    "<u>Voting Record Date</u>" means the record date for determining whether any Holder of an Impaired Claim is entitled to vote to accept or reject the Plan, as established pursuant to the Disclosure Statement Order.

148.    "<u>Workers' Compensation Program</u>" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation, and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

149.    "<u>Zachry Interests</u>" means the Interests in ZHI.

150.    "<u>ZHI</u>" means Zachry Holdings, Inc.

151.    "<u>ZII</u>" means Zachry Industrial, Inc.

B.    <u>Rules of Interpretation</u>.

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits contained in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (8) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (15) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.    <u>Computation of Time</u>.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act, or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such

payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

D.    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan, and the Confirmation Order (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Reorganized Debtor.

E.    Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided herein.

F.    Controlling Document.

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of any inconsistency between the Plan and the GPX Settlement Documents with respect to the terms of the GPX Settlement, the GPX Settlement Documents shall control.  In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Restructuring Expenses have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** hereof.

A.    Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and Restructuring Expenses) shall be paid in full an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed on or prior to the Effective Date, the first Business Day after the date that is thirty (30) days after the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Administrative Claim.

13

For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, any Allowed Administrative Claims that are GPX Administrative Claims to the extent not satisfied prior to the Effective Date, if any, shall be paid by Golden Pass in accordance with the terms of the GPX Settlement and this Plan.

B.      Professional Fee Claims.

1.      Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash as soon as practicable after such Professional Fee Claims are Allowed.

2.      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.      Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      Classification of Claims and Interests.

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in **Article II** of this Plan (or as otherwise set forth herein), all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. In accordance with section 1123(a)(1) of the

Bankruptcy Code, the Debtors have not classified Administrative Claims, Professional Fee Claims, Priority Tax Claims, or Restructuring Expenses, as described in **Article II**.

A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3 | Prepetition Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | Deferred Compensation Plan Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 5 | Convenience Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired/Unimpaired | Presumed to Accept / Presumed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Presumed to Accept / Presumed to Reject; Not Entitled to Vote |
| 9 | Zachry Interests | Unimpaired | Presumed to Accept; Not Entitled to Vote |

B.    <u>Formation of Debtor Groups for Convenience Only</u>.

This Plan is a separate plan of reorganization for each Debtor. This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of this Plan, and making distributions in respect of Claims against and Interests in the Debtors under this Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

C.    <u>Treatment of Claims and Interests</u>.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    <u>Class 1 – Other Secured Claims</u>.

a.    <u>Classification</u>: Class 1 consists of all Other Secured Claims.

b. <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, either:

    i. payment in full in Cash of its Allowed Other Secured Claim;

    ii. the collateral securing its Allowed Other Secured Claim;

    iii. Reinstatement of its Allowed Other Secured Claim; or

    iv. such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

For the avoidance of doubt, and notwithstanding anything to the contrary in this Plan, the treatment provided to any Allowed Other Secured Claim that is a GPX Claim that has not been satisfied prior to the Effective Date, if any, shall be provided by Golden Pass in accordance with the terms of the GPX Settlement and this Plan.

c. <u>Voting</u>: Allowed Other Secured Claims in Class 1 are Unimpaired. Each Holder of an Allowed Other Secured Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

2. <u>Class 2 – Other Priority Claims</u>.

a. <u>Classification</u>: Class 2 consists of all Other Priority Claims.

b. <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

c. <u>Voting</u>: Allowed Other Priority Claims in Class 2 are Unimpaired. Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

3. <u>Class 3 – Prepetition Credit Facility Claims</u>.

a. <u>Classification</u>: Class 3 consists of all Prepetition Credit Facility Claims.

b. <u>Allowance</u>: On the Effective Date, all Prepetition Credit Facility Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $281,250,000, *plus* any obligations, unpaid fees, unpaid premiums, and accrued and unpaid interest as of the Petition Date due and owing to Holders of Prepetition Credit Facility Claims under the Prepetition Credit Facility.

c. <u>Treatment</u>: In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition Credit Facility Claim, each Holder of an Allowed Prepetition Credit Facility Claim shall, on the Effective Date, become party to, and bound by, the A&R Credit Facility on account of such Holder's Allowed Prepetition Credit Facility Claim, on the terms set forth in the A&R Credit Facility Documents.

d. <u>Voting</u>: Allowed Prepetition Credit Facility Claims in Class 3 are Impaired. Each Holder of an Allowed Prepetition Credit Facility Claim shall be entitled to vote to accept or reject this Plan.

4.      Class 4 – Deferred Compensation Plan Claims.

     a.      Classification: Class 4 consists of all Deferred Compensation Plan Claims.

     b.      Treatment: Except to the extent that a Holder of an Allowed Deferred Compensation Plan Claim agrees to less favorable treatment, each Allowed Deferred Compensation Plan Claim shall be Reinstated pursuant to section 1124 of the Bankruptcy Code, and each such Holder's rights under the Deferred Compensation Plan shall be honored by the Reorganized Debtors in accordance with the terms of the Deferred Compensation Plan.

     c.      Voting: Allowed Deferred Compensation Plan Claims in Class 4 are Unimpaired.  Each Holder of an Allowed Deferred Compensation Plan Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

5.      Class 5 – Convenience Claims.

     a.      Classification: Class 5 consists of all Convenience Claims.

     b.      Treatment: Except to the extent that a Holder of an Allowed Convenience Claim agrees to less favorable treatment, each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Convenience Claim, on the Effective Date or as soon as practicable thereafter, Cash in an amount equal to such Holder's Allowed Convenience Claim (excluding any interest that may be owed on such Claim), but in no event shall distributions on account of any Allowed Convenience Claim exceed the Convenience Claim Amount.

     c.      Voting: Allowed Convenience Claims in Class 5 are Unimpaired.  Each Holder of an Allowed Convenience Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

6.      Class 6 – General Unsecured Claims.

     a.      Classification: Class 6 consists of all General Unsecured Claims.

     b.      Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, its Pro Rata share of the GUC Trust Interests, the economic value of which shall (i) comply with the requirements of section 1129(b)(2)(B)(i) of the Bankruptcy Code even if Class 6 votes to accept the Plan, and (ii) be equal to the Allowed amount of such Claim as of the Effective Date, *plus* such Holder's Pro Rata share of any accrued interest on the GUC Trust Unsecured Note; *provided*, *however*, notwithstanding anything to the contrary in this Plan, all Allowed General Unsecured Claims that are GPX Claims, to the extent not satisfied prior to the Effective Date shall be paid by Golden Pass in accordance with the terms of the GPX Settlement and this Plan.

     c.      Voting: Allowed General Unsecured Claims in Class 6 are Impaired.  Each Holder of an Allowed General Unsecured Claim shall be entitled to vote to accept or reject this Plan.

7.       Class 7 – Intercompany Claims.

     a.      Classification: Class 7 consists of all Intercompany Claims.

    b.   <u>Treatment</u>: On the Effective Date, or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the applicable Debtor, Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors, as applicable.

    c.   <u>Voting</u>: Allowed Intercompany Claims in Class 7 are either (i) Unimpaired and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

8.    <u>Class 8 – Intercompany Interests</u>.

    a.   <u>Classification</u>: Class 8 consists of all Intercompany Interests.

    b.   <u>Treatment</u>: On the Effective Date, Intercompany Interests shall, at the option of the applicable Debtor, be:

        i.   Reinstated; or

        ii.   set off, settled, addressed, distributed, contributed, merged, cancelled, or released.

    c.   <u>Voting</u>: Allowed Intercompany Interests in Class 8 are either (i) Unimpaired and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders of Intercompany Interests are not entitled to vote to accept or reject this Plan.

9.    <u>Class 9 – Zachry Interests</u>.

    a.   <u>Classification</u>: Class 9 consists of all Zachry Interests.

    b.   <u>Treatment</u>: Zachry Interests shall be Reinstated on the Effective Date, and the legal, equitable, and contractual rights to which Holders of Zachry Interests are entitled shall remain unaltered.

    c.   <u>Voting</u>: Allowed Zachry Interests in Class 9 are Unimpaired. Holders of Zachry Interests shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

D.    <u>Special Provision Governing Unimpaired Claims</u>.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.    <u>Elimination of Vacant Classes</u>.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      Acceptance by Impaired Classes.

An Impaired Class of Claims shall have accepted this Plan, if not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

G.      Voting Classes, Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims in such Class shall be deemed to have accepted this Plan.

H.      Intercompany Interests.

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of Zachry Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to **Article III.C** of this Plan.  The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with **Article X** of this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

J.      No Substantive Consolidation.

Although this Plan is presented as a joint plan of reorganization for administrative purposes, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.  A Claim or Interest against or in multiple Debtors will be treated as a separate Claim or Interest against or in each applicable Debtor's Estate for all purposes, including voting and distribution; *provided*, *however*, that no Claim will receive value in excess of one hundred percent (100.0%) of the Allowed amount of such Claim (inclusive of postpetition interest, if applicable and if owed under this Plan) under the Plan for all such Debtors.

K.      Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

L.      Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or

otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.    General Settlement of Claims and Interests.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan, including all General Unsecured Claims and GPX Claims, and any challenge to the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Credit Facility Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise.  This Plan shall be deemed a motion to approve the good faith compromise and settlement of all Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to **Article VI** hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.    GPX Settlement.

The terms of the GPX Settlement, as approved by the GPX Final Settlement Order, are incorporated into, and are an integral part of, this Plan.  Nothing herein modifies the terms of the GPX Settlement or the rights, obligations, and interests of the GPX Settlement Parties under the GPX Settlement Documents.  For the avoidance of doubt, the GPX Settlement Parties, as applicable, shall comply with the terms of the GPX Final Settlement Order through and following the Effective Date.  Notwithstanding anything to the contrary herein, including **Article VIII** hereof, the terms of the GPX Settlement and the GPX Final Settlement Order remain binding on the GPX Settlement Parties and, as applicable, the A&R Credit Facility Agent and A&R Credit Facility Lenders.  In the event of any inconsistency between the Plan and the GPX Settlement Documents with respect to the terms of the GPX Settlement, the GPX Settlement Documents shall control.

For the avoidance of doubt, Golden Pass is a Released Party as set forth in this Plan and shall be entitled to the protections of this Plan's release and injunction provisions, including the Third-Party Release, to the fullest extent provided herein and under applicable law.  Further, and for the avoidance of doubt, Golden Pass and any property interest of Golden Pass shall be entitled to the protections of this Plan's release and injunction provisions with respect to all Claims that constitute GPX Claims that are satisfied, discharged, and/or released in connection with the GPX Settlement and this Plan, and no Holder of a satisfied GPX Claim shall have any recourse against any Entity, including Golden Pass and its property, on account of such satisfied GPX Claim regardless of whether such Holder is a Releasing Party under this Plan.

In addition, notwithstanding anything to the contrary in this Plan, neither this Plan nor any Restructuring Transaction contemplated herein shall impair Golden Pass's right to make the GPX L/C Permitted Draws, pursuant to the terms of the GPX Settlement.  However, the Debtors may, with the consent of Golden Pass, wire Cash to Golden Pass in the amount of each Scheduled Draw on the date each Scheduled Draw is due under the GPX Settlement, in lieu of Golden Pass making each Scheduled Draw against the GPX L/C.  If the Debtors fail to make such Cash payments when due, Golden Pass may make the corresponding Scheduled Draw(s) against the GPX L/C, as contemplated under the GPX Settlement.  Upon Golden Pass's receipt of the final GPX L/C Permitted Draw (or the corresponding Cash amounts from the Debtors pursuant to this section), the remaining GPX L/C shall be deemed cancelled, null, and void, without any further notice to or action, order, or approval of the Bankruptcy Court, consistent with the GPX Settlement; Golden Pass shall not be permitted to request any other or additional draws thereunder; and Golden Pass shall be deemed to release, waive, and discharge any and all rights it has or may have in respect of the GPX L/C, the GPX L/C Issuer, and the GPX Parent Guarantee.  Until Golden Pass receives the final GPX L/C Permitted Draw (or the corresponding Cash amounts from the Debtors), the Debtors, GPX L/C Issuer, and A&R Credit

Facility Lenders, as applicable, shall renew the GPX L/C as necessary, and shall not take any action that would impair, affect, or prejudice Golden Pass's rights to the GPX L/C Permitted Draws. The A&R Credit Facility Agent and A&R Credit Facility Lenders have consented to the GPX L/C Permitted Draws in accordance with the GPX Settlement; the Debtors and/or Reorganized Debtors, the A&R Credit Facility Agent, and the A&R Credit Facility Lenders further have waived, released, and extinguished any claims, defenses, or disputes with respect to the GPX L/C Permitted Draws, and stipulate and agree that all conditions and prerequisites for the GPX L/C Permitted Draws in accordance with the GPX L/C have been met (except, in the case of any GPX Excess L/C Amount, actual payment of any Excess Claims (as defined in the GPX Settlement Term Sheet) by Golden Pass), provided that, for each GPX L/C Permitted Draw actually drawn by Golden Pass against the GPX L/C, Golden Pass shall notify the A&R Credit Facility Agent of the GPX L/C Permitted Draw in the manner set forth in Annex A to the GPX L/C, as amended by the parties pursuant to the GPX Settlement.

C.     Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the Confirmation Order; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the Confirmation Order, and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the execution and delivery of the A&R Credit Facility Documents and entry into the A&R Credit Facility; (5) the execution and delivery of the GUC Trust Agreement and the establishment of the GUC Trust; (6) the issuance of the GUC Trust Unsecured Note to the GUC Trust; (7) the issuance of the GUC Trust Interests to Holders of Allowed General Unsecured Claims; (8) the Parent Capital Contribution; (9) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Steps Memorandum; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

D.     The Reorganized Debtors.

Except as otherwise provided herein or as may be provided in the Plan Supplement or the Confirmation Order, each of the Reorganized Debtors shall continue their existence as separate Entities after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each Reorganized Debtor is incorporated and pursuant to the Organizational Documents. On the Effective Date, all Zachry Interests shall be Reinstated and the Reorganized Debtors shall be deemed to adopt and re-affirm the Organizational Documents without any further action, notice, or approval. The Reorganized Debtors shall be authorized to adopt any agreements, documents, and instruments, and to take any other action contemplated under this Plan as necessary to consummate this Plan.

E.     Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, including all Causes of Action and any property acquired by any of the Debtors pursuant to this Plan, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property

and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      GUC Trust.

On or prior to the Effective Date, the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and shall take all steps necessary to establish the GUC Trust in accordance with the Plan. In accordance with section 1141 of the Bankruptcy Code, the GUC Trust Assets shall automatically vest in the GUC Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.

1.      GUC Trust Agreement and GUC Trustee.

The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The GUC Trust Agreement will be included in the Plan Supplement and will provide, among other things, that: (a) the GUC Trustee shall be appointed on or prior to the Effective Date; (b) on the Effective Date, the GUC Trust Assets shall vest in the GUC Trust free and clear of all Claims and Liens, to be held in trust for the benefit of Holders of GUC Trust Interests; (c) the GUC Trust shall hold the GUC Trust Unsecured Note until such time as the GUC Trust Unsecured Note is satisfied and discharged in accordance with the terms and conditions of the GUC Trust Unsecured Note Term Sheet; (d) the GUC Trust shall distribute Cash to Holders of GUC Trust Interests in accordance with their respective holdings of GUC Trust Interests pursuant to the terms of the GUC Trust Unsecured Note Term Sheet, including interim distributions prior to the satisfaction and discharge of the GUC Trust Unsecured Note to the extent such interim distributions are permitted under the GUC Trust Unsecured Note Term Sheet; (e) the GUC Trust shall satisfy the GUC Trust Fees and Expenses after the Effective Date in the ordinary course of business, without the necessity of any approval by the Bankruptcy Court, and solely using the GUC Trust Cash Amount and no other assets of the GUC Trust or the Reorganized Debtors; (f) the GUC Trustee shall be permitted to raise financing secured by assets of the GUC Trust in order to satisfy the ongoing costs and expenses of administering the GUC Trust; and (g) the GUC Trustee and its professionals may be subject to indemnification from the GUC Trust on customary and reasonable terms set forth in the GUC Trust Agreement.

The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this section. The GUC Trustee shall be the exclusive administrator of the GUC Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), solely for purposes of carrying out the GUC Trustee's duties under the Plan and the GUC Trust Agreement.

2.      GUC Trust Unsecured Note.

The GUC Trustee may not transfer, assign, or distribute the GUC Trust Unsecured Note held by the GUC Trust to any other Entity, including Holders of GUC Trust Interests, without the prior written consent of the Reorganized Debtors.

3.      General Unsecured Claims Reconciliation and GUC Trust Reallocations.

As set forth in **Article VII.A** of the Plan, the Reorganized Debtors shall retain sole authority to reconcile and object to Claims after the Effective Date. Following the GUC Trustee's appointment, the Debtors or Reorganized Debtors, as applicable, shall authorize the Claims and Noticing Agent to provide the GUC Trustee access to the Claims and Noticing Agent's claims register for General Unsecured Claims. The Claims and Noticing Agent shall regularly distribute revised versions of the General Unsecured Claims register to the GUC Trustee, reflecting the Allowance, Disallowance, reclassification, withdrawal, or any other alteration of any General Unsecured Claims' status or classification after the Effective Date.

If any General Unsecured Claims are Allowed, Disallowed, reclassified, withdrawn, or otherwise altered after the Effective Date, the GUC Trustee shall allocate (and reallocate) GUC Trust Interests to (and among) Holders of Allowed General Unsecured Claims as necessary to ensure that each Holder of an Allowed General Unsecured

Claim receives the treatment specified in **Article III.C.6** of this Plan.  The GUC Trustee may effect such allocations and reallocations solely on a book-entry basis, which shall be reflected in any statements or reporting required to be provided to Holders of the GUC Trust Interests under the GUC Trust Agreement.  Prior to the satisfaction and discharge of the GUC Trust Unsecured Note, the Reorganized Debtors and GUC Trustee shall modify the principal amount of the GUC Trust Unsecured Note after the Effective Date as necessary to ensure each Holder of an Allowed General Unsecured Claim receives the treatment specified in **Article III.C.6** of this Plan.

       4.       <u>Non-Transferability of GUC Trust Interests.</u>

Any and all GUC Trust Interests shall be non-transferable other than (a) with the prior written consent of the Reorganized Debtors or (b) by will, intestate succession, or otherwise by operation of law.  In addition, any and all GUC Trust Interests shall not constitute Securities and will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it is determined that any such interests constitute Securities, the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance, and distribution under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act and all applicable federal, state, and local securities laws and regulations.

       5.       <u>Tax Treatment.</u>

In furtherance of the Plan, (a) it is intended that the GUC Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the GUC Trust are intended to be deemed for federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the Holders of Allowed General Unsecured Claims, and then contributed by the Holders of Allowed General Unsecured Claims to the GUC Trust in exchange for their GUC Trust Interests; (b) the primary purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the satisfaction of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (c) all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving GUC Trust Interests, and the GUC Trustee) shall report consistently with such treatment described in provisos (a) and (b) of this paragraph; (d) all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving GUC Trust Interests, and the GUC Trustee) shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the Debtors or the Bankruptcy Court at the Confirmation Hearing; (e) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (f) the GUC Trustee shall annually send to each Holder of a GUC Trust Interest a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (a) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving GUC Trust Interests, and the GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.  Any taxes (including with respect to earned interest, if any) imposed on the GUC Trust as a result of this treatment shall be paid out of the assets of the GUC Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

      6.       <u>Dissolution of the GUC Trust</u>.

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, on the earlier of: (a) such time as (i) the GUC Trust Unsecured Note has been satisfied and discharged and (ii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Agreement have been made; (b) such time as is necessary to maintain the GUC Trust's status as a liquidating, grantor trust for the benefit of Holders of GUC Trust Interests under applicable tax law; and (c) such time as set forth in the GUC Trust Unsecured Note Term Sheet.

Upon the dissolution of the GUC Trust, any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement; *provided*, *however*, if all Holders of General Unsecured Claims have received all distributions to which they are entitled under the Plan, any such remaining GUC Trust Assets shall revest in the Reorganized Debtors.

      7.       <u>Single Satisfaction of Allowed General Unsecured Claims</u>.

Notwithstanding anything to the contrary herein, in no event shall Holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from distributions provided by the GUC Trust.

G.      <u>Sources of Consideration for Plan Distributions</u>.

Each distribution and issuance referred to in **Article VI** of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan with (a) Cash on hand, (b) proceeds from the A&R Credit Facility; (c) the issuance of the GUC Trust Unsecured Note; and (d) proceeds from the Parent Capital Contribution.

      1.       <u>Use of Cash</u>.

The Debtors, Reorganized Debtors, and Distribution Agent, as applicable, shall use Cash on hand for working capital purposes and to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

      2.       <u>A&R Credit Facility</u>.

On the Effective Date, the Reorganized Debtors shall enter into the A&R Credit Facility, the terms of which will be set forth in the A&R Credit Facility Documents. Confirmation of this Plan shall be deemed final approval of the A&R Credit Facility, the A&R Credit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization for the Reorganized Debtors to enter into and execute the A&R Credit Facility Documents and such other documents as may be required to effectuate the financings and treatment provided by this Plan.

Acceptance of this Plan by Class 3 (Prepetition Credit Facility Claims) and execution of the A&R Credit Facility Documents by the A&R Credit Facility Agent shall be deemed to bind each A&R Credit Facility Lender as if each such party had executed the A&R Credit Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the A&R Credit Facility Documents shall: (a) be deemed to be granted; (b) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the A&R Credit Facility Documents; (c)

be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the A&R Credit Facility Documents; and (d) not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

       3.     <u>GUC Trust Unsecured Note</u>.

On the Effective Date, the Reorganized Debtors shall issue the GUC Trust Unsecured Note to the GUC Trust, which shall hold the GUC Trust Unsecured Note in trust for the benefit of Holders of GUC Trust Interests, as set forth in the Plan and the GUC Trust Unsecured Note Term Sheet. The issuance of GUC Trust Unsecured Note under the Plan is duly authorized without the need for any further action by the Debtors, the Reorganized Debtors, the GUC Trustee, or any other Entity. The GUC Trust Unsecured Note issued pursuant to the Plan shall be duly authorized, validly issued, and non-assessable.

       4.     <u>Parent Capital Contribution</u>.

On or prior to the Effective Date, the Parent Capital Contribution shall be contributed to ZHI. The Debtors, Reorganized Debtors, and the Distribution Agent, as applicable, shall use the Cash proceeds from the Parent Capital Contribution for working capital purposes and to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan.

H.     <u>Cancellation of Existing Agreements and Interests</u>.

On the Effective Date, except with respect to the A&R Credit Facility, the GUC Trust Unsecured Note, the Parent Capital Contribution, the Zachry Interests, the GPX Settlement Documents, the GPX L/C (subject to **Article IV.B** hereof), the GPX Parent Guarantee (subject to **Article IV.B** hereof), all Employee Obligations (including the Deferred Compensation Plan) assumed pursuant to **Article IV.K** hereof, all Indemnification Obligations assumed pursuant to **Article IV.L** hereof, and all Executory Contracts and Unexpired Leases assumed pursuant to **Article V.A** hereof, or to the extent otherwise provided in this Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of, or parties to, such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan.

I.     <u>Corporate Action</u>.

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the officers or directors of the Debtors, any Governing Body, or the Bankruptcy Court.

J.     <u>Directors and Officers of the Reorganized Debtors</u>.

On the Effective Date, the directors and officers of each Reorganized Debtor shall consist of the current directors and officers of each respective Debtor.

K.    Deferred Compensation Plan and Other Employee Obligations.

All written employment, confidentiality, non-competition agreements, bonus, gainshare and incentive programs, discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, vacation, holiday pay, severance, retirement, retention, supplemental retirement, executive retirement, pension, deferred compensation (including the Deferred Compensation Plan), indemnification, other similar employee-related agreements or arrangements, retirement income plans, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs, and arrangements that are in effect immediately prior to the Effective Date with the Debtors, shall be assumed by the Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date, unless otherwise provided herein or the Confirmation Order, specifically rejected pursuant to a separate order of the Bankruptcy Court, specifically designated as a contract or lease to be rejected on the Rejection List, or specifically identified in a separate rejection motion Filed by the Debtors.  For the avoidance of doubt, the Debtors' assumption of all obligations related to the Deferred Compensation Plan shall include any amounts due to and owing to participants that have accrued under the Deferred Compensation Plan following the Petition Date.

The Debtors' assumption of such compensation and benefits plans, including the Deferred Compensation Plan, pursuant to the terms of this Plan shall be deemed not to trigger any applicable change of control, immediate vesting, termination, or similar provisions in any applicable plan or program, or an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions.  No counterparty shall have rights under a compensation and benefit plan or program, including the Deferred Compensation Plan, assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

Nothing in this Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable orders of the Bankruptcy Court and applicable law.

L.    Indemnification Obligations.

All indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for (each in their capacities as such) the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants, other professionals of, or acting on behalf of, the Debtors, and the Sureties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, other professionals of, or acting on behalf of, the Debtors, and the Sureties, as provided under the indemnification obligations in place prior to the Effective Date; *provided*, *however*, nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

M.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to **Article VIII** hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the GPX Final Settlement Order and the releases and exculpations contained in this Plan, including in **Article VIII**.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in this Plan, the**

**Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the GPX Final Settlement Order and this Plan, including Article VIII of this Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation, Consummation, or the occurrence of the Effective Date.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the GPX Final Settlement Order and this Plan, including **Article VIII** of this Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

N.       Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of this Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

O.       Certain Securities Law Matters.

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of any Securities under the Plan.  The offering, issuance, and distribution of any Securities pursuant to the Plan, including the GUC Trust Unsecured Note and GUC Trust Interests to the extent considered to be Securities, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code.

P.       Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the A&R Credit Facility; (6) the issuance of the GUC Trust Unsecured Note to the GUC Trust; (7) the issuance of the GUC Trust Interests to Holders of Allowed General Unsecured Claims; or (8) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax,

recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.      Dissolution of Certain Debtors.

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, Order, or rule, including any action by the stockholders, members, the board of directors, or similar Governing Body of the Debtors or the Reorganized Debtors; *provided*, *however*, subject in all respects to the terms of this Plan, the Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable and in accordance with the Restructuring Steps Memorandum: (1) file a certificate of dissolution for such Debtors, together with all other necessary corporate and company documents, to effect such Debtors' dissolution under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any such Debtors or their Estates, as determined under applicable tax laws; and (3) represent the interests of the Debtors or their Estates before any taxing authority in all tax matters, including any action, proceeding, or audit.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, all Executory Contracts and Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Debtor in accordance with sections 365 and 1123 of the Bankruptcy Code, other than any Executory Contract or Unexpired Lease that: (1) is identified on the Rejection List; (2) previously expired or terminated pursuant to its own terms; (3) was previously assumed or rejected by the Debtors, including pursuant to the GPX Settlement; (4) is the subject of a motion or notice to reject pending as of the Effective Date; or (5) has an effective date of rejection that is after the Effective Date. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates of the Debtors or Reorganized Debtors.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumption List, and the Rejection List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by this Plan or order of the Bankruptcy Court.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. For the avoidance of doubt, consummation of the Restructuring Transactions shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements,

restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith, unless otherwise ordered by the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to amend or supplement the Assumption List and Rejection List in their discretion prior to the Effective Date (or such later date as may be permitted by this **Article V**); *provided, however*, the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds.

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in this Plan or the Rejection List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection. **Any Proofs of Claim arising from the rejection of an Executory Contract or Unexpired Lease not timely Filed with the Claims and Noticing Agent shall be automatically Disallowed without further order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of this Plan, notwithstanding anything in a Proof of Claim to the contrary.** All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim, as applicable, pursuant to **Article III.C** of this Plan and may be objected to in accordance with the provisions of **Article VII** of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejection List at any time through and including thirty days after the Effective Date.

C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court; *provided, however*, nothing herein shall prevent the Reorganized Debtors, in their sole discretion, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or Reorganized Debtors, for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object

29

to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to this **Article V.C** shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or to the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to any rejected Executory Contracts or Unexpired Leases.

E.    Insurance Policies.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan.  Unless otherwise provided in this Plan or listed on the Rejection List, on the Effective Date: (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.    Workers' Compensation Program.

As of the Effective Date, the Debtors and Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states and (b) the Workers' Compensation Program.  **All Proofs of Claims on account of workers' compensation, including the Workers' Compensation Program, shall be deemed withdrawn and expunged without any further notice to or action, order, or approval of the Bankruptcy Court**; *provided*, *however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs, and nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

G.    Reservation of Rights.

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving

such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to **Article XI** of this Plan.

H.       <u>Contracts and Leases Entered Into After the Petition Date</u>.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       <u>Timing and Calculation of Amounts to Be Distributed</u>.

The Distribution Agent or the GUC Trustee, as applicable, shall make distributions under the Plan on account of each Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Unless the Bankruptcy Court orders otherwise, if, after an initial distribution in respect of a Claim, additional amounts are Allowed in respect of such Claim, the Distribution Agent or GUC Trustee, shall make distributions in respect of such additional Allowed amounts no later than thirty (30) days after such additional amounts are Allowed.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

B.       <u>Distributions to Holders of Disputed Claims and Interests</u>.

Except as otherwise set forth in the Plan or as otherwise deemed appropriate by the Debtors or the Reorganized Debtors (in each of their sole discretion): (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved as set forth in **Article VII** hereof; and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved as set forth in **Article VII** hereof or the Disputed Claim has been Allowed or expunged.

C.       <u>Distribution Agent</u>.

     1.       <u>Powers of the Distribution Agent</u>.

Except with respect to General Unsecured Claims, all distributions under this Plan shall be made by the Distribution Agent.  The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

     2.       <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement obligation (including reasonable attorneys' fees and expenses) shall be paid in Cash by the Reorganized Debtors.

D.        Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.        Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be deemed closed and the Distribution Agent and GUC Trustee, as applicable, shall be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent and GUC Trustee, as applicable, shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.        Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent and GUC Trustee, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records (including the address set forth in a Filed Proof of Claim, a written notice of address change delivered to the Reorganized Debtors, or the Debtors' Schedules) as of the date of any such distribution.

3.        Manner of Payment.

At the option of the Distribution Agent or the GUC Trustee, as applicable, any Cash distribution to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in any applicable agreements.

4.        Minimum Distributions.

No Cash payment of less than $100.00 in the aggregate shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

5.        Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent or GUC Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property shall be discharged and forever barred.  The Reorganized Debtors, Distribution Agent, and GUC Trustee, as applicable, shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings, including reviewing any Filed Proof of Claim, written notice of address change delivered to the Reorganized Debtors, or the Debtors' Schedules.

A distribution shall be deemed unclaimed if a Holder has not: (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Reorganized Debtor, Distribution Agent, or GUC Trustee, as applicable, s of an intent to accept a particular distribution; (iii) responded to the Reorganized Debtors', Distribution Agent's, or GUC Trustee's, as applicable, requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

E.        Compliance with Tax Requirements.

In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, GUC Trustee, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such

withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, Reorganized Debtors, Distribution Agent, and GUC Trustee, as applicable, reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

The Distribution Agent and GUC Trustee, as applicable, may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the Distribution Agent or GUC Trustee, as applicable, to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority. If the Distribution Agent or GUC Trustee, as applicable, makes such a request and the Holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

F.    No Postpetition or Default Interest on Claims.

Unless otherwise specifically provided for in this Plan, the Cash Collateral Order, the Confirmation Order, or applicable bankruptcy or non-bankruptcy law, (a) postpetition and default interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to non-default or default interest accruing on or after the Petition Date on any such prepetition Claim; and (b) no interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim, including with respect to (x) General Unsecured Claims and (y) Disputed Claims that become Allowed Claims after the Effective Date.

G.    Allocations.

To the extent this Plan, the Cash Collateral Order, the Confirmation Order, or applicable bankruptcy or non-bankruptcy law requires the payment of accrued but unpaid interest on prepetition Allowed Claims, distributions in respect of such Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    Foreign Currency Exchange Rate.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.    Setoffs and Recoupment.

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or before the Effective Date (whether pursuant to this Plan, a Final Order, or otherwise); *provided, however*, that neither the failure to effect such a set off or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless (i) the Debtors have consented; and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

J.      Claims Paid or Payable by Third Parties.

        1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, the Distribution Agent, or the GUC Trustee, as applicable. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, the Distribution Agent, or the GUC Trustee, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Allowed Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

        2.      GPX Claims.

Nothing herein modifies the obligations of Golden Pass and the Debtors under the GPX Settlement with respect to the payment of GPX Claims. To the extent not satisfied prior to the Effective Date, Golden Pass shall pay Allowed Claims that constitute GPX Claims, if any, pursuant to the terms of the GPX Settlement and this Plan. Such valid Claims that constitute GPX Claims and that are satisfied by Golden Pass in accordance with the GPX Settlement, and this Plan shall not be the obligation of the Debtors, the Estates, the Reorganized Debtors, the Distribution Agent, or any of their Related Parties, subject to the terms of the GPX Settlement and this Plan.

Notwithstanding anything to the contrary herein, to the extent any Claim, including an Administrative Claim, has not been reconciled and satisfied by Golden Pass prior to the Effective Date, the Debtors and/or Reorganized Debtors shall confer and reconcile such Claim with Golden Pass in good faith consistent with the GPX Settlement, prior to consenting to or otherwise permitting the Allowance of any such Claim, in whole or in part, as an Allowed GPX Claim. Golden Pass shall have no obligation to pay any such GPX Claim prior to such reconciliation with the Debtors and/or Reorganized Debtors and Allowance of such Claim. Any dispute between Golden Pass and the Debtors and/or Reorganized Debtors regarding whether any Claim, including any Administrative Claim, constitutes a valid GPX Claim subject to payment by Golden Pass under the GPX Settlement shall be determined by the Bankruptcy Court.

Notwithstanding anything to the contrary herein, to the extent Golden Pass pays a transferee that has acquired a GPX Claim from the original Holder, such payments shall count against the GPX Direct Payment Cap to the extent set forth in the GPX Settlement, and the Debtors, the Reorganized Debtors, and Golden Pass shall have no obligations to the original Holder. To the extent Golden Pass paid an original Holder of a GPX Claim prior to any transfer of such Claim becoming effective, such payments shall count against the GPX Direct Payment Cap to the extent set forth in the GPX Settlement, and the Debtors, the Estates, Reorganized Debtors, the Distribution Agent, Golden Pass, and any of their Related Parties shall have no obligations to the transferee.

For the avoidance of doubt, Golden Pass shall have no obligation to pay any Disputed Claim or otherwise pay any GPX Claim inconsistent with the terms of the GPX Settlement.

3. <u>Claims Payable by Insurers</u>.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim shall be Disallowed and expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

To the extent that applicable insurance coverage is insufficient to provide the treatment to an Allowed Claim required by **Article III** of this Plan, the Holder of such Allowed Claim shall have an Allowed General Unsecured Claim against the applicable Debtor's estate for the deficiency. To the extent that any insurer reduces the amount payable to the Holder of an Allowed Claim on account of a SIR or deductible under any applicable insurance policy, such Holder shall have an Allowed General Unsecured Claim against the applicable Debtor's estate equal to the amount of such reduction.

Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding liquidating any Claim payable pursuant to an insurance policy.

4. <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A. <u>Claims Administration Responsibilities</u>.

After the Effective Date, the Reorganized Debtors shall have the sole authority (i) to File, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, after the Effective Date, each of the Reorganized Debtors shall have the right to object to Claims and shall retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, including the Causes of Action retained pursuant to **Article IV.L** of this Plan.

**Any objections to, or requests for estimation of, General Unsecured Claims (excluding General Unsecured Claims that are contingent or unliquidated) must be Filed on or before the Claims Objection Deadline. If an objection or request for estimation is not Filed with respect to a General Unsecured Claim by the Claims Objection Deadline, such Claim shall be deemed Allowed, unless (i) such Claim is otherwise Disputed or Disallowed under this Plan or Final Order; (ii) such Claim is contingent or unliquidated as of the Claims Objection Deadline; or (iii) the Claims Objection Deadline is extended with respect to specific Claims by the Bankruptcy Court for good cause shown by the Debtors. If the Bankruptcy Court orders the Claim Objection Deadline extended with respect to specific Claims and an objection or request for estimation is not Filed with respect to any such specific Claim by the extended Claims Objection Deadline, such Claim shall be deemed Allowed, unless (i) such Claim is otherwise Disputed or Disallowed under this Plan or Final Order or (ii) such Claim is contingent or unliquidated as of the extended Claims Objection Deadline.**

**Any Holder of a General Unsecured Claim that is contingent or unliquidated as of the Claims Objection Deadline shall provide prompt notice to the Reorganized Debtors if such Claim later becomes non-contingent and liquidated. The Reorganized Debtors may object to, or request estimation of, such Claim by no**

**later than 180 days after receiving such notice and may withhold any distributions on such Claim until the expiration of such 180-day period or the resolution of any objection or request for estimation, whether by Final Order or agreement between the Reorganized Debtor and the Holder of such Claim.  The Reorganized Debtors may seek an extension of the deadline to object to, or request estimation of, such Claim for good cause shown.**

Notwithstanding anything to the contrary herein, if any General Unsecured Claim is Allowed after the GUC Trust Unsecured Note is satisfied and discharged, the Reorganized Debtors, the Distribution Agent, or their successors, as applicable, shall distribute to the Holder of such General Unsecured Claim Cash in an amount equal to the value of the property such Holder is otherwise entitled to receive under **Article III.C.6** of this Plan.

B.      Allowance of Claims.

Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  The Debtors or Reorganized Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      Estimation of Claims.

Before, on, or after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  A Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim; *provided*, *however*, such limitation shall not apply to Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen (14) calendar days after the date on which such Claim is estimated.  All of the Claims and objection, estimation, and resolution procedures set forth in this Plan are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      Adjustment to Claims Register Without Objection.

Any duplicate Claim, any Claim (filed or scheduled) that has been paid or satisfied, or any Claim that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan or the Confirmation Order), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Debtors or the Reorganized Debtors, as applicable, upon stipulation or any agreement in writing, including, without limitation, email correspondence, between the Debtors and the Holder of the applicable Claim without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      Disallowance of Claims or Interests.

**Except as otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, any and all Proofs of Claim filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, Order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless the Bankruptcy Court shall have determined by a Final Order, on or before the Confirmation Hearing, that cause exists to extend the Claims Bar Date as to such Proof of Claim on the basis of excusable neglect.**

All Claims Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed by the Reorganized Debtors, or honored or reaffirmed, as the case may be, pursuant to this Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

All Proofs of Claim Filed on account of an Employee Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such Obligation, without any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in exchange for the Debtors' assumption of all obligations under the Deferred Compensation Plan and the Reinstatement all Deferred Compensation Plan Claims pursuant to **Article III.C.4** of this Plan, any and all Proofs of Claim asserting Deferred Compensation Plan Claims shall be deemed satisfied and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.  The rights of the Debtors, the Reorganized Debtors, and the Holders of Deferred Compensation Plan Claims with respect to such Deferred Compensation Plan Claims shall be fully reserved, and any disputes relating to amounts owed in connection with such Deferred Compensation Plan Claims shall be resolved by the Reorganized Debtors and the applicable Holder(s) in the ordinary course of business after the Effective Date.

F.      Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim is no longer contingent.

G.      Amendments to Proofs of Claim.

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed Disallowed in full and expunged without any further action or notice to the Bankruptcy Court; *provided*, *however*, the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim.  Nothing in this paragraph shall impair any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

H.      No Distributions Pending Allowance.

Notwithstanding any other provision of this Plan, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim becomes an Allowed Claim.

I.      Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with **Article VI** of this Plan.

J.      Single Satisfaction of Claims.

        In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Interest exceed 100 percent of the underlying Allowed Claim or Interest plus applicable interest required to be paid under this Plan, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      Discharge of Claims and Termination of Interests.

        Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, and GPX or any of its assets or properties with respect to any Claims that constitute GPX Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date. For the avoidance of doubt, the discharge provided herein shall discharge, release, and extinguish any right of any Holder of any Claim to file, assert, levy, or attach any Liens or initiate any claim against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to this Plan, including on account of General Unsecured Claims that are satisfied in full under this Plan, or otherwise enforce, collect, or recover on account of any such Claims other than as expressly permitted under this Plan.  Further, and for the avoidance of doubt, the discharge provided herein shall discharge, release, and extinguish any right of any Holder of any GPX Claim to file, assert, levy, or attach any Liens against property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to this Plan, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass or any property interest of Golden Pass.

B.      Release of Liens.

        **Except as otherwise provided in this Plan, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.C hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including any bonds related to the Debtors, shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The foregoing direction to release Liens shall be considered a direction in accordance with, as applicable, the Prepetition Credit Agreement, as if**

such direction included the signatures of the necessary lenders thereunder to direct the applicable agent to take the actions contemplated thereby.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, including with respect to any bonds related to the Debtors, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      <u>Releases by the Debtors</u>.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in this Plan, the Schedule of Retained Causes of Action, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of each Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Released Avoidance Actions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to this Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in this <u>Article VIII.C</u>, the Debtors shall maintain all rights to object to Filed Claims and shall not release any claims or Causes of Action (i) identified in the Schedule of Retained Causes of Action, or (ii) related to the GPX Settlement that are preserved by the GPX Settlement Documents, the GPX Settlement Dispute Opinion, or the GPX Settlement Dispute Order.  Any and all such

rights, claims, and Causes of Action set forth in this paragraph shall be fully preserved and revest in the Reorganized Debtors pursuant to this Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of this Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      Releases by Third Parties.

Except as otherwise expressly set forth in this Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce this Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to this Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related

provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.    Exculpation.

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, all related agreements, instruments, and other documents, or any transaction related to the Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.    Injunction.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim or Interest that is extinguished, discharged, satisfied, or released pursuant to this Plan.

Except as otherwise expressly provided in this Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, discharged, satisfied, released, or are subject to exculpation pursuant to Article VIII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties and/or the Released Parties:

> 1.    commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

41

2. enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

3. creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

4. filing, asserting, levying, or attaching any Liens against any property of the Debtors or Reorganized Debtors on account of any Claims arising under or related to Executory Contracts or Unexpired Leases that are assumed and cured pursuant to this Plan;

5. filing, asserting, levying, or attaching any Liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to this Plan, including on account of General Unsecured Claims that are satisfied in full under this Plan, and enforcing, collecting, or recovering on account of any such Liens;

6. filing, asserting, levying, or attaching any Liens against any property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, and enforcing, collecting, or recovering on account of any such Liens, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass;

7. filing, asserting, levying, or attaching any Claims or Liens on account of GPX Claims satisfied (or to be satisfied) by Golden Pass under the GPX Settlement, whether against the Released Parties, Exculpated Parties, Golden Pass, Chiyoda, CB&I, or CCZJV-GPX;

8. except as otherwise provided under this Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

9. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, the solicitation of votes with respect to this Plan, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action

42

represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action. The injunction in this Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order, or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order from bringing an action to enforce the terms of this Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order.

G.      Limitation of Liability of Officers, Directors, and Agents.

The provisions of section 1125(e) of the Bankruptcy Code govern the protection from liability with respect to all matters governed by section 1125(e). The Debtors and their successors (and the officers, directors or agents of the Debtors or their successors) have no liability for conduct that was authorized by an order of the Bankruptcy Court. With respect to conduct during the period from the Petition Date through the Effective Date, the Debtors and their successors (and the officers, directors or agents of the Debtors or their successors) may be subject to liability only for conduct that constituted actual fraud, gross negligence, or willful misconduct, provided that such limitations on liability exist under applicable non-bankruptcy law. Notwithstanding the foregoing, this Plan does not limit liability for conduct for which the Bankruptcy Court's approval was required by applicable law, but for which approval was not granted.

H.      Waiver of Statutory Limitations on Releases.

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

I.      Special Provision Regarding the United States Government.

Nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States government or any of its agencies or any state and local authority whatsoever, including without limitation any Claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any Claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

J.        Protections Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

K.        Document Retention.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policies, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.        Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article IX.B** hereof:

1.    The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the Confirmation Order shall be in full force and effect;

2.    The settlements embodied in the Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

3.    The A&R Credit Facility Documents shall have become effective in accordance with their terms;

4.    The Debtors shall have issued the GUC Trust Unsecured Note in accordance with the terms of the GUC Trust Unsecured Note Term Sheet;

5.    The GUC Trust Agreement shall have been executed by the Debtors and the GUC Trustee, and the GUC Trust Assets, including the GUC Trust Unsecured Note, shall have vested in the GUC Trust;

6.    The Parent Capital Contribution shall have been contributed to, and vested in, ZHI; and

7.    The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other restructuring transactions.

B.        Waiver of Conditions.

The conditions to the Effective Date set forth in this **Article IX** may be waived, in whole or in part, by the Debtors only with the prior written consent of the Prepetition Credit Facility Agent (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.      Substantial Consummation.

Consummation of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      Effect of Failure of Conditions.

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      Modification and Amendments.

Except as otherwise specifically provided in this Plan, subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify this Plan without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; *provided*, *however*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

B.      Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      Revocation or Withdrawal of Plan.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or relating to, the Chapter 11 Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

3.  resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Claims; (ii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated; (iii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iv) any other issue related to any Executory Contracts and Unexpired Leases; or (v) any dispute regarding whether the Plan or any Restructuring Transactions trigger any cross-default or change of control provision in any contract or agreement;

4.  ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan or the Confirmation Order;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

7.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.  enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

9.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan or the Confirmation Order and the administration of the Estates;

11.  hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of this Plan or the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

46

12.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

13.      adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article VIII** hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

14.      adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Article VI** hereof;

15.      enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.      determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

17.      enter an order concluding or closing the Chapter 11 Cases;

18.      consider any modifications of this Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.      adjudicate, decide, or resolve disputes as to the ownership of any Claim or Interest;

21.      adjudicate, decide, or resolve all matters related to any subordinated Claim;

22.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

23.      adjudicate, decide, or resolve matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

24.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

25.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under **Article VIII** hereof;

26.      hear and determine all disputes involving the obligations under, or the terms of, the GPX Final Settlement Order;

27.      enforce all orders previously entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

28.      hear any other matter not inconsistent with the Bankruptcy Code; and

29.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this **Article XI**, the provisions of this **Article XI** shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior Order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

As of the Effective Date, notwithstanding anything in this **Article XI** to the contrary, the A&R Credit Facility Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     Immediate Binding Effect.

Subject to **Article IX.A** hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted or rejected this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan or the Confirmation Order, each Entity acquiring property under this Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan and the Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on this Plan.

B.     Waiver of Stay.

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

C.     Additional Documents.

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan or the Confirmation Order.  The Debtors, Reorganized Debtors, or GUC Trustee, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan and the Confirmation Order.

D.     Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors), as applicable, for each

quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made during the applicable period, attested to by the Reorganized Debtors.  The obligation to file quarterly reports shall continue until the earliest of the Debtors' cases being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

E.     <u>Statutory Committee and Cessation of Fee and Expense Payment</u>.

On the Effective Date, the Committee shall dissolve automatically and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to final fee applications of the Professionals asserting Professional Fee Claims.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred after the Effective Date by the members of or advisors to the Committee.

F.     <u>Reservation of Rights</u>.

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any Entity unless and until the Effective Date occurs.

G.     <u>Successors and Assigns</u>.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.     <u>Notices</u>.

To be effective, all notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.     <u>if to the Debtors or the Reorganized Debtors, to</u>:
Zachry Holdings, Inc.
P.O. Box 240130
San Antonio, TX 78224
Attention: Jay Old

with copies (which shall not constitute notice) to:

White & Case LLP
609 Main Street, Suite 2900
Houston, Texas 77002
Attention:  Charles R. Koster
Email:      charles.koster@whitecase.com

-and-

White & Case LLP
111 South Wacker Drive
Chicago, IL 60606
Attention: Bojan Guzina, Andrew F. O'Neill, William A. Guerrieri, Adam T. Swingle
Email:      bojan.guzina@whitecase.com;
              aoneill@whitecase.com;
              william.guerrieri@whitecase.com;
              adam.swingle@whitecase.com

2.      if to the Committee, to:
        Gray Reed LLP
        1300 Post Oak Blvd., Suite 2000
        Houston, TX 77056
        Attention: Jason S. Brookner
        Email:      jbrookner@grayreed.com

        -and-

        Proskauer LLP
        Eleven Times Square
        New York, NY 10036-8299
        Attention:  Ehud Barak, Daniel Desatnik
        Email:      ebarak@proskauer.com;
                    ddesatnik@proskauer.com

        Proskauer LLP
        Three First National Plaza
        70 West Madison, Suite 3800
        Chicago, IL 60602-4342
        Attention: Paul V. Possinger
        Email:      ppossinger@proskauer.com

3.      if to the Prepetition Credit Facility Agent, to:
        Bank of America, N.A.
        Agency Management
        900 W. Trade St.
        Gateway Village – 900 Building
        NC1-026-06-03
        Charlotte, NC 28255
        Attention: Dianna (Dottie) Benner

        with copies (which shall not constitute notice) to:

        McGuireWoods LLP
        845 Texas Ave., 24th Floor
        Houston, TX 77002
        Attention: Demetra Liggins, Andrew C. Papa
        Email:      dliggins@mcguirewoods.com;
                    apapa@mcguirewoods.com

        -and-

        McGuireWoods LLP
        1251 Avenue of Americas, 20th Floor
        New York, New York 10020-1104
        Attention: Shawn R. Fox

Email:      sfox@mcguirewoods.com

After the Effective Date, the Debtors have authority to send a notice to Entities receiving documents pursuant to Bankruptcy Rule 2002 that such Entities must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.      Term of Injunctions or Stays.

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      Entire Agreement.

Except as otherwise indicated, and without limiting the effectiveness of this Plan (including, for the avoidance of doubt, the Plan Supplement), the Confirmation Order supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, the Confirmation Order, the Plan Supplement, and the documents related thereto.

K.      Exhibits.

All exhibits and documents included in this Plan, the Confirmation Order, and the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at www.veritaglobal.net/ZHI or the Bankruptcy Court's website at http://www.txs.uscourts.gov/.

L.      Deemed Acts.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

M.      Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) non-severable and mutually dependent.

N.      Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan,

the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan. Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and other applicable law.

O.      Request for Expedited Determination of Taxes.

        The Debtors and Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

P.      Closing of Chapter 11 Cases.

        Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to (1) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, and enforcement of this Plan shall be administered and heard in such Chapter 11 Case and (2) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

        The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Q.      Waiver or Estoppel.

        Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

R.      Creditor Default.

        An act or omission by a Holder of a Claim in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized Debtors in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of this Plan.

*[Remainder of Page Intentionally Left Blank]*

Dated:  January 22, 2025

ZACHRY HOLDINGS, INC.
(for itself and on behalf of each of the other Debtors
and Debtors in Possession)

By:  /s/ Mohsin Y. Meghji
      Name: Mohsin Y. Meghji
      Title:   Chief Restructuring Officer

**Exhibit B**

**Financial Projections**

## FINANCIAL PROJECTIONS[1]

### I.    INTRODUCTION

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.  In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would be feasible, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors' management team ("**Management**") has prepared these Financial Projections for the Reorganized Debtors for the ten months ending December 31, 2025 and fiscal years ending December 31, 2026 through December 31, 2027 (the "**Projection Period**").  These Financial Projections have been prepared on a consolidated basis in sufficient detail, as far as is reasonably practicable based on the Debtors' books and records and are based on a number of assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' operations, assuming consummation of the Plan.

Management prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified.  No representations or warranties, express or implied, are provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

### II.    ACCOUNTING POLICIES AND GENERAL DISCLAIMER

These Financial Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or the rules and regulations of the U.S. Securities and Exchange Commission.  Furthermore, these Financial Projections have not been audited, reviewed, or subjected to any procedures designed to provide any level of assurance by the Debtors' independent public accountants.

The Financial Projections, while presented with numerical specificity, are necessarily based on a number of estimates and assumptions which, though considered reasonable by Management, may not be realized, and are inherently subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the Debtors' control.  These uncertainties include, among other things, the ultimate outcome and contents of a confirmed plan of reorganization and the timing of the confirmation of such plan.  Consequently, the Financial Projections should not be regarded as a representation or warranty by the Debtors, the Reorganized Debtors, or any other person, as to the accuracy of the Financial Projections or that the Financial Projections will be realized.  Actual results may vary materially from those presented in the Financial Projections.  **THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS AND RELATED INFORMATION OR AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.**  Some assumptions inevitably will not materialize and events and circumstances occurring subsequent to the date on which the Financial Projections were prepared may be different from those assumed or may be unanticipated, and thus may affect financial results in a material and possibly adverse manner.  **THE FINANCIAL PROJECTIONS**

---

[1]    Terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (as altered, amended, modified, or supplemented from time to time, the "**Disclosure Statement**"), to which this exhibit is attached, or the *First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (as altered, amended, modified, or supplemented from time to time, the "**Plan**"), as applicable.

**AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.**

The Financial Projections, including the underlying assumptions, should be carefully reviewed in evaluating the Plan. Although Management believes the assumptions underlying the Financial Projections, when considered on an overall basis, are reasonable in light of current circumstances and expectations, no assurance can be given that the Financial Projections will be realized. The significant assumptions used in the preparation of the Financial Projections are stated below. The Financial Projections assume that the Debtors will emerge from chapter 11 on the Assumed Effective Date (as defined herein). The Financial Projections should be read in conjunction with (1) the Disclosure Statement, including all of the exhibits thereto or incorporated by reference therein, as well as the risk factors set forth therein, and (2) the significant assumptions, qualifications, and notes set forth below. **HOLDERS OF CLAIMS AGAINST THE DEBTORS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.**

The Debtors do not, as a matter of course, publish or disclose their Financial Projections. Accordingly, the Debtors reserve the right, but disclaim any obligation, to (a) furnish updated Financial Projections to Holders of Claims at any time in the future or (b) otherwise make updated information or Financial Projections publicly available.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

## III.    PRINCIPAL ASSUMPTIONS FOR THE FINANCIAL PROJECTIONS

The Financial Projections are based on, and assume the successful implementation of, the Debtors' business plan and the Debtors' emergence from bankruptcy on or before February 28, 2025 pursuant to the terms of the Plan. The Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, the assumed exit financing, and other matters, many of which are beyond the Debtors' control. In addition, there is uncertainty regarding the disruption of future business opportunities as a result of the restructuring. Thus, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Further, any significant delay in the Assumed Effective Date may have a significant negative effect on the operations and financial performance of the Debtors including an increased risk or inability to meet financial forecasts and the incurrence of higher reorganization expenses.

The Financial Projections were prepared utilizing the balance sheet information from recent periods and projected results of operations and cash flows over the Projection Period. Actual balances may vary

from those reflected in the post-emergence balance sheet due to variances in projections and potential changes in cash needed to consummate the Plan.

### A.    Select Risk Factors Related to the Financial Projections

The Financial Projections are subject to inherent risks and uncertainties related to the power, energy, chemical, and refining industries (most of which are difficult to predict and many of which are beyond Management's control).  While the Financial Projections assume significant and profitable future bookings, future project awards are inherently uncertain and volatile.  Any reduction in future awards could have a significant impact on profitability and cash flow due to the lost revenue and potentially large unabsorbed costs.

Factors that may cause actual results to differ from expected results include, but are not limited to:

a)    ability to competitively bid and win the significant new projects assumed in the projections;

b)    ability to attract and retain customers in the Debtors' engineering and services segments;

c)    uncertainty and risks associated with contractual pricing in the Debtors' industries;

d)    delays and cost overruns in the Debtors' projects;

e)    revenues projected may not be realized or, if realized, may not result in profits due to project cancellations or changes in project scope and schedule;

f)    increasing requirements for letters of credit to support new awards, which may exceed letters of credit commitments;

g)    changes in the availability and cost of capital;

h)    employee turnover at the management, support, and field operations level; and

i)    the effects of existing and future laws and governmental regulations, including tax and environmental.

These Financial Projections are premised upon, in part, the Debtors' ability to procure contracts for discrete projects providing engineering, procurement, and construction work.  While the Debtors have a backlog of identified projects and services work through the Projection Period, not all pipeline projects have been awarded.  Given the inherent volatility in the industry in which the Debtors operate, the potential for project-related issues to arise, uncertainty surrounding the Debtors' ability to secure new business, and the potential fluctuation of financial performance, actual future results may be materially different (positively or negatively) from these projections.

### B.    General Assumptions

**Plan and Effective Date.**  The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on or before February 28, 2025 (the "**Assumed Effective Date**").  This date reflects the Debtors' best current estimate but there can be no assurance as to when the Assumed Effective Date will occur.

**Projection Period.**  The Financial Projections contained herein cover the period beginning March 1, 2025 through December 31, 2027.

**Accounting Policies.**  The impact of fresh start accounting is not reflected in these projections.

### C.    Significant Operating Assumptions and Notes

**Revenue.**  For the Projects business, revenues are forecasted utilizing expected percentage of completion, contract price, and work progress for each of the Debtors' projects.  Project revenues have been informed by existing contracts, near-term currently visible pipeline opportunities, and additional longer-term pipeline opportunities estimated by Management.  Services & Engineering revenues are based on monthly billings according to existing contracts, expected renewals, and expected new business.  Projections of future project

3

wins and new Services & Engineering business are uncertain, inherently speculative, and subject to the risk factors noted herein.

**Operating Expenses.**  Operating Expenses are primarily comprised of cost of revenue (which includes direct and indirect labor, subcontractors, materials, and equipment expenses), selling, general, and administrative costs (which includes labor and other expenses associated with the Debtors' corporate overhead, including support for the Debtors' business units), and Depreciation & Amortization (as described below).

**Depreciation & Amortization.**  Depreciation and Amortization reflect: (a) the estimated depreciation of existing fixed assets based on the Debtors' depreciation schedules; (b) the estimated depreciation of new fixed assets added over the Projection Period on a fixed-line basis; and (c) the estimated amortization of intangible assets over the remaining useful lives of such assets.

**Changes in Working Capital.**  The cash impact from Changes in Working Capital has been forecasted on a project level and business unit level and is comprised of changes in accounts receivable, accounts payable, accrued expenses, advance billings on contracts, investments in and advances to EPC joint ventures, and other operating accounts.

**Capital Expenditures, net.**  Capital Expenditures reflect the purchase of fixed assets over the Projection Period, primarily related to maintenance capital expenditures, net of fixed asset sales.

**Income Tax.**  Income Tax is estimated as a percentage of taxable income based an estimated effective tax rate reflective of (a) jurisdictions anticipated in the Debtors' operations in the Financial Projections and (b) certain non-deductible permanent differences.

**Cash Interest & Fees.**  Cash Interest Expense and Fees post-emergence are estimated based on the Debtors' expected capital structure as more fully described in the Plan and the Disclosure Statement.

**Revolver Borrowings, Net of Payments.**  This reflects borrowings, net of payments, on the senior secured revolving credit facility anticipated under the A&R Credit Facility, including as a result of expected draws on Letters of Credit post emergence, including those related to the GPX Settlement.

**Term Loan Principal Repayments.**  Term Loan Principal Repayments reflects (a) projected scheduled principal payments per the A&R Credit Facility Documents and (b) projected cash flow sweep payments per the A&R Credit Facility Documents.

### D.    Significant Balance Sheet Assumptions

**Opening Cash Balance.**  Management expects the Debtors to have approximately $77 million of cash on the Assumed Effective Date after giving effect to the Restructuring Transactions, which includes $5 million of restricted cash.

**Pro Forma Debt.**  The pro forma capital structure on the Assumed Effective Date assumes: (a) a senior secured revolving credit facility due September 2028 with commitments totaling $775 million, with a $150 million borrowing sublimit ($125 million funded); (b) a senior secured term loan facility due September 2028 in a principal amount of $156.25 million; and (c) an unsecured note in a principal amount of $50.3 million.

## IV.    NON-GAAP UNAUDITED FINANCIAL PROJECTIONS

The table below provides a summary of Financial Projections for the Debtors and their Affiliates, which should be reviewed in conjunction with the assumptions herein.  These Financial Projections are unaudited and may contain metrics which do not conform to GAAP.

| $MM | 2025P | 2026P | 2027P |
|---|---|---|---|
| | *10-Months ended 12/31/25* | *Annual* | *Annual* |
| **Income Statement** | | | |
| Total Revenue | $2,409.6 | $3,148.4 | $3,912.9 |
| Operating Expenses | (2,317.1) | (3,034.2) | (3,712.9) |
| **Operating Income** | **$92.5** | **$114.1** | **$199.9** |
| **Cash Flow** | | | |
| Operating Income | $92.5 | $114.1 | $199.9 |
| Depreciation & Amortization | 13.6 | 16.2 | 16.3 |
| Income Tax Benefit (Expense) | (27.9) | (29.1) | (63.0) |
| Changes in Net Working Capital | 119.9 | 136.2 | 64.3 |
| Capital Expenditures, Net | 8.2 | (4.8) | (4.8) |
| Cash Interest & Fees | (30.9) | (31.0) | (20.1) |
| Revolver Borrowings, Net of Payments | (84.9) | (82.6) | – |
| Term Loan Principal Repayments | (112.6) | (43.7) | – |
| **Cash Flow** | **($22.0)** | **$75.4** | **$192.8** |
| **Cash and Debt** | | | |
| Beginning Cash Balance | $77.0 | $55.0 | $130.4 |
| Cash Flow | (22.0) | 75.4 | 192.8 |
| **Ending Cash Balance** | **$55.0** | **$130.4** | **$323.2** |
| Restricted Cash | (5.0) | (5.0) | (5.0) |
| **Ending Unrestricted Cash Balance** | **$50.0** | **$125.4** | **$318.2** |
| **Total Pro Forma Debt** | **$186.4** | **$65.7** | **$72.0** |

**Exhibit C**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS[1]

### I.        INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate that the Plan satisfies the best interests of creditors test, the Debtors, with the assistance of their restructuring advisors, M3 Partners, have prepared a hypothetical liquidation analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis assumes that a chapter 7 trustee would seek to liquidate the assets promptly.  This Liquidation Analysis sets forth estimated recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation.  As illustrated by this Liquidation Analysis, Holders of Claims in Impaired Classes and Holders of Claims or Interests in certain Unimpaired Classes that would otherwise receive a full recovery under the Plan would receive a lower recovery in a hypothetical liquidation.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation.  Accordingly, and as explained further below, the Debtors believe that the Plan satisfies the "best interests of creditors" test.

### II.       STATEMENT OF LIMITATIONS

The preparation of a liquidation analysis involves the use of estimates and assumptions that (although considered reasonable by the Debtors based upon their business judgment and input from their advisors) are inherently subject to significant business, economic, and competitive risks, uncertainties, and contingencies.  These risks, uncertainties, and contingencies are difficult to predict and many are beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis may not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results of an actual chapter 7 liquidation.

This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.

**THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.   THE UNDERLYING FINANCIAL INFORMATION IN THIS LIQUIDATION ANALYSIS AND VALUES STATED HEREIN HAVE NOT BEEN SUBJECT TO ANY REVIEW, COMPILATION, OR AUDIT BY ANY INDEPENDENT ACCOUNTING FIRM.**

In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of a chapter 7 case.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

This Liquidation Analysis does not include estimates for: (i) tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets; (ii) recoveries resulting from the successful prosecution of any Causes of Action; (iii) certain Claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code; (iv) additional unsecured and contract breakage claims, in excess of Surety Bond and Letter of Credit coverage, arising from a chapter 7 liquidation; (v) any adjustments to the Debtors' outstanding letters of credit on account of the GPX L/C Permitted

---

[1]     Terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (as altered, amended, modified, or supplemented from time to time, the "**Disclosure Statement**"), to which this exhibit is attached, or the *First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (as altered, amended, modified, or supplemented from time to time, the "**Plan**"), as applicable.

1

Draws; or (vi) proceeds related to the potential sale of any of the Debtors as a going concern. More specific assumptions are detailed in the notes below.

**ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.**

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for other known liabilities, as necessary. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including chapter 7 administrative claims such as wind down costs and trustee fees (together, the "**Wind-Down Expenses**"). To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

**NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH HEREIN.**

### III. BASIS OF PRESENTATION

This Liquidation Analysis has been prepared assuming that the Debtors converted their Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about February 28, 2025 (the "**Liquidation Date**"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited financial statements of the Debtors as projected as of February 28, 2025. It is assumed that, on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "**Chapter 7 Trustee**") to oversee the liquidation of the Debtors' Estates. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties in interest. The Chapter 7 Trustee would sell all assets of the Debtors and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) *first*, for payment of liquidation and Wind-Down Expenses; (ii) *second*, to pay the secured portions of all Allowed Secured Claims from the respective collateral securing such Claims; and (iii) *third*, to pay amounts on the Allowed Administrative Claims and Allowed Other Priority Claims. Any remaining net cash would be distributed to creditors holding Allowed Unsecured Claims, including deficiency Claims that arise to the extent of the unsecured portion of the Allowed Secured Claims.

This Liquidation Analysis assumes: (i) no incremental equity investment is made into any of the Debtors; (ii) no exit financing is raised; and (iii) the operations of the Debtors will cease and the related individual assets will be sold in a sale under a six-month liquidation process (the "**Liquidation Timeline**") under the direction of the Chapter 7 Trustee, utilizing the Debtors' resources and the Chapter 7 Trustee's third party advisors, to allow for the orderly wind down of the Debtors' Estates. This Liquidation Analysis is also based on the assumptions that the Debtors will have continued access to: (i) Cash Collateral during the course of the Liquidation Timeline to fund Wind Down Expenses and (ii) operations, accounting, treasury, IT, and other management services needed to wind down the Debtors' Estates. There can be no assurance that a liquidation would be completed within the Liquidation Timeline, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Further, local geographic issues may arise (such as the seizure of local assets) that prevents the Debtors' assets from generating proceeds for the Debtors' Estates.

This Liquidation Analysis was conducted on an entity-by-entity basis and is displayed below on a consolidated basis for convenience. Asset recoveries accrue first to satisfy creditor Claims at each legal Entity. To the extent any remaining value exists at each individual Entity, that value then flows to each individual Entity's parent organization or shareholder.

## IV.    DETAILED LIQUIDATION ANALYSIS

This Liquidation Analysis should be reviewed in conjunction with, and is qualified in its entirety by, the associated notes below.  Book values and proceeds by asset type are displayed for all of the Debtors in the table below.

**Zachry Holdings Inc., et al**
*Recovery Analysis under hypothetical Chapter 7 Liquidation scenario*

*($ in Actuals)*

| Liquidation Analysis Summary As of 2/28/2025 | Note | Estimated Book Value Amount $ | Chapter 7 Liquidation Recovery % | Recovery $ |
|---|---|---|---|---|
| **Balance Sheet Sources** | | | | |
| Cash and Cash Equivalents | [A] | $85,563,351 | 100.0% | $85,563,351 |
| Accounts Receivable | [B] | 257,629,837 | 10.0% | 25,762,984 |
| Other Accounts Receivable | [C] | 278,000 | 10.0% | 27,800 |
| Inventories | [D] | 14,464,558 | 5.0% | 723,228 |
| Prepaid Expenses | [E] | 6,854,713 | 0.0% | - |
| Other Assets | [F] | 72,109,000 | 90.0% | 64,898,100 |
| Investment in and Advances to EPC Joint Ventures | [G] | 372,038,053 | 5.0% | 18,601,903 |
| Intangible Assets, net of Amortization | [H] | 19,178,477 | 10.0% | 1,917,848 |
| Goodwill | [I] | 184,297,000 | 0.0% | - |
| Property, Plant, and Equipment, net | [J] | 50,590,848 | 10.0% | 5,059,085 |
| **Gross Proceeds from Balance Sheet Sources** | **[K]** | **$1,063,003,837** | **19.1%** | **$202,554,298** |
| | | | | |
| **Other Sources of Value** | | | | |
| Equity Contribution | | $- | N/A | $- |
| Exit Financing | | - | N/A | - |
| **Gross Proceeds from Other Sources of Value** | **[L]** | **$-** | **N/A** | **$-** |
| | | | | |
| **Total Gross Proceeds Available for Distribution** | | **$1,063,003,837** | **19.1%** | **$202,554,298** |
| | | | | |
| **Post Chapter 7 Costs** | | | | |
| Chapter 7 Trustee | [M] | $6,076,629 | | $6,076,629 |
| Wind-Down Costs | [N] | 50,432,048 | | 50,432,048 |
| **Total Post Chapter 7 Costs** | | **$56,508,677** | **100.0%** | **$56,508,677** |
| | | | | |
| **Net Proceeds Available for Secured Claims** | **[O]** | | | **$146,045,621** |
| | | | | |
| **Secured Claims** | | | | |
| Secured Funded Debt Claims | [P] | $281,250,000 | | $54,933,985 |
| Letters of Credit Assumed to be Drawn | [Q] | 466,471,674 | | 91,111,637 |
| **Total Secured Claims** | **[R]** | **$747,721,674** | **19.5%** | **$146,045,621** |
| | | | | |
| **Net Proceeds Available for Chapter 11 Administrative Claims** | | | | **$-** |
| | | | | |
| **Chapter 11 Administrative Claims** | | | | |
| Chapter 11 Administrative Claims | [S] | $55,258,297 | 0.0% | $- |
| **Net Proceeds Available for Priority Unsecured Claims** | | | | **$-** |
| | | | | |
| **Priority Unsecured Claims** | | | | |
| Priority Unsecured Claims | [T] | $1,345,000 | 0.0% | $- |
| **Net Proceeds Available for General Unsecured Claims** | | | | **$-** |
| | | | | |
| **General Unsecured Claims** | | | | |
| Vendor Claims not Covered by L/C or Surety | [U] | $23,901,131 | | $- |
| Other General Unsecured Claims | [V] | 56,922,000 | | - |
| Called Surety Bonds | | 465,699,559 | | - |
| Secured Creditors' Deficiency Claim | | 601,676,052 | | - |
| **Total General Unsecured Claims** | **[W]** | **$1,148,198,742** | **0.0%** | **$-** |
| | | | | |
| **Net Proceeds Available for Common Equity** | | | | **$-** |

## Notes to the Liquidation Analysis

**[A] Cash and Cash Equivalents**: The adjusted book value of approximately $85.6 million represents the projected amount of cash on the balance sheet at the Liquidation Date less the projected $36.2 million of accrued payroll at the Liquidation Date.  Under a chapter 7 liquidation, the projected $36.2 million of accrued payroll at the Liquidation Date is expected to be pre-funded to limit WARN Act exposure.

**[B] Accounts Receivable**: The Debtors generate a substantial amount of revenue from projects they have contracted to complete.  Thus, the "Accounts Receivable" of the Debtors, and the estimated recovery would likely be offset with the Debtors' liability for Billings in Excess of Cost, Net of Unbilled Charges, which represents the difference between

what has been billed and collected, and what has been earned for percent complete jobs. Although Billings in Excess of Cost, Net of Unbilled Charges is not a line item herein, such amounts are reflected in the estimated chapter 7 liquidation recovery percentage of 10%. The recovery percentage on "Accounts Receivable" also recognizes that collections will become increasingly difficult to recover once the Debtors exit projects and offsetting claims are filed by the Debtors' customers. Moreover, additional costs are likely to be incurred as the Debtors exit projects they have contracted to complete.

**[C] Other Accounts Receivable**: "Other Accounts Receivable" includes certain trade and non-trade related receivables (*e.g.*, expense advances related to travel). This is expected to yield a similar estimated recovery percentage to that of the Debtors' "Accounts Receivable."

**[D] Inventories**: Due to the nature of the Debtors' operations, assets reported in "Inventories" on the balance sheet generally do not comprise goods available for sale. Rather, "Inventories" includes items such as small tools and equipment, supplies, scaffolding, and similar goods. The estimation for "Inventories" is net of balance sheet adjustments that reflect the impact of the GPX Settlement. The residual expected value of "Inventories" would not yield significant proceeds.

**[E] Prepaid Expenses**: "Prepaid Expenses" is generally comprised of payments made for software and other service subscriptions necessary to operate the Debtors' businesses, and are not expected to have any economic value in a liquidation.

**[F] Other Assets**: "Other Assets" generally comprise deferred compensation assets. The estimated 90% recovery of this asset account assumes that the sale of the underlying Securities under a chapter 7 scenario would close at a discount to their fair market value and additional fees would be incurred.

**[G] Investment in and Advances to EPC Joint Ventures**: The Company's proportionate share of all its EPC joint ventures' net assets and liabilities is included in "Investment in and Advances to EPC Joint Ventures." The proportionate method of accounting is used for investments in EPC joint ventures. Neither the estimated book value nor the recovery in a chapter 7 liquidation reflect the enterprise value of such joint ventures, or the Debtors' proportionate share thereof. Due to the nature of the Debtors' relationship with these joint ventures, a 5% recovery for this asset account has been estimated under a chapter 7 scenario, which reflects potential distributions to the Debtors through the Liquidation Date.

**[H] Intangible Assets, Net of Amortization**: Intangible assets included in this asset account are expected to result in minimal recovery. Assets in this group include domain names, intellectual property, and customer relationships.

**[I] Goodwill**: "Goodwill" is not expected to have any economic value and is accordingly not projected to yield any recovery.

**[J] Property, Plant, and Equipment, net**: "Property, Plant and Equipment, net" ("**PP&E**") primarily consists of buildings and improvements, construction machinery and equipment, and office furniture. The net book value of PP&E is inclusive of capital expenditures and accumulated depreciation through the Liquidation Date. Due to the Debtors' longstanding operating history, some of their fixed assets are fully depreciated and do not carry any net book value. Many of the remaining assets on the balance sheet are old and are not expected to yield recoveries in excess of the associated variable costs that would be incurred in a chapter 7 scenario, which has been estimated to be recovered at 10%.

**[K] Gross Proceeds from Balance Sheet Sources**: The estimated "Gross Proceeds from Balance Sheet Sources" comprises all assets recorded on each of the Debtors' balance sheets as projected as of February 28, 2025. Other potential sources of value for each of the Debtors that are not recorded in "Gross Proceeds from Balance Sheet Sources" are reflected separately.

**[L] Gross Proceeds from Other Sources of Value:** This Liquidation Analysis does not assume any recoveries on account of any avoidance, recovery, subordination, or other Claims and Causes of Action that may be brought by or on behalf of the Debtors' estates in a chapter 7 liquidation.

**[M] Chapter 7 Trustee Compensation**: Pursuant to section 326 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for a Chapter 7 Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over in the case by a Chapter 7 Trustee to parties in interest.

4

For purposes of this Liquidation Analysis, these fees are simplified to 3% of the estimated "Total Gross Proceeds Available for Distribution" and does not include estimated proceeds from the "Called Surety Bonds" and "Letters of Credit Assumed to be Drawn," which would be expected to be used by Holders of General Unsecured Claims to satisfy certain General Unsecured Claims.

**[N] Wind-Down Costs**: This total assumes that the Chapter 7 Trustee would engage professionals for six months at a 125% run rate of the Debtors' Professionals July 2024 monthly accrual.  The Wind-Down Costs assumes this 25% increase reflects the short acclimation period for the Chapter 7 Trustee's professionals in a chapter 7 scenario.

Payroll costs, compared to the monthly run rate for each respective month, are projected to be 10% upon commencement of a chapter 7 liquidation, and are reduced by 1.75% per month due to employee terminations.

**[O] Net Proceeds Available for Secured Claims:** No economic value is estimated for any potential unencumbered assets of the Debtors.

**[P] Secured Funded Debt Claims**: This represents the estimated Prepetition Credit Facility Claims and is not inclusive of any prepetition accrued and unpaid interest or fees.

**[Q] Letters of Credit Assumed to be Drawn**: The "Letters of Credit Assumed to be Drawn," which are adjusted for completed projects, are expected to be fully drawn, and include the "GPX L/C Permitted Draws," increasing the Total Secured Claims to approximately $747.7 million.

**[R] Total Secured Claims**: Based on the available proceeds to pay Secured Claims, a recovery of 19.5% has been estimated for "Total Secured Claims."

**[S] Chapter 11 Administrative Claims**: "Chapter 11 Administrative Claims" in a chapter 7 scenario are expected to include: (i) potential employee Claims; (ii) chapter 11 Professional Fees; (iii) remaining unpaid section 503(b)(9) Claims; (iv) the remaining unpaid postpetition accounts payable for goods and services; and (v) postpetition accrued expenses.  Accrued payroll at the Liquidation Date is expected to be pre-funded to mitigate potential WARN Act exposure, which is reflected in the estimated recovery of "Cash and Cash Equivalents."

**[T] Priority Unsecured Claims**: This includes prepetition accrued and unpaid taxes (including property, income, and franchise, among others).  The "Priority Unsecured Claims" do not, but may include additional liabilities, including those that may arise as a result of a chapter 7 liquidation.

**[U] Vendor Claims Not Covered by L/C or Surety**: This is reflective of trade payable General Unsecured Claims which have been reduced to account for: (i) the completion of the PLNG Project; (ii) project-related Claims covered by letters of credit and surety bonds (including the GPX Settlement); (iii) any contractual damages (implied in the "Called Surety Bonds" and "Letters of Credit Assumed to be Drawn"); and (iv) any lien Claims arising from exiting uncompleted projects.

**[V] Other General Unsecured Claims**: This represents non-customer and non-vendor related claims including (i) Deferred Compensation Plan Claims and (ii) Intercompany Claims.

**[W] Total General Unsecured Claims**: In a chapter 7 liquidation, the surety bonds are expected to be fully drawn by a combination of customers and vendors to satisfy General Unsecured Claims.  The Sureties will become general unsecured creditors of the Debtors.  This amount includes estimates for contract rejection damage Claims, liquidation damage Claims, and other costs of exiting the business that may be unsecured Claims, which would likely be material in a chapter 7 scenario.

## V.   CONCLUSION

This Liquidation Analysis shows, and the Debtors have therefore concluded, that Confirmation of the Plan will provide creditors with a recovery that is not less than the recovery they would receive in connection with a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**Exhibit D**

**Valuation Analysis**

## EXHIBIT D

## VALUATION ANALYSIS[1]

**THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.**

## I.      INTRODUCTION

Solely for purposes of the Plan and this Disclosure Statement, Lazard Frères & Co. LLC ("**Lazard**"), as investment banker to the Debtors, has estimated the total enterprise value ("**Enterprise Value**") of the Reorganized Debtors on a consolidated basis and pro forma for the transactions contemplated by the Plan (the "**Valuation Analysis**").  The Valuation Analysis is based on financial information and projections provided by the Debtors' management, including the financial projections attached to the Disclosure Statement as **Exhibit B** (collectively the "**Financial Projections**"), and information that is publicly available or was provided by other sources.  The Valuation Analysis assumes a valuation date as of January 1, 2025.  The valuation estimates set forth herein represent valuation analyses of Reorganized Debtors based on the application of customary valuation techniques to the extent deemed appropriate by Lazard.

Based on the Financial Projections and solely for the purposes of the Plan, Lazard estimates that the potential range of Enterprise Value for the Reorganized Debtors is approximately between $765 million and $985 million. Based on the potential range of Enterprise Value and assumed net debt of $342 million as of the Effective Date, Lazard estimates an imputed range of potential equity value for the Reorganized Debtors of $423 million and $643 million. Lazard's Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

In preparing the estimated Enterprise Value range for the Reorganized Debtors, Lazard, among other things: (a) reviewed certain historical and projected financial information of the Debtors; (b) met with certain members of the Debtors' senior management and other firms retained by the Debtors to discuss the Debtors' operations, financial profile, and future business prospects; (c) reviewed publicly available financial data and considered the market values and valuation multiples of public companies deemed generally relevant to the operating and financial profiles of the Debtors; (d) considered certain economic and industry information relevant to the Debtors' operating businesses; (e) reviewed publicly available financial data for precedent merger and acquisition transactions and implied valuation multiples for companies deemed generally relevant to the operating and financial profiles of the Debtors; (f) reviewed the Financial Projections; and (g) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values.

The valuation information set forth in this Disclosure Statement represents a valuation of the Reorganized Debtors based on the application of standard valuation techniques.  The estimated values set forth in this Valuation Analysis (i) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (ii) do not constitute an opinion on the terms and provisions or fairness to any person, from a financial point of view, of the consideration to be received by such person under the Plan; (iii) do not constitute a recommendation to any Holder of Allowed Claims or Interests as to how such Holder should vote or how such Holder otherwise should act with respect to the Plan; and (iv) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Debtors.

Lazard has relied on the Debtors' representation and warranty that the Financial Projections: (i) had been prepared in good faith; (ii) were based on fully disclosed assumptions that are reasonable in light of the circumstances under which they were made; (iii) reflect the Debtors' best currently available estimates; and (iv) reflect the good faith judgments of the Debtors.  Lazard does not offer an opinion as to the attainability of the Financial Projections.  As

---

[1]      Terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Disclosure Statement.

disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Lazard, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual Enterprise Value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

Lazard did not conduct an independent verification of the Financial Projections used in this Valuation Analysis and did not conduct an independent evaluation or appraisal of the Debtors' assets in connection with this valuation. Lazard also did not conduct an independent investigation into any of the legal, tax, or accounting matters affecting the Debtors, and therefore makes no representations as to their impact on the Debtors' financial statements.

## II.   VALUATION METHODOLOGIES

The following is a brief summary of certain financial analyses performed by Lazard to arrive at a range of estimated Enterprise Values for the Reorganized Debtors. The following summary does not purport to be a complete description of all of the analyses undertaken to support Lazard's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized. In performing this analysis, Lazard applied the following valuation methodologies as applicable to the operations of the Reorganized Debtors: (i) the discounted cash flow ("**DCF**") methodology; (ii) the comparable public company analysis; and (iii) the precedent transactions methodology. Lazard employed both a consolidated approach and a sum-of-the-parts ("**SOTP**") approach that separately valued the Reorganized Debtors' core operating segments including the projects segment ("**Projects Segment**"), the services and engineering segments (combined for purposes of the analysis as "**Services & Engineering Segment**"), and unallocated corporate costs ("**Corporate Segment**").

In conducting this analysis, Lazard did not consider any one factor to the exclusion of any other factors. Accordingly, Lazard believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. This analysis includes numerous valuation methodologies. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

### i.   *Discounted Cash Flow Analysis*

DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "**Discount Rate**"). The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Financial Projections provided by management plus an estimate for the value of the firm beyond the projection period, from fiscal year 2025 through fiscal year 2027 (the "**Projection Period**"), known as the terminal value, utilizing an EV / EBITDA multiple applied to a terminal period EBITDA.

### ii.   *Comparable Public Company Analysis*

The comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Lazard's application of the public company trading multiples methodology involved identifying and examining a group of publicly-traded EPC companies whose businesses and operating characteristics are generally relevant to the Reorganized Debtors' go-forward operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' go-forward operations or historical performance. Multiples and representative EBITDA levels for projected calendar year 2025 and calendar year 2026 were used. The selection of appropriate comparable companies is often difficult and relies on certain qualitative judgements, as is the case here, including as a result of the relatively large earnings of the Services and Engineering segment relative to the Projects Segment.

### iii.   *Precedent Transactions Analysis*

Precedent transaction analysis estimates value by examining comparable precedent merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial metrics. These transaction multiples are calculated based on the purchase price paid to acquire companies that are comparable the Reorganized Debtors, although no selected company is either identical or directly comparable to the Reorganized Debtors.

Precedent transaction analysis may reflect aspects of value other than the intrinsic value of a company, and the transactions analyzed invariably will have occurred in different operating and financial environments. As a result, there are inherent limitations in the application of Precedent transaction analysis to determining the Enterprise Value for the Reorganized Debtors.

       *iv.*       *Sum-of-the-Parts Analysis*

In conducting the SOTP analysis, Lazard estimated the enterprise values of each of the Reorganized Debtors' operating segments separately (i.e., the Projects Segment, the Services & Engineering Segment, and the Corporate Segment), based on the three customary valuation techniques described above. Specifically, Lazard employed DCF analysis, comparable public company analysis, and precedent transactions analysis, and considered the relevance of each in estimating the potential enterprise value range for each segment. In contrast to the public comparable company and precedent transactions analyses conducted on a consolidated basis, Lazard identified a subset of EPC companies more weighted towards the Projects Segment or Services & Engineering Segment, as applicable.

## III.    VALUATION CONSIDERATIONS

This valuation is based upon information available to, and analyses undertaken by, Lazard and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Lazard has assumed that no changes that would materially affect the value of the Reorganized Debtors' will occur between the date of this Disclosure Statement and the Effective Date. Events and conditions subsequent to the date hereof, including but not limited to updated Financial Projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' value. Neither Lazard nor the Debtors has any obligation to update, revise, or reaffirm this Valuation Analysis.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the minimum amount of cash required to operate the Debtors' businesses, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of Holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

Enterprise Value estimate set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Lazard did not evaluate any costs that would be required if the Reorganized Debtors' businesses were to be sold in two divisions, including any tax costs. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Reorganized Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

The estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holders of Allowed Claims entitled to vote on the Plan as to how such person should vote or otherwise act with respect

to the Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Lazard or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD.  THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES; THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.  LAZARD IS ACTING AS INVESTMENT BANKER TO THE DEBTORS.  LAZARD HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.**

**<u>Exhibit E</u>**

**Organizational Structure Chart**

# Zachry Organizational Chart



Non-Debtor entities have been excluded from this organizational chart.

## **Exhibit 2**

**Form of Ballot for Prepetition Credit Facility Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**BALLOT FOR VOTING ON THE MODIFIED FIRST AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY
HOLDINGS, INC. AND ITS DEBTOR AFFILIATES AND OPPORTUNITY
FOR HOLDERS OF CLAIMS TO OPT OUT OF THE THIRD-PARTY RELEASE**

**CLASS 3 – PREPETITION CREDIT FACILITY CLAIMS**

---

THIS BALLOT SUPERSEDES ANY PREVIOUS VOTES CAST ON THE PLAN. ALL PREVIOUS VOTES SHALL <u>NOT</u> BE COUNTED TOWARD ACCEPTANCE OR REJECTION OF THE PLAN.

PLEASE COMPLETE AND RETURN THIS BALLOT, PURSUANT TO THE INSTRUCTIONS CONTAINED HEREIN, IF YOU WOULD LIKE TO SUBMIT A BALLOT ACCEPTING OR REJECTING THIS PLAN.

---

**PLEASE CAREFULLY READ – YOUR RESPONSE IS REQUIRED BY <u>4:00 P.M.
(PREVAILING CENTRAL TIME) ON FEBRUARY 20, 2025</u>**

- PLEASE FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**")[2] FOR ZACHRY HOLDINGS, INC., ET AL. (THE "**DEBTORS**") <u>BEFORE</u> COMPLETING THIS BALLOT.  THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN **ARTICLE VIII** OF THE PLAN).  THE PLAN IS SUBJECT TO BANKRUPTCY COURT APPROVAL.

- THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **<u>ACTUALLY RECEIVED</u>** BY VERITA GLOBAL, LLC (THE "**CLAIMS AND NOTICING AGENT**") PRIOR TO **<u>4:00 P.M. (PREVAILING CENTRAL TIME) ON FEBRUARY 20, 2025</u>** (THE "**VOTING DEADLINE**").

- **PLEASE BE ADVISED THAT <u>ARTICLE VIII</u> OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.  THESE PROVISIONS ARE INCLUDED IN THE BALLOT.  YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER EVEN IF YOU ABSTAIN FROM**

---

[1]     The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI.  The location of the Debtors' service address in these chapter 11 cases is:  P.O. Box 240130, San Antonio, Texas 78224.

[2]     Capitalized terms used but not defined herein have the meanings given to them in the Plan.

1

**VOTING. IF YOU (A) ABSTAIN FROM VOTING OR (B) VOTE TO ACCEPT OR VOTE TO REJECT THE PLAN AND, IN EACH CASE, DO NOT CHECK THE "OPT OUT" BOX BELOW, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASE PROVISIONS SET FORTH IN <u>ARTICLE VIII.D</u> OF THE PLAN, UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.**

- **PLEASE BE ADVISED THAT YOUR DECISION TO OPT OUT DOES NOT AFFECT THE AMOUNT OF DISTRIBUTION YOU WILL RECEIVE UNDER THE PLAN. SPECIFICALLY, YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.**

- CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN <u>ARTICLE VIII</u> OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND INTERESTS IN THE MANNER DESCRIBED IN <u>ITEM 2</u> OF THIS BALLOT.

- IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

- NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.

- IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE SUBMIT AN INQUIRY WITH THE CLAIMS AND NOTICING AGENT AT HTTPS://WWW.VERITAGLOBAL.NET/ZHI/INQUIRY, OR CALL (866) 479-8211 (US OR CANADA) OR +1 (781) 575-2037 (INTERNATIONAL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.

The Debtors are soliciting votes with respect to the Plan, as set forth in the Disclosure Statement. The Debtors filed for protection under title 11 of the United States Code (the "**Bankruptcy Code**") on May 21, 2024 (the "**Petition Date**") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") and now seek to confirm the Plan. Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. Pursuant to the Bankruptcy Code, a voting class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims vote to accept the Plan. The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan then would be binding on all Holders of Prepetition Credit Facility Claims in Class 3, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in <u>**Exhibit A**</u> to this Ballot. **For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan. You may wish to seek legal advice concerning the Plan.**

You have received this Ballot because the list of recordholders maintained by the Prepetition Credit Facility Agent indicates that you are a Holder of a Claim in Class 3 as of **January 22, 2025** (the "**Voting Record Date**") and as set forth in <u>Item 1</u> of the Ballot. Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of such Claim or Claims.

The Disclosure Statement, the Plan, and certain other materials (the "**Solicitation Package**") have been served on you along with this Ballot. This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain elections and certifications with respect thereto. If

you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Claims and Noticing Agent immediately.

To have your vote to either accept or reject the Plan count, you must properly complete and return this Ballot so that the Claims and Noticing Agent **actually receives** it on or before the Voting Deadline.  This ballot supersedes any previous votes cast on the Plan.  All previous votes shall not be counted toward acceptance or rejection of the Plan.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

**VOTING — COMPLETE THIS SECTION**

<u>Item 1</u>. Principal Amount of Claims

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of Claims in Class 3 as set forth below (your "**Claims**"). You must check the applicable box in the right-hand columns below to "accept" or "reject" the Plan.

Please note that you are voting all of your Claims in Class 3 either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted. If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Accordingly, your vote cast below will be applied in the same manner and in the same amount against each applicable Debtor.

**Any listing of Claims for purposes of voting on the Plan is not an admission of liability on part of the Debtors or for any other party for the purposes of ultimate allowance or distribution.**

The Holder of the Class 3 Claims listed below votes to (*please check <u>one and only one box for all Claims</u>*):

| Holder: [List Name] | | | | |
|---|---|---|---|---|
| **Voting Class** | **Description** | **Amount** | **Vote to Accept the Plan** | **Vote to Reject the Plan** |
| **Class 3 (Prepetition Credit Facility Claims)** | | | | |
| **Class 3** | **Prepetition Credit Facility Claims** | $_____ | ☐ | ☐ |

**Item 2.** **Important Information Regarding the Plan's Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions**

The Plan includes the following release, exculpation, and injunction provisions:[3]

**Article VIII.C: <u>Releases by the Debtors</u>.**

> **As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in the Plan, the Schedule of Retained Causes of Action, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of each Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Released Avoidance Actions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

> **Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.**

> **Notwithstanding anything to the contrary in Article VIII.C of the Plan, the Debtors shall maintain all rights to object to Filed Claims and shall not release any claims or Causes of Action (i) identified in the Schedule of Retained Causes of Action, or (ii) related to the GPX Settlement that**

---

[3]   The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights.  If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs.  You should read the Plan before completing this Ballot.

are preserved by the GPX Settlement Documents, the GPX Settlement Dispute Opinion, or the GPX Settlement Dispute Order.  Any and all such rights, claims, and Causes of Action set forth in this paragraph shall be fully preserved and revest in the Reorganized Debtors pursuant to the Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**Article VIII.D: <u>Releases by Third Parties</u>.**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan,

6

in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

Article VIII.E: Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, all related agreements, instruments, and other documents, or any transaction related to the Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Article VIII.F:** <u>Injunction.</u>

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, satisfied, or released pursuant to the Plan.

Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, discharged, satisfied, released, or are subject to exculpation pursuant to <u>Article VIII</u>, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties and/or the Released Parties:

1. commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

2. enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

3. creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

4. filing, asserting, levying, or attaching any Liens against any property of the Debtors or Reorganized Debtors on account of any Claims arising under or related to Executory Contracts or Unexpired Leases that are assumed and cured pursuant to the Plan;

5. filing, asserting, levying, or attaching any Liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, and enforcing, collecting, or recovering on account of any such Liens;

6. filing, asserting, levying, or attaching any Liens against any property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, and enforcing, collecting, or recovering on account of any such Liens, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass;

7. filing, asserting, levying, or attaching any Claims or Liens on account of GPX Claims satisfied (or to be satisfied) by Golden Pass under the GPX Settlement, whether against the Released Parties, Exculpated Parties, Golden Pass, Chiyoda, CB&I, or CCZJV-GPX;

8. except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with

respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

9. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, the solicitation of votes with respect to the Plan, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.  The injunction in the Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order from bringing an action to enforce the terms of the Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order.

### IMPORTANT INFORMATION REGARDING THE THIRD-PARTY RELEASE

**Certain defined terms with respect to the Third-Party Release are set forth below:**

**UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, THE FOLLOWING ENTITIES, IN EACH CASE IN THEIR CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH MEMBER OF THE COMMITTEE; (D) THE PREPETITION CREDIT FACILITY AGENT; (E) THE A&R CREDIT FACILITY AGENT; (F) THE RELEASED PREPETITION LENDERS; (G) GOLDEN PASS, BUT SOLELY WITH RESPECT TO THE DEBTORS, THE DEBTORS' RELATED PARTIES, AND HOLDERS OF CLAIMS RELATED TO THE GPX PROJECT, CONSISTENT WITH THE GPX SETTLEMENT; (H) THE SURETIES; (I) ALL RELEASING PARTIES; AND (J) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (I); *PROVIDED*, *HOWEVER*, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE OR (II) FILES WITH THE BANKRUPTCY COURT AN OBJECTION TO THE PLAN, INCLUDING WITH RESPECT TO THE THIRD-PARTY RELEASE, THAT IS NOT CONSENSUALLY RESOLVED BEFORE CONFIRMATION OR OTHERWISE SUPPORTS ANY SUCH OBJECTION OR OBJECTOR.**

**UNDER THE PLAN, "RELEASING PARTY" MEANS, COLLECTIVELY, THE FOLLOWING ENTITIES, IN EACH CASE IN THEIR CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH MEMBER OF THE COMMITTEE; (D) THE PREPETITION CREDIT FACILITY AGENT; (E) THE A&R CREDIT FACILITY AGENT; (F) THE RELEASED PREPETITION LENDERS; (G) GOLDEN PASS, BUT SOLELY WITH RESPECT TO THE DEBTORS AND THE DEBTORS' RELATED PARTIES CONSISTENT WITH THE GPX SETTLEMENT; (H) THE SURETIES; (I) ALL HOLDERS OF CLAIMS WHO VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (L) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (M) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; AND (N) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (M) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED*, *HOWEVER*, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, CURRENT**

EMPLOYEES OF THE DEBTORS AS OF THE VOTING RECORD DATE SHALL NOT BE RELEASING PARTIES UNDER THE PLAN.

**PLEASE TAKE NOTICE THAT, IF YOU FAIL TO CHECK THE "OPT OUT" BOX BELOW, YOU WILL BE DEEMED A "RELEASING PARTY," UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.** AS A "RELEASING PARTY" UNDER THE PLAN, YOU WILL BE DEEMED TO PROVIDE THE RELEASES CONTAINED IN <u>ARTICLE VIII.D</u> OF THE PLAN, AS SET FORTH ABOVE.

YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN <u>ARTICLE VIII.D</u> OF THE PLAN <u>ONLY IF</u> YOU (A) CHECK THE BOX BELOW, (B) TIMELY FILE WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN <u>ARTICLE VIII.D</u> OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION, OR (C) PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN <u>ARTICLE VIII.D</u> OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN <u>ARTICLE VIII</u> OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

PLEASE TAKE NOTICE THAT PARTIES RECEIVING THIS BALLOT MAY CHECK THE BOX BELOW TO OPT OUT OF THE THIRD-PARTY RELEASE.

☐ **Opt Out of the Third-Party Release**

PLEASE BE ADVISED THAT YOUR DECISION TO OPT OUT DOES NOT AFFECT THE AMOUNT OF DISTRIBUTION YOU WILL RECEIVE UNDER THE PLAN.  SPECIFICALLY, YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

a.  that, as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims as set forth in Item 1; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims as set forth in Item 1;

b.  that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  that the undersigned has cast the same vote with respect to all Claims in Class 3;

d.  that no other Class 3 Ballots have been cast by the undersigned or, if any other Class 3 Ballots have been cast with respect to such Claims, then any such earlier Class 3 Ballots voting those Claims are hereby revoked;

e.  that the undersigned acknowledges that a vote to accept the Plan constitutes an acceptance of the treatment of the undersigned's Class 3 Claims;

f.  that the undersigned understands and, if accepting the Plan, agrees with the treatment provided for its Class 3 Claims under the Plan;

g.  that the undersigned acknowledges and understands that (i) if no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed to be accepted by the Holders of such Claims in such Class; and (ii) any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code; and

h.  that the undersigned acknowledges and agrees that the Debtors may make conforming changes to the Plan to the extent provided by Bankruptcy Rule 3019 as may be reasonably necessary.

| BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION |
|---|

Name of Holder:  _____

Signature:  _____

Signatory Name
(if other than the Holder):  _____

Title:  _____

Address:  _____

Email Address:  _____

Date Completed:  _____

---

**RETURN INSTRUCTIONS**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY.**

**THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT PRIOR TO THE VOTING DEADLINE.  YOU MAY SUBMIT YOUR BALLOT VIA FIRST CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**ZACHRY BALLOT PROCESSING CENTER
C/O VERITA
222 N. PACIFIC COAST HWY., STE. 300
EL SEGUNDO, CA 90245**

**VIA THE CLAIMS AND NOTICING AGENT'S ONLINE BALLOTING PORTAL:**

**HTTPS://WWW.VERITAGLOBAL.NET/ZHI**

**CLICK ON "SUBMIT E-BALLOT" LINK ON THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR BALLOT.**

IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized electronic Ballot:

ID Number  _____
Passcode  _____

The Claims and Noticing Agent's online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted via facsimile, email, or other means of electronic transmission will not be counted.

Each ID Number is to be used solely for voting only those Claims described in <u>Item 1</u> of your electronic Ballot.  Please complete and submit an electronic Ballot for each ID Number you receive.  Creditors who cast a Ballot using the Claims and Noticing Agent's online portal should NOT also submit a paper ballot.

**If the Claims and Noticing Agent does not actually receive this Ballot on or before <u>February 20, 2025, at 4:00 p.m., prevailing Central Time</u>, your vote transmitted via this Ballot may be counted toward confirmation of the Plan only in the Debtors' discretion or by order of the Court.  <u>This ballot supersedes any previous votes cast on the Plan.  All previous votes shall not be counted toward acceptance or rejection of the Plan.</u>**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND NOTICING AGENT AT (866) 479-8211 (US OR CANADA) OR +1 (781) 575-2037 (INTERNATIONAL) OR SUBMIT AN INQUIRY AT HTTPS://WWW.VERITAGLOBAL.NET/ZHI/INQUIRY.**

## INSTRUCTIONS FOR COMPLETING THIS BALLOT:

1.      To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered (a) via first class mail, overnight courier, or hand delivery to Zachry Ballot Processing Center c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300 El Segundo, CA 90245 or (b) via the Claims and Noticing Agent's online balloting portal on www.veritaglobal.net/zhi, so that this Ballot is **actually received by the Claims and Noticing Agent on or before the Voting Deadline, 4:00 p.m. (prevailing Central Time) on February 20, 2025**. This ballot supersedes any previous votes cast on the Plan.  All previous votes shall not be counted toward acceptance or rejection of the Plan.

2.      If you wish to abstain from voting on the Plan, but wish to opt-out of the Third-Party Release in <u>Item 2</u> of the Ballot, you must properly complete, execute, and deliver this Ballot by the Voting Deadline as instructed above.  Notwithstanding the foregoing, if you previously submitted an Opt-Out Form electing to opt-out of the Third-Party Release, your opt-out election remains valid and effective.

3.      If you disagree with the Claim amount listed on this Ballot for purposes of voting on the Plan, the deadline for you to file a Rule 3018 Motion for temporary allowance of your Claim in a different amount for voting purposes is **February 13, 2025 at 4:00 p.m. (prevailing Central Time)**.

4.      Any Ballot received by the Claims and Noticing Agent after the Voting Deadline will not be counted unless otherwise ordered by the Court or determined by the Debtors.  No Ballot may be withdrawn or modified after the Voting Deadline without the Debtors' prior consent.

5.      Any Ballot submitted that is incomplete or illegible, indicates unclear or inconsistent votes with respect to the Plan or is improperly signed will **NOT** be counted unless otherwise ordered by the Court or determined by the Debtors.

6.      Delivery of a Ballot reflecting your vote to the Claims and Noticing Agent will be deemed to have occurred only when the Claims and Noticing Agent actually receives your paper Ballot or E-Ballot. In all cases, you should allow sufficient time to assure timely delivery.

7.      If you deliver multiple Class 3 Ballots to the Claims and Noticing Agent, **ONLY** the last properly executed Class 3 Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Class 3 Ballot(s).

8.      You must vote all of your Claims in Class 3 either to accept or reject the Plan and may not split your vote.  Further, if a Holder has multiple Class 3 Claims, the Debtors may direct the Claims and Noticing Agent to aggregate those Claims for the purpose of counting votes.

9.      This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim, or an assertion or admission of a Claim, in the Chapter 11 Cases.

10.     You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan other than as set forth in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

11.     **SIGN AND DATE** your Ballot.[4]  In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot.  Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

---

[4]     If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, the Debtors' counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

12.     If your Class 3 Claim is held in multiple accounts, you may receive more than one Class 3 Ballot coded for each such account for which your Class 3 Claims are held.  Each Class 3 Ballot votes only your Class 3 Claim(s) indicated on that Class 3 Ballot.  Accordingly, complete and return each Ballot you receive.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING AND TABULATION PROCEDURES, PLEASE SUBMIT AN INQUIRY WITH THE CLAIMS AND NOTICING AGENT AT HTTPS://WWW.VERITAGLOBAL.NET/ZHI/INQUIRY, OR BY CALLING (866) 479-8211 (US OR CANADA) OR +1 (781) 575-2037 (INTERNATIONAL).**

*(Remainder of Page Left Intentionally Blank)*

**<u>Exhibit A</u>**

Subject to the terms and conditions of the Plan, you will receive the following treatment on account of your Class 3 Claim if the Plan is consummated and your Claim is Allowed:

| | | |
|---|---|---|
| Class 3 | Prepetition Credit Facility Claims | In exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Prepetition Credit Facility Claim, each Holder of an Allowed Prepetition Credit Facility Claim shall, on the Effective Date, become party to, and bound by, the A&R Credit Facility on account of such Holder's Allowed Prepetition Credit Facility Claim, on the terms set forth in the A&R Credit Facility Documents. |

## Exhibit 3

**Form of Ballot for General Unsecured Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**BALLOT FOR VOTING ON THE MODIFIED FIRST AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY
HOLDINGS, INC. AND ITS DEBTOR AFFILIATES AND OPPORTUNITY
FOR HOLDERS OF CLAIMS TO OPT OUT OF THE THIRD-PARTY RELEASE**

**CLASS 6 – GENERAL UNSECURED CLAIMS**

THIS BALLOT SUPERSEDES ANY PREVIOUS VOTES CAST ON THE PLAN. ALL PREVIOUS VOTES SHALL NOT BE COUNTED TOWARD ACCEPTANCE OR REJECTION OF THE PLAN.

PLEASE COMPLETE AND RETURN THIS BALLOT, PURSUANT TO THE INSTRUCTIONS CONTAINED HEREIN, IF YOU WOULD LIKE TO SUBMIT A BALLOT ACCEPTING OR REJECTING THIS PLAN.

**PLEASE CAREFULLY READ – YOUR RESPONSE IS REQUIRED BY 4:00 P.M. (PREVAILING CENTRAL TIME) ON FEBRUARY 20, 2025**

- PLEASE FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ZACHRY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**")[2] FOR ZACHRY HOLDINGS, INC., ET AL. (THE "**DEBTORS**") **BEFORE** COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN **ARTICLE VIII** OF THE PLAN). THE PLAN IS SUBJECT TO BANKRUPTCY COURT APPROVAL.

- THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **ACTUALLY RECEIVED** BY VERITA GLOBAL, LLC (THE "**CLAIMS AND NOTICING AGENT**") PRIOR TO **4:00 P.M. (PREVAILING CENTRAL TIME) ON FEBRUARY 20, 2025** (THE "**VOTING DEADLINE**").

- **PLEASE BE ADVISED THAT ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. THESE PROVISIONS ARE INCLUDED IN THE BALLOT. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER EVEN IF YOU ABSTAIN FROM VOTING. IF YOU (A) ABSTAIN FROM VOTING OR (B) VOTE TO ACCEPT OR VOTE TO REJECT**

---

[1] The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these chapter 11 cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Plan.

1

THE PLAN AND, IN EACH CASE, DO NOT CHECK THE "OPT OUT" BOX BELOW, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASE PROVISIONS SET FORTH IN **ARTICLE VIII.D** OF THE PLAN, UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.

- **PLEASE BE ADVISED THAT YOUR DECISION TO OPT OUT DOES NOT AFFECT THE AMOUNT OF DISTRIBUTION YOU WILL RECEIVE UNDER THE PLAN.  SPECIFICALLY, YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.**

- CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN **ARTICLE VIII** OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES.  THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND INTERESTS IN THE MANNER DESCRIBED IN ITEM 3 OF THIS BALLOT.

- IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

- NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.

- IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE SUBMIT AN INQUIRY WITH THE CLAIMS AND NOTICING AGENT AT HTTPS://WWW.VERITAGLOBAL.NET/ZHI/INQUIRY, OR CALL (866) 479-8211 (US OR CANADA) OR +1 (781) 575-2037 (INTERNATIONAL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.

The Debtors are soliciting votes with respect to the Plan, as set forth in the Disclosure Statement.  The Debtors filed for protection under title 11 of the United States Code (the "**Bankruptcy Code**") on May 21, 2024 (the "**Petition Date**") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") and now seek to confirm the Plan.  Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein.  Pursuant to the Bankruptcy Code, a voting class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims vote to accept the Plan.  The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code.  The Plan then would be binding on all Holders of General Unsecured Claims in Class 6, among others.  Subject to the terms and conditions of the Plan, you will receive the treatment identified in **Exhibit A**.  **For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan**. **You may wish to seek legal advice concerning the Plan.**

You have received this Ballot because you are a Holder of a Claim in Class 6 as of **January 22, 2025** (the "**Voting Record Date**") and as set forth in Item 1 of the Ballot.  Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of such Claim or Claims.

The Disclosure Statement, the Plan, and certain other materials (the "**Solicitation Package**") have been served on you along with this Ballot.  This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain elections and certifications with respect thereto.  If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Claims and Noticing Agent immediately.

To have your vote to either accept or reject the Plan count, you must properly complete and return this Ballot so that the Claims and Noticing Agent **actually receives** it on or before the Voting Deadline. This ballot supersedes any previous votes cast on the Plan.  All previous votes shall not be counted toward acceptance or rejection of the Plan.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

## VOTING — COMPLETE THIS SECTION

<u>**Item 1**</u>. **Principal Amount of Claims**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of Claims in Class 6 as set forth below (your "**Claims**").  You must check the applicable box in the right-hand columns below to "accept" or "reject" the Plan.

Please note that you are voting all of your Claims in Class 6 either to accept or reject the Plan.  You may not split your vote.  If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted.  If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor.  Accordingly, your vote cast below will be applied in the same manner and in the same amount against each applicable Debtor.

**Any listing of Claims for purposes of voting on the Plan is not an admission of liability on part of the Debtors or for any other party for the purposes of ultimate allowance or distribution.**

If you disagree with the Claim amount listed below for purposes of voting on the Plan, the deadline for you to file a Rule 3018 Motion for temporary allowance of your Claim in a different amount for voting purposes is **February 13, 2025 at 4:00 p.m. (prevailing Central Time)**.

The Holder of the Class 6 Claims listed below votes to (*please check <u>one and only one box for all Claims</u>*):

| Holder: [List Name] | | | | |
|---|---|---|---|---|
| **Voting Class** | **Description** | **Amount** | **Vote to Accept the Plan** | **Vote to Reject the Plan** |
| **Class 6 (General Unsecured Claims)** | | | | |
| **Class 6** | **General Unsecured Claims** | $_____ | ☐ | ☐ |

4

**Item 2**. **OPTIONAL: Convenience Class Election**

Holders of Class 6 General Unsecured Claims may **irrevocably** elect to have their Claim treated as a Class 5 Convenience Claim and have such Allowed General Unsecured Claim reduced to the Convenience Claim Amount ($25,000); *provided*, *however*, that General Unsecured Claims may not be subdivided into multiple Claims of the Convenience Claim Amount or less for purposes of receiving treatment as a Convenience Claim.

Holders of General Unsecured Claims that would like to make the optional Convenience Claim election and elect to have their Class 6 General Unsecured Claim treated as a Convenience Claim, reducing such Claim to $25,000, should check the box below.

Holders of Convenience Claims are entitled to a Cash payment in full of their Allowed Convenience Claim, on the Effective Date or as soon as practicable thereafter.  Holders of Class 6 General Unsecured Claims who make the Convenience Claim election will receive $25,000 in full and final satisfaction of their Claim.

**IF YOU MAKE THE CONVENIENCE CLAIM ELECTION, YOUR GENERAL UNSECURED CLAIM WILL BE CONSIDERED A CLASS 5 CONVENIENCE CLAIM AND YOUR CLAIM SHALL NOT BE ENTITLED TO ANY OTHER DISTRIBUTION OTHER THAN THE CONVENIENCE CLAIM AMOUNT.  <u>YOU MAY NOT REVOKE YOUR CONVENIENCE CLAIM ELECTION.</u>**

☐    **Elect to reduce General Unsecured Claim to the Convenience Claim Amount**

<u>Item 3</u>. **Important Information Regarding the Plan's Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions**

The Plan includes the following release, exculpation, and injunction provisions:[3]

**Article VIII.C: <u>Releases by the Debtors</u>.**

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in the Plan, the Schedule of Retained Causes of Action, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of each Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Released Avoidance Actions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.**

**Notwithstanding anything to the contrary in Article VIII.C of the Plan, the Debtors shall maintain all rights to object to Filed Claims and shall not release any claims or Causes of Action**

---

[3]   The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights.  If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs.  You should read the Plan before completing this Ballot.

(i) identified in the Schedule of Retained Causes of Action, or (ii) related to the GPX Settlement that are preserved by the GPX Settlement Documents, the GPX Settlement Dispute Opinion, or the GPX Settlement Dispute Order.  Any and all such rights, claims, and Causes of Action set forth in this paragraph shall be fully preserved and revest in the Reorganized Debtors pursuant to the Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Article VIII.D: <u>Releases by Third Parties</u>.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan,

in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

Article VIII.E: <u>Exculpation</u>.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, all related agreements, instruments, and other documents, or any transaction related to the Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Article VIII.F: <u>Injunction</u>.**

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, satisfied, or released pursuant to the Plan.

Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, discharged, satisfied, released, or are subject to exculpation pursuant to <u>Article VIII</u>, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties and/or the Released Parties:

1. commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

2. enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

3. creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

4. filing, asserting, levying, or attaching any Liens against any property of the Debtors or Reorganized Debtors on account of any Claims arising under or related to Executory Contracts or Unexpired Leases that are assumed and cured pursuant to the Plan;

5. filing, asserting, levying, or attaching any Liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, and enforcing, collecting, or recovering on account of any such Liens;

6. filing, asserting, levying, or attaching any Liens against any property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, and enforcing, collecting, or recovering on account of any such Liens, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass;

7. filing, asserting, levying, or attaching any Claims or Liens on account of GPX Claims satisfied (or to be satisfied) by Golden Pass under the GPX Settlement, whether against the Released Parties, Exculpated Parties, Golden Pass, Chiyoda, CB&I, or CCZJV-GPX;

8. except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with

9

respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

9. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, the solicitation of votes with respect to the Plan, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action. The injunction in the Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order from bringing an action to enforce the terms of the Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order.

## IMPORTANT INFORMATION REGARDING THE THIRD-PARTY RELEASE

**Certain defined terms with respect to the Third-Party Release are set forth below:**

**UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, THE FOLLOWING ENTITIES, IN EACH CASE IN THEIR CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH MEMBER OF THE COMMITTEE; (D) THE PREPETITION CREDIT FACILITY AGENT; (E) THE A&R CREDIT FACILITY AGENT; (F) THE RELEASED PREPETITION LENDERS; (G) GOLDEN PASS, BUT SOLELY WITH RESPECT TO THE DEBTORS, THE DEBTORS' RELATED PARTIES, AND HOLDERS OF CLAIMS RELATED TO THE GPX PROJECT, CONSISTENT WITH THE GPX SETTLEMENT; (H) THE SURETIES; (I) ALL RELEASING PARTIES; AND (J) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (I); *PROVIDED*, *HOWEVER*, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) FILES WITH THE BANKRUPTCY COURT AN OBJECTION TO THE PLAN, INCLUDING WITH RESPECT TO THE THIRD-PARTY RELEASE, THAT IS NOT CONSENSUALLY RESOLVED BEFORE CONFIRMATION OR OTHERWISE SUPPORTS ANY SUCH OBJECTION OR OBJECTOR.**

**UNDER THE PLAN, "RELEASING PARTY" MEANS, COLLECTIVELY, THE FOLLOWING ENTITIES, IN EACH CASE IN THEIR CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH MEMBER OF THE COMMITTEE; (D) THE PREPETITION CREDIT FACILITY AGENT; (E) THE A&R CREDIT FACILITY AGENT; (F) THE RELEASED PREPETITION LENDERS; (G) GOLDEN PASS, BUT SOLELY WITH RESPECT TO THE DEBTORS AND THE DEBTORS' RELATED PARTIES CONSISTENT WITH THE GPX SETTLEMENT; (H) THE SURETIES; (I) ALL HOLDERS OF CLAIMS WHO VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (L) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; (M) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD-PARTY RELEASE PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN; AND (N) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (M) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED*, *HOWEVER*, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, CURRENT**

EMPLOYEES OF THE DEBTORS AS OF THE VOTING RECORD DATE SHALL NOT BE RELEASING PARTIES UNDER THE PLAN.

**PLEASE TAKE NOTICE THAT, IF YOU FAIL TO CHECK THE "OPT OUT" BOX BELOW, YOU WILL BE DEEMED A "RELEASING PARTY," UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.**  AS A "RELEASING PARTY" UNDER THE PLAN, YOU WILL BE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE.

YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU (A) CHECK THE BOX BELOW, (B) TIMELY FILE WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION, OR (C) PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

PLEASE TAKE NOTICE THAT PARTIES RECEIVING THIS BALLOT MAY CHECK THE BOX BELOW TO OPT OUT OF THE THIRD-PARTY RELEASE.

☐   **Opt Out of the Third-Party Release**

PLEASE BE ADVISED THAT YOUR DECISION TO OPT OUT DOES NOT AFFECT THE AMOUNT OF DISTRIBUTION YOU WILL RECEIVE UNDER THE PLAN.  SPECIFICALLY, YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

12

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

a.      that, as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims as set forth in <u>Item 1</u>; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims as set forth in <u>Item 1</u>;

b.      that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.      that the undersigned has cast the same vote with respect to all Claims in Class 6;

d.      that no other Class 6 Ballots have been cast by the undersigned or, if any other Class 6 Ballots have been cast with respect to such Claims, then any such earlier Class 6 Ballots voting those Claims are hereby revoked;

e.      that the undersigned acknowledges that a vote to accept the Plan constitutes an acceptance of the treatment of the undersigned's Class 6 Claims;

f.      that the undersigned understands and, if accepting the Plan, agrees with the treatment provided for its Class 6 Claims under the Plan;

g.      that the undersigned acknowledges and understands that (i) if no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed to be accepted by the Holders of such Claims in such Class; and (ii) any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code; and

h.      that the undersigned acknowledges and agrees that the Debtors may make conforming changes to the Plan to the extent provided by Bankruptcy Rule 3019 as may be reasonably necessary.

| **BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION** |
|---|

Name of Holder: _____

Signature: _____

Signatory Name
(if other than the Holder): _____

Title: _____

Address: _____

Email Address: _____

Date Completed: _____

---

**RETURN INSTRUCTIONS**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY.**

**THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT PRIOR TO THE VOTING DEADLINE. YOU MAY SUBMIT YOUR BALLOT VIA FIRST CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**ZACHRY BALLOT PROCESSING CENTER**
**C/O VERITA**
**222 N. PACIFIC COAST HWY., STE. 300**
**EL SEGUNDO, CA 90245**

**VIA THE CLAIMS AND NOTICING AGENT'S ONLINE BALLOTING PORTAL:**

**HTTPS://WWW.VERITAGLOBAL.NET/ZHI**

**CLICK ON "SUBMIT E-BALLOT" LINK ON THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR BALLOT.**

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

ID Number _____

Passcode _____

The Claims and Noticing Agent's online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted via facsimile, email, or other means of electronic transmission will not be counted.

Each ID Number is to be used solely for voting only those Claims described in <u>Item 1</u> of your electronic Ballot.  Please complete and submit an electronic Ballot for each ID Number you receive.  Creditors who cast a Ballot using the Claims and Noticing Agent's online portal should NOT also submit a paper ballot.

**If the Claims and Noticing Agent does not actually receive this Ballot on or before <u>February 20, 2025, at 4:00 p.m., prevailing Central Time</u>, your vote transmitted via this Ballot may be counted toward confirmation of the Plan only in the Debtors' discretion or by order of the Court.  <u>This ballot supersedes any previous votes cast on the Plan.  All previous votes shall not be counted toward acceptance or rejection of the Plan.</u>**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND NOTICING AGENT AT (866) 479-8211 (US OR CANADA) OR +1 (781) 575-2037 (INTERNATIONAL) OR SUBMIT AN INQUIRY AT HTTPS://WWW.VERITAGLOBAL.NET/ZHI/INQUIRY.**

### INSTRUCTIONS FOR COMPLETING THIS BALLOT:

1. To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered (a) via first class mail, overnight courier, or hand delivery to Zachry Ballot Processing Center c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300 El Segundo, CA 90245 or (b) via the Claims and Noticing Agent's online balloting portal on www.veritaglobal.net/zhi, so that this Ballot is **actually received by the Claims and Noticing Agent on or before the Voting Deadline, 4:00 p.m. (prevailing Central Time) on February 20, 2025**. This ballot supersedes any previous votes cast on the Plan.  All previous votes shall not be counted toward acceptance or rejection of the Plan.

2. If you wish to abstain from voting on the Plan, but wish to opt-out of the Third-Party Release in <u>Item 3</u> of the Ballot, you must properly complete, execute, and deliver this Ballot by the Voting Deadline as instructed above.  Notwithstanding the foregoing, if you previously submitted an Opt-Out Form electing to opt-out of the Third-Party Release, your opt-out election remains valid and effective.

3. If you disagree with the Claim amount listed on this Ballot for purposes of voting on the Plan, the deadline for you to file a Rule 3018 Motion for temporary allowance of your Claim in a different amount for voting purposes is **February 13, 2025 at 4:00 p.m. (prevailing Central Time)**.

4. Any Ballot received by the Claims and Noticing Agent after the Voting Deadline will not be counted unless otherwise ordered by the Court or determined by the Debtors.  No Ballot may be withdrawn or modified after the Voting Deadline without the Debtors' prior consent.

5. Any Ballot submitted that is incomplete or illegible, indicates unclear or inconsistent votes with respect to the Plan or is improperly signed will **NOT** be counted unless otherwise ordered by the Court or determined by the Debtors.

6. Delivery of a Ballot reflecting your vote to the Claims and Noticing Agent will be deemed to have occurred only when the Claims and Noticing Agent actually receives your paper Ballot or E-Ballot.  In all cases, you should allow sufficient time to assure timely delivery.

7. If you deliver multiple Class 6 Ballots to the Claims and Noticing Agent, **ONLY** the last properly executed Class 6 Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Class 6 Ballot(s).

8. You must vote all of your Claims in Class 6 either to accept or reject the Plan and may not split your vote.  Further, if a Holder has multiple Class 6 Claims, the Debtors may direct the Claims and Noticing Agent to aggregate those Claims for the purpose of counting votes.

9. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim, or an assertion or admission of a Claim, in the Chapter 11 Cases.

10. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan other than as set forth in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

11. **SIGN AND DATE** your Ballot.[4]  In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot.  Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

---

[4]  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, the Debtors' counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING AND TABULATION PROCEDURES, PLEASE SUBMIT AN INQUIRY WITH THE CLAIMS AND NOTICING AGENT AT HTTPS://WWW.VERITAGLOBAL.NET/ZHI/INQUIRY, OR BY CALLING (866) 479-8211 (US OR CANADA) OR +1 (781) 575-2037 (INTERNATIONAL).**

*(Remainder of Page Left Intentionally Blank)*

**Exhibit A**

Subject to the terms and conditions of the Plan, you will receive the following treatment on account of your Class 6 Claim if the Plan is consummated, your Claim is Allowed, and you do not make the Convenience Claim election in Item 2 of your Ballot:

| | | |
|---|---|---|
| Class 6 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, its Pro Rata share of the GUC Trust Interests, the economic value of which shall (i) comply with the requirements of section 1129(b)(2)(B)(i) of the Bankruptcy Code even if Class 6 votes to accept the Plan, and (ii) be equal to the Allowed amount of such Claim as of the Effective Date, *plus* such Holder's Pro Rata share of any accrued interest on the GUC Trust Unsecured Note; *provided*, *however*, notwithstanding anything to the contrary in the Plan, all Allowed General Unsecured Claims that are GPX Claims, to the extent not satisfied prior to the Effective Date shall be paid by Golden Pass in accordance with the terms of the GPX Settlement and the Plan. |

## Exhibit 4

**Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ZACHRY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90377 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

**NOTICE OF (A) NON-VOTING STATUS TO HOLDERS
OR POTENTIAL HOLDERS OF (I) UNIMPAIRED CLAIMS OR EQUITY
INTERESTS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN AND
(II) IMPAIRED CLAIMS OR EQUITY INTERESTS CONCLUSIVELY
DEEMED TO REJECT THE PLAN AND (B) OPPORTUNITY FOR HOLDERS OF
CLAIMS AND EQUITY INTERESTS TO OPT OUT OF THE THIRD-PARTY RELEASE**

     **PLEASE TAKE NOTICE THAT** on [●], 2025 the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [●]] (the "**Disclosure Statement Order**") that, among other things: (a) conditionally approved the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Code (the "**Bankruptcy Code**"); and (b) authorized the above-captioned debtors and debtors in possession (the "**Debtors**") to solicit acceptances for the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1978] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**").[2]

     **PLEASE TAKE FURTHER NOTICE THAT** you are a Holder or potential Holder of a Claim against or Interest in the Debtors that, due to the nature and treatment of such Claim or Interest under the Plan, **is not entitled to vote on the Plan**. Specifically, under the terms of the Plan: (i) a Holder of a Claim or an Interest in Classes 1, 2, 4, 5, or 9 is Unimpaired under the Plan and, therefore, is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and (ii) a Holder of a Claim or an Interest in Classes 7 or 8 is either: (a) Unimpaired under the Plan and, therefore, is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (b) Impaired under the Plan and, therefore, is conclusively presumed to have rejected the Plan pursuant to section 1126(g)

---

[1]    The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' Claims and Noticing Agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these Chapter 11 Cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Plan or the Disclosure Statement, as applicable. The statements contained herein are summaries of the provisions contained in the Plan and the Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred therein. To the extent there is a discrepancy between the terms herein and the Plan or the Disclosure Statement, the Plan or the Disclosure Statement, as applicable, shall govern and control.

of the Bankruptcy Code.  Holders of Claims or Interests in Classes 1, 2, 4, 5, 7, 8, and 9 are **not** entitled to vote on the Plan.

    **PLEASE TAKE FURTHER NOTICE THAT** the Court will consider final approval of the Disclosure Statement and confirmation of the Plan at a hearing (the "**Combined Hearing**") to commence on February 26, 2025 at 1:30 p.m. (prevailing Central Time), before the Honorable Marvin Isgur in the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, TX 77002.  The Combined Hearing may be continued from time to time without further notice other than by an announcement in open court or notice filed on the Court's docket and served on all parties entitled to notice.

    **PLEASE TAKE FURTHER NOTICE THAT** any objections (each, an "**Objection**") to the Plan or Disclosure Statement must (1) be in writing, (2) comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas, (3) state the name and address of the objecting party and the amount and nature of the objecting party's Claim or Interest, (4) state with particularity the legal and factual basis for such Objection, and, if practicable, a proposed modification to the Plan or Disclosure Statement that would resolve such an Objection, and (5) **be filed with the Court no later than February 20, 2025, at 4:00 p.m., prevailing Central Time** (the "**Objection Deadline**").

    **PLEASE TAKE FURTHER NOTICE THAT** if you have questions regarding this notice or would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact the Claims and Noticing Agent in the Chapter 11 Cases by: (a) visiting the Debtors' restructuring website at www.veritaglobal.net/zhi; (b) writing to the Claims and Noticing Agent at Zachry Ballot Processing Center c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300 El Segundo, CA 90245; (c) contacting the Claims and Noticing Agent at www.veritaglobal.net/zhi/inquiry; and/or (d) calling the Debtors' restructuring hotline at (866) 479-8211 (US or Canada) or +1 (781) 575-2037 (International) and requesting to have a member of the Solicitation Team contact you.

    All pleadings Filed in the Chapter 11 Cases are available on the website maintained by the Claims and Noticing Agent at www.veritaglobal.net/zhi.

---

**PLEASE TAKE FURTHER NOTICE THAT** <u>ARTICLE VIII</u> **OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.**

**ALTHOUGH YOU ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, THE OPT-OUT FORM ATTACHED HERETO PROVIDES YOU WITH THE OPTION TO** <u>**NOT GRANT**</u> **THE VOLUNTARY THIRD-PARTY RELEASE CONTAINED IN** <u>ARTICLE VIII.D</u> **OF THE PLAN (THE "**<u>THIRD-PARTY RELEASE</u>**").**

**PLEASE BE ADVISED THAT YOUR FAILURE TO RETURN THE FULLY COMPLETED OPT-OUT FORM, DESIGNATING YOUR DECISION TO OPT OUT OF GRANTING THE RELEASES DESCRIBED IN** <u>ARTICLE VIII</u>**, WILL RESULT IN YOUR DESIGNATION AS A "RELEASING PARTY" UNDER THE PLAN, UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.**

---

**Article VIII.D:**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

Certain defined terms with respect to the Third-Party Release are set forth below:

"**Affiliate**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**Cause of Action**" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, statutory or otherwise, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

"**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors.

"**Debtor Release**" means the release set forth in **Article VIII.C** of the Plan.

"**Holder**" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

"**Plan**" means the joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article IX.A** of the Plan, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference the Plan and made part of the Plan as if set forth in the Plan.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms in the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) calendar days before the deadline to object to confirmation of the Plan to the extent available, or such later date as may be approved by the Bankruptcy Court, including the following, as applicable: (a) the Organizational Documents (solely to the extent that the Debtors determine, in their sole discretion, that any amendments to such Organizational Documents are necessary to effectuate the Restructuring Transactions

on the Effective Date); (b) the Assumption List; (c) the Rejection List; (d) the Schedule of Retained Causes of Action; (e) the A&R Credit Facility Term Sheet; (f) the GUC Trust Unsecured Note Term Sheet; (g) the GUC Trust Agreement; and (h) the Restructuring Steps Memorandum (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date).

"**Related Party**" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.

"**Released Party**" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors, the Debtors' Related Parties, and Holders of Claims related to the GPX Project, consistent with the GPX Settlement; (h) the Sureties; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided*, *however*, in each case, an Entity shall not be a Released Party if it: (i) elects to opt out of the Third-Party Release or (ii) Files with the Bankruptcy Court an objection to the Plan, including with respect to the Third-Party Release, that is not consensually resolved before Confirmation or otherwise supports any such objection or objector.

"**Releasing Party**" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors and the Debtors' Related Parties consistent with the GPX Settlement; (h) the Sureties; (i) all Holders of Claims who vote to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (j) all Holders of Claims or Interests who are deemed to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (k) all Holders of Claims or Interests who are deemed to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided*, *however*, notwithstanding anything to the contrary in the Plan, current employees of the Debtors as of the Voting Record Date shall not be Releasing Parties under the Plan.

"**Restructuring Transactions**" means the transactions described in **Article IV.C** of the Plan.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES AND TO PROVIDE YOU WITH THE ATTACHED OPT OUT FORM WITH RESPECT TO THE THIRD-PARTY RELEASE PROVIDED IN THE PLAN.  IF YOU HAVE ANY QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT.**

---

Dated: [●], 2025
     Houston, Texas

_/s/_ _____

Charles R. Koster (Texas Bar No. 24128278)
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

-and-

Bojan Guzina (admitted _pro hac vice_)
Andrew F. O'Neill  (admitted _pro hac vice_)
William A. Guerrieri (admitted _pro hac vice_)
Fan He (admitted _pro hac vice_)
Adam Swingle (admitted _pro hac vice_)
Barrett Lingle (admitted _pro hac vice_)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  bojan.guzina@whitecase.com
      aoneill@whitecase.com
      william.guerrieri@whitecase.com
      fhe@whitecase.com
      adam.swingle@whitecase.com
      barrett.lingle@whitecase.com

_Counsel to the Debtors and_
_Debtors in Possession_

**<u>Exhibit 5</u>**

**Opt-Out Form**

## THIRD-PARTY RELEASE OPT-OUT FORM

You are receiving this opt-out form (the "**Opt-Out Form**") because you are or may be a Holder of a Claim or Interest that is not entitled to vote on the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "**Plan**"). Except as otherwise set forth in the Plan, Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in **Article VIII.D** (the "**Third-Party Release**"), unless a Holder affirmatively opts out or timely objects to the Third-Party Release as described below.

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM CAREFULLY **BEFORE** COMPLETING THIS OPT-OUT FORM.

**THIS OPT-OUT FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY VERITA GLOBAL, LLC (THE "CLAIMS AND NOTICING AGENT") ON OR BEFORE 4:00 P.M. PREVAILING CENTRAL TIME ON FEBRUARY 20, 2025 (THE "OPT-OUT DEADLINE"). YOU WILL BE HELD TO FOREVER RELEASE THE RELEASE PARTIES IN ACCORDANCE WITH THE PLAN UNLESS YOU CHECK THE BOX ON THIS OPT-OUT FORM AND FOLLOW ALL INSTRUCTIONS, OR UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.**

If you believe you have received this Opt-Out Form in error, please contact the Claims and Noticing Agent immediately by calling (866) 479-8211 (US or Canada) or +1 (781) 575-2037 (International) and requesting to have a member of the Solicitation Team contact you, or submitting an inquiry at https://www.veritaglobal.net/zhi/inquiry.

Before completing this Opt-Out Form, please read and follow the enclosed "Instructions for Completing this Opt-Out Form" carefully to ensure that you complete, execute, and return this Opt-Out Form properly.

**Item 1**. **Optional Third-Party Release.**

**AS A HOLDER OF A CLAIM OR INTEREST, YOU WILL BE A "RELEASING PARTY" UNDER THE PLAN AND DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH BELOW. YOU MAY, HOWEVER, CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN ONLY IF YOU (A) CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT FORM BY THE OPT-OUT DEADLINE; (B) TIMELY OBJECT TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION OF THE PLAN; OR (C) PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.**

☐       **By checking this box, you elect to opt out of the Third-Party Release set forth below.**

**Article VIII.D** of the Plan contains the following Third-Party Release.

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

Certain defined terms with respect to the Third-Party Release are set forth below:

"**Affiliate**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**Cause of Action**" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, statutory or otherwise, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law.  For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

"**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors.

"**Debtor Release**" means the release set forth in **Article VIII.C** of the Plan.

"**Holder**" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

"**Plan**" means the joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article IX.A** the Plan, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference herein and made part of the Plan as if set forth herein.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms in the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) calendar days before the deadline to object to confirmation of the Plan to the extent available, or such later date as may be approved by the Bankruptcy Court, including the following, as applicable: (a) the Organizational Documents (solely to the extent that the Debtors determine, in their sole discretion, that any amendments to such Organizational Documents are necessary to effectuate the Restructuring Transactions on the Effective Date); (b) the Assumption List; (c) the Rejection List; (d) the Schedule of Retained Causes of Action; (e) the A&R Credit Facility Term Sheet; (f) the GUC Trust Unsecured Note Term Sheet; (g) the

3

GUC Trust Agreement; and (h) the Restructuring Steps Memorandum (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date).

"**Related Party**" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.

"**Released Party**" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors, the Debtors' Related Parties, and Holders of Claims related to the GPX Project, consistent with the GPX Settlement; (h) the Sureties; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided*, *however*, in each case, an Entity shall not be a Released Party if it: (i) elects to opt out of the Third-Party Release or (ii) Files with the Bankruptcy Court an objection to the Plan, including with respect to the Third-Party Release, that is not consensually resolved before Confirmation or otherwise supports any such objection or objector.

"**Releasing Party**" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors and the Debtors' Related Parties consistent with the GPX Settlement; (h) the Sureties; (i) all Holders of Claims who vote to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (j) all Holders of Claims or Interests who are deemed to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (k) all Holders of Claims or Interests who are deemed to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided*, *however*, notwithstanding anything to the contrary in the Plan, current employees of the Debtors as of the Voting Record Date shall not be Releasing Parties under the Plan.

"**Restructuring Transactions**" means the transactions described in **Article IV.C** of the Plan.

**Item 2.  Certifications.**

By signing this Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

a.    that, as of January 22, 2025, either: (i) the undersigned is the Holder of a Claim or an Interest; or, (ii) the undersigned is an authorized signatory for an Entity or Person that is the Holder of a Claim or an Interest;

b.    that the Holder has received a copy of the *Notice of (A) Non-Voting Status to Holders or Potential Holders of (I) Unimpaired Claims or Equity Interests Conclusively Presumed to Accept the Plan and (II) Impaired Claims or Equity Interests Conclusively Deemed to Reject the Plan and (B) Opportunity for Holders of Claims and Equity Interests to Opt-Out of the Third-Party Release* and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

c.    that the undersigned has made the same election with respect to all Claims or Interests held by the undersigned; and

d.    that no other Opt-Out Form has been cast with respect to the Holder's Claims or Interests, or, if any other Opt-Out Forms have been cast with respect to such Claims or Interests, such Opt-Out Forms are hereby revoked.

YOUR RECEIPT OF THIS OPT-OUT FORM DOES NOT SIGNIFY THAT YOUR CLAIM OR INTEREST HAS BEEN OR WILL BE ALLOWED.

| | |
|---|---|
| Name of Holder: | |
| Signature: | |
| Signatory Name (if other than the Holder): | |
| Title: | |
| Address: | |
| Email Address: | |
| Date Completed: | |

If your address or contact information has changed, please note the new information here.

**IF YOU WISH TO OPT OUT, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN PROMPTLY VIA FIRST CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**ZACHRY BALLOT PROCESSING CENTER**
**C/O VERITA**
**222 N. PACIFIC COAST HWY., STE. 300**
**EL SEGUNDO, CA 90245**

**OR VIA THE ONLINE FORM AT: HTTPS://WWW.VERITAGLOBAL.NET/ZHI**

If you have any questions, please call the Claims and Noticing Agent at (866) 479-8211 (US and Canada), +1 (781) 575-2037 (International) and request to have a member of the Solicitation Team contact you, or submit an inquiry at www.veritaglobal.net/zhi/inquiry.

---

IF THE CLAIMS AND NOTICING AGENT DOES NOT **ACTUALLY RECEIVE THIS OPT-OUT FORM ON OR BEFORE 4:00 P.M., PREVAILING CENTRAL TIME, ON FEBRUARY 20, 2025**, THEN THE ELECTIONS TRANSMITTED HEREBY WILL NOT BE EFFECTIVE.

OPT-OUT FORMS SENT BY FACSIMILE OR EMAIL WILL **NOT** BE ACCEPTED.

## **INSTRUCTIONS FOR COMPLETING THIS FORM**

1. Capitalized terms used in the Opt-Out Form or in these instructions (the "**Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2. You will be held to forever release the Release Parties in accordance with the Plan unless you properly submit the Opt-Out Form, or unless you properly submitted an Opt-Out Form during the solicitation of the Debtors' initial plan of reorganization, in which case such Opt-Out Form remains valid and effective.

3. To complete this Opt-Out Form, take the following steps:  (a) clearly indicate your decision to "opt out" of the Third-Party Release set forth in the Plan in Item 1 above; (b) make sure that the information required by Item 2 above has been correctly inserted; and (c) sign, date and return an original of your Opt-Out Form in accordance with paragraph 3 directly below.

4. **Return of Opt-Out Form:** Your Opt-Out Form MUST be returned to the Claims and Noticing Agent so as to be **actually received** by the Claims and Noticing Agent on or before the Opt-Out Deadline, which is **4:00 p.m. (prevailing Central Time), on February 20, 2025**.

5. If an Opt-Out Form is received by the Claims and Noticing Agent after the Opt-Out Deadline, it will not be effective.  Additionally, the following Opt-Out Forms will **NOT** be counted:

   a. Any Opt-Out Form that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest;

   b. Any Opt-Out Form cast by or on behalf of an Entity that is not entitled to opt out of the Third-Party Release;

   c. Any Opt-Out Form sent to any party other than the Claims and Noticing Agent;

   d. Any Opt-Out Form transmitted by facsimile or email;

   e. Any unsigned Opt-Out Form; or

   f. Any Opt-Out Form not completed in accordance with the procedures approved in the Disclosure Statement Order and described herein.

6. The method of delivery of Opt-Out Forms to the Claims and Noticing Agent is at the election and risk of each Holder of a Claim or Interest.  Except as otherwise provided herein, such delivery will be deemed made to the Claims and Noticing Agent only when the Claims and Noticing Agent **actually receives** the executed Opt-Out Form.  Holders should allow sufficient time to assure timely delivery.

7. If multiple Opt-Out Forms are received from the same Holder with respect to the same Claim or Interest prior to the Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Form.

8. The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to opt-out of the Third-Party Release.  Accordingly, at this time, Holders of Claims or Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, and neither the Debtors nor the Claims and Noticing Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

9. The Opt-Out Form does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim, (b) proof of interest, or (c) an assertion or admission of a Claim or Interest.

10. **Please be sure to sign and date your Opt-Out Form**.  If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when

signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form.

<u>**PLEASE RETURN YOUR OPT-OUT FORM PROMPTLY**</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-OUT FORM OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT: (866) 479-8211 (US OR CANADA), +1 (781) 575-2037 (INTERNATIONAL) AND REQUEST TO HAVE A MEMBER OF THE SOLICITATION TEAM CONTACT YOU OR SUBMIT AN INQUIRY AT HTTPS://WWW.VERITAGLOBAL.NET/ZHI/INQUIRY**

---

**IF THE CLAIMS AND NOTICING AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THIS OPT-OUT FORM OPT-OUT FORM FROM YOU BEFORE THE OPT-OUT DEADLINE—WHICH IS 4:00 P.M., PREVAILING CENTRAL TIME ON FEBRUARY 20, 2025—THEN THE OPT-OUT ELECTIONS TRANSMITTED THEREBY WILL NOT BE EFFECTIVE.**

---

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE DOCUMENTS MAILED HEREWITH.

**<u>Exhibit 6</u>**

**Combined Hearing Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF (I) COMBINED HEARING TO CONSIDER (A) FINAL
APPROVAL OF THE DISCLOSURE STATEMENT, (B) CONFIRMATION OF
THE MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN, AND (C) OPPORTUNITY TO OPT
OUT OF THIRD-PARTY RELEASES, AND (II) RELATED VOTING AND OBJECTION DEADLINES**

**NOTICE IS HEREBY GIVEN** as follows:

On January [●], 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") their *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (as amended, supplemented, or otherwise modified from time to time, the "**Plan**") and the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (as amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "**Bankruptcy Code**"). Copies of the Plan and the Disclosure Statement may be obtained for free at the restructuring website maintained by Verita Global, LLC (the "**Claims and Noticing Agent**"), available at https://www.veritaglobal.net/zhi. These documents may also be obtained by: (a) calling the Debtors' restructuring hotline at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International), (b) submitting the inquiry form at https://www.veritaglobal.net/zhi/inquiry, and/or (c) writing to the Claims and Noticing Agent at Zachry Ballot Processing c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245.[2]

**<u>Confirmation Information</u>**

A hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will be held before the Honorable Judge Marvin Isgur, Courtroom 404, of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Houston, Texas 77002, on February 26, 2025 at 1:30 p.m., prevailing Central Time. At the Combined Hearing, the Court will consider final approval of the Disclosure Statement, any objections to the Disclosure Statement, confirmation of the Plan, any objections thereto, and any other matter that may properly come before the Court. Please be advised that the Court or the Debtors may continue the Combined Hearing from time to time without further notice other than a reset being requested in open Court or a notice of reset being filed with the Court and served on parties entitled to notice.

---

[1]   The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these Chapter 11 Cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2]   Capitalized terms used but not defined herein have the meanings given to them in the Plan or the Disclosure Statement, as applicable. The statements contained herein are summaries of the provisions contained in the Plan and the Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred therein. To the extent there is a discrepancy between the terms herein and the Plan or the Disclosure Statement, the Plan or the Disclosure Statement, as applicable, shall govern and control.

**Information Regarding the Plan**

**Voting Record Date.** The Voting Record Date was **January 22, 2025**, which was the date used for determining which Holders of Claims in Classes 3 and 6 were entitled to vote on the Plan.

**Objections to the Plan and Disclosure Statement.** The deadline for filing objections to the Plan or Disclosure Statement must (1) be in writing, (2) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas, (3) state the name and address of the objecting party and the amount and nature of the objecting party's Claim or Interest, (4) state the legal and factual basis for such Objections, and, if practicable, a proposed modification to the Plan or Disclosure Statement that would resolve such an Objection, and (5) **be filed with the Court with proof of service thereof and served no later than February 20, 2025, at 4:00 p.m., prevailing Central Time** (the "**Objection Deadline**").

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**AS DESCRIBED BELOW, YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE DISCHARGE, RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.**

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS AND ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**ALL HOLDERS OF CLAIMS OR INTERESTS (A) THAT ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE NON-VOTING STATUS NOTICE INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (B) THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE NON-VOTING STATUS NOTICE INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; AND (C) WHO ARE IN A VOTING CLASS (I) BUT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (II) WHO VOTE TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; OR (III) WHO VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN ARE RELEASING PARTIES UNDER THE PLAN.**

**FAILURE TO (A) ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN IN ACCORDANCE WITH THE ABOVE OR (B) TIMELY OBJECT TO THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION WILL RESULT IN SUCH HOLDER BEING DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.**

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE DISCHARGE, RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.**

---

**Summary of Plan Treatment**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agree to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND, THEREFORE, ARE SUBJECT TO CHANGE. REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. [3]**

| Class | Claim or Interest | Treatment of Claim or Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1 | Other Secured Claims | Each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, either: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the treatment provided to any Allowed Other Secured Claim that is a GPX Claim that has not been satisfied prior to the Effective Date, if any, shall be provided by Golden Pass in accordance with the terms of the GPX Settlement and the Plan. | $2.87 | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $1.35 | 100% |
| 3 | Prepetition Credit Facility Claims | Each Holder of an Allowed Prepetition Credit Facility Claim shall, on the Effective Date, become party to, and bound by, the A&R Credit Facility on account of such Holder's Allowed Prepetition Credit Facility Claim, on the terms set forth in the A&R Credit Facility Documents. | $281.25[4] | 100% |

---

[3]   The recoveries set forth in the chart are, in some cases, based on the estimated going concern value of the Reorganized Debtors, and may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business assets and general economic conditions.

[4]   Prepetition Credit Facility Claims include Prepetition L/C Claims, which are contingent and excluded from the amount disclosed here. This amount also excludes all other fees, premiums, and accrued and unpaid interest due and owing to Holders of Prepetition Credit Facility Claims under the Prepetition Credit Facility as of the Petition Date.

| Class | Claim or Interest | Treatment of Claim or Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|-------|-------------------|-------------------------------|------------------------------------------|-----------------------------------|
| 4 | Deferred Compensation Plan Claims | Except to the extent that a Holder of an Allowed Deferred Compensation Plan Claim agrees to less favorable treatment, each Allowed Deferred Compensation Plan Claim shall be Reinstated pursuant to section 1124 of the Bankruptcy Code, and each such Holder's rights under the Deferred Compensation Plan shall be honored by the Reorganized Debtors in accordance with the terms of the Deferred Compensation Plan. | $62.58 | 100% |
| 5 | Convenience Claims | Except to the extent that a Holder of an Allowed Convenience Claim agrees to less favorable treatment, each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Convenience Claim, on the Effective Date or as soon as practicable thereafter, Cash in an amount equal to such Holder's Allowed Convenience Claim (excluding any interest that may be owed on such Claim), but in no event shall distributions on account of any Allowed Convenience Claim exceed the Convenience Claim Amount. | $4.10[5] | 100% |
| 6 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, its Pro Rata share of the GUC Trust Interests, the economic value of which shall (i) comply with the requirements of section 1129(b)(2)(B)(i) of the Bankruptcy Code even if Class 6 votes to accept the Plan, and (ii) be equal to the Allowed amount of such Claim as of the Effective Date, *plus* such Holder's Pro Rata share of any accrued interest on the GUC Trust Unsecured Note; *provided, however*, notwithstanding anything to the contrary in the Plan, all Allowed General Unsecured Claims that are GPX Claims, to the extent not satisfied prior to the Effective Date shall be paid by Golden Pass in accordance with the terms of the GPX Settlement and the Plan. | $57.40[6] | 100% |
| 7 | Intercompany Claims | Allowed Intercompany Claims shall be, at the option of the applicable Debtor, Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably | N/A | N/A |

---

[5]  Any election to treat an Allowed General Unsecured Claim in excess of $25,000 as a Convenience Claim will increase the total amount of Allowed Convenience Claims, with a corresponding decrease to the total amount of Allowed General Unsecured Claims. Potential Convenience Claim elections are not included in this projection of the estimated amount of Allowed Convenience Claims.

[6]  The projected amount of Allowed General Unsecured Claims excludes various trade claims that are otherwise treated as Administrative Expense Claims, Other Secured Claims, and Other Priority Claims, as described in further detail in **Article I** of the Disclosure Statement.

| Class | Claim or Interest | Treatment of Claim or Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | determined to be appropriate by the Debtors or Reorganized Debtors, as applicable. | | |
| 8 | Intercompany Interests | Intercompany Interests shall, at the option of the applicable Debtor, be:<br>(i) Reinstated; or<br>(ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released. | N/A | N/A |
| 9 | Zachry Interests | Zachry Interests shall be Reinstated on the Effective Date, and the legal, equitable, and contractual rights to which Holders of Zachry Interests are entitled shall remain unaltered. | N/A | N/A |

**Discharge, Injunctions, Exculpation, and Releases**

Please be advised that the Plan contains certain release, exculpation, and injunction provisions as follows:

A.   **Relevant Definitions.**

"**Affiliate**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**Cause of Action**" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, statutory or otherwise, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law.  For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

"**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors.

"**Debtor Release**" means the release set forth in **Article VIII.C** of the Plan.

"**Exculpated Parties**" means, collectively, and in each case in its capacity as such, the Debtors, the Committee, and each member of the Committee.

"**Holder**" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

"**Plan**" means the joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments to the Plan, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article IX.A** of the Plan, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference in the Plan and made part of the Plan as if set forth in the Plan.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms in the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) calendar days before the deadline to object to confirmation of the Plan to the extent available, or such later date as may be approved by the Bankruptcy Court, including the following, as applicable: (a) the Organizational Documents (solely to the extent that the Debtors determine, in their sole discretion, that any amendments to such Organizational Documents are necessary to effectuate the Restructuring Transactions on the Effective Date); (b) the Assumption List; (c) the Rejection List; (d) the Schedule of Retained Causes of Action; (e) the A&R Credit Facility Term Sheet; (f) the GUC Trust Unsecured Note Term Sheet; (g) the GUC Trust Agreement; and (h) the Restructuring Steps Memorandum (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date).

"**Related Party**" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.

"**Released Party**" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors, the Debtors' Related Parties, and Holders of Claims related to the GPX Project, consistent with the GPX Settlement; (h) the Sureties; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided*, *however*, in each case, an Entity shall not be a Released Party if it (i) elects to opt out of the Third-Party Release or (ii) Files with the Bankruptcy Court an objection to the Plan, including with respect to the Third-Party Release, that is not consensually resolved before Confirmation or otherwise supports any such objection or objector.

"**Releasing Party**" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each member of the Committee; (d) the Prepetition Credit Facility Agent; (e) the A&R Credit Facility Agent; (f) the Released Prepetition Lenders; (g) Golden Pass, but solely with respect to the Debtors and the Debtors' Related Parties consistent with the GPX Settlement; (h) the Sureties; (i) all Holders of Claims who vote to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (j) all Holders of Claims or Interests who are deemed to accept the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (k) all Holders of Claims or Interests who are deemed to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the Third-Party Release provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not

6

affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the Third-Party Release provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided*, *however*, notwithstanding anything to the contrary in the Plan, current employees of the Debtors as of the Voting Record Date shall not be Releasing Parties under the Plan.

"**Restructuring Transactions**" means the transactions described in **Article IV.C** of the Plan.

**B.        Discharge of Claims and Termination of Interests.**

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, and GPX or any of its assets or properties with respect to any Claims that constitute GPX Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date. For the avoidance of doubt, the discharge provided in the Plan shall discharge, release, and extinguish any right of any Holder of any Claim to file, assert, levy, or attach any Liens or initiate any claim against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, or otherwise enforce, collect, or recover on account of any such Claims other than as expressly permitted under the Plan. Further, and for the avoidance of doubt, the discharge provided in the Plan shall discharge, release, and extinguish any right of any Holder of any GPX Claim to file, assert, levy, or attach any Liens against property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass or any property interest of Golden Pass.**

**C.        Release of Liens.**

**Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.C of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including any bonds related to the Debtors, shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such**

actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The foregoing direction to release Liens shall be considered a direction in accordance with, as applicable, the Prepetition Credit Agreement, as if such direction included the signatures of the necessary lenders thereunder to direct the applicable agent to take the actions contemplated thereby.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, including with respect to any bonds related to the Debtors, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

**D.**    **Releases by the Debtors.**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in the Plan, the Schedule of Retained Causes of Action, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of each Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Released Avoidance Actions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in <u>Article VIII.C</u> of the Plan, the Debtors shall maintain all rights to object to Filed Claims and shall not release any claims or Causes of Action (i) identified in the Schedule of Retained Causes of Action, or (ii) related to the GPX Settlement that are preserved by the GPX Settlement

Documents, the GPX Settlement Dispute Opinion, or the GPX Settlement Dispute Order.  Any and all such rights, claims, and Causes of Action set forth in this paragraph shall be fully preserved and revest in the Reorganized Debtors pursuant to the Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

E.      **Releases by Third Parties**.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding

that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

F.      **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, all related agreements, instruments, and other documents, or any transaction related to the Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

G.      **Injunction.**

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, satisfied, or released pursuant to the Plan.

Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, discharged, satisfied, released, or are subject to exculpation pursuant to **Article VIII**, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties and/or the Released Parties:

1.      commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

2.      enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

10

3. creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

4. filing, asserting, levying, or attaching any Liens against any property of the Debtors or Reorganized Debtors on account of any Claims arising under or related to Executory Contracts or Unexpired Leases that are assumed and cured pursuant to the Plan;

5. filing, asserting, levying, or attaching any Liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, and enforcing, collecting, or recovering on account of any such Liens;

6. filing, asserting, levying, or attaching any Liens against any property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, and enforcing, collecting, or recovering on account of any such Liens, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass;

7. filing, asserting, levying, or attaching any Claims or Liens on account of GPX Claims satisfied (or to be satisfied) by Golden Pass under the GPX Settlement, whether against the Released Parties, Exculpated Parties, Golden Pass, Chiyoda, CB&I, or CCZJV-GPX.

8. except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

9. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, the solicitation of votes with respect to the Plan, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.  The injunction in the Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order from bringing an action to enforce the terms of the Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order.

> **If you have any questions related to this notice, please call (866) 479-8211 (U.S./Canada) or +1 (781) 575-2037 (International) or visit https://www.veritaglobal.net/ZHI to submit an inquiry.**

Dated:   [●], 2025
      Houston, Texas

/s/
Charles R. Koster (Texas Bar No. 24128278)
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

-and-

Bojan Guzina (admitted *pro hac vice*)
Andrew F. O'Neill (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Fan He (admitted *pro hac vice*)
Adam Swingle (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: bojan.guzina@whitecase.com
      aoneill@whitecase.com
      william.guerrieri@whitecase.com
      fhe@whitecase.com
      adam.swingle@whitecase.com
      barrett.lingle@whitecase.com

*Counsel to the Debtors and*
*Debtors in Possession*

**Exhibit 7**

**Publication Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF (I) COMBINED HEARING**
**TO CONSIDER (A) FINAL APPROVAL OF THE DISCLOSURE STATEMENT,**
**(B) CONFIRMATION OF THE MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN,**
**AND (C) OPPORTUNITY TO OPT OUT OF THIRD-PARTY RELEASES, AND**
**(II) RELATED VOTING AND OBJECTION DEADLINES**

**TO:      ALL HOLDERS OF CLAIMS, HOLDERS OF INTERESTS, AND PARTIES IN INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES**

**PLEASE TAKE NOTICE THAT** on January [●], 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") their *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1978] (as amended, supplemented, or otherwise modified from time to time, the "**Plan**") and the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (as amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "**Bankruptcy Code**"). Copies of the Plan and the Disclosure Statement may be obtained for free at the restructuring website maintained by Verita Global, LLC (the "**Claims and Noticing Agent**"), available at www.veritaglobal.net/zhi. These documents may also be obtained by: (a) calling the Debtors' restructuring hotline at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International), (b) submitting the inquiry form at www.veritaglobal.net/zhi/inquiry, and/or (c) writing to the Claims and Noticing Agent at Zachry Ballot Processing c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245.[2]

**PLEASE TAKE FURTHER NOTICE THAT** a hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will be held before the Honorable Judge Marvin Isgur, Courtroom 404, of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Houston, Texas 77002, on February 26, 2025 at 1:30 p.m., prevailing Central Time. At the Combined Hearing, the Court will consider final approval of the Disclosure Statement, any objections to the Disclosure Statement, confirmation of the Plan, any objections thereto, and any other matter that may properly come before the Court. Please be advised that the Court or the Debtors may continue the Combined Hearing from time to time without further notice other than a reset being requested in open Court or a notice of reset being filed with the Court and served on parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE THAT** objections (each, an "**Objection**") to the Plan or Disclosure Statement must  (1) be in writing, (2) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy

---

[1]    The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these Chapter 11 Cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Plan or the Disclosure Statement, as applicable. The statements contained herein are summaries of the provisions contained in the Plan and the Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred therein. To the extent there is a discrepancy between the terms herein and the Plan or the Disclosure Statement, the Plan or the Disclosure Statement, as applicable, shall govern and control.

Local Rules for the Southern District of Texas, (3) state the name and address of the objecting party and the amount and nature of the objecting party's Claim or Interest, (4) state the legal and factual basis for such Objections, and, if practicable, a proposed modification to the Plan or Disclosure Statement that would resolve such an Objection, and (5) **be filed with the Court with proof of service thereof no later than February 20, 2025, at 4:00 p.m., prevailing Central Time** (the "**Objection Deadline**").

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

**ARTICLE VIII** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS AND **ARTICLE VIII.D** CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

ALL HOLDERS OF CLAIMS OR INTERESTS (A) THAT ARE DEEMED TO ACCEPT THE PLAN **AND** WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE NON-VOTING STATUS NOTICE INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (B) THAT ARE DEEMED TO REJECT THE PLAN **AND** WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE NON-VOTING STATUS NOTICE INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; AND (C) WHO ARE IN A VOTING CLASS (I) BUT ABSTAIN FROM VOTING ON THE PLAN **AND** WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (II) WHO VOTE TO ACCEPT THE PLAN **AND** WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN ARE RELEASING PARTIES UNDER THE PLAN; OR (III) WHO VOTE TO REJECT THE PLAN **AND** WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN ARE RELEASING PARTIES UNDER THE PLAN.

FAILURE TO (A) ELECT TO OPT OUT OF THE RELEASE CONTAINED IN **ARTICLE VIII.D** OF THE PLAN IN ACCORDANCE WITH THE ABOVE OR (B) TIMELY OBJECT TO THE RELEASES CONTAINED IN **ARTICLE VIII** OF THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION WILL RESULT IN SUCH HOLDER BEING DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.

YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSDIER THE PLAN, INCLUDING THE DISCHARGE, RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.

**<u>Exhibit 8</u>**

**Assumption Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ZACHRY HOLDINGS, INC., *et al.*[1] | Case No. 24-90377 (MI) |
| Debtors. | (Jointly Administered) |

**NOTICE OF ASSUMPTION OF
EXECUTORY CONTRACT OR UNEXPIRED LEASE AND CURE AMOUNTS, IF ANY**

    **PLEASE TAKE NOTICE THAT** on [●], 2025 the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [●]] (the "**Disclosure Statement Order**") that, among other things: (a) conditionally approved the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Code (the "**Bankruptcy Code**"); and (b) authorized the above-captioned debtors and debtors in possession (the "**Debtors**") to solicit acceptances for the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1978] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**").[2]

    **PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *List of Executory Contracts and/or Unexpired Leases to be Assumed* [Docket No. [●]] (the "**Assumption List**") and the *List of Executory Contracts and/or Unexpired Leases to be Rejected* [Docket No. [●]] (the "**Rejection List**") with the Court as part of the Plan Supplement on February 13, 2025, as contemplated under the Plan. The Assumption List and Rejection List may be further modified, amended, or supplemented from time to time in accordance with the Plan, including to add or remove any Executory Contract or Unexpired Lease from the Assumption List or Rejection List.

    **PLEASE TAKE FURTHER NOTICE THAT** the Court will consider final approval of the Disclosure Statement and confirmation of the Plan at a hearing (the "**Combined Hearing**") to commence on February 26, 2025 at 1:30 p.m. (prevailing Central Time), before the Honorable Marvin Isgur in the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, TX 77002. The Combined Hearing may be continued from time

---

[1]    The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these chapter 11 cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or Disclosure Statement, as applicable.

to time without further notice other than by an announcement in open court or notice filed on the Court's docket and served on all parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this Notice because the Debtors' records reflect that you may be a party to an Executory Contract or Unexpired Lease that may be assumed pursuant to the Plan. Therefore, you are advised to review carefully the information contained in this Notice, the Assumption List, the Rejection List, and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors may assume the Executory Contract(s) and Unexpired Lease(s) listed on the Assumption List, attached hereto, to which you are a party and any other Executory Contract and/or Unexpired Lease to which you are a party that is not identified on the Rejection List or otherwise treated under the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s) and have listed such amounts on the Assumption List. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount owing for such contract or lease, and the proposed Cure Claim for each Executory Contract and/or Lease is therefore $0.00.

**PLEASE TAKE FURTHER NOTICE THAT** any Allowed Cure Claims in respect of assumed Executory Contracts and/or Unexpired Leases shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code, by payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption List, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or Reorganized Debtors, as applicable, may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors and the Reorganized Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. The Debtors may adjourn consideration of any cure dispute beyond the Combined Hearing.

**PLEASE TAKE FURTHER NOTICE THAT** any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court no later than **30 DAYS AFTER THE PLAN'S EFFECTIVE DATE**.

**PLEASE TAKE FURTHER NOTICE THAT** any request for payment of a Cure Claim that differs from the cure amounts listed in the Assumption List paid must be Filed with the Bankruptcy Court no later than **30 DAYS AFTER THE PLAN'S EFFECTIVE DATE**.

**PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO TIMELY OBJECT TO THE PROPOSED ASSUMPTION, ASSUMPTION AND ASSIGNMENT, OR RELATED CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH**

**ASSUMPTION, ASSUMPTION AND ASSIGNMENT, AND/OR CURE AMOUNT OF SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE, AS APPLICABLE, AND ANY UNTIMELY OBJECTION SHALL BE DISALLOWED AND FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTION, AND SHALL NOT BE ENFORCEABLE AGAINST ANY REORGANIZED DEBTOR, WITHOUT THE NEED FOR ANY OBJECTION BY THE REORGANIZED DEBTORS OR ANY OTHER PARTY IN INTEREST OR ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT. SUCH COUNTERPARTIES TO SUCH EXECUTORY CONTRACTS OR UNEXPIRED LEASES SHALL BE DEEMED TO RELEASE AND WAIVE, SUBJECT TO SUCH COUNTERPARTIES' RECEIPT OF THE APPLICABLE CURE AMOUNT(S) PURSUANT TO THE PLAN, ANY AND ALL RIGHTS ARISING UNDER SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE RELATED TO ANY DEFAULT, CROSS-DEFAULT, TERMINATION, PUT RIGHT, OR OTHER SIMILAR PROVISION RELATED TO ANY EVENT, DEFAULT, OR POTENTIAL DEFAULT ON OR OCCURING PRIOR TO THE PLAN EFFECTIVE DATE.**

**PLEASE TAKE FURTHER NOTICE THAT** assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time on or before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Subject to the resolution of any timely objections in accordance with Article V of the Plan, any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejection List or Assumption List, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease, that any Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is a binding and enforceable agreement. In addition, the Debtors shall have the right to: (i) alter, amend, modify, or supplement any information set forth herein, including to add or remove any Executory Contract or Unexpired Lease from the Rejection List or Assumption List, pursuant to the terms of the Plan; and (ii) contest any Claim asserted in connection with any Executory Contract or Unexpired Lease.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan and Disclosure Statement may be obtained free of charge by visiting the website maintained by the Claims and Noticing Agent at www.veritaglobal.net/ZHI. Copies of the Plan and Disclosure Statement may also be obtained by calling the Claims and Noticing Agent at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International).

Dated: [●], 2025  
      Houston, Texas

/s/ _____

Charles R. Koster (Texas Bar No. 24128278)  
**WHITE & CASE LLP**  
609 Main Street, Suite 2900  
Houston, Texas 77002  
Telephone: (713) 496-9700  
Facsimile: (713) 496-9701  
Email: charles.koster@whitecase.com

-and-

Bojan Guzina (admitted *pro hac vice*)  
Andrew F. O'Neill (admitted *pro hac vice*)  
William A. Guerrieri (admitted *pro hac vice*)  
Fan B. He (admitted *pro hac vice*)  
Adam T. Swingle (admitted *pro hac vice*)  
Barrett Lingle (admitted *pro hac vice*)  
111 South Wacker Drive, Suite 5100  
Chicago, Illinois 60606  
Telephone: (312) 881-5400  
Email: bojan.guzina@whitecase.com  
      aoneill@whitecase.com  
      william.guerrieri@whitecase.com  
      fhe@whitecase.com  
      adam.swingle@whitecase.com  
      barrett.lingle@whitecase.com

*Counsel to the Debtors and*  
*Debtors in Possession*

## Exhibit 1

**Assumption List**

**Exhibit 9**

**Rejection Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF REJECTION OF**
**EXECUTORY CONTRACT OR UNEXPIRED LEASE**

 **PLEASE TAKE NOTICE THAT** on [●], 2025 the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [●]] (the "**Disclosure Statement Order**") that, among other things: (a) conditionally approved the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Code (the "**Bankruptcy Code**"); and (b) authorized the above-captioned debtors and debtors in possession (the "**Debtors**") to solicit acceptances for the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1978] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**").[2]

 **PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *List of Executory Contracts and/or Unexpired Leases to be Assumed* [Docket No. [●]] (the "**Assumption List**") and the *List of Executory Contracts and/or Unexpired Leases to be Rejected* [Docket No. [●]] (the "**Rejection List**") with the Court as part of the Plan Supplement on February 13, 2025 as contemplated under the Plan. The Assumption List and Rejection List may be further modified, amended, or supplemented from time to time in accordance with the Plan, including to add or remove any Executory Contract or Unexpired Lease from the Assumption List or Rejection List.

 **PLEASE TAKE FURTHER NOTICE THAT** the Court will consider final approval of the Disclosure Statement and confirmation of the Plan at a hearing (the "**Combined Hearing**") to commence on February 26, 2025 at 1:30 p.m. (prevailing Central Time), before the Honorable Marvin Isgur in the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, TX 77002. The Combined Hearing may be continued from time

---

[1] The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these chapter 11 cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or Disclosure Statement, as applicable.

to time without further notice other than by an announcement in open court or notice filed on the Court's docket and served on all parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this Notice because the Debtors' records reflect that you may be a party to an Executory Contract or Unexpired Lease that may be rejected pursuant to the Plan. Therefore, you are advised to review carefully the information contained in this Notice, the Rejection List, the Assumption List, and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** all Executory Contracts and Unexpired Leases listed on the Rejection List, attached hereto, will be deemed rejected as of the Effective Date of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** all Proofs of Claim, if any, with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases listed on the Rejection List must be Filed with the Bankruptcy Court no later than **30 DAYS AFTER THE PLAN'S EFFECTIVE DATE**.

**PLEASE TAKE FURTHER NOTICE THAT ANY CLAIMS ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR UNEXPIRED LEASE LISTED ON THE REJECTION LIST THAT ARE NOT TIMELY FILED SHALL BE DISALLOWED, FOREVER BARRED FROM ASSERTION, AND SHALL NOT BE ENFORCEABLE AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, OR PROPERTY THEREOF, WITHOUT THE NEED FOR ANY OBJECTION BY THE DEBTORS OR THE REORGANIZED DEBTORS OR FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND ANY CLAIM ARISING OUT OF THE REJECTION OF THE EXECUTORY CONTRACT OR UNEXPIRED LEASE SHALL BE DEEMED FULLY SATISFIED, RELEASED, AND DISCHARGED, NOTWITHSTANDING ANYTHING IN THE SCHEDULES, IF ANY, OR A PROOF OF CLAIM TO THE CONTRARY**.

**PLEASE TAKE FURTHER NOTICE THAT** neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejection List or Assumption List, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease, that any Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is a binding and enforceable agreement. In addition, the Debtors shall have the right to: (i) alter, amend, modify, or supplement any information set forth herein, including to add or remove any Executory Contract or Unexpired Lease from the Rejection List or Assumption List, pursuant to the terms of the Plan; and (ii) contest any Claim asserted in connection with any Executory Contract or Unexpired Lease.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan and Disclosure Statement may be obtained free of charge by: (a) visiting the website maintained by the Claims and Noticing Agent at www.veritaglobal.net/ZHI or (b) contacting the Claims and Noticing Agent by calling (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International).

Dated: [●], 2025
      Houston, Texas

_/s/_ _____

Charles R. Koster (Texas Bar No. 24128278)
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

-and-

Bojan Guzina (admitted _pro hac vice_)
Andrew F. O'Neill  (admitted _pro hac vice_)
William A. Guerrieri (admitted _pro hac vice_)
Fan He (admitted _pro hac vice_)
Adam Swingle (admitted _pro hac vice_)
Barrett Lingle (admitted _pro hac vice_)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  bojan.guzina@whitecase.com
       aoneill@whitecase.com
       william.guerrieri@whitecase.com
       fhe@whitecase.com
       adam.swingle@whitecase.com
       barrett.lingle@whitecase.com

_Counsel to the Debtors and_
_Debtors in Possession_

**Exhibit 1**

**Rejection List**

**Exhibit 10**

**Disputed Claims Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS

**PLEASE TAKE NOTICE THAT** on January [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [●]] (the "**Disclosure Statement Order**") that, among other things: (a) conditionally approved the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Code (the "**Bankruptcy Code**"); and (b) authorized the above-captioned debtors and debtors in possession (the "**Debtors**") to solicit acceptances for the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1978] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Court will consider final approval of the Disclosure Statement and confirmation of the Plan at a hearing (the "**Combined Hearing**") to commence on February 26, 2025, at 1:30 p.m. (prevailing Central Time), before the Honorable Marvin Isgur in the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, TX 77002.  The Combined Hearing may be continued from time to time without further notice other than by an announcement in open court or notice filed on the Court's docket and served on all parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because your Claim(s) against the Debtors is subject to a pending objection by the Debtors and, pursuant to the Disclosure Statement Order, you are not entitled to vote to accept or reject the Plan on account of

---

[1]   The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI.  The location of the Debtors' service address in these chapter 11 cases is:  P.O. Box 240130, San Antonio, Texas 78224.

[2]   Capitalized terms used but not defined herein have the meanings given to them in the Plan or the Disclosure Statement, as applicable.  The statements contained herein are summaries of the provisions contained in the Plan and the Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred therein.  To the extent there is a discrepancy between the terms herein and the Plan or the Disclosure Statement, the Plan or the Disclosure Statement, as applicable, shall govern and control.

your Disputed Claim(s) unless one of the following events occurs prior to or at the Combined Hearing (collectively, the "**Resolution Events**"):

1.  Entry of an order of the Court, after notice and a hearing, allowing such Claim pursuant to section 502(b) of the Bankruptcy Code;

2.  Entry of an order of the Court, after notice and a hearing, granting a motion pursuant to Bankruptcy Rule 3018(a) and temporarily allowing such Claim for voting purposes;

3.  Execution of a stipulation or other agreement between the Holder of a Disputed Claim and the Debtors resolving the objection and allowing such Claim for voting purposes in an agreed-upon amount or otherwise fixing an amount of the Claim for voting purposes; or

4.  Voluntary withdrawal of the pending objection by the objecting party.

**PLEASE TAKE FURTHER NOTICE THAT** if you seek to challenge the disallowance of your Disputed Claim for voting purposes, you must file with the Bankruptcy Court a motion for an order, pursuant to Bankruptcy Rule 3018(a), temporarily allowing such claim for purposes of voting to accept or reject the Plan (a "**Rule 3018 Motion**").  Any Rule 3018 Motion must be filed with the Bankruptcy Court and served on the Debtors so as to be **actually received by 4:00 p.m. prevailing Central Time on February 13, 2025** (the "**Rule 3018 Motion Deadline**").

**PLEASE TAKE FURTHER NOTICE THAT** if a Holder of a Disputed Claim files a Rule 3018 Motion by the Rule 3018 Motion Deadline, the Claims and Noticing Agent, at the direction of the Debtors or their counsel, shall send such Holder a Solicitation Package, including an applicable Ballot, as soon as reasonably practicable after such Rule 3018 Motion is filed.  A Ballot returned by a Holder of a Disputed Claim to the Claims and Noticing Agent in compliance with the Solicitation Procedures shall only be counted to the extent that a Resolution Event has occurred with respect to the Holder's Disputed Claim by or at the Combined Hearing.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan or Disclosure Statement must (1) be in writing, (2) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas, (3) state the name and address of the objecting party and the amount and nature of the objecting party's Claim or Interest, (4) state the legal and factual basis for such Objections, and, if practicable, a proposed modification to the Plan or Disclosure Statement that would resolve such an Objection, and (5) be filed with the Court with proof of service thereof no later than **February 20, 2025, at 4:00 p.m., prevailing Central Time**.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan and the Disclosure Statement may be obtained for free at the restructuring website maintained by the Claims and Noticing Agent, available at www.veritaglobal.net/zhi.  These documents may also be obtained by: (a) calling the Debtors' restructuring hotline at (866) 479-8211 (US and Canada) or +1 (781)

575-2037 (International), (b) submitting the inquiry form at https://www.veritaglobal.net/zhi/inquiry, and/or (c) writing to the Claims and Noticing Agent at Zachry Ballot Processing c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245.

**PLEASE TAKE FURTHER NOTICE THAT THE PLAN CONTAINS RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS, WHICH WILL BECOME EFFECTIVE IF THE PLAN IS CONFIRMED. YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THESE RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED. THE OPT-OUT FORM ATTACHED HERETO PROVIDES YOU WITH THE OPTION TO NOT GRANT THE VOLUNTARY THIRD-PARTY RELEASE CONTAINED IN <u>ARTICLE VIII.D</u> OF THE PLAN.**

**PLEASE BE ADVISED THAT YOUR FAILURE TO RETURN THE FULLY COMPLETED OPT-OUT FORM BY THE OPT OUT DEADLINE OF FEBRUARY 20, 2025 AT 4:00 P.M. (PREVAILING CENTRAL TIME), DESIGNATING YOUR DECISION TO OPT OUT OF GRANTING THE RELESES DESCRIBED IN <u>ARTICLE VIII</u>, WILL RESULT IN YOUR DESIGNATION AS A "RLEASING PARTY" UNDER THE PLAN, UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.**

**PLEASE BE ADVISED THAT ARTICLE VIII OF THE PLAN PROVIDES AS FOLLOWS:**

A.    <u>Discharge of Claims and Termination of Interests</u>.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, and GPX or any of its assets or properties with respect to any Claims that constitute GPX Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date. For the avoidance of doubt, the discharge provided in the Plan shall discharge,

release, and extinguish any right of any Holder of any Claim to file, assert, levy, or attach any Liens or initiate any claim against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, or otherwise enforce, collect, or recover on account of any such Claims other than as expressly permitted under the Plan. Further, and for the avoidance of doubt, the discharge provided in the Plan shall discharge, release, and extinguish any right of any Holder of any GPX Claim to file, assert, levy, or attach any Liens against property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass or any property interest of Golden Pass.

B.     **Release of Liens.**

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with <u>Article III.C</u> of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including any bonds related to the Debtors, shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The foregoing direction to release Liens shall be considered a direction in accordance with, as applicable, the Prepetition Credit Agreement, as if such direction included the signatures of the necessary lenders thereunder to direct the applicable agent to take the actions contemplated thereby.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, including with respect to any bonds related to the Debtors, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.     **Releases by the Debtors.**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in the Plan, the Schedule of Retained Causes of Action, or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and

on behalf of each Debtor and its Estate, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Released Avoidance Actions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in Article VIII.C of the Plan, the Debtors shall maintain all rights to object to Filed Claims and shall not release any claims or Causes of Action (i) identified in the Schedule of Retained Causes of Action, or (ii) related to the GPX Settlement that are preserved by the GPX Settlement Documents, the GPX Settlement Dispute Opinion, or the GPX Settlement Dispute Order. Any and all such rights, claims, and Causes of Action set forth in this paragraph shall be fully preserved and revest in the Reorganized Debtors pursuant to the Plan and the Confirmation Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**D.**      <u>**Releases by Third Parties.**</u>

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the GPX Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, and all related agreements, instruments, and other documents, and the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and

reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.    **Exculpation.**

       **Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, all related agreements, instruments, and other documents, or any transaction related to the Restructuring Transactions, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.**

       **The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

F.    **Injunction.**

       **Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, satisfied, or released pursuant to the Plan.**

       **Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, discharged, satisfied, released, or are subject to exculpation pursuant to Article VIII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties and/or the Released Parties:**

           1.    **commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

2. **enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

3. **creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

4. **filing, asserting, levying, or attaching any Liens against any property of the Debtors or Reorganized Debtors on account of any Claims arising under or related to Executory Contracts or Unexpired Leases that are assumed and cured pursuant to the Plan;**

5. **filing, asserting, levying, or attaching any Liens against any bonds or the Sureties on account of any Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, including on account of General Unsecured Claims that are satisfied in full under the Plan, and enforcing, collecting, or recovering on account of any such Liens;**

6. **filing, asserting, levying, or attaching any Liens against any property of Golden Pass on account of any GPX Claims against any of the Debtors that are discharged, satisfied, or released pursuant to the Plan, and enforcing, collecting, or recovering on account of any such Liens, or otherwise enforce, collect, or recover on account of any such GPX Claims against Golden Pass;**

7. **filing, asserting, levying, or attaching any Claims or Liens on account of GPX Claims satisfied (or to be satisfied) by Golden Pass under the GPX Settlement, whether against the Released Parties, Exculpated Parties, Golden Pass, Chiyoda, CB&I, or CCZJV-GPX;**

8. **except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and**

9. **commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the negotiation, formulation, preparation, Filing, or consummation of the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Transactions, the A&R Credit Facility, the GUC Trust, the Parent Capital Contribution, the GPX Settlement Documents, the Cash Collateral Order, the Disclosure Statement, the solicitation of votes with respect to the Plan, or any transaction related to**

the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.  The injunction in the Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order from bringing an action to enforce the terms of the Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order.

*[Remainder of Page Intentionally Left Blank]*

Dated:  [●], 2025
        Houston, Texas

/s/
_____
Charles R. Koster (Texas Bar No. 24128278)
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

-and-

Bojan Guzina (admitted *pro hac vice*)
Andrew F. O'Neill  (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
Adam T. Swingle (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  bojan.guzina@whitecase.com
        aoneill@whitecase.com
        william.guerrieri@whitecase.com
        fhe@whitecase.com
        adam.swingle@whitecase.com
        barrett.lingle@whitecase.com

*Counsel to the Debtors and*
*Debtors in Possession*

## Exhibit 11

**Reclassification Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZACHRY HOLDINGS, INC., *et al.*[1] | ) | Case No. 24-90377 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF RECLASSIFICATION AND VOTING STATUS**

**PLEASE TAKE NOTICE THAT** on [●], 2025 the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. [●]] (the "**Disclosure Statement Order**") that, among other things: (a) conditionally approved the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Code (the "**Bankruptcy Code**"); and (b) authorized the above-captioned debtors and debtors in possession (the "**Debtors**") to solicit acceptances for the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1978] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Court will consider final approval of the Disclosure Statement and confirmation of the Plan at a hearing (the "**Combined Hearing**") to commence on February 26, 2025 at 1:30 p.m. (prevailing Central Time), before the Honorable Marvin Isgur in the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, TX 77002. The Combined Hearing may be continued from time to time without further notice other than by an announcement in open court or notice filed on the Court's docket and served on all parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors have filed an objection (the "**Reclassification Objection**") to the asserted administrative, priority, or secured status of your filed Claim, as applicable, and are seeking Court approval to reclassify your asserted Claim as set forth in the Reclassification Objection separately served upon you.

**PLEASE TAKE FURTHER NOTICE THAT**, as the Holder of a Claim subject to a Reclassification Objection, you will receive a Solicitation Package on account of your reclassified

---

[1] The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814. A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI. The location of the Debtors' service address in these chapter 11 cases is: P.O. Box 240130, San Antonio, Texas 78224.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Plan or the Disclosure Statement, as applicable.

Claim in accordance with the Reclassification Objection.  Your Solicitation Package enclosed with this notice contains: (a) the Cover Letter; (b) a Ballot for the Class of Claims in which your Claim is reclassified; (c) the Disclosure Statement (including the Plan and all other exhibits) on a USB flash drive; (d) the Disclosure Statement Order (without exhibits) on a USB flash drive; and (e) the Combined Hearing Notice.

**PLEASE TAKE FURTHER NOTICE THAT**, to ensure your Vote is counted, you must timely and properly submit your Ballot in accordance with the instructions contained in the Ballot. If you fail to timely and properly submit your Ballot by the Voting Deadline of **February 20, 2025, at 4:00 p.m., prevailing Central Time**, your Vote may not be counted.

**PLEASE TAKE FURTHER NOTICE THAT**, if you wish to make the Opt-Out election, you must timely and properly submit your Ballot indicating your Opt-Out election by the Voting Deadline in accordance with the instructions contained in the Ballot. Such Opt-Out election will be recorded even if the Reclassification Objection is not granted and your Vote is not counted. If you properly submitted an opt-out form during the solicitation of the Debtors' initial plan of reorganization, such opt-out form remains valid and effective.

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN'S THIRD-PARTY RELEASE, WHICH IS RESTATED IN FULL IN THE BALLOT.  IF YOU DO NOT OPT-OUT OF THE THIRD-PARTY RELEASE BY CHECKING THE OPT-OUT BOX ON YOUR BALLOT AND TIMELY AND PROPERTY SUBMITTING YOUR BALLOT, YOU WILL BE DEEMED TO HAVE EXPRESSLY AND UNCONDITIONALLY CONSENTED TO THE THIRD-PARTY RELEASE PURSUANT TO THE PLAN UNLESS YOU PROPERLY SUBMITTED AN OPT-OUT FORM DURING THE SOLICITATION OF THE DEBTORS' INITIAL PLAN OF REORGANIZATION, IN WHICH CASE SUCH OPT-OUT FORM REMAINS VALID AND EFFECTIVE.**

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan or Disclosure Statement must (1) be in writing, (2) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas, (3) state the name and address of the objecting party and the amount and nature of the objecting party's Claim or Interest, (4) state the legal and factual basis for such Objections, and, if practicable, a proposed modification to the Plan or Disclosure Statement that would resolve such an Objection, and (5) be filed with the Court with proof of service thereof and served no later than **February 20, 2025, at 4:00 p.m., prevailing Central Time**.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan and the Disclosure Statement may be obtained for free at the restructuring website maintained by the Claims and Noticing Agent, available at www.veritaglobal.net/zhi.  These documents may also be obtained by: (a) calling the Debtors' restructuring hotline at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International), (b) submitting the inquiry form at www.veritaglobal.net/zhi/inquiry, and/or (c) writing to the Claims and Noticing Agent at Zachry Ballot Processing c/o Verita, 222 N. Pacific Coast Hwy., Ste. 300, El Segundo, CA 90245.

Dated: [●], 2025             /s/_____
Houston, Texas             Charles R. Koster (Texas Bar No. 24128278)
          **WHITE & CASE LLP**
          609 Main Street, Suite 2900
          Houston, Texas 77002
          Telephone: (713) 496-9700
          Facsimile: (713) 496-9701
          Email: charles.koster@whitecase.com

          -and-

          Bojan Guzina (admitted *pro hac vice*)
          Andrew F. O'Neill (admitted *pro hac vice*)
          William A. Guerrieri (admitted *pro hac vice*)
          Fan B. He (admitted *pro hac vice*)
          Adam T. Swingle (admitted *pro hac vice*)
          Barrett Lingle (admitted *pro hac vice*)
          111 South Wacker Drive, Suite 5100
          Chicago, Illinois 60606
          Telephone: (312) 881-5400
          Email: bojan.guzina@whitecase.com
              aoneill@whitecase.com
              william.guerrieri@whitecase.com
              fhe@whitecase.com
              adam.swingle@whitecase.com
              barrett.lingle@whitecase.com

          *Counsel to the Debtors and*
          *Debtors in Possession*

**<u>Exhibit 12</u>**

**Cover Letter**

**ZACHRY HOLDINGS, INC.**
P.O. Box 240130
San Antonio, Texas 78224

[●], 2025

RE:    **Zachry Holdings, Inc.** *et al.*,
       **Chapter 11 Case No. 24-90377 (MI) (Jointly Administered)**

**TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN**:

Zachry Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") on May 21, 2024.

You have received this letter and the enclosed materials (this "**Solicitation Package**") because you are entitled to vote on the *Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "**Plan**").  On [●], 2025, the Court entered an order (the "**Disclosure Statement Order**") that, among other things: (a) conditionally approved the *Disclosure Statement for the Modified First Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and its Debtor Affiliates* (the "**Disclosure Statement**")[2] as containing "adequate information" pursuant to section  1125 of the Bankruptcy Code, and (b) authorizing the Debtors to solicit acceptances of the Plan.

In addition to this cover letter, your Solicitation Package includes:

    a)  The Disclosure Statement approved by the Court (and its exhibits, including the Plan);

    b)  A Ballot, together with detailed voting instructions and a return envelope;

    c)  The Disclosure Statement Order (excluding its exhibits); and

    d)  The Combined Hearing Notice, noting the date and time for the Combined Hearing at which the Court will consider final approval of the Disclosure Statement and confirmation of the Plan.

---

**You should review these materials carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one**.

---

[1]    The last four digits of Zachry Holdings, Inc.'s tax identification number are 6814.  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at www.veritaglobal.net/ZHI.  The location of the Debtors' service address in these chapter 11 cases is:  P.O. Box 240130, San Antonio, Texas 78224.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan or the Disclosure Statement, as applicable.

The Debtors believe that the acceptance of the Plan is in the best interests of their estates, Holders of Claims, and all other parties in interest. Moreover, the Debtors believe that any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, could result in smaller distributions or recoveries on account of Allowed Claims asserted in the Debtors' Chapter 11 Cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN.**
> **THE VOTING DEADLINE IS**
> **FEBRUARY 20, 2025 AT 4:00 P.M., PREVAILING CENTRAL TIME.**

If you should have any questions about your Ballot or the procedures for voting, please contact the Claims and Noticing Agent by: (a) calling the hotline at (866) 479-8211 (US and Canada) or +1 (781) 575-2037 (International), or (b) submitting the inquiry form at www.veritaglobal.net/zhi/inquiry. Copies of filings as well other information regarding these Chapter 11 Cases may be obtained at the Debtors' website at www.veritaglobal.net/ZHI.

The Claims and Noticing Agent cannot answer legal questions regarding the Plan. For legal assistance (including regarding the Plan or the Plan's Third-Party Release), please consult your own legal counsel.

Sincerely,

_/s/_ _____

Mohsin Y. Meghji
Chief Restructuring Officer
Zachry Holdings, Inc.

## Exhibit 13

**Employee Letter**



**RE: Chapter 11 Update**

Dear Team:

As you are aware, on May 21, 2024, certain Zachry entities filed voluntary petitions for chapter 11 relief in the United States Bankruptcy Court for the Southern District of Texas. Through the chapter 11 cases, Zachry executed a settlement with respect to the GPX Project outside Sabine Pass, Texas, completely demobilized from the GPX Project, and right-sized its business. Zachry's focus now is on exiting chapter 11 as soon as reasonably practicable. In late 2024, Zachry proposed a plan of reorganization that contemplated raising new debt financing that would rank junior to Zachry's existing secured debt. Ultimately, Zachry did not receive any financing proposal that was acceptable to all of Zachry's stakeholders, including its existing secured lenders. As a result, Zachry has now filed an amended plan that will allow it to exit chapter 11 without raising additional debt financing.

Like Zachry's original plan, the amended plan provides that Zachry will assume all valid, outstanding obligations to employees and pay such obligations in the ordinary course of business; all valid claims of vendors, subcontractors, and other general unsecured creditors will be satisfied in full (to the extent not already paid by Golden Pass under the settlement for the GPX Project); and Zachry's prepetition credit facility will be amended and restated on terms to be agreed with Zachry's lenders. The amended plan will provide Zachry with sufficient liquidity to continue providing first-class services to its customers, while also ensuring Zachry's long-term viability.

To confirm the amended plan and exit chapter 11, Zachry must solicit votes to accept the amended plan from creditors holding claims against Zachry that arose prior to May 21, 2024 and whose rights are impaired under the amended plan. ***The amended plan does not impair Zachry's obligations to its current employees, which will continue to be satisfied in the ordinary course of business. As a current employee, your rights are unaffected by the amended plan.*** If you have any questions about the amended plan or the chapter 11 cases, you may contact Zachry's claims and noticing agent by calling (866) 479-8211 or submitting the inquiry form at: https://www.veritaglobal.net/zhi/inquiry.

The Bankruptcy Court will consider whether to confirm the amended plan at a hearing scheduled for February 26, 2025, at 1:30 p.m. (prevailing Central Time), at Courtroom 404, 515 Rusk Street, Houston, Texas 77002. Instructions to attend the hearing virtually are available at: https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-marvin-isgur. Please be advised that the hearing may be continued at the Court or Zachry's discretion.

Once the amended plan is confirmed, Zachry will emerge from these Chapter 11 Cases as a stronger company. We will provide a further update once Zachry has emerged. Thank you for your continued efforts and focus during the chapter 11 cases, and we look forward to continuing to make our customers' ambitious goals a reality through your partnership.

**<u>Exhibit 14</u>**

**U.S. Trustee Letter**

**Statement of the United States Trustee**
**Regarding Zachry's Proposed Plan of Reorganization**

January 23, 2025

---

**To Holders of Claims in all Classes:**

The United States Trustee Program (the "U.S. Trustee Program") is a litigating component of the Department of Justice whose mission is to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders — debtors, creditors and the public. Often described as the "watchdog of the bankruptcy system," the U.S. Trustee Program acts to prevent fraud, dishonesty, and overreaching in the bankruptcy system.

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), makes this *Statement* in connection with the Debtors' proposed *Modified 1st Amended Joint Chapter 11 Plan of Reorganization of Zachry Holdings, Inc. and its Debtor Affiliates* [ECF No. 1978] (the "Plan").

The U.S. Supreme Court recently ruled that the Bankruptcy Code does not permit non-consensual third-party releases. *See Harrington v. Purdue Pharma, L. P.*, 144 S. Ct. 2071, 2082–88 (2024).  In the Plan, the Debtors require you to timely submit an "opt out" form to avoid being bound by the third-party releases.  The U.S Trustee objected to this procedure because, if you do not act, you will be considered to consent to those releases.

The objection filed raising this issue, among other Plan objections, can be obtained free of charge from the Claims and Noticing Agent's website at https://veritaglobal.net/ZHI.

Please be advised that the U.S. Trustee *cannot* make recommendations on how you should vote in this case, or otherwise provide legal advice.  **This Statement *does not* constitute and should not be construed as legal advice.**

Respectfully,

KEVIN M. EPSTEIN,
UNITED STATES TRUSTEE